**THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

TOUCHSTREAM TECHNOLOGIES, INC.,

Plaintiff,

v.

CHARTER COMMUNICATIONS, INC., et al.,

Defendants.

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

Lead Case No. 2:23-cv-00059-JRG
Member Case No. 2:23-cv-00062-JRG

TOUCHSTREAM TECHNOLOGIES, INC.,

Plaintiff,

v.

COMCAST CABLE COMMUNICATIONS, LLC, d/b/a XFINITY, et al.,

Defendants.

**<u>DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF</u>**

# TABLE OF CONTENTS

PAGE

I.    INTRODUCTION ................................................................................................. 1

II.   THE ALLEGED INVENTION OF THE ASSERTED PATENTS ................................... 1

III.  DISPUTED TERMS ............................................................................................. 3

      A.   "media player" ('251 Patent Claims 1 and 2) ...................................... 3

      B.   "media player application" ('751 Patent Claims 12, 13, 14, and 16)
           "media playing application" ('934 Patent Claims 17, 18, 19) ............... 6

      C.   "a synchronization code" / "the synchronization code"
           ('251 Patent Claims 1, 8, 9; '751 Patent Claim 12) ............................ 8

      D.   "a unique identifier" / "the unique identifier" ('934 Patent Claim 17) ... 9

      E.   "synchronization code"
           ('251 Patent Claims 1, 8, and 9; '751 Patent Claim 12) ..................... 10

      F.   "unique identifier" ('934 Patent Claim 17) ........................................ 14

      G.   "storing…based on the synchronization code" ('251 Patent Claim 1) ... 15

      H.   "first format" / "second format" ('751 Patent Claims 12 and 16) ....... 17

      I.   "first format" / "universal format" ('934 Patent Claim 17) ................. 20

      J.   "the first format of the first message" ('751 Patent Claim 12) ........... 22

      K.   Order of Method Claim Steps .......................................................... 26

IV.   CONCLUSION .................................................................................................. 29

## TABLE OF AUTHORITIES

PAGE

**Cases**

*Altiris, Inc. v. Symantec Corp.*,
  318 F.3d 1363 (Fed. Cir. 2003) ............................................................................................ 27

*Andersen Corp. v. Fiber Composites, LLC*,
  474 F.3d 1361 (Fed. Cir. 2007) ............................................................................................ 19

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
  448 F.3d 1324 (Fed. Cir. 2006) ............................................................................................ 24

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
  713 F.3d 1090 (Fed. Cir. 2013) ............................................................................................ 19

*CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG*,
  224 F.3d 1308 (Fed. Cir. 2000) ............................................................................................ 24

*CardWare Inc. v. Samsung Elecs. Co. Ltd.*,
  No. 2:22-cv-141-JRG-RSP, 2023 WL 5434763 (E.D. Tex. Aug. 23, 2023)........................... 23

*Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*,
  677 F.3d 1361 (Fed. Cir. 2012) ............................................................................................ 24

*Cisco Sys., Inc. v. Int'l Trade Comm'n*,
  873 F.3d 1354 (Fed. Cir. 2017) ............................................................................................ 17

*Data Engine Techs. LLC v. Google LLC*,
  10 F.4th 1375 (Fed. Cir. 2021) .............................................................................................. 4

*Eon Corp. IP Holdings LLC v. Silver Spring Networks*,
  815 F.3d 1314 (Fed. Cir. 2016) ...................................................................................... 16, 26

*Fenner Invs., Ltd. v. Cellco P'ship*,
  778 F.3d 1320 (Fed. Cir. 2015) .............................................................................................. 4

*Halliburton Energy Servs., Inc. v. M-I LLC*,
  514 F.3d 1244 (Fed. Cir. 2008) ............................................................................................ 23

*Indacon, Inc. v. Facebook, Inc.*,
  824 F.3d 1352 (Fed. Cir. 2016) ............................................................................................ 12

*Intel Corp. v. Qualcomm Inc.*,
  21 F.4th 801 (Fed. Cir. 2021) ................................................................................................ 8

*Intervet, Inc. v. Merial Ltd.*,
   617 F.3d 1282 (Fed. Cir. 2010) ................................................................ 12

*Koninklijke KPN N.V. v. Telefonaktiebolaget LM Ericsson*,
   No. 2:21-cv-00113-JRG, 2022 WL 811072 (E.D. Tex. Mar. 16, 2022) ................................. 12

*Lodsys, LLC v. Brother Int'l Corp.*,
   No. 2:11-cv-00090-JRG, 2013 WL 2949959 (E.D. Tex. June 14, 2013) ................................. 8

*Mantech Env't Corp. v. Hudson Env't Servs., Inc.*,
   152 F.3d 1368 (Fed. Cir. 1998) ................................................................ 29

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   572 U.S. 898 (2014) ................................................................ 23

*Neville v. Found. Constructors, Inc.*,
   972 F.3d 1350 (Fed. Cir. 2020) ................................................................ 24

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
   521 F.3d 1351 (Fed. Cir. 2008) ................................................................ 26

*Omega Eng'g, Inc, v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003) ................................................................ 6, 7, 19

*Ormco Corp. v. Align Tech., Inc.*,
   498 F.3d 1307 (Fed. Cir. 2007) ................................................................ 7

*Pause Tech., LLC v. TiVo, Inc.*,
   419 F.3d 1326 (Fed. Cir. 2005) ................................................................ 5

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ................................................................ 1

*Red Rock Analytics, LLC v. Samsung Electronics Co., Ltd.*,
   No. 2:17-cv-101-RWS-RSP, 2018 WL 1806859 (E.D. Tex. Apr. 16, 2018) ................................. 27

*Saffran v. Johnson & Johnson*,
   712 F.3d 549 (Fed. Cir. 2013) ................................................................ 4

*SmartPhone Techs. LLC v. HTC Corp.*,
   No. 6:10-cv-580-LED-JDL, 2013 WL 1136972 (E.D. Tex. Mar. 18, 2013) ................................. 19

*SpeedTrack, Inc. v. Amazon.com, Inc.*,
   998 F.3d 1373 (Fed. Cir. 2021) ................................................................ 19

*Synchronoss Techs., Inc. v. Dropbox, Inc.*,
   987 F.3d 1358 (Fed. Cir. 2021) ................................................................ 26

*Tegal Corp. v. Tokyo Electron Am., Inc.*,
    257 F.3d 1331 (Fed. Cir. 2001) ........................................................................ 7

*Traxcell Techs., LLC v. Nokia Sols. & Networks Oy*,
    15 F.4th 1136 (Fed. Cir. 2021) ........................................................................ 18

*Tubular Rollers, LLC v. Maximus Oilfield Prod., LLC*,
    No. 2021-2319, 2023 WL 4230371 (Fed. Cir. June 28, 2023) .......................... 19

*WAPP Tech Ltd. P'ship v. Bank of Am., N.A.*,
    No. 4:21-cv-670, 2022 WL 2463569 (E.D. Tex. July 6, 2022) .......................... 23

*Wisconsin Alumni Rsch. Found. v. Apple, Inc.*,
    905 F.3d 1341 (Fed. Cir. 2018) ........................................................................ 1

*World Class Tech. Corp. v. Ormco Corp.*,
    769 F.3d 1120 (Fed. Cir. 2014) ........................................................................ 16

*X One, Inc. v. Uber Techs., Inc.*,
    440 F. Supp. 3d 1019 (N.D. Cal. 2020) ............................................................ 9

*Zilkr Cloud Techs., LLC, v. Cisco Sys., Inc.*,
    No. 2:22-cv-166, Dkt. 121, slip op. (E.D. Tex. Aug. 3, 2023) .......................... 23

## I.    INTRODUCTION

The Court should adopt Defendants' proposed constructions.[1]  Although Touchstream asserts that each disputed term should be given its plain and ordinary meaning, it does not state what that plain and ordinary meaning is.  "Giving a term its plain and ordinary meaning does not leave the term devoid of any meaning whatsoever.  Instead, 'the "ordinary meaning" of a claim term is its meaning to the ordinary artisan after reading the entire patent.'"  *Wisconsin Alumni Rsch. Found. v. Apple, Inc.*, 905 F.3d 1341, 1348 (Fed. Cir. 2018) (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1321 (Fed. Cir. 2005) (en banc)).  Touchstream fails to consider how the skilled artisan would understand the terms in view of the specification and instead simply opposes Defendants' proposals.  In so doing, it either attempts to evade the intrinsic evidence or to ignore ambiguities inherent in the claims.  The disputed terms must therefore be construed consistent with Defendants' proposals to avoid jury confusion and to align with the applicant and examiner's understanding when the claims were allowed.

## II.    THE ALLEGED INVENTION OF THE ASSERTED PATENTS

The three Asserted Patents all name David Strober as their sole inventor, share the same specification, and claim priority to the same provisional application filed on April 21, 2011.[2]  The Asserted Patents admit that it was well known in the art that media could be "played on

---

[1] This brief uses the following abbreviations: Plaintiff Touchstream Technologies, Inc. ("Touchstream"); Defendants Comcast Cable Communications, LLC, Comcast Cable Communications Management, LLC, Comcast of Houston, LLC, Comcast Corporation, Charter Communications, Inc., Charter Communications Operating, LLC, Time Warner Cable Enterprises LLC, Spectrum Management Holding Company, LLC, Spectrum Gulf Coast, LLC, and Charter Communications, LLC (collectively "Defendants"); U.S. Patent No. 8,356,251 ("the '251 Patent"); U.S. Patent No. 11,048,751 ("the '751 Patent"); U.S. Patent No. 11,086,934 ("the '934 Patent," and together collectively "Asserted Patents"); Exhibits to the Declaration of Alena Farber ("Ex."); Touchstream's Opening Claim Construction Brief (Dkt. 36) ("Pl. Br.").

[2] All specification citations in this brief are to the '251 Patent.

computers rather than television displays" and that one could "connect a computer to a television set in order to watch Web media." '251 Patent at 1:22–24.  The claimed invention's goal was straightforward: "[g]iven the desire to watch various World Wide Web media on a family's primary television set, and to control this operation from the comfort of one's couch, there is a need to operate a television set or other display remotely from a personal computing device, such as a mobile phone." '251 Patent at 1:32–36.  The patent wished to "allow a user to perform a general Web search to locate and capture Web media," '251 Patent at 1:37–38, to allow sending a YouTube or Netflix video, for example, from the mobile phone to the larger screen.

The purported invention accomplishes its goal via an intermediary server system that stores an association between a given mobile device and a given display device and translates commands sent in one format from the mobile device to a different format.  More particularly, the display device provides a synchronization code by, for example, presenting the synchronization code on a "splash page" from which the user may input the code into the mobile device.  '251 Patent at 2:17–27, 5:14–23, Fig. 7A.  The mobile device will then transmit the synchronization code to the server system, which causes the server system to store an association of the mobile device and the display device.  '251 Patent at 1:50–52, 2:17–27, 5:36–41, 7:30–35, Fig. 4.  Next, the user selects content to watch, which causes the mobile device to send a message to the server system identifying the name and location of a media player, a video file, and a universal command for controlling playback of the video file.  '251 Patent at 1:48–54, 1:66–2:3, 4:27–35, 5:54–6:17, Fig. 3.  The server system converts the universal command into the appropriate format for the particular media player.  '251 Patent at 2:3–7, 5:58–6:17, Fig. 5. The server system then stores a message including the media player name and location, the video file, and the converted command, before providing the message to the display device.  '251

Patent at 2:7–9, 3:18–23, 6:3–6, 6:18–28.  After receiving that message, the display device accesses the content provider and loads the media player and video identified in the message.  '251 Patent 3:19–23.  Finally, the display device executes the converted command, and the media player plays the referenced piece of content.  '251 Patent at 2:9–11, 6:50–61.

The Asserted Patents do not purport to have invented a mobile phone,[3] a display device,[4] a server system,[5] a media player,[6] or the formats used to send messages or commands between these components.[7]  Rather, the alleged invention is simply the transmission and translation of information between these well-known pre-existing components.

## III.    DISPUTED TERMS

### A.    "media player" ('251 Patent Claims 1 and 2)

| Defendants' Proposed Construction | Touchstream's Proposed Construction |
|---|---|
| Application software for playing back video content. | No construction necessary. Touchstream proposes that the term be construed in accordance with its plain and ordinary meaning. |

Defendants' proposed construction is, verbatim, the definition Touchstream asserted during prosecution of the '251 Patent in which the term appears.  Touchstream must be held to

---

[3] '251 Patent at 1:34–36 ("there is a need to operate a television set or other display remotely from a personal computing device, such as a mobile phone").

[4] '251 Patent at 1:15–17 ("Such display devices include, for example, television displays used by consumers in their home for viewing videos and other media."), 1:34–36.

[5] '251 Patent at 2:66–3:1 (devices "connected to the Internet 21 or other computer network"), Fig. 1.

[6] '251 Patent at 6:9–15 (giving "YouTube" and "Ted.com" as examples of media players and the corresponding command formatting for each).

[7] '251 Patent at 5:54–58 (indicating JavaScript could be used to control a media player), 6:9–15.

that definition, which is consistent with the term's usage in both the patent's claims and specification.

Touchstream could not have been more direct when it represented to the Patent Office that "it is clear that a 'media player' refers to application software for playing back the video content." Ex. 1 ('251 File History, 2/22/2012 Response to Office Action) at 10. When an applicant offers such a clear definition during prosecution, courts construe the relevant term in accordance with the applicant's chosen meaning. *Saffran v. Johnson & Johnson*, 712 F.3d 549, 559 (Fed. Cir. 2013) (construing "device" to "mean a continuous sheet and to exclude stents having open mesh holes" based in part on statement during prosecution that "the device used is a sheet"); *see Data Engine Techs. LLC v. Google LLC*, 10 F.4th 1375, 1382 (Fed. Cir. 2021) (construing "three-dimensional spreadsheet" to require a mathematical relation among cells on different spreadsheet pages based on applicant's statement during prosecution that "a 3D spreadsheet defines a mathematical relation among cells on the different pages"); *Fenner Invs., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1325 (Fed. Cir. 2015) (construing "personal identification number" to mean "a number associated with the user, not the device" based on applicant's statement that "[t]he user is identified by a personal code").

The claims and specification of the '251 Patent confirm this definition. First, they make clear that the claimed media player is application software, not hardware. The claims state that the display device "loads . . . media players." '251 Patent cl. 1, 22. The specification also explains that media players can be loaded by the display device, '251 Patent 1:58–65, 3:18–33, 6:32–49, Fig. 6, as well as unloaded, '251 Patent 6:45–49. Neither the claims nor the specification ever discuss hardware media players, nor could hardware be loaded or unloaded by a device. The use of the term "loading" generally refers to software, not hardware. Indeed,

during prosecution, Touchstream indicated that references to the display device loading and unloading media players support its chosen definition of a media player being "application software." Ex. 1 at 10.

Second, the claims of the '251 Patent establish that the referenced "media player" must play back video content. The claims require presentation of "video content," not "content" more broadly. '251 Patent cl. 1, 5, 6, 7, 16, 17, 18, 22, 25, 26. Indeed, Touchstream concedes that the '251 Patent is limited to video content. Pl. Br. at 4. "[P]roper claim construction . . . demands interpretation of the entire claim in context, not a single element in isolation." *Pause Tech., LLC v. TiVo, Inc.*, 419 F.3d 1326, 1331 (Fed. Cir. 2005) (quoting *Hockerson–Halberstadt, Inc. v. Converse Inc.,* 183 F.3d 1369, 1374 (Fed. Cir. 1999)) (construing "circular storage buffer" based on operation of the buffer as described in other claim limitations). It is not only appropriate but necessary to construe the term based on how it is used in the context of the other claim limitations.

Touchstream argues that an explicit construction is unnecessary and suggests that Defendants' proposed construction may "deviat[e] from the terms' ordinary meaning." Pl. Br. at 3. But Touchstream does not offer a plain and ordinary meaning of "media player" if it is not "application software for playing back video content." Touchstream also suggests that a "juror will understand what is or is not a 'media player,'" but provides no support for that assertion. *Id.* Common sense tells us otherwise—in today's world, jurors know what "software" is but will not be as comfortable with technical-sounding jargon like "media player." They could erroneously conclude that physical devices that play media, such as a VCR or DVD player, qualify, which would contradict the intrinsic record as explained above.

Thus, the Court should enter the definition asserted by Touchstream during prosecution and construe "media player" to mean "application software for playing back video content."

**B.     "media player application" ('751 Patent Claims 12, 13, 14, and 16)**
**"media playing application" ('934 Patent Claims 17, 18, 19)**

| Defendants' Proposed Construction | Touchstream's Proposed Construction |
|---|---|
| Application software for playing back content. | No construction necessary. Touchstream proposes that the term be construed in accordance with its plain and ordinary meaning. |

Defendants' proposed construction is based on Touchstream's statements during prosecution of the patent family and accounts for the difference between the claims of the '751 and '934 Patents and those of the '251 Patent.

Much like the "media player" recited in the '251 Patent, the '751 and '934 Patents recite a "media play[er/ing] application." *See, e.g.*, '251 Patent cl. 1;'751 Patent cl. 12; '934 Patent cl. 17.  However, while the '251 Patent describes "a particular media player for playing the ***video*** content," '251 Patent cl. 1 (emphasis added), the '751 and '934 Patents claims do not specify the type of content.  Rather, the '751 Patent claims a "first media player application being selected to play a first piece of content," and the '934 Patent recites "controlling . . . how the selected first type of media playing application plays the referenced piece of content," '751 Patent cl. 12; '934 Patent cl. 17.  The common terminology and functions of these components suggest that the terms should be construed to have similar meanings with allowance for non-video content in the later two patents.  *See Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("same claim term in the same patent or related patents carries the same construed meaning").  Indeed, Touchstream addresses "media play[er/ing] application" together with "media player" in its brief, suggesting the terms should be construed similarly.  Pl. Br. at 3–4.

Crucially, "statements from prosecution of a familial patent relating to the same subject matter as the claim language at issue in the patent being construed . . . are relevant in construing the claims at issue." *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1314 (Fed. Cir. 2007). Thus, Touchstream's statement to the PTO that "media player" in the '251 Patent "clear[ly] . . . refers to application software for playing back the video content," Ex. 1 at 10, establishes that the "media play[er/ing] application" of the other Asserted Patents must also be application software for playing back content. All three Asserted Patents are part of the same patent family, share the same specification, and are directed to methods for translating commands among associated devices to control media. Here, Touchstream filed the applications leading to the '751 and '934 Patents after making its statement during prosecution of the '251 Patent and that statement must inform the meaning of this term in the later applications. *Omega Eng'g*, 334 F.3d at 1333.

The claims and specification are in accord with Defendants' construction. First, the claim language confirms that the "media play[er/ing] application" is not any type of application software but specifically one for playing back content. *See* '751 Patent cl. 12 (reciting a "media player . . . to play a first piece of content" and "controlling . . . how the selected first media player application plays the referenced first piece of content."); '934 Patent cl. 17 (reciting "a piece of content associated with a first type of media playing application" and "controlling . . . how the selected first type of media playing application plays the referenced piece of content."). Second, the only component disclosed in the specification that could serve as a "media play[er/ing] application" is a "media player," which, as discussed above, must be application software that may be uploaded or downloaded. *See supra* p. 4–5; *Tegal Corp. v. Tokyo Electron Am., Inc.*, 257 F.3d 1331, 1345 (Fed. Cir. 2001) (holding that, when the claim term at issue does not appear in the specification, the term may be construed to be coextensive with the

corresponding term in the specification); *Lodsys, LLC v. Brother Int'l Corp.*, No. 2:11-cv-00090-JRG, 2013 WL 2949959, at *9, *16 (E.D. Tex. June 14, 2013) (same).

Touchstream provides no alternative construction to these terms, but simply states that they should be given their plain and ordinary meaning. Because the Asserted Patents share a specification but have certain differences in claim scope, however, it is important to clarify for the jury what that plain meaning is and in what ways it is the same as and different from the "media player" of the '251 Patent. Moreover, the "media playing application" term was specifically added during prosecution at the Examiner's suggestion to distinguish it from the patent's earlier recitation of the broader term "media playing element(s)." *See, e.g.*, Ex. 6 ('934 File History, 10/28/2020 Response to Office Action) at 9; Ex. 7 ('934 File History, 3/3/2021 Response to Office Action) at 2–6, 8 ("[t]he Examiner suggested clarification relating to this phrasing," which the applicant implemented by replacing "media playing element" with "media playing application."). Thus, the applicant and examiner considered a media playing "application" to be meaningfully different, and more narrow, than a media playing "element," and it is important to give effect to that distinction, which is done through Defendants' construction. *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 809–10 (Fed. Cir. 2021). The term requires application software for playing back content, not just any generic element.

Accordingly, the Court should adopt Defendants' construction, which will inform the jury of the important distinctions between terms and ensure that it applies the meaning the applicant and examiner understood at the time the claims were allowed.

### C.  "a synchronization code" / "the synchronization code" ('251 Patent Claims 1, 8, 9; '751 Patent Claim 12)

| Defendants' Proposed Construction | Touchstream's Proposed Construction |
| --- | --- |
| Must be the same "synchronization code" throughout the claim. | No construction necessary. Touchstream proposes that the term be construed in |

| | accordance with its plain and ordinary meaning. |
|---|---|

The antecedent-basis relationship between "a synchronization code" and "the synchronization code" creates a presumption that the two instances of "synchronization code" refer to the same code. *See X One, Inc. v. Uber Techs., Inc.*, 440 F. Supp. 3d 1019, 1036 (N.D. Cal. 2020). That is Defendants' construction. Touchstream agrees with that construction, but still argues against it. Specifically, Touchstream states: "The jury needs no guidance as to whether 'a synchronization code' and 'the synchronization code' ***refer to the same 'synchronization code'*** because the jury is capable of understanding the words 'a' and 'the.'" Pl. Br. at 5 (emphasis added). Touchstream cites no authority for the proposition that an agreed construction should be rejected because the jurors can allegedly figure it out on their own.

The fact is, Defendants' construction is necessary because Touchstream's infringement contentions suggest that it will point the jury to different "synchronization codes." And while Touchstream concedes in its brief that "'a synchronization code' and 'the synchronization code' refer to the same 'synchronization code,'" Pl. Br. at 5, that brief cannot be presented to the jury at trial, e.g., to impeach an expert who might contradict Touchstream's representation. The only way to ensure that the jury applies the agreed-upon construction is to provide it to the jury. The Court should therefore adopt the agreed construction that the synchronization code "must be the same 'synchronization code' throughout the claim."

### D. "a unique identifier" / "the unique identifier" ('934 Patent Claim 17)

| Defendants' Proposed Construction | Touchstream's Proposed Construction |
|---|---|
| Must be the same "unique identifier" throughout the claim. | No construction necessary. Touchstream proposes that the term be construed in accordance with its plain and ordinary meaning. |

The issue with respect to the limitations "a unique identifier" and "the unique identifier" referring to the *same* "unique identifier" is the same as that addressed in Section III.C above with respect to "a synchronization code" and "the synchronization code."  Touchstream agrees that the unique identifiers must be the same as a matter of law, but does not want the claims construed, risking that the jury will never hear that they must be the same.  Touchstream argues that "the antecedent basis rule renders Defendants' construction redundant," but provides no explanation as to how a jury would know the "antecedent basis rule."  One guiding purpose of claim construction is to avoid jury confusion.  Because the parties agree that Defendants' construction is correct, and because Touchstream cites no law that an agreed construction should be rejected because the jurors should know and apply claim construction principles themselves, Defendants' construction should be adopted.

### E.    "synchronization code" ('251 Patent Claims 1, 8, and 9; '751 Patent Claim 12)

| Defendants' Proposed Construction | Touchstream's Proposed Construction |
|---|---|
| A code which can be obtained by a user from the [display device / content presentation device] and provided by the user to the [personal computing device / remote computing device]. | No construction necessary. Touchstream proposes that the term be construed in accordance with its plain and ordinary meaning. |

The claimed "synchronization code" is directed to the entire purported value proposition of Mr. Strober's patents and his company, Shodogg: the ability of a user to cast video content from any personal computing device (like a mobile phone) to *any* arbitrary display device (like a TV)—not just display devices that have been pre-initialized for communication with the phone. *See, e.g.*, '251 Patent at 7:17–35 (describing user connecting to "personal computer with a display monitor" by accessing "website associated with the server system"), 8:9–18 (describing multiple users connected to singular display device), 8:33–37 (describing user connecting to

multiple display devices in turn), 8:45–9:2 (describing multiple users "in different locations each of which has a separate display device"). The examiner required that the claims be limited to this feature during prosecution to overcome the prior art, and the term must be construed consistently with this feature.

Admittedly, the specification describes an embodiment that does not require use of a synchronization code. In that embodiment, the user can select a display device that has been "previously . . . initialized for connection" to the phone: "In some implementations, the user can select the display device from a list of devices displayed on the mobile phone 20. The list can include a field populated with names or identifications of display devices that previously have been initialized for connection." '251 Patent at 5:10–14. As discussed below, however, ***Touchstream did not claim this embodiment***.

The specification describes the claimed embodiment as an "alternative" to user selection of a pre-initialized display device whereby "the user can select the display device by entering a synchronization code uniquely associated with the particular display device." '251 Patent at 5:14–16. The reason the user must "enter" the synchronization code into the phone, of course, is that the phone does not already know about display devices that were not previously initialized and cannot otherwise cast to display devices about which it is unaware. The asserted '251 Patent and '751 Patent claims address this "alternative" embodiment that uses a synchronization code. All of their asserted claims require performing steps—"assigning," "receiving," "storing," "obtaining," "providing"—with the synchronization code to synchronize an arbitrary display device with an arbitrary computing device.

This feature was important during prosecution of the '251 Patent, when the examiner and applicant "discussed claim amendments that could overcome the prior art of record" and

specifically discussed the Schwartz reference. Schwartz disclosed a system and method for "managing Internet media content" using a mobile phone that executes an application to facilitate accessing media and video content on a connected television. Ex. 2 ('251 File History, 8/16/2012 Examiner-Initiated Interview Summary); *see also* Ex. 1 at 12. Although Schwartz disclosed a component which could maintain an internal list of the available rendering devices in the network, it did not disclose the ability of a user to connect the mobile phone to new televisions by obtaining a code from the television and providing it to the mobile phone. *See generally* U.S. Pub. No. 2011/0060998A1 (Schwartz). Thus, following this interview, the examiner himself amended the claims to add the "synchronization code" limitations and issued a Notice of Allowability. Ex. 3 ('251 File History, 8/16/2012 Notice of Allowability) at 2–8, 11–12.

Turning to the proper construction of "synchronization code," the Court cannot rely on any "plain and ordinary meaning" because the phrase does not have a plain and ordinary meaning in the art, and Touchstream provides no evidence of any such plain meaning. Thus, the only construction for this coined claim term must come from the intrinsic evidence. *Indacon, Inc. v. Facebook, Inc.*, 824 F.3d 1352, 1357 (Fed. Cir. 2016) (coined terms "cannot be construed broader than the disclosure in the specification"); *Intervet, Inc. v. Merial Ltd.*, 617 F.3d 1282, 1287 (Fed. Cir. 2010) ("Idiosyncratic language, highly technical terms, or terms coined by the inventor are best understood by reference to the specification."); *Koninklijke KPN N.V. v. Telefonaktiebolaget LM Ericsson*, No. 2:21-cv-00113-JRG, 2022 WL 811072, at *22 (E.D. Tex. Mar. 16, 2022) (construing "service code" based on the specification because it "is a coined term" for which plaintiff has not demonstrated "any established meaning in the relevant art"). And there, the specification explains that, one way or another, a user must obtain the

synchronization code from the TV and provide it to the phone. Touchstream's protestations to the contrary notwithstanding, *every* disclosed embodiment is in accord:

- One example is direct entry of the synchronization code by the user. '251 Patent at 5:14–16 ("the user can select the display device by entering a synchronization code uniquely associated with the particular display device."). That is, the user sees the code displayed on the display device and enters it into the personal computing device (e.g., a mobile phone).

- Another example is scanning a displayed image which represents the synchronization code, such as a QR code, with the camera on the user's personal computing device. '251 Patent at 5:16–21. Here, as is common knowledge, a user scans a QR code (or similar image) by pointing the phone at the display device. Touchstream asserts without support that the user is not involved in this process, but obviously the user must aim the device's camera at the display in order to capture the image.

- Another example is that "[t]he code can be scanned, for example, using optical scanning or RFID techniques," '251 Patent at 5:21–23, but again these necessarily involve the user initiating/facilitating the scan, as with the previous examples.

Thus, the user always obtains the synchronization code and the user provides that code to the personal computing device. It must be so, as that is how users identify uninitialized display devices to which they want to cast.

For these reasons, Touchstream's conclusion that "the display device may provide the synchronization code directly to the personal computing device *without the user serving as an intermediary*," Pl. Br. at 8 (emphasis added), is unsupported attorney argument that is contrary to the disclosures of the patent. Defendants' proposed construction *is* the plain and ordinary meaning of "synchronization code" in view of the specification, and that construction should therefore be adopted.

### F.    "unique identifier" ('934 Patent Claim 17)

| Defendants' Proposed Construction | Touchstream's Proposed Construction |
|---|---|
| An identifier which can be obtained by a user from the media receiver and provided by the user to the computing device. | No construction necessary. Touchstream proposes that the term be construed in accordance with its plain and ordinary meaning. |

Unlike the claims of the other Asserted Patents, claim 17 of the '934 Patent does not recite a "synchronization code" verbatim. Instead, it requires "a unique identifier of the media receiver." The patent's only explicit reference to "unique identifier" is found in the Abstract: "A system for controlling playback of various types of content includes a first computing device that provides a unique identifier to a second computing device to establish an association therebetween." '934 Patent at Abstract. Turning to the specification, this association is accomplished either through previous initialization of the targeted display device, '251 Patent at 5:10–14, or through use of a "synchronization code uniquely associated with the particular display device," '251 Patent at 5:14–16. There is no other disclosure. Only the latter involves using a "unique[]" "code"; and, as explained above, only the uninitialized embodiment is claimed. In the claimed embodiment, the user must facilitate the association using the "unique identifier." There are over a billion mobile devices in the world. It is only some action of the user selecting a particular device to associate with the media receiver (display device) that causes the two to become synchronized. Each disclosed method in the patent, such as "by the user" "manually" "enter[ing]" the code, or by "scan[ning]" the code using "optical scanning or RFID," requires action by the user. '251 Patent at 5:14–23. Thus, a POSITA is left with understanding the claimed "unique identifier" to be a synchronization code as described in Section III.E above. And Touchstream's argument regarding this term largely repeats its argument as to "synchronization code" in the '251 and '751 Patents, indicating that it, too, sees the terms as

14

similar in scope.  This claim term should therefore be construed in accordance with the disclosed "synchronization code"; otherwise, it lacks written description support in the specification.

### G.    "storing…based on the synchronization code" ('251 Patent Claim 1)

| Defendants' Proposed Construction | Touchstream's Proposed Construction |
|---|---|
| Based on the synchronization code, storing. | No construction necessary.  Touchstream proposes that the term be construed in accordance with its plain and ordinary meaning. |

Defendants' proposed construction resolves an ambiguity in the claim language consistent with the specification.  In offering no construction, Touchstream provides no clarification and its brief suggests an interpretation that finds no support in the patent.

The relevant claim limitation reads:

> storing, by the server system, a record establishing an association between the personal computing device and the display device based on the synchronization code

'251 Patent cl. 1.  As a matter of language, it is not clear what "based on the synchronization code" modifies.  Touchstream asserts that "[t]he relative phrase 'based on the synchronization code' describes the immediately preceding object: 'an association between the personal computing device and the display device.'"  Pl. Br. at 10.  But the claim term could equally mean that the "storing" of that association is based on the synchronization code.  This interpretation does not render any of the claim language superfluous—regardless of what object is modified by the phrase "based on the synchronization code," the claim still requires "storing, by the server system, a record establishing an association between the personal computing device and the display device."  But for the jury to properly assess infringement and invalidity, it must be instructed as to whether the "storing" or the "association" must be "based on the synchronization code."

The parties' dispute as to this term's meaning shows that, at the very least, the term cannot be given a plain-and-ordinary meaning construction. Construction is necessary when the claim language itself is subject to multiple interpretations. *Eon Corp. IP Holdings LLC v. Silver Spring Networks*, 815 F.3d 1314, 1317–19 (Fed. Cir. 2016) (holding that "plain and ordinary meaning" construction was error because it did not "provide the jury with a clear understanding of the disputed claim scope").

When the claim language is ambiguous, courts "turn to the specification to resolve the uncertainty." *World Class Tech. Corp. v. Ormco Corp.*, 769 F.3d 1120, 1124 (Fed. Cir. 2014). Here, the specification drives home that the "storing" occurs "based on the synchronization code." The specification explains that the association is stored based on the receipt of the synchronization code. Specifically, the specification explains that "the user can select the display device by entering a synchronization code uniquely associated with the particular display device." '251 Patent at 5:14–16. "Once the synchronization code is entered into, or captured by, the mobile phone 20, it is sent from the mobile phone 20 to the server system 24, which stores the information in the look-up table 36 so as to establish a connection between the mobile phone 20 and the display device 22 through the server system 24." '251 Patent at 5:36–41. Thus, the server system stores information establishing a connection between the two devices based on its receipt of the synchronization code.

Similarly, in an embodiment in which the synchronization code is displayed on the display device, the user enters the code into personal computing device application, "[t]he user then clicks on a SEND button which causes a message including the sync-code to be sent [sic] the server system 24. **In response,** the server system 24 establishes a connection between the

user's smartphone and the selected display device through a look-up table as described above with respect to FIG. 4." '251 Patent at 7:30–35 (emphasis added).

Moreover, there is no disclosure in the specification of any association between the mobile and display devices based on the synchronization code. Instead, Figure 4 shows "a look-up table 34 that stores a correspondence between a particular personal computing device (such as mobile phone 20) and target devices (e.g., the television set 22)" without the synchronization code. '251 Patent at 4:55–58. That figure confirms that, contrary to Touchstream's assertion, the "association" itself need not be "based on the synchronization code." *See* '251 Patent at Fig. 4. Rather, the fact that the server system establishes the association between the two devices "in response" to receiving the synchronization code, '251 Patent at 7:30–35, shows that it is the claimed "storing" that is "based on the synchronization code," not the association itself.[8]

Given the ambiguity in the claim language, it would constitute legal error not to resolve the parties' dispute. The Court should therefore adopt Defendants' proposed construction, which reflects the specification's description of the relevant method step.

### H.    "first format" / "second format" ('751 Patent Claims 12 and 16)

| Defendants' Proposed Construction | Touchstream's Proposed Construction |
|---|---|
| Second format is different from the first format. | No construction necessary. Touchstream proposes that the term be construed in accordance with its plain and ordinary meaning. |

---

[8] The disclosure in the specification is sufficient to overcome the presumption that "[t]he relative phrase 'based on the synchronization code' describes the immediately preceding object" on which Touchstream relies. Pl. Br. at 10; *see Cisco Sys., Inc. v. Int'l Trade Comm'n*, 873 F.3d 1354, 1361 (Fed. Cir. 2017) (affirming construction based on language of specification, rather than that based on grammar of claim language).

Defendants' proposed construction reflects Touchstream's own statements made to the PTO to overcome prior art and the plain language of the claims. In response, Touchstream "does not dispute that the 'first format' and 'second format' are different formats." Pl. Br. at 11. Yet it nonetheless seeks to avoid a ruling to that effect in an attempt to inject ambiguity in front of the jury.

Importantly, during prosecution, the applicant argued that the Morris prior-art reference did not disclose the invention claimed in the '751 Patent because the formats in Morris were not different. Ex. 4 ('751 File History, 5/9/2019 Response to Office Action) at 8–12. In particular, the applicant asserted that Morris did not disclose "receiving, from the remote server device, a first message that includes ***at least one command <u>in a first format</u>***, wherein the first message is received based at least in part on a second message including ***at least one command <u>in a second format</u>*** having been sent from the associated remote computing device," *id.* at 8 (emphasis in original), and specifically that "Morris never describes commands in ***different formats***," *id.* at 10 (emphasis added). Indeed, during prosecution of the '751 Patent, the applicant acknowledged that the PTO might interpret Morris to disclose sending a command in a particular format but reiterated that "Morris still fails to describe that another message having a command ***in a different format*** is generated." *Id.* at 10 (emphasis added). Such a clear and unmistakable argument by the applicant that a prior art reference is distinguishable on a particular ground serves as a "clear and unmistakable" disclaimer. *Traxcell Techs., LLC v. Nokia Sols. & Networks Oy*, 15 F.4th 1136, 1142 (Fed. Cir. 2021). And although the applicant also distinguished Morris on other grounds, *see* Ex. 5 ('751 File History, 12/12/2019 Response to Office Action) at 11–15, "[a]n applicant's argument that a prior-art reference is distinguishable on a particular ground can serve as a disclaimer of claim scope even if the applicant distinguishes

the reference on other grounds as well." *SpeedTrack, Inc. v. Amazon.com, Inc.*, 998 F.3d 1373, 1380 (Fed. Cir. 2021) (quoting *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1374 (Fed. Cir. 2007)).

Additionally, the claims and specification of the '751 Patent show that the second format must be different from the first format. The specification includes a definition explaining that "terms such as 'first,' 'second,' etc." are "labels to distinguish the various messages from one another." '251 Patent at 9:34–36. Because "first" and "second" are meant to distinguish the items they describe, the "first format" must be different from the "second format." Moreover, multiple claims refer to converting "the at least one command in the second format into the at least one command in the first format." '751 Patent cl. 5, 6, 16.[9] If the two formats were the same, no conversion would be necessary or, indeed, possible. A court in this district has already recognized that, "[t]he phrase 'a second format,' when read in conjunction with the remainder of [the claim, which included translation from the first format to the second format], plainly indicates that the 'second format' is different from the 'first format.'" *SmartPhone Techs. LLC v. HTC Corp.*, No. 6:10-cv-580-LED-JDL, 2013 WL 1136972, at *11 (E.D. Tex. Mar. 18, 2013).

Touchstream's brief concedes that the formats need to be different, but improperly interjects that the "content" of the different formats can be the same. Pl. Br. at 11–12. Touchstream provides no support for this statement, and the examples offered by Touchstream

---

[9] Although claims 5 and 6 are not asserted in this case, their use of "first format" and "second format" is relevant because the "same claim term in the same patent or related patents carries the same construed meaning." *Omega Eng'g, Inc*, 334 F.3d at 1334. Claim 3 of the '751 Patent, which depends from an unasserted claim, provides that "the first format is different than the second format." Federal Circuit "cases make clear, however, that where found, prosecution history disclaimer can overcome the presumption of claim differentiation." *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1097 (Fed. Cir. 2013); *see also Tubular Rollers, LLC v. Maximus Oilfield Prod., LLC*, No. 2021-2319, 2023 WL 4230371, at *6 (Fed. Cir. June 28, 2023).

fall within Defendants' proposed construction. Contrary to Touchstream's suggestion, the Vimeo-specific player command "pause" (lower case) is not the same as the universal command "Pause" (upper case) in Fig. 5. '251 Patent at Fig. 5. Moreover, the Vimeo "loadNewVideo" command is even more different than the universal "New Video" command. '251 Patent at Fig. 5. Similarly, Touchstream's reference to "no" in English and Spanish misses the mark because the Spanish "no" has meanings beyond the English "no."

Touchstream explains in its brief that it "does not dispute that the 'first format' and 'second format' are different formats," Pl. Br. at 11, but it then goes on to do exactly that, suggesting that they may be the same notwithstanding the claim language, specification, and prosecution history. In so doing, Touchstream demonstrates why construction is necessary. The idea of the claims is to convert commands sent by a personal computing device into specific commands understandable by various media players. '251 Patent at 1:66–2:7, 5:58–6:17, 6:58–59, Fig. 5. That is what Touchstream claimed, and that is how it distinguished its patent during prosecution. Ex. 4 at 10. Without such a conversion, the claimed remote server device would merely serve as a conduit to relay the exact message it received from the remote computing device to the content presentation device. Touchstream should not be permitted to put such an interpretation before the jury.

## I.    "first format" / "universal format" ('934 Patent Claim 17)

| Defendants' Proposed Construction | Touchstream's Proposed Construction |
|---|---|
| Universal format is different from the first format. | No construction necessary. Touchstream proposes that the term be construed in accordance with its plain and ordinary meaning. |

The '934 Patent requires conversion between commands in a "universal format" and a different "first format" for similar reasons as the "first" and "second" formats of the '751 Patent.

First, any claim in the '934 Patent reciting a command in a "universal format" also requires "conversion" of that command into another format. '934 Patent cl. 4, 8, 11, 17, 19; *see also* cl. 9, 20 (referring to "universal format" and depending from claims requiring conversion). Indeed, unasserted claim 8 and asserted claim 17 expressly describe "commands converted from a ***universal format*** defined by the computing device to a ***first format*** that corresponds to the first type of media playing application." '934 Patent cl. 8, 17 (emphasis added). These claims recite a set of commands originating from a computing device in a "universal format" and then being converted into a "first format that corresponds to" a media playing application before being sent to a media receiver which loads that media playing application. '934 Patent cl. 17. The conversion requirement indicates that the two formats must be different. A conversion which leaves the input entirely unchanged would be nonsensical; conversion inherently implies some change in form, character, or function.

Second, the only discussion of "universal" commands in the specification is in the context of how those commands may be converted into different, specific commands recognized by the media player. '251 Patent at 5:58–62, Fig. 5. The patent describes how universal commands such as "New Video" and "Pause" (upper case) are converted into player-specific commands such as "yt_loadVideo" and "pauseVideo" or "pause" (lower case). '251 Patent at Fig. 5. All of the examples of converted commands in Figure 5 are different from the universal command and, if the "universal format" of the computing device and the "first format" of the media playing application were the same, there would be no need for the conversion step recited in the claims and illustrated in the specification. Accordingly, the two formats must be different. *See also supra* p. 19.

J.    "the first format of the first message" ('751 Patent Claim 12)

| Defendants' Proposed Construction | Touchstream's Proposed Construction |
|---|---|
| Indefinite | No construction necessary. Touchstream proposes that the term be construed in accordance with its plain and ordinary meaning. |

Claim 12 is indefinite because it is not reasonably ascertainable whether a "command" or a "message" must be in the claimed "first format" and one of two claim limitations lacks antecedent basis.

Claim 12 of the '751 Patent recites:

> [12.C] receiving, by the content presentation device and from the remote server device, *a first message that includes at least one command in a first format* . . .
>
> [12.D] selecting . . . a first media player application from a plurality of media player applications based at least in part on *the first format of the first message*, the first media player application being selected to play a first piece of content referenced in the received first message; and
>
> [12.E] controlling . . . how the selected first media player application plays the referenced first piece of content based on a first command of the *at least one command in the first format* having been included in the received first message.

In element 12.C, it is ambiguous whether the "first format" modifies the "first message" or the "at least one command." That is, that claim language could require "a first message . . . in a first format," where the message "includes at least one command." Alternatively, that claim language could require "at least one command in a first format" that is included in "a first message." The rest of the claim does not clarify this ambiguity but rather aggravates it by adding an antecedent-basis problem. If 12.C requires "a first message . . . in a first format," then 12.E ("at least one command in the first format") does not have an antecedent basis. But if 12.C means "at least one command in a first format," then 12.D ("the first format of the first

message") lacks the requisite antecedent basis.  Thus, even if a person of skill in the art could ascribe a meaning to 12.C in isolation, the claim would still be indefinite because at least one of 12.D or 12.E lacks antecedent basis.

As the Federal Circuit has explained, "a claim could be indefinite if a term does not have proper antecedent basis where such basis is not otherwise present by implication or the meaning is not reasonably ascertainable." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008) (cited approvingly by *CardWare Inc. v. Samsung Elecs. Co. Ltd.*, No. 2:22-cv-141-JRG-RSP, 2023 WL 5434763, at *10 (E.D. Tex. Aug. 23, 2023)). And courts have consistently recognized that recital of a related concept is not enough to provide antecedent basis where it is otherwise missing.  *WAPP Tech Ltd. P'ship v. Bank of Am., N.A.*, No. 4:21-cv-670, 2022 WL 2463569, at *19 (E.D. Tex. July 6, 2022) (finding that "one or more characteristics of a selected mobile device type" did not provide antecedent basis for "the selected characteristics"); *Zilkr Cloud Techs., LLC, v. Cisco Sys., Inc.*, No. 2:22-cv-166, Dkt. 121, slip op. at 35–40 (E.D. Tex. Aug. 3, 2023) (finding "the definition of the plan" lacked antecedent basis, despite the fact that the claim recited a "service" and the specification was "clear that plans may be 'associated with' the service").  Here, the claim fails to "inform those skilled in the art about the scope of the invention with reasonable certainty" and is therefore indefinite.  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014).

Touchstream's only response to the facially inconsistent claim language is that "the 'command' is in the message, so the format of the command is also the format 'of the message.'" Pl. Br. at 13.  But both the claims and the specification confirm that messages and commands are **not** the same, such that the format of one is not the same as the format of the other.

23

First, the claims refer to both "commands" and "messages" separately, and there is a "general presumption that different terms have different meanings." *Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1369 (Fed. Cir. 2012) (citing *CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG,* 224 F.3d 1308, 1317 (Fed. Cir. 2000)); *see also Neville v. Found. Constructors, Inc.*, 972 F.3d 1350, 1357 (Fed. Cir. 2020) (quoting *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006)).

Second, the specification distinguishes between messages and the commands.  For example, a "message ***can include*** a command," '251 Patent at 2:1–3 (emphasis added), and "[e]ach command is ***incorporated into*** a message," '251 Patent at 6:53–54 (emphasis added).  It also explains that commands "control[] playing of the content on the display device," '251 Patent at 2:2–3, while messages facilitate communication between various devices, '251 Patent at 1:48–58 (personal computing device "transmit[s] a first message . . . to the server system" and server system "provide[s] to the display device a second message").

Third, the patent discusses various formats for commands and messages that are different. For example, a mobile phone may send a command in a universal format, such as "New Video" or "Pause," that is then converted into a command in a player-specific format, such as "yt_loadVideo" or "pauseVideo."  '251 Patent at 6:9–15.  The patent also explains that "[v]arious types of video players may use different JavaScript commands to control their respective playback," indicating that JavaScript is another possible format of a command.  '251 Patent at 5:57–58.  Meanwhile, the specification provides detailed disclosure of messages formatted differently using transmission codes that include more information than just the commands they contain: "[t]he message from the mobile phone 20 contains a transmission code that includes data regarding the user information (e.g., user identification or account number),

the secondary display it wants to connect to (e.g., television set 22 with display 23), the location and name of the media player for the selected video, the command (e.g., play, pause, rewind, etc.), and the video file to be acted upon." '251 Patent at 4:29–35. Figure 3 provides a depiction of "the format of a transmission code from the mobile phone 20 to the server system 24," '251 Patent at 4:36–37. It shows that the format of the message is different than the format of the commands in Figure 5 and that a command is just one subcomponent of the message.

Thus, contrary to Touchstream's assertion, there is every reason why "the format of the first command cannot also be referred to as the format 'of' the message it is in." Pl. Br. at 14–15. Commands have a format of their own, which is distinct from the format of messages. For this reason, Touchstream's analogy to a "brief that includes a text in a first font" is inapposite; a brief does not have a font other than the font of the text it contains. Pl. Br. at 14. A brief may, however, have a format (length, organization, etc.) that is different than the format of the text within it (bold, italics, etc.).

More importantly, there are numerous examples where the format of a message may be converted but not the command inside and, conversely where the format of a command may be converted but not the format of the message in which it is contained. For example, a letter can be moved from a FedEx envelope to a USPS envelope. The underlying letter remains the same, but the envelope on the outside is changed. Conversely, the envelope can be opened and the papers inside written on or even replaced, all without changing the format of the envelope. In the computer-science context, a message can be encrypted or decrypted (changing its format), all while the underlying command that it transmits remains unchanged. Or the command can be edited while remaining in an unencrypted message. There are two different formats for two different data structures, and the format of one is self-evidently not also the format of the other.

Touchstream's argument appears to really be that 12.D, which recites "the first format of the first message," actually means "the first format *in* the first message." But that is not what the claims say, and "it is not [the Court's] function to rewrite claims to preserve their validity." *Synchronoss Techs., Inc. v. Dropbox, Inc.*, 987 F.3d 1358, 1367 (Fed. Cir. 2021). Either 12.C requires "a first message . . . in a first format" such that there is no antecedent basis for "at least one command in the first format" recited in 12.E, or it requires "at least one command in a first format," in which case there is no antecedent basis for "the first format of the first message" in 12.D. Thus, under either interpretation, the claim contains a term without antecedent basis and is indefinite.

### K. Order of Method Claim Steps

| Defendants' Proposed Construction | Touchstream's Proposed Construction |
|---|---|
| All steps of claim 12 must occur in order. (*'751 Patent*)<br><br>All steps of claim 17 must occur in order. (*'934 Patent*)<br><br>Step 2.A ("checking") must occur after step 1.D ("receiving, in the server system, one or more signals") (*'251 Patent*) | No construction necessary. Touchstream proposes that the term be construed in accordance with its plain and ordinary meaning. |

The parties appear to dispute whether the claims must be construed to require certain steps be performed in order. Specifically, Touchstream insists that "[t]he terms are not chronologically limited under the relevant caselaw," Pl. Br. at 8, notwithstanding the fact that the language of the claims themselves requires that some steps must be performed before others. Defendants' constructions are therefore necessary and should be adopted. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."); *Eon Corp.*, 815 F.3d at 1317–19 (holding that "plain and ordinary meaning" construction

was error when patentee argued no construction was needed but parties disputed scope of claim term at issue).

"Courts apply a two-part test to determine whether a particular order of steps is required: 'First, we look to the claim language to determine if, as a matter of logic or grammar, they must be performed in the order written,' and '[i]f not, we next look to the rest of the specification to determine whether *it* directly or implicitly requires such a narrow construction.'" *Red Rock Analytics, LLC v. Samsung Electronics Co., Ltd.*, No. 2:17-cv-101-RWS-RSP, 2018 WL 1806859, at *4 (E.D. Tex. Apr. 16, 2018) (finding that "the claims 'actually recite an order'" because "the phrase 'in turn' plainly requires that the determinations at issue be performed in the order recited") (citing *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369–70 (Fed. Cir. 2003)) (emphasis and alteration in original).  Here, the language of the claims themselves establishes that Defendants' proposed order of the steps is required.

First, the language of claim 12 of the '751 Patent dictates that each of its steps must be performed in the order written.

- The content presentation device must first obtain "a synchronization code" in step 12.A before it can provide "the synchronization code" to the remote computing device in step 12.B.  Without first obtaining the code in 12.A, the content presentation device would have no code to provide in step 12.B, and those steps must therefore occur in the order, as Touchstream concedes.  *See* Pl. Br. at 9.

Steps 12.C, 12.D, 12.E of the '751 Patent must then occur in the order in which they are recited because each of those steps includes language indicating that the immediately preceding step has been completed.

- Step 12.B requires "the remote server device to **store an association**" and Step 12.C requires "receiving . . . a first message . . . based at least in part on **the stored association**."  There would be no "stored association" in step 12.C unless the "stor[ing] an association" of 12.B had already occurred.

- Step 12.C also requires "receiving . . . *a first message*" and step 12.D requires "selecting . . . based at least in part on the first format of *the first message*." Again, unless step 12.C comes before 12.D, there is no receipt of "a first message" upon which the selection can be made.

- Finally, Step 12D also requires "selecting . . . *a first media player application*" and step 12.E requires "controlling . . . how *the selected first media player application* plays." Unless 12.D, which requires the selection, comes before 12.E, there is no "selected first media player application" that can be controlled.

Thus, each step in the claim requires the performance of the immediately preceding step.

The steps recited in claim 17 of the '934 Patent follow the same logic as claim 12 of the '751 Patent.

- First, the media receiver must first provide "a unique identifier" to the computing device (step 17.A) before it can receive a set of messages and commands from the computing device "based on the provided unique identifier" (step 17.B). The computing device cannot send messages to the media receiver "based on *the provided* unique identifier" in step 17.B if it is not first provided in step 17.A.

Then, as with the '751 Patent, steps 17.B, 17.C, and 17.D of the '934 Patent must occur in the order in which they are recited because each includes language indicating that the immediately preceding step has been completed:

- Step 17.B, requires "*receiving . . . a set of messages*" and Step 17.C then requires "*in response to receiving the set of messages*, selecting, . . . the first type of media playing application." That 17.C's selection must be done "in response to" receiving the commands in 17.B establishes that 17.B must occur before 17.C.

- Finally, step 17.D requires "controlling, by the media receiver, *how the selected first type of media playing application* plays the referenced piece of content based on at least one command." "[*T*]*he selected* first type of media playing application" makes clear that the selection in step 17.C has already occurred.

Thus, all of the steps of claim 17 of the '934 Patent must be performed in the order in which they are recited.

Finally, step 2.A of the '251 Patent (the *checking* step) must occur after step 1.D of the '251 Patent (the *receiving* step).  Step 1.D of the '251 Patent requires that the server system receives "one or more signals from the personal computing device . . . identifying a particular media player for playing the video content."  Step 2.A of the '251 Patent requires that the server system check "the identity of the media player identified in the one or more signals from the personal computing device."  Thus, the signals must have already been received and, unless step 2.A comes after step 1.D, the server system has no media player to check.

Touchstream makes no effort to explain how the language of the claims can support any other order of the steps.  Touchstream simply states that the "order is apparent from how those limitations are written."  *See* Pl. Br. at 9.  But rather than following the case law that requires a particular order when dictated by the claim language, Touchstream asserts without any basis that Defendants' construction "would introduce confusing baggage for the jury."  *See id*.  Of course, it is Touchstream who seeks to confuse the jury by denying it guidance from the Court whereas Defendants simply seek to clarify for the jury which claim steps must be performed in the order in which they are recited.  *See Mantech Env't Corp. v. Hudson Env't Servs., Inc.*, 152 F.3d 1368, 1376 (Fed. Cir. 1998) (affirming the district court's construction that the claim steps must be performed in order because "the sequential nature of the claim steps is apparent from the plain meaning of the claim language").  That is particularly important here, where many, but not every, step of the asserted claims must be performed in order.

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court adopt their proposed constructions.

Dated: April 18, 2024

Respectfully submitted,

*/s/ David J. Lisson*
Deron Dacus (State Bar No. 00790553)
THE DACUS FIRM, P.C.
821 ESE Loop 323, Suite 430
Tyler, TX 75701
Tel: (903) 705-1117
Fax: (903) 581-2543
ddacus@dacusfirm.com

Ashok Ramani (CA Bar No. 200020)
David J. Lisson (CA Bar No. 250994)
James Y. Park (CA Bar No. 343659)
Micayla Hardisty (CA Bar No. 333246)
DAVIS POLK & WARDWELL LLP
1600 El Camino Real
Menlo Park, CA 94025
ashok.ramani@davispolk.com
david.lisson@davispolk.com
james.park@davispolk.com
micayla.hardisty@davispolk.com

Alena Farber (NY Bar No. 5896170)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
alena.farber@davispolk.com

*Counsel for Comcast Defendants*

*/s/ Daniel L. Reisner*
ARNOLD & PORTER KAYE SCHOLER LLP
Dina M. Hayes
70 West Madison Street, Suite 4200
Chicago, IL 60602
dina.hayes@arnoldporter.com
Daniel L. Reisner
David Benyacar
Elizabeth A. Long
Melissa Brown
Robert Stout
250 West 55th Street
New York, NY 10019
daniel.reisner@arnoldporter.com
david.benyacar@arnoldporter.com

elizabeth.long@arnoldporter.com
melissa.brown@arnoldporter.com
robert.stout@arnoldporter.com

*Counsel for Charter Defendants*

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Local Rule CV-5(c), the undersigned hereby certifies that all counsel of record who have consented to electronic service are being served with a copy of this document via ECF on April 18, 2024.

*/s/ David J. Lisson*
David J. Lisson