**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| TOUCHSTREAM TECHNOLOGIES, INC., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| CHARTER COMMUNICATIONS, INC., et al., | § | |
| Defendants. | § | Lead Case No. 2:23-cv-00059-JRG |
| TOUCHSTREAM TECHNOLOGIES, INC., | § | Member Case No. 2:23-cv-00062-JRG |
| Plaintiff, | § | |
| | § | REDACTED |
| v. | § | |
| | § | |
| COMCAST CABLE COMMUNICATIONS, LLC, d/b/a XFINITY, et al., | § | |
| Defendants. | § | |

**COMCAST'S MOTION TO STRIKE THE OPINIONS OF**
**DR. RUSSELL W. MANGUM III**

# TABLE OF CONTENTS

<u>PAGE</u>

I.     INTRODUCTION ................................................................................................. 1

II.    BACKGROUND ................................................................................................... 2

     A.     The Accused TV Remote Functionalities ................................................. 2

     B.     Dr. Mangum's Damages Methodology..................................................... 4

III.   LEGAL STANDARD............................................................................................ 7

IV.   ARGUMENT ....................................................................................................... 7

     A.     Dr. Mangum Fails to Reasonably Approximate or Otherwise Consider the Extent of Use of the Claimed Methods................................... 7

     B.     Dr. Mangum Does Not Adjust the Quadriga Rate ................................. 11

     C.     Dr. Mangum Uses an Improper Hypothetical Negotiation Date .......................... 13

     D.     Dr. Mangum's References to *Google* Are Irrelevant and Unfairly Prejudicial ............................................................................................ 14

V.     CONCLUSION................................................................................................... 15

# TABLE OF AUTHORITIES

<u>Page</u>

**Cases**

*Apple Inc. v. Wi-LAN Inc.*,
  25 F.4th 960 (Fed. Cir. 2022) ........................................................................................ 2, 11, 12

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
  576 F.3d 1348, (Fed. Cir. 2009) .......................................................................................... 1, 7, 9

*Cassidian Commc'ns, Inc. v. Microdata GIS, Inc.*,
  2013 WL 11322510 (E.D. Tex. Dec. 3, 2013) ................................................................... 13, 14

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ................................................................................................................. 2, 7

*Ecolab Inc. v. Dubois Chems., Inc.*,
  2023 WL 7019266 (D. Del. Oct. 25, 2023) ............................................................................ 8, 9

*Embrex, Inc. v. Serv. Eng'g Corp.*,
  216 F.3d 1343 (Fed. Cir. 2000) ................................................................................................. 9

*Infernal Tech., LLC v. Sony Interactive Ent., LLC*,
  No. 19-cv-00248-JRG (E.D. Tex. Feb. 26, 2021) ..................................................................... 7

*Joy Techs., Inc. v. Flakt, Inc.*,
  6 F.3d 770 (Fed. Cir. 1993) .................................................................................................... 7, 8

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012) ................................................................................................ 2, 13

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) .............................................................................................. 7, 8

*Maxell, Ltd. v. Apple Inc.*,
  2021 WL 3021253 (E.D. Tex. Feb. 26, 2021) ...................................................................... 14, 15

*Mirror Worlds, LLC v. Apple, Inc.*,
  784 F. Supp. 2d 703 (E.D. Tex. 2011) ....................................................................................... 9

*MLC Intell. Prop., LLC v. Micron Tech., Inc.*,
  10 F.4th 1358 (Fed. Cir. 2021) ...................................................................................... 11, 12, 13

*Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*,
  30 F.4th 1339 (Fed. Cir. 2022) ............................................................................................... 1, 8

*Omega Pats., LLC v. CalAmp Corp.*,
13 F.4th 1361 (Fed. Cir. 2021) .................................................................. 11

*Packet Intel. LLC v. NetScout Sys., Inc.*,
965 F.3d 1299 (Fed. Cir. 2020) ................................................................... 9

*Personalized Media Commc'ns, LLC v. Apple Inc.*,
No. 2:15-cv-1366 (E.D. Tex. Mar. 2, 2021) .............................................. 15

*RSA Protective Techs., LLC v. Delta Sci. Corp.*,
2021 WL 4978462 (C.D. Cal. Oct. 20, 2021).................................... 13, 14

*Syneron Med. Ltd. v. Invasix, Inc.*,
2018 WL 4696969 (C.D. Cal. Aug. 27, 2018)........................................... 13

*The Chamberlain Grp. LLC v. Overhead Door Corp.*,
No. 2:21-cv-84 (E.D. Tex. Mar. 1, 2022) .................................................. 15

*Touchstream Techs., Inc. v. Google LLC*,
6:21-cv-00569-ADA (W.D. Tex. 2021) ....................................................... 1

*Vocalife LLC v. Amazon.com, Inc.*,
2020 WL 5815950 (E.D. Tex. Sept. 30, 2020) ........................................... 8

**Statutes**

35 U.S.C. § 284................................................................................................... 7

**Rules**

Fed. R. Evid. 702 ............................................................................................... 7

## TABLE OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---|---|
| Ex. 1 | Expert Report of Russell W. Mangum III, Ph.D. (and appendices and exhibits thereto) |
| Ex. 2 | Touchstream's Final Election of Asserted Claims |
| Ex. 3 | Expert Report of Dr. Kevin C. Almeroth Regarding Infringement of U.S. Patent Nos. 8,356,251, 11,048,751, & 11,086,934 (and appendices and exhibits thereto) |
| Ex. 4 | U.S. Patent No. 8,356,251 |
| Ex. 5 | U.S. Patent No. 11,048,751 |
| Ex. 6 | U.S. Patent No. 11,086,934 |
| Ex. 7 | May 23, 2024 Deposition of Scott Manning |
| Ex. 8 | COM_00105403 |
| Ex. 9 | July 24, 2024 Deposition of Kevin Almeroth |
| Ex. 10 | Clarification to the June 24, 2024 Expert Report of Russell W. Mangum III, Ph.D. (and appendices and exhibits thereto) |
| Ex. 11 | July 26, 2024 Deposition of Russell Mangum |
| Ex. 12 | COM_00105110 |
| Ex. 13 | Expert Report of Stephen L. Becker, Ph.D. (and appendices and exhibits thereto) |
| Ex. 14 | COM_00093296 |
| Ex. 15 | TS_COMCAST_00023052 |
| Ex. 16 | May 30-31, 2024 Deposition of Herb Mitschele |
| Ex. 17 | Jury Trial Proceedings, *Touchstream Techs., Inc. v. Google LLC*, 6:21-cv-00569-ADA (W.D. Tex. 2021), July 18-19, 2023 |
| Ex. 18 | Jury Verdict Form, *Touchstream Techs., Inc. v. Google LLC*, 6:21-cv-00569-ADA (W.D. Tex. 2021), Dkt. No. 247 |
| Ex. 19 | June 6, 2024 Deposition of David Strober |

████████████████████████████████████████████████

## I.     INTRODUCTION

Comcast moves to strike the opinions of Touchstream's damages expert, Dr. Russell W. Mangum III.[1]  Dr. Mangum opines that damages related to a free mobile application ████████ ████████████████████████████████ should be between ████████████████. He reaches these exorbitant amounts because he violates fundamental principles of damages law.

*First*, Dr. Mangum fails to consider the extent of use of the allegedly infringing methods. Where, as here, the patentee has only alleged direct infringement of a method claim, damages must be limited to "a reasonable approximation of actual infringing uses of the claimed method." *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1357 (Fed. Cir. 2022) ("*Niazi*"). That is because a "method claim is directly infringed only by one practicing the patented method."  *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348, 1359 (Fed. Cir. 2009) ("*Cardiac*").  The number of accused products that are merely ***capable*** of infringement is therefore irrelevant, *see Niazi*, 30 F.4th at 1357, and Dr. Mangum's inclusion in his royalty base of ***all*** Comcast X1 set-top boxes allegedly "***capable*** of performing the accused methods" is improper.  Ex. 1 (Mangum Rpt.) ¶ 182 (emphasis added).  Dr. Mangum was required to consider the extent of use of the accused functionalities (which require the use of the mobile application) but did not do so, resulting in damages many times higher than permitted.

---

[1] This motion refers to Plaintiff Touchstream Technologies, Inc. as "Touchstream"; Defendants Comcast Cable Communications, LLC, Comcast Cable Communications Management, LLC, Comcast of Houston, LLC, and Comcast Corporation collectively as "Comcast"; U.S. Patent No. 8,356,251 as the "'251 Patent"; U.S. Patent No. 11,048,751 as the "'751 Patent"; U.S. Patent No. 11,086,934 as the "'934 Patent"; the '251 Patent, '751 Patent, and '934 Patent collectively as the "Asserted Patents"; claims 1, 5, 7, 8, and 9 of the '251 Patent, claims 12, 13, 14, and 16 of the '751 Patent, and claims 17, 18, 19, and 20 of the '934 Patent collectively as the "Asserted Claims" (*see* Ex. 2 (Touchstream's Final Election)); and *Touchstream Techs., Inc. v. Google LLC*, 6:21-cv-00569-ADA (W.D. Tex. 2021), as "*Google*"; and Exhibits to the Declaration of James Y. Park as "Ex."

*Second*, Dr. Mangum fails to adjust his royalty rate to account for differences between the license on which he relies and the hypothetical negotiation here. Where an expert relies on allegedly "comparable licenses to prove a reasonable royalty," they must "account for differences in the technologies and economic circumstances of the contracting parties." *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 971 (Fed. Cir. 2022). But Dr. Mangum declines to adjust in any way a royalty rate from a ***software*** license for a product that included functionality Comcast does not offer, and he fails to isolate the alleged point of novelty in Touchstream's patents.

*Third*, Dr. Mangum analyzes a hypothetical negotiation years before the date of first infringement considered by Touchstream's technical expert. It is black-letter law that "the date of the hypothetical negotiation is the date that the infringement began." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 75 (Fed. Cir. 2012). Yet Dr. Mangum opines that the hypothetical negotiation began in May 2012 and culminated in a hypothetical agreement by January 2013, even though Touchstream's technical expert only offered an infringement analysis starting in February 2017. Ex. 3 (Almeroth Rpt.) ¶ 122.

Each of those three defects independently renders Dr. Mangum's opinions unreliable and inadmissible under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). In addition, Dr. Mangum improperly considers Touchstream's litigation and jury verdict against Google, and those opinions must be excluded under Federal Rules of Evidence 402, 403, and/or 702.

## II.     BACKGROUND

### A.     The Accused TV Remote Functionalities

The Asserted Claims are all method claims. They are directed to methods for controlling presentation of content on a display (e.g., a television) using a personal computing device (e.g., a mobile phone) through a server. *See* Ex. 4 ('251 Patent) at Claim 1; Ex. 5 ('751 Patent) at Claim 12; Ex. 6 ('934 Patent) at Claim 17. The asserted claims of the '251 Patent, which issued on

████████████████████████████████████████

January 15, 2013, recite steps performed by the "server system" while the asserted claims of the '934 and '751 Patents, which issued in 2021, recite steps performed by the "content presentation device" / "media receiver."  Ex. 4 at Claim 1; Ex. 5 at Claim 12; Ex. 6 at Claim 17.

Touchstream's technical expert, Dr. Kevin Almeroth, opines that Comcast's "Accused TV Remote Functionalities" infringe the Asserted Claims.  Ex. 3 ¶ 122.  The Accused TV Remote Functionalities are implemented by what Dr. Almeroth identifies as the "Infringing Instrumentalities," which include Comcast's TV Remote mobile application ("TV Remote App") operating on a user's mobile device in conjunction with Comcast's X1 platform ("X1").  *See id.* ¶ 59 ("Other components include . . . [Comcast's] TV Remote Mobile Application."), 122, 127.

X1 is Comcast's premium cable-television service.  *See* Ex. 1 ¶ 101.  Subscribers can access X1 through an X1 set-top box ("STB").  *Id.* ¶ 128.  An X1 STB is installed in a subscriber's home and connected to a television.  *See id.*  Each STB is also connected to Comcast's cable network and receives data and video programming over the network.  *See id.*

████████████████████████████████████████████████████

████████████, which Touchstream does not accuse of infringement.  *See* Ex. 3 ¶ 59, 122, 127; Ex. 7 (Manning Dep. Tr.) at 74:23-75:4.

██████████████████████████████████████████████████

███████████████.  *See* Ex. 8 (COM_00105403) at 2, 4.  Among other things, the TV Remote App allows a Comcast subscriber to initiate playback of linear, VOD, and DVR content on their TV through their STB.  Ex. 3 ¶ 174, App. 1 at 2-12.  To initiate playback, a subscriber must first download and install the application on their Android or iOS device.  *Id.* ¶¶ 127, 129, App. 1 at 2; Ex. 9 (Almeroth Dep. Tr.) at 40:9-23.  The subscriber must then log in with their Comcast account credentials and use the application.  Ex. 3 ¶ 245, App. 1 at 3.  Comcast conceived of and developed the TV Remote App in early 2010, Ex. 1 ¶ 78, and ████████████████████

████████████████████████████████████████████████████

███████████████. Ex. 7 at 70:4-71:2. ██████████████████████

██████████  *See* Ex. 1 ¶ 29.

Touchstream's technical expert was asked to "opine on the operation of Comcast's systems since February 17, 2017." Ex. 3 ¶ 122. Although he opines that "Comcast's TV Remote functionality ███████████████████████████████" since then, he does not analyze the operation of the accused system at any earlier date. *Id.* Consistent with the structure of the Asserted Claims and his definition of the Accused TV Remote Functionalities, Dr. Almeroth's infringement analysis for each asserted claim requires "a smartphone or tablet running a TV Remote Application" that sends messages to a server system that then communicates with an X1 STB. *Id.* ¶¶ 127, 252, 263-64; Ex. 9 at 55:12-56:8, 67:6-12.

**B.    Dr. Mangum's Damages Methodology**

Touchstream's damages expert, Dr. Mangum, opines that "a reasonable royalty for the patents-in-suit, determined under the hypothetical negotiation framework, is ████████████ ████████████" Ex. 1 ¶¶ 10, 182. Dr. Mangum asserts the hypothetical negotiation would begin in May 2012, when Comcast allegedly launched X1, and culminate in a hypothetical agreement by January 2013. *Id.* ¶ 111, 116; Ex. 10 (Mangum Clarification). He does not explain why the hypothetical negotiation would have occurred years before the date of first alleged infringement analyzed by Dr. Almeroth. *See* Ex. 11 (Mangum Dep. Tr.) at 149:25-152:3.

He then calculates two royalty bases starting from March 2017 through December 2023:

1) Total number of subscriber months, based on X1 STB counts: ████████████████
2) Total number of subscriber months, based on number of accounts: ████████████████

Ex. 1 ¶ 182; *see also id.* Exs. 2-2.2. The second number "de-dupes" X1 STBs deployed to subscribers that have more than one X1 STB in their home. *Id.*

█████████████████████████████████████████████████

Dr. Mangum then applies to that base a royalty rate of █████████████████, which originates from a 2013 software-license agreement between Touchstream and Quadriga Worldwide Ltd. ("Quadriga"), a hotel-management company.  Under that agreement, Quadriga allegedly agreed to pay Touchstream a license fee of ███████████████.  *Id.* ¶ 55. Applying that rate yields Dr. Mangum's proposed damages of ████████████████ depending on the base.  Ex. 1 ¶¶ 10, 182, Ex. 2.

Dr. Mangum's royalty base is premised on his assumption that "[t]he applicable set top boxes are those that are *capable* of performing the accused methods and that are in the households of subscribers with access to Defendant's application accused of playing a role in those methods."  *Id.* ¶ 10.  According to Dr. Mangum, because Comcast "stands ready to perform the patented methods for each STB in a subscriber's house upon request, [it] should pay Touchstream per STB, per month for the right to do so."  *Id.* ¶ 128.

As a result, Dr. Mangum does not attempt to approximate the use of the Accused TV Remote Functionalities.  To the contrary, he expressly *declines* to consider evidence of use, asserting that "a damages model based on usage of the app is inappropriate [because] it can . . . reward[] Defendant and punish[] Touchstream for mistakes made by Defendant in deploying Touchstream's technology."  *Id.* ¶ 159; *see also* Ex. 11 at 76:2-78:12.  Dr. Mangum's refusal to consider usage results in a royalty base that includes, for example, ██████████████ ███████████—notwithstanding the fact that ███████████████████ used the Xfinity TV Remote app that month.  *See* Ex. 12 (COM_00105110); Ex. 13 (Becker Rpt.) Ex. SLB-1A at 1, 11; Ex. 14 (COM_00093296).  The inclusion of ██████████████ ████████████████ that were never used with the Accused TV Remote Functionalities results in a royalty base that exceeds ████████████████ from March 2017 through December

2023, as compared to ███████████████████ actual X1 users of the TV Remote App during that period.  *See* Ex. 1 ¶ 10; Ex. 13 Exs. SLB-1A at 1, 11, SLB-2 at 1.

Dr. Mangum similarly declines to make ***any*** adjustments to the Quadriga license fee of ███ to account for the many differences between the Quadriga agreement and the hypothetical negotiation here.  *See* Ex. 1 ¶¶ 136, 174, 178.  These differences include that the Quadriga agreement was a software license and, if it included any implied patent license at all, such an implied license would have covered unasserted patents and claims that Dr. Mangum fails to apportion out.  *See* Ex. 15 (TS_COMCAST_00023052) at -57, -59, -64; Ex. 16 (Mitschele Dep. Tr.) at 95:15-18; Ex. 17 (*Google* Trial Tr.) at 623:8-624:22, 655:7-656:21; Ex. 18 (*Google* Verdict) at 1; Ex. 4 at Claims 11-21; Ex. 6 at Claims 1-16; Ex. 5 at Claims 1-11, 17-20.  Further, the product licensed in the Quadriga agreement included functionalities that Comcast does not offer—██████████████████████████████—which Dr. Mangum similarly does not account for.  Ex. 19 (Strober Dep. Tr.) at 97:5-98:23, 137:21-139:15; Ex. 16 at 90:21-91:15; Ex. 11 at 128:13-129:9, 135:10-21; *see* Ex. 3 ¶ 174, App. 1 at 2-12, Ex. F at 1.

Finally, Dr. Mangum improperly considers *Google*.  There, the jury found infringement of three patents, two of which are not asserted here, and awarded $339 million in damages.  Ex. 18 at 1.  Dr. Mangum references both the verdict and damages award in his report.  Ex. 1 ¶ 40.  Purportedly to support the value and commercial success of the patented technology, he points to both the *Google* verdict and the accused Google Chromecast product, stating that it was "found to utilize Touchstream's technology."  *Id.* ¶ 157 n.223; *see also id.* ¶¶ 36, 40-45, 126 & n.186, 157 & n.223, 176.  He also refers to *Google* in his opinions on licenses.  *See id.* ¶¶ 61-62 nn.115-18, 128 & n.202, 145 n.218.  For example, he references evidence in *Google* to support his claim that the Quadriga agreement's structure "is generally consistent with the pricing structure of the

broader video industry"—even though Google never took a license.  *Id.* ¶ 128 & n.202.  He does not use the *Google* verdict to derive his royalty rate or base.

### III.    LEGAL STANDARD

Upon a finding of infringement, a patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."  35 U.S.C. § 284.  Courts determine a reasonable royalty using the "hypothetical negotiation" approach, which "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began."  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).  A district court must "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert*, 509 U.S. at 597; Fed. R. Evid. 702.

### IV.    ARGUMENT

Dr. Mangum violates numerous rules governing expert testimony on patent damages.  First, he fails to approximate or even consider the extent of use of the allegedly infringing methods.  Second, he does not adjust the rate from the Quadriga license in any way.  Third, he uses a hypothetical negotiation date ***four*** years before the date of first infringement considered by Touchstream's technical expert.  Finally, he improperly considers the *Google* litigation.

#### A.    Dr. Mangum Fails to Reasonably Approximate or Otherwise Consider the Extent of Use of the Claimed Methods

"A method claim is directly infringed only by one practicing the patented method."  *Cardiac*, 576 F.3d at 1359 (quoting *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993)).  This Court has recognized this fundamental tenet of patent law.  *Infernal Tech., LLC v. Sony Interactive Ent., LLC*, 19-cv-00248-JRG, Dkt. No. 281 at 4 (E.D. Tex. Feb. 26, 2021) (Gilstrap, C.J.) ("Sale of an apparatus is not an infringement of a method claim merely because

the apparatus is capable of performing the claimed method steps."); *Vocalife LLC v. Amazon.com, Inc.*, 2020 WL 5815950, at *2 (E.D. Tex. Sept. 30, 2020) (Gilstrap, C.J.) ("[A] method claim is 'not directly infringed by the mere sale of an apparatus capable of performing the claimed process.'") (quoting *Joy*, 6 F.3d at 773).

The Federal Circuit has thus repeatedly held that, where the asserted claim is a method claim, a patentee's "damages award ought to be correlated, in some respect, to the extent the infringing method is used by consumers." *Lucent*, 580 F.3d at 1334 (vacating damages award because plaintiff failed to "prove that the extent to which the infringing method has been used supports" it). Indeed, the Federal Circuit recently reinforced that damages must be limited to "a ***reasonable approximation*** of actual infringing uses of the claimed method."[2] *Niazi*, 30 F.4th at 1357 (emphasis added); *see also Ecolab Inc. v. Dubois Chems., Inc.*, 2023 WL 7019266, at *13 (D. Del. Oct. 25, 2023) (noting *Lucent* and *Niazi* are "consistent" on this issue). It also made clear that "patentees cannot recover damages based on sales of products with the mere ***capability*** to practice the claimed method." *Niazi*, 30 F.4th at 1357 (emphasis added).

In light of these principles, this Court and others have excluded expert opinions that fail to consider the extent of use of the allegedly infringing methods. *See, e.g.*, *Vocalife*, 2020 WL 5815950, at *2-3 (Gilstrap, C.J.) ("Since testing was the only pre-suit direct infringement theory proffered by Plaintiff, any pre-suit damages from direct infringement [of the asserted methods] must consequently . . . be tied to such testing."); *Niazi*, 30 F.4th at 1357 (affirming exclusion

---

[2] Although the court in *Lucent* noted that the Federal Circuit has "never laid down any rigid requirement that damages in all circumstances be limited to specific instances of infringement proven with direct evidence," it also made clear that a patentee bears "the burden to prove that the extent to which the infringing method has been used supports the lump-sum damages award"—particularly where, as here, there is no practical impediment to doing so. *Lucent*, 580 F.3d at 1334-35; *see also Niazi*, 30 F.4th at 1357-58 (affirming exclusion of damages opinions where expert "did not even attempt to explain why a royalty based on use of the method would be impractical in this case").

because expert "[did] not reliably establish how often the patented method was used by doctors to allow a reasonable approximation of the damages base"); *Ecolab*, 2023 WL 7019266, at *13 (excluding expert's opinion that used **all** "sales of the Accused Products in her royalty base").[3]

These decisions render Dr. Mangum's opinions inadmissible.  Touchstream alleges only direct infringement of method claims.  Yet Dr. Mangum makes no attempt to approximate the use of the Accused TV Remote Functionalities.  Instead, he includes in his royalty base all X1 STBs allegedly **capable** of performing the Asserted Claims and suggests that doing so is justified because the TV Remote App is "included" in all monthly X1 subscriptions.  Ex. 1 ¶¶ 166-67, 182.  But a subscriber must first download and install the TV Remote App on their mobile device before they can even use the application necessary for infringement.  Ex. 3 ¶¶ 127, 129, App. 1 at 2; Ex. 9 at 40:9-23.  Indeed, Dr. Almeroth's infringement analysis expressly requires "a smartphone or tablet running a TV Remote Application" that sends messages to a server system that then communicates with an X1 STB.  *See* Ex. 3 ¶¶ 252, 263-64, 290, 296, 314, 316; Ex. 9 at 55:12-56:8, 67:6-12.  Thus, an X1 STB, standing alone, is not capable of infringement until a user has downloaded the TV Remote App and, even if it were, it still would be an improper base without some consideration of whether it had been used as part of the accused methods.[4]

---

[3] *See also Cardiac*, 576 F.3d at 1359 (affirming patentee "can only receive infringement damages on those devices that actually performed the patented method during the relevant infringement period"); *Packet Intel. LLC v. NetScout Sys., Inc.*, 965 F.3d 1299, 1315 (Fed. Cir. 2020) (rejecting damages award because "[t]he damages base was not tailored to any alleged internal use of the claimed methods"); *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1350 (Fed. Cir. 2000) ("[B]ecause the sale of devices that may be used to practice a patented method cannot infringe without proof of direct infringement, [defendant]'s offers to sell its machines cannot supply adequate evidentiary support for a compensatory damage award."); *Mirror Worlds, LLC v. Apple, Inc.*, 784 F. Supp. 2d 703, 724-25 (E.D. Tex. 2011), *aff'd*, 692 F.3d 1351 (Fed. Cir. 2012) ("[S]ale of the apparatus is not the sale of the method—and thereby irrelevant in calculating liability for direct infringement.").

[4] Dr. Mangum also ignores that the '251 Patent's asserted claims recite steps performed by a "server system" and so cannot be practiced by an X1 STB at all.  Ex. 4 at Claim 1.

*See Niazi*, 30 F.4th at 1357 ("[P]atentees cannot recover damages based on sales of products with the mere capability to practice the claimed method"); Ex. 9 at 47:8-48:5, 70:21-72:3, 78:6-22.

Notably, this is not a case in which Defendants quibble with how an expert attempted to consider extent of use of the claimed method.  Here, Dr. Mangum expressly ***refused*** to consider such use at all.  Ex. 1 ¶ 159; Ex. 11 at 76:2-78:12.  That position flies in the face of Federal Circuit law and cannot be permitted.  Dr. Mangum also claims that applying a per-STB running royalty makes damages easy to calculate, Ex. 1 ¶ 155, but mere convenience cannot justify departure from fundamental principles of patent damages law.  In any event, Dr. Mangum's excuse is nonsensical since Comcast produced usage data for the TV Remote App from which he could have easily calculated appropriate damages figures.  Ex. 14.

In an apparent contradiction to his earlier opinion that considering usage would be "inappropriate," Dr. Mangum elsewhere suggests that usage is "implicitly considered" in his analysis of the Quadriga agreement.  Ex. 1 ¶ 168.  But Dr. Mangum elsewhere states that the Quadriga agreement was untethered to use.  *Id.* ¶ 117.  That concession is unsurprising because the license was primarily for software that Quadriga installed in hotel rooms.  *See* Ex. 15 at -57, -59, -64.  While it may be reasonable for parties to agree to a license fee for each deployment of software, such a framework has no bearing on whether a reasonable royalty to method patent claims may disregard actual performance of the method.  Moreover, to the extent the Quadriga agreement included an implied patent license, that license would have covered ***system/apparatus*** claims not asserted here.  Ex. 4 at Claims 11-21; Ex. 6 at Claims 1-16; Ex. 5 at Claims 1-11, 17-20; Ex. 17 at 623:8-624:22.  Such system/apparatus claims may be infringed by the mere deployment of device capable of infringement, but the Asserted Claims here cannot. The Quadriga license therefore provides no basis to ignore the black letter law that requires that a damages award be correlated to the extent of use of the infringing method.

████████████████████████████████████████████████

Because Dr. Mangum refuses to consider use of the accused methods, he includes in his base ███████████████████████████ where the STB was never involved in any performance of those methods.  His opinions should therefore be excluded.

### B.    Dr. Mangum Does Not Adjust the Quadriga Rate

Where an expert relies on allegedly "comparable licenses to prove a reasonable royalty," the Federal Circuit requires the expert to "account for differences in the technologies and economic circumstances of the contracting parties."  *Apple*, 25 F.4th at 971.  The expert must conduct an "assessment of the licensed technology versus the accused technology to account for any differences."  *MLC Intell. Prop., LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1375 (Fed. Cir. 2021).  And he must sufficiently explain how the license fee accounts for apportionment "between the patented improvement . . . and the conventional features" of the accused product. *Omega Pats., LLC v. CalAmp Corp.*, 13 F.4th 1361, 1379 (Fed. Cir. 2021) (cleaned up).

Despite several glaring differences between the Quadriga agreement and the hypothetical license here, Dr. Mangum does not adjust the Quadriga license fee at all.

*First*, as noted above, the Quadriga agreement was a software license and states that



██████████  Ex. 15 at -64.  Even if the software license included an implied patent license, that implied license could not have constituted 100% of the license's value.[5]  *See* Ex. 11 at 127:11-128:12 (Dr. Mangum testifying that at least "something" about the Quadriga software was "outside of the patent" and that "the patents don't cover the software").  Indeed, ████████

████████████████████████████████████████████████

---

[5] While Dr. Mangum purports to calculate Touchstream's cost in developing the licensed software, he does not deduct the cost in his calculations nor explain why doing so would identify the value of any implied patent license that passed with the software.  *See* Ex. 1 ¶¶ 127, 182.

████████████████████████████████████████████

██████████████████████████████████  Ex. 15 at -57; Ex. 16 at 86:6-87:6.  ██████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████  *See* Ex. 13 ¶ 207.  Thus, as in *Apple*, there is "no basis upon which to conclude" that the Quadriga license fee "is a meaningful proxy for the royalty rate of the [Asserted Patents]."  25 F.4th at 973 (excluding opinions where expert relied on a license that did not list any of the asserted patents).

*Second*, even if the Quadriga royalty rate did reflect a patent license, the agreement would have covered unasserted patents and various unasserted system/apparatus claims of the Asserted Patents.[6]  *See* Section II.B., *supra*.  The license fee thus would have compensated Touchstream for far more than the Asserted Claims, yet Dr. Mangum "fail[s] to address the extent to which these other patents [and claims] contributed to the royalty rate in the [Quadriga] license," rendering his opinions unreliable.  *Apple*, 25 F.4th at 973; *see also MLC*, 10 F.4th at 1375 (affirming exclusion where agreement was "not a license for the same single patent").

*Third*, Dr. Mangum fails to explain how the Quadriga license fee apportions the allegedly novel feature of the claimed methods from conventional features, including of the TV Remote App that predates the Asserted Patents.  *See* Ex. 1 ¶ 102; *see also id.* ¶¶ 103-10.  Dr. Mangum asserts that there is "no need for comparison of the Quadriga product and Defendant's product" merely because the Quadriga agreement "is a license for ongoing rights to David Strober's invention."  *Id.* ¶ 131.  But this assertion does nothing to distinguish between what allegedly

---

[6] Based on a conversation with Touchstream's technical expert, Dr. Mangum notes that the Quadriga product practiced "at least" the '251 Patent.  Ex. 1 ¶ 129.  But neither he nor Dr. Almeroth opines that the Quadriga product did ***not*** practice any other Touchstream patents. Indeed, Touchstream asserted in *Google* that the Quadriga product practiced two patents not asserted here.  *See* Ex. 17 at 623:8-624:22.

constitutes the "invention" embodied in the Quadriga software and what in the Accused TV Remote Functionalities was conventional.

*Finally*, the licensed Quadriga product included features that Comcast does not offer, including ███████████████████████. Section II.B., *supra*.  But Dr. Mangum "conduct[s] no assessment of the licensed technology versus the accused technology to account for [these] differences." *MLC*, 10 F.4th at 1375.  Instead, he expressly **refuses** to draw those comparisons. Ex. 1 ¶ 131.

Each of these separate failures to adjust the Quadriga license fee warrants exclusion.[7]

### C.     Dr. Mangum Uses an Improper Hypothetical Negotiation Date

The Federal Circuit has "consistently adhered to [the] principle" that "the date of the hypothetical negotiation is the date that the infringement began." *LaserDynamics*, 694 F.3d at 75; *see also Cassidian Commc'ns, Inc. v. Microdata GIS, Inc.*, 2013 WL 11322510, at *2 (E.D. Tex. Dec. 3, 2013) (Gilstrap, C.J.).  Moreover, "'[t]he correct determination of the hypothetical negotiation date is essential for properly assessing damages.'"  *Id*. at *2 (quoting *LaserDynamics*, 694 F.3d at 75).  Courts thus exclude expert opinions that rely on a hypothetical negotiation untethered to the alleged first infringement.  *See, e.g.*, *id* (excluding "fundamentally flawed methodology" where expert's hypothetical negotiation was "two years *after* the date infringement began" (emphasis in original)); *RSA Protective Techs., LLC v. Delta Sci. Corp.*, 2021 WL 4978462, at *5 (C.D. Cal. Oct. 20, 2021) (excluding opinions where expert's hypothetical negotiation was one year after first infringement); *Syneron Med. Ltd. v. Invasix, Inc.*, 2018 WL 4696969, at *7 & n.10 (C.D. Cal. Aug. 27, 2018) (excluding opinions where

---

[7] Dr. Mangum's failure to account for the significant economic differences between the Quadriga agreement and the hypothetical negotiation here also renders the Quadriga license not comparable for purposes of determining patent damages.

expert's hypothetical negotiation was years *before* two asserted patents issued), *report and recommendation adopted*, 2018 WL 11351325 (C.D. Cal. Sept. 28, 2018).

Here, Dr. Mangum relies on a hypothetical negotiation in May 2012 that culminated in a hypothetical agreement by January 2013, which is *four* years before the February 2017 date of first infringement analyzed by Touchstream's technical expert.  *Compare* Ex. 3 ¶ 122, *with* Ex. 1 ¶ 111, 116, *and* Ex. 10.  There is no opinion that Comcast's accused systems did not change between 2013 and 2017, and Dr. Mangum does not explain why the hypothetical negotiation would take place well before the only period of alleged infringement occurred.  *See* Ex. 11 at 149:25-152:3.  Dr. Mangum's error in using such an early hypothetical negotiation date affects his entire analysis of the *Georgia-Pacific* factors, many of which look to events contemporaneous with the hypothetical-negotiation date.  For example, ██████████ ████████████████████████████████, which would have weakened its bargaining power in a later hypothetical negotiation. Ex. 16 at 121:14-130:5, 280:2-281:11, 287:18-289:15, 359:2-17.  Thus, Dr. Mangum's error is not harmless, and his opinions should be excluded on this basis as well.  *RSA*, 2021 WL 4978462, at *5 (noting that "using the wrong hypothetical negotiation date is not harmless error"); *see Cassidian*, 2013 WL 11322510, at *2 (refusing to "overlook such a material flaw" in expert's opinion even where challenged party claimed that "the record is completely silent with regard to any market changes between the two dates").

### D.    Dr. Mangum's References to *Google* Are Irrelevant and Unfairly Prejudicial

This Court's MIL No. 13 precludes parties "from introducing, evidence, testimony, or argument regarding either party's other litigations or arbitrations."  Standing Order on MILs at 3.  Although evidence of other litigations may sometimes have marginal relevance, it is "unfairly prejudicial and confusing" where the evidence sought to be admitted is a prior verdict.  *Maxell, Ltd. v. Apple Inc.*, 2021 WL 3021253, at *7 (E.D. Tex. Feb. 26, 2021).  Accordingly, this Court

has refused to permit such evidence at trial except for the limited, "necessary mention of other litigation **underlying** any settlement licenses used in the damages analysis." *Personalized Media Commc'ns, LLC v. Apple Inc.*, No. 2:15-cv-1366, Dkt. No. 510 at 2 (E.D. Tex. Mar. 2, 2021) (Payne, M.J.) (emphasis added); *see also The Chamberlain Grp. LLC v. Overhead Door Corp.*, No. 2:21-cv-84, Dkt. No. 331 at 7 (E.D. Tex. Mar. 1, 2022) (Gilstrap, C.J.).

Here, Dr. Mangum's reliance on *Google* is both irrelevant and unfairly prejudicial. He does not invoke *Google* to calculate his royalty base or rate. Instead, he cites *Google*'s verdict and supporting documents purportedly to support more general opinions regarding (1) the value and commercial success of Touchstream's patented invention, and (2) licenses and settlement agreements that did **not** arise from *Google*. *See* Section II.B., *supra*. Neither use is permissible. *Google* involved "different parties, accused products, witnesses, [] prior art," and two patents not asserted here. *Maxell*, 2021 WL 3021253, at *7. Dr. Mangum's invocation of *Google* to bolster Touchstream's purported invention would "invit[e] the jury . . . to defer to the [prior] jury's verdict" by conflating Google's and Comcast's products. *Id.* And, because *Google* did not give rise to any licenses or settlement agreements, it is irrelevant to the licenses on which Dr. Mangum opines and would only confuse the jury. *See Personalized Media*, Dkt. No. 510 at 2. The Court should exclude all references to *Google*.[8]

## V.    CONCLUSION

For all the foregoing reasons, Dr. Mangum's damages opinions should be excluded.

---

[8] To the extent Touchstream intends to rely on *Google* to support its allegations of willful infringement, such reliance is irrelevant and unduly prejudicial, and, in any event, Dr. Mangum does not refer to *Google* for that purpose.

Dated:  August 5, 2024

Respectfully submitted,

/s/ David J. Lisson
Deron Dacus (State Bar No. 00790553)
THE DACUS FIRM, P.C.
821 ESE Loop 323, Suite 430
Tyler, TX 75701
Tel:     (903) 705-1117
ddacus@dacusfirm.com

DAVIS POLK & WARDWELL LLP
Ashok Ramani (CA Bar No. 200020)
David J. Lisson (CA Bar No. 250994)
James Y. Park (CA Bar No. 343659)
Micayla Hardisty (CA Bar No. 333246)
1600 El Camino Real
Menlo Park, CA 94025
ashok.ramani@davispolk.com
david.lisson@davispolk.com
james.park@davispolk.com
micayla.hardisty@davispolk.com

Alena Farber (NY Bar No. 5896170)
450 Lexington Avenue
New York, NY 10017
alena.farber@davispolk.com

*Counsel for Defendants Comcast Cable
Communications, LLC, Comcast Cable
Communications Management, LLC,
Comcast of Houston, LLC, and Comcast
Corporation*

## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

I hereby certify that this document is authorized to be filed under seal pursuant to the

Protective Order entered in this case.

/s/ David J. Lisson
David J. Lisson

## **CERTIFICATE OF CONFERENCE**

I hereby certify that counsel has complied with the meet and confer requirement in Local Rule CV-7(h) and that this motion is opposed.  James Y. Park and Micayla Hardisty, counsel for Comcast, met and conferred by Zoom videoconference on July 31, 2024 with Mark Schafer, Jordan Bergsten, Anita Liu, and Philip A. Eckert, counsel for Touchstream.  The parties were unable to reach agreement as to the relief sought in this motion.  As such, discussions have conclusively ended in an impasse, leaving an open issue for the Court to resolve.

*/s/ James Y. Park*
James Y. Park

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 5, 2024 true and correct copies of the foregoing were served upon the following as indicated:

| | |
|---|---|
| SHOOK HARDY & BACON LLP<br>Robert H. Reckers<br>Andrew M. Long<br>Meagan Janee Mitchell<br>Anita Liu<br>600 Travis Street, Suite 3400<br>Houston, TX 77002<br>rreckers@shb.com<br>amlong@shb.com<br>mjmitchell@shb.com<br>aliu@shb.com | ☒  Via Email<br>☐  Via Overnight Courier<br>☐  Via Hand Delivery<br>☐  Via First Class Mail |

*Counsel for Plaintiff Touchstream Technologies, Inc.*

| | |
|---|---|
| BOIES SCHILLER FLEXNER LLP<br>Ryan Dykal<br>Jordan Bergsten<br>Mark Schafer<br>1401 New York Avenue, NW<br>Washington, DC 20005<br>rdykal@shb.com<br>jbergsten@bsfllp.com<br>mschafer@bsfllp.com | ☒  Via Email<br>☐  Via Overnight Courier<br>☐  Via Hand Delivery<br>☐  Via First Class Mail |

*Counsel for Plaintiff Touchstream Technologies, Inc.*

GILLIAM & SMITH LLP
Melissa Richards Smith
303 South Washington Avenue
Marshall, TX 75670
melissa@gillamsmithlaw.com

☒ Via Email
☐ Via Overnight Courier
☐ Via Hand Delivery
☐ Via First Class Mail

*Counsel for Plaintiff Touchstream Technologies, Inc.*

ARNOLD & PORTER KAYE SCHOLER LLP
Dina M. Hayes
70 West Madison Street, Suite 4200
Chicago, IL 60602
dina.hayes@arnoldporter.com

☒ Via Email
☐ Via Overnight Courier
☐ Via Hand Delivery
☐ Via First Class Mail

Daniel L. Reisner
David Benyacar
Elizabeth A. Long
Melissa Brown
Robert Stout
250 West 55th Street
New York, NY 10019
daniel.reisner@arnoldporter.com
david.benyacar@arnoldporter.com
elizabeth.long@arnoldporter.com
melissa.brown@arnoldporter.com
robert.stout@arnoldporter.com

Carson Anderson
3000 El Camino Real, Suite 500
Palo Alto, CA 94306
carson.anderson@arnoldporter.com

Marc A. Cohn
601 Massachusetts Avenue, NW
Washington, DC 20001
marc.cohn@arnoldporter.com

*Counsel for Charter Defendants*

THE DACUS FIRM, PC
Deron R. Dacus
821 ESE Loop 323, Suite 430
Tyler, TX 75701
ddacus@dacusfirm.com

☒ Via Email
☐ Via Overnight Courier
☐ Via Hand Delivery
☐ Via First Class Mail

*Counsel for Comcast and Charter Defendants*

*/s/ Angela Quach*
Angela Quach
Senior Litigation Paralegal