**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| **TOUCHSTREAM TECHNOLOGIES, INC.,** | |
| *Plaintiff,* | |
| *v.* | |
| **CHARTER COMMUNICATIONS, INC. et al.,** | |
| *Defendants.* | |
| | **Lead Case No. 2:23-cv-00059-JRG** |
| **TOUCHSTREAM TECHNOLOGIES, INC.,** | Member Case No. 2:23-cv-00062-JRG |
| *Plaintiff,* | |
| *v.* | |
| **COMCAST CABLE COMMUNICATIONS, LLC, D/B/A XFINITY, et al.,** | |
| *Defendants.* | |

**TOUCHSTREAM'S OPPOSITION TO COMCAST'S MOTION
TO STRIKE THE OPINIONS OF DR. RUSSELL W. MANGUM III**

██████████████████████████████

# **TABLE OF CONTENTS**

I.      FACTUAL BACKGROUND .................................................................................2

II.     ARGUMENT .....................................................................................................4

        A.    Dr. Mangum's Reasonable Royalty Calculation Is Appropriate and Admissible....4

              i.    Comcast's Characterization of Dr. Mangum's Opinion Is Factually Incorrect ..........................................................................................4

              ii.   The Legal Basis For Comcast's Challenge Is Incorrect ...........................5

        B.    Dr. Mangum's Treatment of the ██████████ Was Appropriate.............10

III.    Dr. Mangum Used a Proper Hypothetical Negotiation Date...............................13

IV.     Dr. Mangum's References to *Google* Are Relevant and Admissible ...................15

## **TABLE OF AUTHORITIES**

**Cases**

*Acceleration Bay LLC v. Activision Blizzard Inc.*,
    No. 1:16-cv-00453-RGA, 2019 WL 4194060 (D. Del. Sept. 4, 2019) ....................................11

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
    694 F.3d 1312 (Fed. Cir. 2012) ........................................................................................12

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*,
    576 F.3d 1348 (Fed. Cir. 2009) ..........................................................................................9

*Carnegie Mellon University v. Marvell Technology Group*,
    890 F. Supp. 2d 602 (W.D. Pa. 2012) ................................................................................7

*Cassidian Communications, Inc. v. Microdata GIS, Inc.*,
    No. 12-00162-JRG, 2013 WL 11322510 (E.D. Tex. Dec. 3, 2013) ..................................14

*EcoFactor, Inc. v. Google LLC*,
    104 F.4th 243, (Fed. Cir. 2024) .........................................................................................11

*Ecolab Inc. v. Dubois Chemicals, Inc.*,
    No. CV 21-567-RGA, 2023 WL 7019266 (D. Del. Oct. 25, 2023) .....................................9

*Embrex, Inc. v. Service Engineering Corp.*,
    216 F.3d 1343 (Fed. Cir. 2000) ..........................................................................................8

*Ericsson, Inc. v. D-Link Sys., Inc.*,
    773 F.3d 1201 (Fed. Cir. 2014) .........................................................................................11

*Hanson v. Alpine Valley Ski Area, Inc.*,
    718 F.2d 1075 (Fed. Cir. 1983) ......................................................................................2, 6

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51, 76 (Fed. Cir. 2012) ......................................................................................14

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009) ..........................................................................1, 2, 6, 10

*Mirror Worlds, LLC v. Apple, Inc.*,
    784 F. Supp. 2d 703 (E.D. Tex. 2011) ...............................................................................8

*Niazi Licensing Corp. v. Saint Jude Medical S.C., Inc.*,
    30 F.4th 1339 (Fed. Cir. 2022) .......................................................................................7, 8

*Packet Intelligence LLC v. NetScout Systems, Inc.*,
    965 F.3d 1299 (Fed. Cir. 2020) ..........................................................................................8

██████████████████████████

*RSA Protective Technologies, LLC v. Delta Scientific Corp.,*
    2021 WL 4978462 (C.D. Cal. Oct. 20, 2021)...........................................................15

*Sprint Communications Co. v. Charter Communications, Inc.,*
    No. 17-1734-RGA, 2021 WL 982732 (D. Del. Mar. 16, 2021)...........................7, 11

*Sprint Communications Co. v. Time Warner Cable, Inc.,*
    760 F. App'x 977, 982-84 (Fed. Cir. 2019), *cert. denied*, 140 S.Ct. 467 ..........................11, 15

*SSL Servs., LLC v. Citrix Sys., Inc.,*
    769 F.3d 1073 (Fed. Cir. 2014)..........................................................................13

*Syneron Medical. Ltd. v. Invasix, Inc.,*
    No. 8:16-cv-00143-DOC, 2018 WL 4696969 (C.D. Cal. Aug. 27, 2018) ..............................15

*Trading Technologies International v. IBG LLC,*
    10-715, 2021 WL 5038754 (N.D. Ill. July 23, 2021)...............................................7

*Virnetx, Inc. v. Cisco Sys., Inc.,*
    767 F.3d 1308 (Fed. Cir. 2014)..........................................................................12

*Vocalife LLC v. Amazon.com, Inc.,*
    19-00123-JRG, 2020 WL 5815950 (E.D. Tex. Sept. 30, 2020)................................8

*Wang Lab'ys, Inc. v. Toshiba Corp.,*
    993 F.2d 858 (Fed. Cir. 1993).......................................................................2, 13

███████████████████████████

Touchstream's damages expert, Dr. Russell Mangum III, Ph.D., has unchallenged credentials and his methods closely follow Federal Circuit guidance. Dr. Mangum identified a comparable agreement, considered all differences, explained why no further adjustments were needed, applied the *Georgia-Pacific* factors, and constructed a hypothetical negotiation using the appropriate date. In short, Dr. Mangum assigned value to the patented methods the same way companies do in the real world, cognizant that for some methods "value is added simply by having the patented invention available for use" and that applying a "rigid requirement that damages in all circumstances be limited to specific instances of infringement" could "create a hypothetical negotiation far-removed from what parties regularly do during real-world licensing negotiations." *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1334 (Fed. Cir. 2009).

Comcast's main argument for striking Dr. Mangum's opinions misstates both the facts and the law. **On the facts**, Comcast repeatedly claims that Dr. Mangum "fails to consider" how many times Comcast performed the patented method. *E.g.*, Mot. at 1, Dkt. 83. Not so. As just one example, Dr. Mangum explains how both in this case and in the comparable agreement on which he relied, "Touchstream would consider the expectation and potential of the counterparty's use of the technology," so expected use would be factored into the royalty rate. Ex. A,[1] Mangum Report, ¶ 120; *see also id.* at ¶ 158 ("extent of use…is accounted for in the royalty base").[2] **On the law**, Comcast repeatedly suggests that every royalty in a method case must have as a mathematical input an estimated number of times a patented method is performed. But the Federal Circuit long ago rejected that precise argument—in a case that Comcast neglects to even mention. *See Hanson*

---

[1] "Ex. __" denotes the exhibits attached to the Declaration of Jordan Bergsten in support of this opposition unless otherwise specified.

[2] Dr. Mangum explains the value of Touchstream's technology to Comcast (Ex. A, Mangum Report at ¶¶ 26-39, 76-102), and why it would accept the market rate of ██████████ applied to customers that ████████████████████████. *Id.* ¶ 29 n.56.

1

████████████████████████████

*v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1080 (Fed. Cir. 1983) (affirming flat royalty where only method claims were infringed, and specifically rejecting the argument that the royalty "should have been based upon actual use"); *see also Lucent*, 580 F.3d at 1334 (citing *Hanson* favorably).

Comcast's remaining arguments are equally flawed. ***First***, Comcast asserts that Dr. Mangum "fails to adjust his royalty rate to account for differences between the [████████] license on which he relies and the hypothetical negotiation here." Mot. at 2. But Dr. Mangum's report spends over ten pages explaining the similarities and differences between that agreement and this case, detailing how he accounts for differences and why no further adjustments are required. Ex. A, Mangum Report pp. 41-53. ***Second***, Comcast challenges Dr. Mangum's opinion that a hypothetical negotiation would culminate in January 2013. Mot. at 4. But controlling law says that date should be "the start of infringement, *i.e.*, when both a patent had issued and accused products were sold," and it is undisputed that January 2013 was when those conditions were met. *Wang Lab'ys, Inc. v. Toshiba Corp.*, 993 F.2d 858, 869 (Fed. Cir. 1993). ***Third***, Comcast moves to strike Dr. Mangum's references to the *Google* verdict, but this verdict is relevant to post-suit willfulness and Comcast has signaled several ways it might open the door to this evidence on other issues.

## I.    FACTUAL BACKGROUND

Touchstream invented a method that enables content like videos to be wirelessly "cast," or sent, from a mobile device to a second display screen or audio device. Ex. A, Mangum Report ¶¶ 12-14. Touchstream tried to commercialize its technology, and licensed rights to practice the Patents to several companies. *Id.* ¶¶ 52-73. In 2012, Comcast released its Xfinity X1 TV platform. *Id.* ¶ 21. Touchstream alleges that Comcast infringes on the patents-at-issue when the X1 platform displays content on a secondary screen upon receiving a request from a subscriber's mobile device. *Id.* ¶¶ 20-21. From 2011 to 2016, Touchstream and Comcast had business discussions on

████████████████████████████████████

Touchstream's patented technology, but never reached an agreement. *Id.* ¶¶ 25-26, 93-102.

Dr. Mangum opines that an appropriate running royalty rate in this case would be ████

per X1 set top box account month under the hypothetical negotiation framework. *Id.* ¶ 178. He

determined that a ████████ licensing agreement between Touchstream and ████████ was

comparable. *Id.* ¶¶ 116, 120. In that agreement, Touchstream provided ████████████████

████████████████████████████—with casting software with the same

functionality and benefits as the X1 platform. *Id.* ¶¶ 120, 129, 131. The software provided

practiced Touchstream's patents, one of which had issued at that time. *Id.* ¶¶ 22-24, 54, 122.

In exchange for the right to use Touchstream's software practicing its patents, ████████

agreed to pay Touchstream "License Fees" totaling ████████████████████████

████████████████████████████. *Id.* ¶ 55; Ex. B ¶ 9.3

& Schedule 1. Quadriga would pay that flat rate for rooms enabled with Touchstream's technology

regardless of how much the technology was used or if any guests even stayed in that room for that

month. Ex. A, Mangum Report ¶ 158. Dr. Mangum determined that the ████████████ was

comparable to a hypothetical negotiation with Comcast because, among other reasons: (i) both

negotiations relate to licensing the same technology and would have taken place around the same

time (████████████████) (*id.* ¶¶ 116, 129); (ii) ████████ and Comcast both would have

factored the extent of their customers' use of the infringing functionalities into their respective

licensing agreements (*id.* ¶ 158); and (iii) the ████████████████████ Touchstream

provided under the ████████ Agreement, ████████████████████████████████

████████████████████████████████ (*id.* ¶ 124-25).[3] Dr.

---

[3] Touchstream would separately provide ████████████████████████████████

████████████████████████████████ Ex. A, Mangum Report ¶¶ 54-56;

███████████████████████████████████████████████

Mangum explained why the ██████████, per month rate (but none of the several other payments in the agreement) would serve as an appropriate royalty rate (including because any other items included in that rate beyond a patent license had no separate value), and he then carefully selected a royalty base for Comcast's infringement that would preserve the commercial footprint (*i.e.*, royalty base) of the bargain struck in the ██████ deal—including expectations on the extent of use of the patented technology. *Id.* ¶¶ 123-25, 158, 178.

## II.    ARGUMENT

### A.  Dr. Mangum's Reasonable Royalty Calculation Is Appropriate and Admissible

Comcast's lead argument for excluding Dr. Mangum's opinions misstates both the facts and the law. Comcast (i) takes out of context a single line in his report regarding the relevance of app usage to his damages calculation, and (ii) conflates the availability of damages in a method patent case with how an expert may calculate a reasonable royalty. *See* Mot. at 5, 7-11.

#### i.  Comcast's Characterization of Dr. Mangum's Opinion Is Factually Incorrect

Comcast partly bases its *Daubert* challenge to Dr. Mangum's reasonable royalty calculation on the erroneous claim that "Dr. Mangum expressly ***refused*** to consider such use [of the infringing method] at all." Mot. at 10 (emphasis in original). This is plainly false.

***First***, Dr. Mangum explained that Touchstream, both in its real-world negotiation with ██████ and in its hypothetical negotiation with Comcast, "would consider the expectation and potential of the counterparty's use of the technology." Ex. A, Mangum Report ¶ 120. In other words, the ████ per room, per month royalty rate in the ██████ agreement was chosen as the

---

████████████████████████ ¶¶ 1.1, 5.1. In exchange for those services, ████████████████
████████████████████████████████████████ Ex. A, Mangum Report ¶ 55; Ex. B, at Schedule 1; *see also* Mangum Report ¶ 124. *See also* section II.B, *infra*.

4

appropriate flat rate for Touchstream's patented technology after factoring in estimates for how many times ███ would use the patented method. *See id.* ¶ 158 ("This factor is implicitly considered in the preceding analysis considering royalty rates…").[4] He also concluded that expected use by Comcast would be comparable to ███ Ex. A, Mangum Report ¶¶ 166-70.

**Second**, Dr. Mangum explained why, given the nature of Touchstream's patented methods, Comcast's need for them, and the nature of the video industry in charging per device for services whether subscribers use them or not, Touchstream and Comcast would agree to a flat per-month rate rather than one based on the number of times the infringing method was performed. *Id.* ¶ 128.

**Third**, Dr. Mangum's report reflects that he did in fact consider the usage statistics provided by Comcast, *compare* Appx. 2 at 12 (listing COM_00105403) *with* Mot. at 3 (citing the same), and his analysis of *Georgia-Pacific* factor 11 on "[t]he extent to which the infringer has made use of the invention" explains why this necessitated no change to his royalty rate or base, each of which already reflected estimates of use. *Id.* ¶ 166-70; *see also id.* ¶ 158 ("extent of use…is accounted for in the royalty base."). Dr. Mangum also specifically considered other reasons "why a damages model based on usage of the app is inappropriate[.]" *Id.* ¶ 159.

### ii.  The Legal Basis For Comcast's Challenge Is Incorrect

Comcast's legal arguments also fail because they are contrary to long-standing Federal Circuit precedent. In *Hanson v. Alpine Valley*, involving "the airless snowmaking method of [plaintiff's] patent," the district court found that the defendant infringed through the use of three snowmaking machines, and "had operated one of the machines during the 1972–73 and 1973–74

---

[4] *See also* Ex. C, Mangum Dep. Tr. at 68:9-69:25 ("The parties could have said if you want to measure use, it won't be ███ maybe it's four or five dollars…But they didn't do that. You can't use the ███ then go and change the nature of the base as reflected in the agreement."). Comcast is thus wrong in declaring "an apparent contradiction" in Dr. Mangum's opinions. *See* Mot at 10.

seasons and the two other machines during one season." 718 F.2d at 1076-77; *see also id.* at 1083 (confirming that only method claims were infringed). Applying the *Georgia-Pacific* factors for a hypothetical negotiation, the district court awarded damages for use of the patented method by "[m]ultiplying the $25 per gallon by the snowmaking capacity of the three [snowmaking] machines [that the defendant] used and the four years of use involved." *Id*. at 1077. The Federal Circuit affirmed this approach as "fully supported by the record," including testimony that the plaintiff "would have refused to grant a license based on actual use." *Id.* at 1079-80. The Federal Circuit specifically rejected the defendant's argument that this damages award should be set aside because it "acquired the [snowmaking] machines for experimental purposes and did not use them much," and that the royalty therefore "should have been based upon actual use[.]" *Id.* at 1080.

More recently, the Federal Circuit in *Lucent* relied on *Hanson* and specifically "rejecte[ed]" defendant's argument that its precedent "requires that damages be limited to the proven number of instances of actual infringing use[,]" explaining that it has "never laid down any rigid requirement that damages in all circumstances be limited to specific instances of infringement proven with direct evidence," as "[s]uch a strict requirement could create a hypothetical negotiation far-removed from what parties regularly do during real-world licensing negotiations." *Lucent*, 580 F.3d at 1323-25, 1334. The *Lucent* court recognized that sometimes "value is added simply by having the patented invention available for use…. Thus, potential licensors and licensees routinely agree to royalty payments regardless of whether the invention is used frequently or infrequently by the consumer." *Id.* at 1334. The court reiterated the well-settled principle that the hypothetical negotiation ought to reflect what parties regularly do during real-world licensing negotiations because "[t]he hypothetical negotiation tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement." *Id.* at 1325.

In the wake of *Hanson* and *Lucent,* district courts reject similar *Daubert* challenges to plaintiffs' damages experts in method patent cases. In *Trading Technologies International v. IBG LLC,* the court denied the defendant's motion to exclude the plaintiff's damages opinion on method claims that applied a rate for "all users with access to" the accused technology, including because this reflected real-world settlement agreements on the patented technology. 10-715, 2021 WL 5038754, at *1-2 (N.D. Ill. July 23, 2021), *aff'd sub nom. Brumfield v. IBG LLC*, 97 F.4th 854 (Fed. Cir. 2024). The court in *Carnegie Mellon University v. Marvell Technology Group* likewise rejected defendant's argument that "because [defendant's] sales or offers for sale do not infringe the asserted method patents, they cannot be the basis for damages," explaining that "Federal Circuit precedent…does not require a reasonable royalty to be tied only to use of the patented method" and associated non-infringing sales could help "determine the value of an infringing use of a patented method." 890 F. Supp. 2d 602, 609-10 (W.D. Pa. 2012) (alteration in original). Finally, in *Sprint Communications Co. v. Charter Communications, Inc.*, with only method claims, the court denied defendants' motion to exclude Dr. Mangum's $1.37 per subscriber per month rate for lack of apportionment, noting: "Plaintiff asserts that Dr. Mangum's opinion is reliable, as he was not required to subtract out non-infringing calls, as Defendants' subscribers could make those calls and Defendants did not refund any money to subscribers if they did not make those calls….I agree with Plaintiff." No. 17-1734-RGA, 2021 WL 982732, at *14 (D. Del. Mar. 16, 2021).

Comcast ignores these authorities and instead relies on a strained reading of *Niazi Licensing Corp. v. Saint Jude Medical S.C., Inc.*, which excluded an expert's damages opinion as "conclusory," with "no explanation of how (or even whether) he apportioned to account for unpatented uses when selecting the minimum royalty rate of 14.6%." *See* 30 F.4th 1339, 1343, 1358 (Fed. Cir. 2022). Further, the sole basis that expert gave for not including extent of use in his

royalty calculations was that doing so was "impractical," but he "did not explain why a royalty based on the alleged use of the method would be impractical in this case." *Id.* at 1356. As discussed above, Dr. Mangum's opinion was far from "conclusory"—he explained how his royalty rate and base reflect expected use of the patented method, and further explained in great detail why—as in *Hanson* and as with ███—the parties here would agree to a flat-rate monthly fee rather than a per-use rate. *See* Section I, *supra.* Also, Dr. Mangum explained why the commercial preference in the video industry, in which Comcast competes, is to negotiate agreements with a price structure based on a fixed amount per subscriber month per device, which is "generally consistent with" the royalty rate adopted from the ███ Agreement. Ex. A, Mangum Report ¶ 128.

The remaining cases cited by Comcast are easily distinguishable. Almost all of them involve a situation where, after a damages opinion was offered, the court excluded a significant underlying theory of infringement and the damages expert had provided no analysis that would support the requested damages award on the remaining infringement theories.[5] Here, Dr. Mangum acknowledges from the start that all asserted claims are method claims, and as discussed above, he explains at length why the nature of the invention, the nature of Comcast's need for technology, the licensing history of both parties, and the structure of the relevant industries supports his opinions. *See* Section I, *supra.* And *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, simply stands for the unremarkable proposition that if an apparatus claim is dismissed and all that remains is a method claim, then plaintiff's damages opinion based on the apparatus claim may no longer

---

[5] This applies to *Embrex, Inc. v. Service Engineering Corp.*, 216 F.3d 1343, 1349-50 (Fed. Cir. 2000) (no applicable opinion after offers for sale dismissed); *Packet Intelligence LLC v. NetScout Systems, Inc.*, 965 F.3d 1299, 1314-15 (Fed. Cir. 2020) (no applicable damages opinion after pre-suit infringement excluded); *Vocalife LLC v. Amazon.com, Inc.*, 19-00123-JRG, 2020 WL 5815950, at *2-3 (E.D. Tex. Sept. 30, 2020) (no applicable opinion after indirect infringement excluded, allowing expert to supplement); and *Mirror Worlds, LLC v. Apple, Inc.*, 784 F. Supp. 2d 703, 727 (E.D. Tex. 2011) (no applicable damages opinion after indirect infringement dismissed).

applicable, depending on the expert's explanations. 576 F.3d 1348, 1358-59 (Fed. Cir. 2009). Finally, in *Ecolab Inc. v. Dubois Chemicals, Inc.*, while the specifics of the underlying damages opinion are unclear, it appears the damages expert included in his royalty base products that had been expressly re-designed to only perform a non-infringing version of the method. No. CV 21-567-RGA, 2023 WL 7019266, at *1, *12-13 (D. Del. Oct. 25, 2023). Here, in contrast, Dr. Mangum's royalty base expressly excludes set-top boxes that are only configured to perform non-accused methods for displaying video. *See* Ex. A, Mangum Report ¶ 182.

Comcast also ignores several fact disputes counseling against requiring any royalty to include actual use as a mathematical input. ***First***, Comcast's usage data appears unreliable—it is dated the week before the deposition of Comcast's corporate witness on the subject, and purports to be a presentation (although nobody at Comcast is aware of it being presented or has seen anything like it). Ex. D, Manning Dep. Ex. 8 at p.1; Ex. E, Manning Dep. 96:9-100:6; *see also* Ex. F, Pighini Dep. at 85:24-87:20. ***Second***, Comcast's damages expert made several assumptions about the data that a jury is free to reject. Ex. G, Becker Report ¶¶ 72-78 ███████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████ ***Third***,

some of the asserted claims require steps performed by a Comcast "server system" (Mot. at 9 n.4), and ███████████████████████████████████████████

███████████████████████████████████. *See* Ex.

H, Becker Dep. 120:5-123:5. ***Fourth***, Comcast's own damages expert admits that "███████

███████████████████████████████████████████

███████████ *Id.* at 118:18-120:15. ***Finally***, Comcast points to no projections of use from the relevant timeframe of the hypothetical negotiation that Dr. Mangum should have used to

████████████████████████████

calculate a reasonable royalty, and instead demands that Touchstream directly rely on Comcast's later, litigation-inspired estimates of actual use despite Federal Circuit precedent expressly rejecting any such requirement. S*ee Lucent*, 580 F.3d at 1333-34.

**B.  Dr. Mangum's Treatment of the ███████████████ Was Appropriate**

Comcast next faults Dr. Mangum for allegedly failing to adjust the ██████ royalty rate "[d]espite several glaring differences between the ███████████ and the hypothetical license here." Mot. at 11. But this ignores his detailed explanations about the adjustments he made (*i.e.*, excluding certain payments in the agreement) and why no further adjustment was needed, including (i) both negotiations related to licensing the same technology, Ex. A, Mangum Report ¶ 129; (ii) both negotiations take place around the same time, *id.* ¶ 116; (iii) ████████ and Comcast both would have factored the extent of their customers' use of the infringing functionalities into their respective licensing agreements, *id.* ¶ 158; (iv) ████████ and Comcast had similar motives for licensing Touchstream's Patents, *id.* ¶ 117; (v) a fixed, running royalty per subscriber account month is consistent with the pricing structure of the broader video industry in which Comcast competes, *id.* ¶ 128; and (vi) Dr. Mangum's adjustments to the ████████ agreement to remove payments that were not applicable to the hypothetical negotiation in this case, *id.* ¶ 124-27.

In general, Comcast employs the common, unpersuasive tactic of claiming that simply because a damages expert employs the same royalty rate from a prior agreement, they did "not apportion" that rate to the footprint of the patent. But courts routinely reject such arguments where, as here, the expert explains why there is nothing additional of value to subtract away from a prior rate. For instance, in *Sprint Communications Co. v. Time Warner Cable, Inc.*, a case involving only method claims, the Federal Circuit affirmed a jury award of the exact same flat rate from a prior verdict and two prior licenses, noting that these prior rates provided "strong support" for the jury

███████████████████████████████

verdict. 760 F. App'x 977, 982-84 (Fed. Cir. 2019), *cert. denied*, 140 S.Ct. 467. It did so over defendant's objection that plaintiff's damages expert must have "made no attempt to apportion" because he used the same rate from those agreements "without adjusting it even a fraction of a cent," when in truth that expert looked at the non-infringing aspects of the product he used for his base and decided they had no value to subtract. Br. of Def.-Appellants, *Sprint Commc'ns Co., L.P., v. Time Warner Cable, Inc.*, 2017 WL 5515391, at *2 (Fed Cir. Nov. 13, 2017); *see also Sprint*, 2021 WL 982732, at *14. Here, Dr. Mangum explained how any additional consideration ████ received for the █████rate he applies in this case had no meaningful value to subtract out, and as in other cases this is an issue for cross-examination. Mangum Report ¶¶ 127, 130, 174-75.

Indeed, Dr. Mangum's approach follows the Federal Circuit's guidance, which recognizes that "[p]rior licenses . . . are almost never perfectly analogous to the infringement action" and "may cover more patents than are at issue in the action, include cross-licensing terms, [or] cover foreign intellectual property rights[.]" *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014).[6] Although Comcast may disagree with Dr. Mangum's reliance on the ████████ agreement, such "economic differences" offer "potentially good impeachment" but are simply "not significant enough to render [the] opinion so unreliable as to be inadmissible." *Acceleration Bay*, 2019 WL 4194060 at *6. Applying these precedents, the Court should reject Comcast's challenges.

***First***, Dr. Mangum explains at length why he finds the Quadriga Agreement is comparable to the agreement that would have resulted from the hypothetical negotiation between Touchstream and Comcast. For instance, he observes that the Quadriga Agreement addressed an implementation

---

[6] *See also, e.g., EcoFactor, Inc. v. Google LLC*, 104 F.4th 243, 252, 255-56 (Fed. Cir. 2024) (affirming comparability despite 3-4 year difference and agreement did not list asserted patent); *Acceleration Bay LLC v. Activision Blizzard Inc.*, No. 1:16-cv-00453-RGA, 2019 WL 4194060 at *6 (D. Del. Sept. 4, 2019) (denying motion to exclude license with eight-year difference, asserted patents had not issued and license "included copyrights, trade secrets, and trademarks").

████████████████████████████████████████████

of Touchstream's patented method that is very similar to Comcast's accused implementation: use of Touchstream's patented technology to allow users to stream media to a second screen. *See* Ex. A, Mangum Report ¶¶ 14-15, 131-32. He also notes that the ████████████ was entered in July 2013, "within approximately 6 months" of the culmination of the hypothetical negotiation between Touchstream and Comcast. Ex. I, Mangum Clarification ¶ 2. He also detailed how ████████ and Comcast had the same motivation for implementing Touchstream's patented method, *i.e.*, to appear innovative to their viewing customers at no extra cost. Ex. A, Mangum Report ¶ 117.

**Second**, Dr. Mangum examined the differences in circumstances between the ████████ Agreement and the hypothetical negotiation in this case, and explained why they would not affect the reasonable royalty rate portion of the ████████ agreement. *E.g.*, Ex. A, Mangum Report ¶¶ 123-27. Comcast argues that (i) the ████████ Agreement dealt with software rather than patents,[7] and (ii) that the product licensed in the ████████ agreement included functionalities not offered by Comcast like the ability to cast personal content. Mot. at 11-13. But even accepting Comcast's interpretation, the Federal Circuit has affirmed the use of royalty rates from comparable agreements even if that agreement's subject matter was broader than that of the hypothetical negotiation. *See, e.g.*, *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330-31 (Fed. Cir. 2014) (permitting expert testimony on a software plus patent license agreement involving patent and related technology).[8] And Dr. Mangum proactively explained why Touchstream's license rate to

---

[7] Comcast claims, without citation to expert analysis, that the ████████████ would have covered unasserted patents and claims that Dr. Mangum fails to apportion out." Mot. at 6. But Dr. Mangum explains why "Defendant in this case, like other parties, would want a license to Touchstream's entire portfolio…and would expect these rights at no extra charge regardless of the number of claims being specifically discussed." Ex. A, Mangum Report ¶ 177.

[8] *See also, e.g.*, *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) (rejecting challenge to reliance on agreement that "covered [plaintiff's] patents and software services" as the "degree of comparability" is "best addressed by cross examination and

███████ was focused on patent rights, *see* Ex. A, Mangum Report ¶¶ 123-27 (and Touchstream separately charged ████ for services such as software development, the fees for which were excluded by Dr. Mangum, *see id.* ¶¶ 124-25). Dr. Mangum also explained why any differences between the hypothetical negotiation and ████ agreements did not necessitate more subtractions to further account for apportionment to the patented footprint, including because there was nothing else of value to subtract out. *Id.* ¶¶ 127, 130, 174-75.

### III.    Dr. Mangum Used a Proper Hypothetical Negotiation Date

Dr. Mangum used the correct hypothetical negotiation date for his damages opinions under controlling law, which is "the start of infringement, *i.e.*, when both a patent had issued and accused products were sold." *Wang Labs.*, 993 F.2d at 869. Comcast does not dispute that this is the law, *see* Mot. at 13-14, and likewise does not appear to dispute the relevant facts: (i) Comcast's infringing Xfinity X1 TV platform and app was introduced by 2012, and (ii) the '251 patent issued in 2013. *Id.*; Ex. A, Mangum Report ¶¶ 21-22. Dr. Mangum's decision to use a 2012 hypothetical negotiation date culminating in a hypothetical license in January 2013 is well-supported.

Comcast now claims that because Touchstream's technical expert, Dr. Kevin Almeroth, focused his opinions on the period beginning in 2017 (when damages begin accruing in this case), Dr. Mangum should have used 2017 as the date for a hypothetical negotiation. *See* Mot. at 13-14. But this is contrary not only to law but to the opinion of Comcast's own technical expert, Dr. Jeffay, who conceded that that ███████████████████████████████████████████ ██████████████████████████. *See* Ex. J, Jeffay Dep. 180:5-184:6 (confirming that Comcast

---

not by exclusion"); *SSL Servs., LLC v. Citrix Sys., Inc.*, 769 F.3d 1073, 1093 (Fed. Cir. 2014) (affirming admission of agreements that "only supplied [defendant] with distribution rights to the Smartgate software product and provided no patent license" as "sufficiently probative of the circumstances which would surround a hypothetical negotiation") (applying Fifth Circuit law).

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████ Comcast also fails to disclose that when

Touchstream sought discovery regarding infringement back to 2011, Comcast objected and limited

its answers to 2017 forward. *See, e.g.*, Ex. K, Comcast's Second Supp. Responses to Touchstream's

First Set of Indiv. Interrogs. at 11-14 ("Moreover, Comcast objects to this Interrogatory as overly

broad and unduly burdensome to the extent that it requests information from **2011** to present.

***Comcast interprets this Interrogatory as seeking information from February 2017 to the present***.

35 U.S.C. § 286." (emphases added)).[9] After using discovery objections as a shield to refuse to

produce information regarding its infringement from 2011 to 2016, Comcast now seeks to

strategically use that same failure to produce information as a sword to argue that Touchstream

cannot show that 2013 is the appropriate date for a hypothetical negotiation. *See* Mot. at 13-14.

The Court should not approve such gamesmanship, especially when Comcast has failed to identify

any factual evidence showing that 2013 is not the appropriate date under the law.

     The cases cited by Comcast only demonstrate that its motion to strike should be denied. In

*LaserDynamics, Inc. v. Quanta Computer, Inc.*, the district court set a hypothetical negotiation date

three years ***after*** infringement started, and the Federal Circuit reversed out of concern that a date

after infringement has started fails to "pin down how the prospective infringement might have

been avoided." 694 F.3d 51, 76 (Fed. Cir. 2012). Similarly, in *Cassidian Communications, Inc. v.

Microdata GIS, Inc.*, the defendant's expert opined on a hypothetical negotiation date two years

***after*** infringement started. No. 12-00162-JRG, 2013 WL 11322510, at *2 (E.D. Tex. Dec. 3, 2013).

And in *RSA Protective Technologies, LLC v. Delta Scientific Corp.*, the defendant's damages expert

---

[9] *See also* Ex. L, Subbiah Dep. 117:8-118:9 (30(b)(6) designee for technical topics relating to the Xfinity TV Remote app for mid-2010 to mid-2016 confirming he "didn't do anything to investigate what features were implemented" as to the Xfinity TV app from mid-2010 through 2016.

merely selected the beginning of the damages period as the hypothetical negotiation date, rather than looking to the factual record on when first infringement began. 19-6024, 2021 WL 4978462, at *3-5 (C.D. Cal. Oct. 20, 2021).[10] The Court should reject Comcast's invitation to commit error by using a hypothetical negotiation date years after the infringement began.

IV.    **Dr. Mangum's References to *Google* Are Relevant and Admissible**

The Court should defer ruling on the admissibility of evidence relating to *Touchstream v. Google* until trial. Touchstream is cognizant of Court's Standing MIL No. 13 against referencing "either party's other litigations," but Comcast appears likely to open the door on this issue.

***First***, Comcast's post-filing willfulness will be a jury issue, and the jury verdict in the *Google* case finding the here-asserted '251 patent valid and infringed is highly relevant to Comcast's state of mind in continuing to infringe after Touchstream filed this case. ***Second***, the *Google* verdict may become relevant if Comcast argues that Touchstream's technology was never commercially successful, or that the hypothetical negotiation date should be in 2017 when it claims

███████████████████████████████████████████████████████████

Mot. at 14. If Comcast makes these arguments, then Touchstream should be permitted to explain that this financial decline was the result of infringement of Touchstream's patents, ████████

███████████████████████████████████████████████████████████

████████. ***Third***, the Federal Circuit has recognized that prejudice from evidence relating to other cases may be cured by a limiting instruction. *See, e.g.*, *Sprint*, 760 F. App'x at 980-81.

For the foregoing reasons, the Court should deny Comcast's motion.

---

[10] In *Syneron Medical. Ltd. v. Invasix, Inc.*, the plaintiff's damages expert opined on the wrong parties to a hypothetical negotiation and opined on a royalty increase from 6% to 52% based on a "commercial relationship" that did not exist between the correct parties. No. 8:16-cv-00143-DOC, 2018 WL 4696969, at *9 (C.D. Cal. Aug. 27, 2018). It is unclear how this case is relevant here.

██████████████████████████

Date: August 19, 2024                    Respectfully submitted,


                                         /s/ *Ryan D. Dykal*
                                         Lead Counsel

                                         Ryan D. Dykal (*pro hac vice*)
                                         Jordan T. Bergsten (*pro hac vice*)
                                         Mark Schafer (*pro hac vice*)
                                         Philip A. Eckert (*pro hac vice*)
                                         Anita Liu (TX State Bar No. 24134054)
                                         **BOIES SCHILLER FLEXNER LLP**
                                         1401 New York Ave, NW
                                         Washington, D.C. 20005
                                         (t) 202-274-1109
                                         rdykal@bsfllp.com
                                         jbergsten@bsfllp.com
                                         mschafer@bsfllp.com
                                         peckert@bsfllp.com
                                         aliu@bsfllp.com

                                         John M. Lyons (*pro hac vice*)
                                         Sabina Mariella (*pro hac vice*)
                                         Sophie Roytblat (*pro hac vice*)
                                         **BOIES SCHILLER FLEXNER LLP**
                                         55 Hudson Yards, 20th Floor
                                         New York, NY 10001
                                         jlyons@bsfllp.com
                                         smariella@bsfllp.com
                                         sroytblat@bsfllp.com

                                         Melissa Smith (TX State Bar No. 24001351)
                                         **GILLAM & SMITH LLP**
                                         303 S. Washington Ave.
                                         Marshall, TX 75670
                                         (t) 903-934-8450
                                         melissa@gillamsmithlaw.com

                                         ***Counsel for Plaintiff Touchstream Technologies, Inc.***

16

███████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████.

                                        /s/ *Ryan D. Dykal*
                                        Ryan D. Dykal

█

## <u>CERTIFICATE OF SERVICE</u>

I, Ryan D. Dykal, declare under penalty of perjury that a true and correct copy of the foregoing Opposition To Comcast's Motion To Strike The Opinions Of Dr. Russell W. Mangum III was filed on August 19, 2024  by means of the U.S. District Court for the Eastern District of Texas's Case  Management/Electronic Case Filing (CM/ECF), which will send notification of such filing by  electronic mail to all ECF participants.

By: */s/ Ryan D. Dykal*
Ryan D. Dykal

18