IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| TOUCHSTREAM TECHNOLOGIES, INC., <br> *Plaintiff*, <br> v. <br> CHARTER COMMUNICATIONS, INC., et al., <br> *Defendants*. | CASE NO. 2:23-cv-00059-JRG-RSP <br> (Lead Case) |

### MEMORANDUM ORDER

Before the Court is Comcast's Motion to Strike the Opinions of Dr. Russell W. Mangum III filed by Defendants Comcast Cable Communications, LLC, Comcast Cable Communications Management, LLC, Comcast of Houston, LLC, and Comcast Corporation. **Dkt. No. 83.** For the reasons discussed below, the Motion is **DENIED**.

### I. LEGAL STANDARD

An expert witness may provide opinion testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Rule 702 requires a district court to make a preliminary determination, when requested, as to whether the requirements of the rule are satisfied with regard to a particular expert's proposed testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993). District courts are accorded broad discretion in making

Rule 702 determinations of admissibility. *Kumho Tire*, 526 U.S. at 152 ("the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable"). Although the Fifth Circuit and other courts have identified various factors that the district court may consider in determining whether an expert's testimony should be admitted, the nature of the factors that are appropriate for the court to consider is dictated by the ultimate inquiry—whether the expert's testimony is sufficiently reliable and relevant to be helpful to the finder of fact and thus to warrant admission at trial. *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

Importantly, in a jury trial setting, the Court's role under Daubert is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role; instead, the Court's role is limited to that of a gatekeeper, ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue before the jury that it is appropriate for the jury's consideration. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391-92 (Fed. Cir. 2003) (applying Fifth Circuit law) ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony."); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249-50 (5th Cir. 2002) ("'[t]he trial court's role as gatekeeper [under Daubert] is not intended to serve as a replacement for the adversary system.' . . . Thus, while exercising its role as a gate-keeper, a trial court must take care not to transform a Daubert hearing into a trial on the merits," quoting Fed. R. Evid. 702 advisory committee note). As the Supreme Court explained in *Daubert*, 509 U.S. at 596, "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *See Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002).

## II.   ANALYSIS

### A. Use of the Method Claims

In the Motion, Comcast argues that Dr. Mangum, Touchstream's damages expert, improperly fails "to approximate the use of the Accused TV Remote Functionalities" because the only asserted claims are method claims. (Dkt. No. 83 at 9.) According to Comcast, Dr. Mangum incorrectly "includes in his royalty base all X1 STBs allegedly *capable* of performing the Asserted Claims and suggests that doing so is justified because the TV Remote App is 'included' in all monthly X1 subscriptions." *Id*. Comcast contends that Dr. Mangum's error is significant because he "expressly *refused* to consider" infringing uses "at all." *Id*. at 10. Indeed, Comcast further argues that Dr. Mangum admits that the agreement between Plaintiff Touchstream Technologies, Inc. and Quadriga Worldwide Ltd. (the "Quadriga Agreement"), which is the source of Dr. Mangum's royalty rate, is "untethered to use." *Id*.

In response, Plaintiff argues that Dr. Mangum "explained that Touchstream, both in its real-world negotiation with Quadriga and in its hypothetical negotiation with Comcast, 'would consider the expectation and potential of the counterparty's use of the technology.'" Dkt. No. 124 at 4 (quoting Dkt. No. 124-2 ¶ 120). Dr. Mangum further explained why Plaintiff and Comcast would agree to a flat per-month rate per device capable of infringing. *Id*. at 5. Additionally, Plaintiff argues that "Dr. Mangum's report reflects that he did in fact consider the usage statistics provided by Comcast . . . and his analysis of *Georgia-Pacific* factor 11 . . . explains why this necessitated no change to his royalty rate or base, each of which already reflected estimates of use." *Id*. Plaintiff further attempts to distinguish this case from those cited by Comcast and argues that Comcast "ignores several fact disputes counseling against requiring any royalty to include actual use as a mathematical input." *Id.* at 9.

3

In reply, Comcast argues that Dr. Mangum's "core assumption" is that the "applicable set top boxes are those that are *capable* of performing the accused methods," but as Plaintiff admits, "a Comcast X1 STB is not capable of performing the accused methods (or otherwise being involved in any infringement) unless the subscriber has separately downloaded and installed the Xfinity TV Remote mobile application." Dkt. No. 155 at 1. Moreover, Comcast argues that Plaintiff does not dispute "that only a fraction of X1 subscribers used" the application that enables the infringing features in any given month, indicating that Dr. Mangum's royalty base is severely inflated. *Id*. at 2. Comcast further contends that the Quadriga Agreement does not concern use of the licensed technology, but rather deployment of Plaintiff's technology in hotel rooms. *Id*.

In its sur-reply, Plaintiff reiterates that Dr. Mangum properly connected his analysis to use of the claimed inventions. Dkt. No. 180 at 1. According to Plaintiff, Dr. Mangum adequately explained why Plaintiff and Comcast would agree to a flat monthly rate here, "including because Quadriga agreed to this in similar circumstances, and because this approach aligns with Comcast's need for the technology and how Comcast (and its competitors) charge video customers." *Id*. at 1–2.

Here, Dr. Mangum applied a royalty rate found in the Quadriga Agreement to a base of all devices capable of infringing (or, alternatively, all accounts with access to one or more devices that are capable of infringing). Dr. Mangum adequately explains how the Quadriga Agreement is an appropriate proxy for use. *See e.g.*, Dkt. No. 124-2 ¶ 120 ("At the time of negotiations for the agreements, Touchstream would consider the expectation and potential of the counterparty's use of the technology, including the potential with Defendant providing the app with most of its subscription packages and potential for Quadriga to pursue deployment of the technology in most of the hotel rooms where it had a presence and initiate arrangements with additional hotels.").

4

Other courts have found a similar approach acceptable. *See, e.g.*, *Trading Techs. Int'l, Inc. v. IBG LLC*, 2021 WL 5038754, at *2 (N.D. Ill. July 23, 2021); *Carnegie Mellon Univ. v. Marvell Tech. Grp.*, 890 F. Supp. 2d 602, 609–10 (W.D. Pa. 2012); *Sprint Commc'ns Co. v. Charter Comm'ns, Inc.*, 2021 WL 982732, at *14 (D. Del. Mar. 16, 2021). This Court agrees. Comcast raises valid concerns regarding Dr. Mangum's failure to directly address Comcast's actual use data, but the proper solution to this neglect is vigorous cross-examination.

### B.  Quadriga Agreement Rate

In the Motion, Comcast argues that Dr. Mangum fails to adjust the rate of the Quadriga license. Dkt. No. 83 at 11–13. First, Comcast argues that the Quadriga Agreement was a software license that never "intended to transfer any Intellectual Property Rights from one Party to the other." *Id.* at 11. Second, Comcast argues that if the Quadriga Agreement conveys patent rights, then it would cover other unasserted patents, but Dr. Mangum failed to apportion out these other patents. *Id.* at 12. Third, Comcast argues that Dr. Mangum fails to apportion the allegedly novel features of the asserted claimed methods from conventional features. *Id.* at 12–13. Finally, Comcast contends that the Quadriga Agreement was for a product that Comcast does not offer. *Id.* at 13.

In response, Plaintiff argues that Comcast ignores Dr. Mangum's "detailed explanations about the adjustments he made (*i.e.*, excluding certain payments in the agreement) and why no further adjustment was needed." Dkt. No. 124 at 10–13. Plaintiff argues that the Federal Circuit affirmed a jury verdict where the jury awarded "the exact same flat rate from a prior verdict and two prior licenses." *Id.* at 10 (citing *Sprint Commc'ns Co. v. Time Warner Cable, Inc.*, 760 F. App'x 977, 982–84 (Fed. Cir. 2019). Plaintiff further argues that Dr. Mangum explains why the Quadriga Agreement is comparable; for example, "the Quadriga Agreement addressed an implementation of Touchstream's patented method that is very similar to Comcast's accused

implementation." *Id*. at 11–12. Plaintiff also argues that Dr. Mangum "examined the differences in circumstances between the Quadriga Agreement and the hypothetical negotiation in this case, and explained why they would not affect the reasonable royalty rate portion of the Quadriga Agreement." *Id*. at 12.

The Court finds that Dr. Mangum adequately adjusts the terms of the Quadriga Agreement. The Court agrees with Plaintiff that Dr. Mangum makes certain adjustments to the Quadriga Agreement, such as excluding certain payments Quadriga made to Plaintiff to develop the technology at issue in the Quadriga Agreement. Comcast raises several credible disputes, but the Court will not exclude Dr. Mangum's opinion based upon these disputes—once again, these are best addressed with vigorous cross examination.

### C. Hypothetical Negotiation Date

In the Motion, Comcast argues that "Dr. Mangum relies on a hypothetical negotiation in May 2012 that culminated in a hypothetical agreement by January 2013, which is four years before the February 2017 date of first infringement analyzed by Touchstream's technical expert." Dkt. No. 83 at 13–14. According to Comcast, Dr. Mangum does not explain why the hypothetical negotiation would have occurred before any infringement could have occurred. *Id*. at 14. Comcast argues that this error is not harmless because "Touchstream had experienced a significant financial decline by 2017, which would have weakened its bargaining power in a later hypothetical negotiation." *Id*.

In the response, Plaintiff argues that the hypothetical negotiation must occur at "the start of infringement, *i.e.*, when both a patent had issued and accused products were sold." Dkt. No. 124 at 13 (quoting *Wang Lab'ys, Inc. v. Toshiba Corp.*, 993 F.2d 858, 869 (Fed. Cir. 1993)). Plaintiff contends that because the allegedly infringing product was introduced in 2012 and the '251 Patent

6

issued in 2013, then the hypothetical negotiation would have ended in an agreement upon issuance of the '251 Patent in 2013. *Id.* at 13–14.

The Court agrees with Plaintiff. While the damages period may be limited, that does not control the date of the hypothetical negotiation. Dr. Mangum correctly determined that the hypothetical negotiation would have culminated in an agreement as of the date that the '251 Patent issued in 2013.

### D. Reliance Upon *Google*

In the Motion, Comcast argues that Dr. Mangum should be prohibited from discussing or relying upon the jury verdict in *Touchstream Technologies, Inc. v. Google LLC*, 6:21-cv-00569-ADA (W.D. Tex. 2021). Dkt. No. 83 at 14–15. Comcast argues that any such discussion would violate the Court's MIL No. 13 and would be irrelevant and unfairly prejudicial. *Id.* According to Plaintiff, Dr. Mangum "does not invoke Google to calculate his royalty base or rate," but he instead relies upon the *Google* verdict to support his opinion regarding the commercial value of Plaintiff's patented inventions and agreements that did not arise from *Google*. *Id.* at 15.

In response, Plaintiff requests that "[t]he Court should defer ruling on the admissibility of evidence relating to *Touchstream v. Google* until trial." Dkt. No. 124 at 15. Plaintiff argues that the *Google* verdict is relevant to willfulness, and that Comcast may open the door to discussing the verdict if Comcast "argues that Touchstream's technology was never commercially successful, or that the hypothetical negotiation date should be in 2017." *Id.*

The Court finds that Dr. Mangum's opinions regarding the *Google* case should not be stricken. However, as the Court ruled in granting Defendant's Motion *in Limine* No. 2,[1] the Parties

---

[1] See Dkt. No. 233 at 104.

must request and receive leave of Court before introducing evidence, testimony, or argument regarding the *Google* case—whether or not Plaintiff believes that Comcast has opened the door.

### III.   CONCLUSION

For the reasons discussed above, the Court **DENIES** the Motion.

**SIGNED this 27th day of December, 2024.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE