```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
 2                         MARSHALL DIVISION

 3  TOUCHSTREAM TECHNOLOGIES, INC.,(  CAUSE NO. 2:23-CV-059-JRG
                                    )
 4           Plaintiff,            (
                                    )
 5  vs.                            (
                                    )
 6  CHARTER COMMUNICATIONS, INC.,  (
    et al.,                         )  MARSHALL, TEXAS
 7                                 (  MARCH 3, 2025
             Defendants.           )  9:00 A.M.
 8  _____

 9
                              VOLUME 1
10
    _____
11
                         TRIAL ON THE MERITS
12

13             BEFORE THE HONORABLE RODNEY GILSTRAP
                UNITED STATES CHIEF DISTRICT JUDGE
14                          and a jury
    _____
15

16

17

18

19

20

21

22              SHAWN McROBERTS, RMR, CRR
                   100 E. HOUSTON STREET
23               MARSHALL, TEXAS  75670
                      (903) 923-8546
24          shawn_mcroberts@txed.uscourts.gov

25
```

```
 1                    A P P E A R A N C E S

 2       FOR THE PLAINTIFF:     BOIES SCHILLER FLEXNER, LLP
                                1401 NEW YORK AVENUE, NW
 3                              WASHINGTON, DC 20005
                                (202) 274-1109
 4                              BY: MR. RYAN DYKAL
                                    MR. JORDAN BERGSTEN
 5
                                GILLAM & SMITH, LLP
 6                              303 SOUTH WASHINGTON AVENUE
                                MARSHALL, TEXAS  75670
 7                              (903) 934-8450
                                BY:  MS. MELISSA SMITH
 8
         FOR THE DEFENDANT:     ARNOLD & PORTER KAYE
 9                              SCHOLER, LLP
                                250 WEST 55TH STREET
10                              NEW YORK, NEW YORK  10019
                                (212) 836-8132
11                              BY:  MR. DANIEL REISNER

12                              ARNOLD & PORTER KAYE
                                SCHOLER, LLP
13                              601 MASSACHUSETTS AVE, NW
                                WASHINGTON, DC 20001
14                              (202) 942-5797
                                BY:  MR. MARC COHN
15
                                THE DACUS FIRM, PC
16                              821 ESE LOOP 323, SUITE 430
                                TYLER, TEXAS  75701
17                              (903) 705-1117
                                BY:  MR. DERON DACUS
18
         OFFICIAL REPORTER:     SHAWN M. McROBERTS, RMR, CRR
19                              100 E. HOUSTON STREET
                                MARSHALL, TEXAS  75670
20                              (903) 923-8546

21

22

23

24

25
```

## <u>INDEX</u>

**EXAMINATION**

| Witness Name | Page |
|---|---|
| DAVID STROBER | |
| Direct By MR. BERGSTEN | 168 |
| Cross By MR. DACUS | 205 |
| Redirect By MR. BERGSTEN | 237 |
| Recross By MR. DACUS | 242 |
| JAMIE COHEN | |
| BY VIDEO DEPOSITION | 244 |
| ALAN LUI | |
| BY VIDEO DEPOSIITON | 272 |

1          THE COURT:  Thank you.  Be seated, please.

2      Good morning, ladies and gentlemen.  Thank you for being

3  here.

4      My name is Rodney Gilstrap, and I am a United States

5  district judge posted here in the Marshall Division of the

6  Eastern District of Texas.  I have been on the bench since

7  2011, so I'm in my 14th year here on the bench.

8      Prior to coming on the bench, I practiced law in this

9  area of East Texas for 30 years.  I'm married, had two

10  children, both adults, one's passed away a couple of years

11  ago, the other lives in Dallas.  And between them, I have four

12  perfect grandchildren.  My wife is retired.  She previously

13  ran a retail floral business here in Marshall.

14      Now, I tell you all these things about myself because in

15  a few minutes I'm going to ask each of you-all to tell me the

16  same kind of information about each of you, and I think you're

17  entitled to know as much about me as I'm about to find out

18  about each of you-all.

19      We're about to engage in the selection of a jury in a

20  civil case involving allegations of patent infringement.  But

21  if you will, before we go any further, I'd like to briefly

22  review with all of you how we came to have our American civil

23  jury trial system.

24      If you go back in ancient history, if you look at the

25  first five books of the Old Testament, the Pentateuch, you'll

1    find that the ancient Hebrew nation impaneled juries to decide

2    issues of property ownership and property value.

3        The ancient Greeks began using a jury system about 1500

4    BC.  And the Romans, as in many things, they copied the jury

5    system from the Greeks, and it was the Romans that brought the

6    jury system to what we now know to be Great Britain when they

7    crossed the English Channel and conquered that island in the

8    4th century AD.

9        And having brought the jury system with them, it took

10   root in Great Britain and flourished for about 800 years until

11   a rather tyrannical king came to the throne of Great Britain

12   called King John.  And King John became embroiled in multiple

13   disputes with his subjects and his nobles that led to the

14   verge of a civil war.

15       And one of those disputes was King John's efforts to

16   curtail and restrict the right to trial by jury.  There was

17   not a civil war at that time.  Those disputes were resolved

18   through a written document signed by the king and his nobles

19   at a place in England called Runnymede.  And that document is

20   quite famous, you may have heard of it, it's called the Magna

21   Carta.

22       The Magna Carta guarantees the right to all English men

23   to have a right to trial by jury.  And so you can see that the

24   concept of right to trial by jury crossed the Atlantic Ocean

25   with our British forefathers when they came to this continent

1  as English colonists to settle North America.

2      They brought the jury trial system with them, and it took

3  root in colonial America and flourished here for over a

4  hundred years until another rather tyrannical king came to the

5  throne of Great Britain, and this time his name was King

6  George III.  And like King John, King George III became

7  embroiled with his colonial subjects here in North America on

8  many, many different levels, and one of the areas where King

9  George became in a serious dispute with his American colonists

10  was his efforts to curtail the right to trial by jury.

11      As a matter of fact, ladies and gentlemen, when Thomas

12  Jefferson set down to write the Declaration of Independence,

13  one of the specific reasons spelled out in the Declaration of

14  Independence for why we were compelled to seek a separation

15  from England and to form our own independent nation was the

16  king's efforts to curtail the right to trial by jury.

17      So you can see that this was a serious problem, and

18  unlike the problem with King John, it did result in a civil

19  war -- excuse me, a revolution.  And we did separate from

20  England, and we did form our own independent nation.

21      And shortly after we won our independence from England,

22  we developed and adopted the supreme law of the land for our

23  new country, the United States of America, and you-all know

24  that supreme law of the land as the Constitution of the United

25  States.

1    The original 13 states ratified the Constitution, and

2    several of them made it abundantly clear that they were

3    conditioning their ratification of the Constitution upon the

4    promise that as soon as it was ratified and went into effect,

5    there would immediately be ten additional amendments added.

6    And those ten amendments were immediately added to our

7    Constitution, and you know all -- you-all know from your

8    studies of American history that those ten amendments are

9    called the Bill of Rights.  And if you look at the Bill of

10    Rights, the first ten amendments to the U.S. Constitution,

11    you'll find the Seventh Amendment.  The Seventh Amendment to

12    the U.S. Constitution guarantees the right to a trial by jury

13    in a civil dispute for all Americans.

14    The Constitution was ratified in 1789 and the Bill of

15    Rights were ratified in 1791.  So since 1791, ladies and

16    gentlemen, every American has had a constitutionally-

17    guaranteed right to resolve their civil disputes through a

18    trial by jury.  So by being here today, in a very real sense,

19    you are each doing your part as good citizens to preserve,

20    protect, and defend the Constitution of our country,

21    particularly the Seventh Amendment of that Constitution.

22    I always tell citizens who appear for jury duty as you

23    have here today that in my personal opinion jury service is

24    the second highest form of public service that any American

25    can render for our country.  In my personal opinion, the

 1    highest form of public service are those young men and women

 2    that serve in our armed forces.

 3         Now, as a part of the process today, the lawyers for

 4    these competing parties are going to address the panel, all of

 5    you-all, and they're going to ask various questions.  And I

 6    want you to understand that they have a right to ask questions

 7    of the panel to help secure a fair and impartial jury to hear

 8    the evidence.

 9         I also want you to understand that the lawyers will not

10    be seeking to pry into your personal affairs unduly.  I do not

11    expect there to be any improper questions.  These are very

12    experienced trial lawyers.  But if there should be, I won't

13    hesitate to jump in.  But the purpose of the questions from

14    them to you and your answers to them is to help us secure a

15    fair and an impartial jury to hear the evidence in this case.

16         The important thing for you to remember with regard to

17    any questions you may be asked by the lawyers today is that as

18    long as your response is full, complete, and truthful, there

19    are no wrong answers to any question you might be asked.

20         Now, I don't know if it will happen today, it very rarely

21    does, but it is possible that you might be asked a question

22    that in your own internal personal view is so personal and so

23    private that you're not comfortable answering it in the

24    presence of everybody else on the panel.

25         If that should happen, you always have the option to

1    simply say, I'd like to discuss that with Judge Gilstrap.  And

2    if that's your answer, I'll provide an opportunity where you

3    can answer that question outside of the presence of everyone

4    else on the panel.

5         However, ladies and gentlemen, as I told you, I'm

6    partially into my 14th year here on the bench; I think this

7    has come up three times in 14 years.  It's very rare because

8    the lawyers are not going to ask you questions that are

9    intentionally personal or private.  But if it should come up,

10   I want you to know you have that option.

11        Now, the trial in this case is going to begin today after

12   the jury is selected and seated, and it's going to continue

13   through what I anticipate will be the rest of this week.  I

14   anticipate that we will be through with this trial by Friday

15   of this week, which should be March the 7th.

16        Now, I need to know from you-all if there are any of you

17   on the panel who, if you were selected to serve on this jury,

18   have a serious impediment to being able to be here throughout

19   each day of the week to complete the trial.

20        And let me explain this.  I'm not asking if it would be

21   inconvenient for any of you-all to serve on the jury, because

22   it is always inconvenient to serve on a jury.  Every one of

23   you have other things to do, other responsibilities, other

24   things you'd rather be doing.  I understand that.  I'm not

25   asking you about convenience; I'm asking you about serious

1    impediments.

2       For example, what I'm talking about is if you have a

3    family member who is scheduled for a surgical procedure this

4    week and they're dependent upon you to get them there, to be

5    with them, and that surgical procedure can't easily be

6    rescheduled, that's a serious impediment.  If you and your

7    family have pre-paid, non-refundable airline tickets to go

8    somewhere and it's going to cost your family thousands of

9    dollars if you don't use those tickets this week, then that's

10   a serious impediment.

11      But I'm not asking about it would be -- I'm not asking

12   whether it would be convenient or inconvenient.  I know it's

13   inconvenient.  And quite honestly, ladies and gentlemen,

14   that's why it's valuable public service because you are giving

15   something, you are giving that inconvenience and living with

16   that inconvenience, you are giving something to your country

17   to be here and serve on this jury.

18      So if there are any of you with that explanation that

19   believe you have a serious or would have a serious impediment

20   to being here throughout this week if you were selected to

21   serve on this jury, if you would, I'd like you to raise your

22   hand so I can make a note of it.

23      All right.  No. 3, No. 13.  I don't see anybody else in

24   the jury box.  No. 23.  Anybody else?

25      Mr. 21, you're just fanning yourself; you're not raising

1    your hand, are you?  That's great.  All right.

2        I see No. 3, No. 13, and No. 23.  Anybody else?  All

3    right.  Thank you, ladies and gentlemen.

4        Now, at this time I'm going to call for announcements on

5    the record in the case of Touchstream Technologies, Inc.

6    Versus Charter Communications, Inc., et al.  This is Civil

7    Case No. 2:23-CV-059.

8        And, counsel, as you give your announcements from the

9    podium, please identify yourself, the members of your trial

10   team, and any corporate representatives that you have with you

11   in the courtroom.

12       What says the Plaintiff?

13           MR. DYKAL:  Thank you, Your Honor.

14   My name is Ryan Dykal.  I'm with the law firm of Boies

15   Schiller and Flexner.  My co-counsel is Melissa Smith with the

16   law firm of Gillam & Smith.  Jordan Bergsten is also my

17   partner at Boies Schiller and Flexner.

18       And Mr. David Strober is the corporate representative for

19   my client, Touchstream Technologies.

20           THE COURT:  You're ready to proceed?

21           MR. DYKAL:  Yes, Your Honor.

22           THE COURT:  Thank you, Mr. Dykal.

23   What says the Defendants?

24           MR. DACUS:  Good morning, Your Honor.

25   Good morning, everyone.  I'm Deron Dacus here on behalf

1    of Charter Communications, and here with me representing

2    Charter are Marc Cohn and Dan Reisner.

3         Also here with us from Charter is Mr. Doug Frusciano, and

4    Mr. Frusciano is vice president of video platform at Charter.

5         And we're ready to proceed, Your Honor.

6         THE COURT:  All right.  Thank you, Mr. Dacus.

7         Ladies and gentlemen, as I've told you, this is a patent

8    case arising under the patent laws of the United States.  And

9    what the Plaintiff is claiming in this case is that three of

10    its patents have been infringed by the Defendants, and it is

11    seeking -- the Plaintiff is seeking money damages to

12    compensate it for that infringement.

13         Now, the Defendants deny that they infringe any of the

14    claims of the three patents-in-suit urged by the Plaintiff,

15    and they contend that the Plaintiff's patents are invalid.

16         Now, what I've just told you is a very shorthand

17    high-level, informal description of what's at issue in this

18    case.  I know that you have all seen the patent video prepared

19    by the Federal Judicial Center, and having seen that, you

20    already know more about patent cases than most folks in East

21    Texas do.

22         Now, as I mentioned, the lawyers for both sides are going

23    to question the members of the panel in a moment to gather

24    relevant information to help them exercise their rights and

25    complete the process with the Court of selecting and seating

1    the jury to hear the evidence in this case.

2        One more time, ladies and gentlemen, there are no wrong

3    answers to any question you'll be asked today, as long as your

4    responses are full, complete, and truthful.  And as I've

5    noted, the lawyers involved for the competing parties are

6    entitled to gather the information that they're asking for,

7    but they are not going to pry unduly into your personal

8    affairs.

9        All right.  One thing I do want to call your attention to

10   before the lawyers begin with their questions is something

11   that you may be asked about during their questioning, and that

12   is your ability to apply the correct burden of proof to the

13   evidence in this case.

14       In a patent case like this, the jury is called upon to

15   apply to the evidence two different burdens of proof.  The

16   jury may apply the burden of proof known as the preponderance

17   of the evidence.  I'll say that again--the preponderance of

18   the evidence--as well as a burden of proof known as clear and

19   convincing evidence--clear and convincing evidence.

20       Now, when responding to lawyers' questions about your

21   ability to apply the burden of proof, I need to instruct you

22   that when a party has the burden of proof on any issue by a

23   preponderance of the evidence, that means that you, the jury,

24   must be persuaded by the credible, believable evidence that

25   that claim or defense is more probably true than not true.

1    Let me say that again for emphasis--more probably true than

2    not true.  This is sometimes talked about as being the greater

3    weight and degree of credible testimony.

4         Let me give you an example that I hope will be helpful to

5    you.  In front of me is our court reporter, Mr. McRoberts.

6    And in front of Mr. McRoberts, you'll all see a statue.  That

7    statue is of the Lady of Justice.  She's sometimes called

8    Justicia.

9         A couple of things to point out about this statue:  First

10   of all, she's blindfolded.  Second of all, she holds lowered

11   at her right side the sword of justice.  Thirdly, she holds

12   raised on her left side the scales of justice.  And it's those

13   scales I want to talk to you about at this point.

14        If you'll notice, they are completely balanced and equal,

15   and that's where these parties must start out at the beginning

16   of this trial--completely balanced and equal.  Think of it

17   this way when you think about the burden of proof, ladies and

18   gentlemen.  Over the course of the trial, the Plaintiff is

19   going to put their evidence on one side of those scales, and

20   when they put all their evidence on that one side of the

21   scales, then the Defendants are going to have an opportunity

22   to come forward with their evidence and the Defendants will

23   put their evidence on the other side of those scales.

24        And when the Defendants have put all their evidence on

25   the other side of the scales and all the evidence is on one

1    side or the other, then if a party has the burden of proof by

2    a preponderance of the evidence and those scales tip in that

3    party's favor, even if they tip ever so slightly, then that

4    party has met the burden of proof of the preponderance of the

5    evidence.

6         Now, on the other hand, when a party has the burden of

7    proof on any defense by clear and convincing evidence, that

8    second burden of proof that I mentioned to you, clear and

9    convincing evidence means that the jury must have an abiding

10   conviction that the truth of the party's factual contentions

11   are highly probable.  I'll say that again--an abiding

12   conviction that the truth of the party's factual contentions

13   are highly probable.

14        Now, this second burden of proof, the clear and

15   convincing burden of proof, is a higher standard, a higher

16   burden of proof than the first burden of proof, the

17   preponderance of the evidence standard that I mentioned to

18   you.

19        If we go back to the same example I gave you, the scales

20   of justice are completely equal when we start out.  The

21   Plaintiff and the Defendant are in equal positions.  And over

22   the course of the trial, the Plaintiff puts all their evidence

23   on one side of the scales and the Defendants put all of their

24   evidence on the other side of the scales.

25        Then when all the evidence is on one side or the other,

1    if a party has the burden of proof on any defense by clear and

2    convincing evidence, and those scales tip in that party's

3    favor--and it's not adequate that they tip ever so slightly;

4    they must definitely tip in that party's favor--then if they

5    do, if they definitely tip in that party's favor, then that

6    party has met the burden of proof known as clear and

7    convincing evidence.

8        Now, one thing I want to be clear about, ladies and

9    gentlemen--neither of these two burdens of proof has anything

10   to do with a third and altogether different burden of proof

11   that I'm confident you've heard about on television and the

12   movies called beyond a reasonable doubt.  Beyond a reasonable

13   doubt is the burden of proof applied in a criminal case, and

14   it has no application whatsoever in a civil case like this.

15       Beyond a reasonable doubt is a higher burden of proof

16   than clear and convincing evidence, and clear and convincing

17   evidence is a higher burden of proof than the preponderance of

18   the evidence.  But you should not in any event confuse any of

19   these instructions with beyond a reasonable doubt.  That is

20   not applicable in this case at all.

21       Now, I give you these instructions and this example in

22   case some of the lawyers in their questioning ask you about

23   your ability to apply these two applicable burdens of proof to

24   the evidence that you'll hear in the case.

25       Now, before the lawyers address the panel and ask any

1    questions that they'd like to ask, I'm going to ask each of

2    you-all to do the same thing for my benefit that I did when we

3    started and that is give me the same information about you

4    that I gave you about myself.

5         As you can all see, there are nine standard questions.

6    They're on your monitors.  I think you-all have printed copies

7    as well.  And we're going to go through each member of the

8    panel and let each of you answer those questions one at a

9    time.

10        And let me explain this, ladies and gentlemen, before we

11   start.  This is a big room, there are a lot of people here,

12   and it's important that everyone hear your answers.  So this

13   is how we're going to answer these nine questions, how I'm

14   going to ask each of you to answer these nine questions.

15        When it's your turn, the Court Security Officer is going

16   to bring you a handheld microphone.  When you get that

17   handheld microphone, I want you to stand up, I want you to

18   hold the microphone near your mouth, and then answer those

19   nine questions.  And when you're finished, either pass it to

20   the person next to you or hand it back to the Court Security

21   Officer.

22        Now, let me say this, ladies and gentlemen.  In my over

23   13 years on the bench, I have tried more than a hundred civil

24   jury cases to a verdict.  I think we're 120-something now.

25   And over the course of those more than a hundred trials, jury

trials, some people will stand up and answer these questions,

and they will be people who naturally talk with their hands,

and they'll hold that microphone and be waving it out here.

And when it's out here, it doesn't amplify your voice at all.

     And, again, it's important that everybody in the room

hear your answers.  Some people, no matter how many times I

tell them to hold the microphone near their mouth, immediately

take it and put it at their waist.  It's not going to do the

job it's intended to do if you're holding it at your waist.

So don't wave it around and don't hold it at your waist.

Please hold it near your mouth and use it and answer those

questions so that we can all hear your answers.

     And with that, ladies and gentlemen, we'll begin the

process with Panel Member No. 1 if the Court Security Officer

will take him a microphone.

     Mr. Dispenza.  Is that correct?

          THE PANEL MEMBER:  Yes.

          THE COURT:  If you'd answer those questions for us,

sir?

          THE PANEL MEMBER:  Okay.  My name is Robert Dispenza

from Hallsville.  I have one 31-year-old daughter.

     I'm retired from Fire Tech Systems out of Shreveport

where I worked for 28 years.  I have one year of college.

     I'm divorced.  And I've served in a civil case in this

court and a couple of criminal cases in Harrison County.

1        THE COURT:  All right.  With regard to your prior

2   jury service in this court, can you tell me when that was

3   approximately and can you tell me what kind of a case it was?

4        THE PANEL MEMBER:  It was a discrimination case, and

5   it was probably around 10 or 12 years ago.

6        THE COURT:  All right.  Thank you very much.  If

7   you'll hand the microphone to Panel Member No. 2.

8      Mr. Winchell, if you'll give your answers, please.

9        THE PANEL MEMBER:  My name is Bryan Winchell, and I

10  live in Big Sandy.  I have three girls.

11     And I work at Christus Health as a nurse on a helicopter

12  in Longview.  I've been there for about 15 years.  And I also

13  work for the state of Texas as a rescue swimmer on the

14  helicopters for Texas Task Force 1.  I have an Associate's

15  degree in nursing.

16     My wife's name is Hannah, and she was a dental assistant

17  for about eight years.  And she now stays home with our three

18  girls.

19     And I have gone through the voir dire process here in

20  your courtroom, Judge Gilstrap.  And that's the only jury

21  service I've had.

22        THE COURT:  You weren't selected to serve on a jury?

23        THE PANEL MEMBER:  No, sir.

24        THE COURT:  All right.  Thank you very much.  If

25  you'll hand the microphone to Panel Member No. 3, Mrs.

1    Skinner?

2              THE PANEL MEMBER:  I'm Aubrey Skinner.  I live in

3    Longview.  I have six-year-old twins.

4         I work for Pine Tree ISD as an educational diagnostician

5    and been there for seven years.  I have a Master's in

6    education.

7         My husband's name is Michael.  He's a director at Eastman

8    Chemical.  He's been there for 15 years, yeah.

9         And I've not served on a jury before.

10             THE COURT:  All right.  Thank you.

11        Next is No. 4, Mrs. Giddings.

12             THE PANEL MEMBER:  My name is Sarah Giddings, and I

13   live in Waskom, Texas.  I have two 21-year-old sons.

14        I work at Word of God Academy in Shreveport as the

15   assistant principal.  I've been there six years, and I have a

16   Master's degree in education.

17        My husband's name is Keith Giddings, and he works at

18   Bossier Federal Credit Union in IT.  And I think he's been

19   there 24 years.

20        And I have previously served on a civil jury in Harrison

21   County.

22             THE COURT:  Not in federal court, in state court?

23             THE PANEL MEMBER:  State court, yes.

24             THE COURT:  How long ago was that, ma'am, best

25   guess?

1          THE PANEL MEMBER:  I'd say maybe 15 years.

2          THE COURT:  Thank you very much.

3      Next is Panel Member No. 5.

4          THE PANEL MEMBER:  My name is Sharon Paye.  I live

5    in Big Sandy, Texas.  I have two grown daughters.

6      I work for Mortenson Construction.  I've worked off and

7    on for them for four years.  I have an Associate's degree in

8    horticulture.  I'm divorced.

9          THE COURT:  Have you ever had any prior jury

10   service?

11         THE PANEL MEMBER:  No, sir, I never had any prior

12   jury service.

13         THE COURT:  And what do you do for the construction

14   company?

15         THE PANEL MEMBER:  I work -- at construction, I run

16   the tool room and parts, keep us from running out of parts.

17   We're building a solar farm in Hillsboro, Texas.  So I'm

18   living there, but come home for the weekend.

19         THE COURT:  Thank you, ma'am.

20         THE PANEL MEMBER:  Uh-huh.

21         THE COURT:  Next is No. 6, Mr. Donley.

22         THE PANEL MEMBER:  My name is Todd Donley.  I'm from

23   Atlanta, Texas.  I have one daughter who's 35 and three

24   wonderful grandkids.

25      I was a retired truck driver for 25 years.  I've got a

```
 1    high school education.  Divorced.  No prior jury service.

 2            THE COURT:  All right, sir.  Thank you.

 3        No. 7 is next, Ms. Franklin.

 4            THE PANEL MEMBER:  My name is Cortina Franklin.  I

 5    have one child.  He's 17.

 6        I work at a child development center in Mt. Pleasant,

 7    Texas, as a teacher assistant for special education.  I've

 8    been there going on 16 years.  I have a high school diploma.

 9            No spouse.  No prior service.

10            THE COURT:  Thank you, ma'am.

11        If you'll hand that microphone to the Court Security

12    Officer, he'll take it around to No. 8, Mr. Thomasson.

13            THE PANEL MEMBER:  My name is Ben Thomasson, and I

14    live in Waskom, Texas.  I have no children.

15        I am currently looking for a job, although my career is

16    web design.  I'm also busy helping with my elderly mom because

17    of reasons.  My educational background, I went to TSTC here in

18    Marshall about 20 years ago.

19        I'm not currently married, and I have not served on a

20    jury.

21            THE COURT:  All right.  Thank you, sir.

22        Next is No. 9, Mr. Porter.

23            THE PANEL MEMBER:  Charles Porter.  I've got four

24    kids or I had four kids, lost one.

25        I work at -- worked at Cook Feed Store in Gilmer.  I was
```

1    a delivery driver, tractor driver, anything he told me to do

2    driver.  I worked there for about 10 years.  High school

3    education.

4        My spouse is Teresa Porter.  She was a -- we're both

5    retired.  And she was a cafeteria manager at the Harmony High

6    School.  She worked there for 25 years.

7                THE COURT:  Mr. Porter, can you hold that microphone

8    a little closer?

9                THE PANEL MEMBER:  I'm sorry.  I'm one of the

10   guys -- Upshur County, I was on the jury.  I had a criminal

11   and a civil trial.

12               THE COURT:  Never been a juror in a federal court

13   before?

14               THE PANEL MEMBER:  No.

15               THE COURT:  All right, sir.  Thank you very much.

16       If you'll pass that to Panel Member No. 10, Ms. Lohman?

17               THE PANEL MEMBER:  My name is Haley Lohman.  I have

18   one daughter.  She's nine months old.

19       I am a teller at Austin Bank.  I've been there about two

20   years.  I have a high school diploma.  I don't have a spouse.

21   I've never served on a jury.

22               THE COURT:  And you're at the Austin Bank location

23   here in Marshall?

24               THE PANEL MEMBER:  Uh-huh.

25               THE COURT:  Thank you, ma'am.

1        No. 11 is next.

2            THE PANEL MEMBER:  My name is Austin Padilla.  I've

3    got two daughters.

4        I work for Christus health, helicopter nurse in Longview.

5    I've been with Christus for 12 years.  I've got two

6    associate's--associate's in nursing and associate's in science

7        My wife is Kayla Padilla.  She is a school nurse at Big

8    Sandy ISD.  She's been there for three years now.

9        No prior jury service.

10           THE COURT:  All right, sir.  Thank you.

11       No. 12 is next, Mrs. Lynch?

12           THE PANEL MEMBER:  My name is Debrah Lynch.  I live

13   here in Marshall.

14       I worked for Elysian Fields ISD for 20 years.  I was a

15   teacher's aide.  I worked with Special Ed.  I have an

16   Associate's degree from Panola College.

17       My husband's name is Richard Lynch.  He worked for Smith

18   fastener in Longview for six or seven years.  We're both

19   retired.

20       And I served on a petit jury in Panola County.

21           THE COURT:  Did you tell us whether you had children

22   or not?

23           THE PANEL MEMBER:  Oh, I have two daughters.  Sorry.

24           THE COURT:  Okay.  Thank you, ma'am.

25       No. 13 is next, Mrs. Caraway?

1          THE PANEL MEMBER:  Hello.  My name is Kimberly

2   Caraway.  I'm from Gilmer, Texas.  I have five adult children

3   and two perfect granddaughters.

4      I work for Active Faith Ministries as the executive

5   director, and I've been there for five years.  I have a

6   terminal degree in educational leadership.

7      I am married to Rodney Caraway.  He works for Thomas Oil

8   Field Services in Longview, Texas, and he is an equipment

9   operator.

10     And I have served none at all on any prior juries.

11         THE COURT:  All right.  Thank you very much.

12     No. 14 is next, Mrs. Ormes.

13         THE PANEL MEMBER:  My name is Paula Ormes.  I have

14  two adult children, one grandchild.

15     I worked for Lone Star Steel for 35 years.  I'm retired.

16  I have one year of college.

17     My spouse's name is Gary.  He retired from ETBU after 15

18  years.

19     And I have no jury.

20         THE COURT:  Never served on a jury?

21         THE PANEL MEMBER:  Uh-uh.

22         THE COURT:  Thank you, ma'am.

23     All right.  We'll go to the front row of the gallery.

24  Next, No. 15, Mrs. McCall?

25         THE PANEL MEMBER:  Yes.  My name is Vicki McCall,

1    and I'm from Atlanta, Texas.  I have three grown children and

2    six beautiful granddaughters.

3         I'm a retired schoolteacher.  I worked with special needs

4    special education, and I was there for 23 years.  I do have a

5    college degree.

6         My husband's name is William McCall, and he is retired

7    from International Paper Company at Domino, worked there for

8    about 35 years.

9         And I've never been called for jury service.

10             THE COURT:  All right, ma'am.  Thank you.  If you'll

11    hand the microphone to No. 16, Mrs. Hart?

12             THE PANEL MEMBER:  Good morning.  My name is Sarajon

13    Hart.  I live in Longview.  I have one child that's at college

14    right now.

15         I work at Diagnostic Clinic.  I've been there 30 years.

16    This is my 31st year.  I have some college.

17         My husband's name is Marvin.  He works at Longview

18    Regional in maintenance, and he's been there for three years.

19         And I did serve on a civil trial at Harrison County but

20    not in federal.

21             THE COURT:  All right.  Thank you, ma'am.

22         No. 17 is next, Mrs. Watson?

23             THE PANEL MEMBER:  Good morning.  My name is Heather

24    Watson.  I have two kids, a 16-year-old and a 4-year-old.  I

25    live in Harleton, Texas.

1    I work for Experity as a medical biller.  I've been there

2    three years.  I have some college.

3    My husband's name is Steven.  He works at Eastman

4    Chemical in maintenance and been there two years.

5    And I've never served on a jury.

6         THE COURT:  Thank you, ma'am.

7    No. 18 is next, Mr. Segers?

8         THE PANEL MEMBER:  I'm Kenneth Segers.  I'm from

9    Marshall.  I have no children.

10   I work for Central Jet Service, aircraft mechanic.  Been

11   there 20 years.  High school.

12   My spouse's name is Sheila.  She's an aircraft

13   electrician.  She's retired from Metro Aviation.

14   And I've had civil and criminal cases, but nothing

15   federal.

16        THE COURT:  All right.  Where were those prior jury

17   cases?

18        THE PANEL MEMBER:  District court.

19        THE COURT:  Here in Marshall?

20        THE PANEL MEMBER:  Yes.

21        THE COURT:  How long ago was that?

22        THE PANEL MEMBER:  About 10 years ago.

23        THE COURT:  All right, sir.  Thank you very much.

24   If you'll pass the microphone back to the Court Security

25   Officer, he'll take it to Panel Member No. 19, Mr. Jolly?

1          THE PANEL MEMBER:  Hello.  My name is John Jolly.  I

2     live in Kildare, Texas.  No children.

3          I work at American Eagle Logistics in Lone Star, Texas,

4     as a dispatcher.  I've worked there for over 19 years.  I have

5     a high school diploma.

6          My wife's name is Amy.  We've been married 20 years.  She

7     works at the Christus Outpatient Center here in Marshall as a

8     speech pathologist, and she's been there over 19 years -- I

9     mean, over 10 years.

10          And I have not served on a previous jury.

11          THE COURT:  Thank you, sir.

12          In you'll pass the microphone to No. 20, Mr. Ashburn?

13          THE PANEL MEMBER:  I'm Nathan Ashburn.  I live in

14     Diana, Texas.  I have no children.

15          I'm currently a caretaker for my grandfather and I manage

16     his ranch.  And some college.  Not married and no prior jury

17     service.

18          THE COURT:  All right, sir.  Thank you.

19          No. 21 is next.

20          THE PANEL MEMBER:  My name is Kevin Brown.  I live

21     in Hughes Springs, Texas, from Hughes Springs.  Last three

22     years I've actually had my own business, an escort business.

23     Electrician by trade.

24          One daughter, four grandchildren, and never served on a

25     jury.

1          THE COURT:  And are you married, sir, or not?

2          THE PANEL MEMBER:  No, not married.

3          THE COURT:  Okay.  Thank you.

4     No. 22 is next, Mr. Foster?

5          THE PANEL MEMBER:  My name is Michael Foster.  I'm

6     from Hallsville.  I have two children.

7          My place of employment is Hayes Pipe.  I'm a CDL driver.

8     I've been there four years.  I have a high school education.

9          My spouse's name is Ronda Foster.  She works at Energy

10    Well Fab, and she's in accounts payable.  She's been there 15

11    years.

12         I believe I have a criminal and a civil, and they both

13    were in this county, Harrison.

14         THE COURT:  But not in this court, in state court?

15         THE PANEL MEMBER:  No.  I've never been to this

16    court.

17         THE COURT:  All right, sir.  Thank you.  No. 23 is

18    next, Mrs. Bauer.

19         THE PANEL MEMBER:  My name is Amanda Bauer.  I'm

20    from Atlanta, Texas.  I have two adult children and two

21    grandchildren.

22         I am retired from Wadley Regional Medical Center.  I was

23    human resources generalist there.  I retired after 20 years.

24    I have an associate degree from Texarkana College.

25         My spouse's name is William Bauer.  He works for

 1    Honeywell, and he is a regional migration principal.  He's

 2    been there for over 25 years.

 3        And I have no prior jury service.

 4            THE COURT:  All right, ma'am.  Thank you very much.

 5        If you'll pass the microphone back, we'll give it to

 6    Panel Member No. 24, Mrs. Jacobs?

 7            THE PANEL MEMBER:  My name is Tonya Jacobs.  I have

 8    two children.

 9        I work at Diagnostic Clinic of Longview.  I've been there

10    for probably 24 years.  I am a registered nurse.

11        My husband's name is Eric.  He worked for Union Pacific

12    Railroad, and he's worked there for 20-plus years.

13        I have been on a jury trial before.  It was like an

14    injury.

15            THE COURT:  And where was it, ma'am?

16            THE PANEL MEMBER:  It was in Harrison County.

17            THE COURT:  In state court?

18            THE PANEL MEMBER:  Yes.

19            THE COURT:  You've never served on a jury in federal

20    court?

21            THE PANEL MEMBER:  No, sir.

22            THE COURT:  All right.  Thank you very much, Mrs.

23    Jacobs.

24        No. 25 is next?

25            THE PANEL MEMBER:  My name is Leslie Mobley.  I have

1    no children.

2        I work at Blue Cross Blue Shield here in Marshall.  I'm a

3    senior claims tech.  I've been there for seven years.  Have

4    two years of college.

5        I am not married.  And I have had two criminal juries

6    here in Harrison County for the state court.

7            THE COURT:  How long ago was that, ma'am?

8            THE PANEL MEMBER:  Seven years for one and two for

9    the other.

10            THE COURT:  Thank you very much.

11        Next is No. 26, Mr. Hammarsten?

12            THE PANEL MEMBER:  My name is William Hammarsten.  I

13    have two kids.

14        I work at the post office delivering mail, been there

15    about 10 years.  Some college.

16        My wife's name is Danika.  She also works at the post

17    office.  She's been there about 10 or 12 years.

18        And no prior service, jury service.

19            THE COURT:  All right, sir.  Thank you.

20        No. 27 is next, Mrs. Vaughn?

21            THE PANEL MEMBER:  Good morning.  My name is Debora

22    Vaughn.  I live in Marshall, Texas.  I have one grown daughter

23    and one deceased son.

24        I retired in 2020 from Christus Good Shepherd as a

25    radiologic technologist and echo tech.  A year and a half ago,

1    I went to work part-time with Dr. Gerber, and I've been there

2    since three-and-a-half years.

3         My spouse is deceased and, I've never served on a jury.

4              THE COURT:  And did you tell us about your

5    education?

6              THE PANEL MEMBER:  Registered radiologic

7    technologist hospital-based program out of Wadley Hospital in

8    1973.

9              THE COURT:  Thank you, ma'am.

10        No. 28 is next, Mrs. Thompson?

11             THE PANEL MEMBER:  My name is Jennifer Thompson.  I

12   have three grown children.  I work at UT Health Center in

13   Tyler as a radiology tech.  I've worked there a little over 13

14   years.  I have an associate's of applied science degree.

15        My spouse's name is Thomas.  He works for Ark-La-Tex

16   Landscaping for about eight months now.

17        And I served on a grand jury in Upshur County just last

18   year.

19             THE COURT:  Have you ever served on a petit jury?

20             THE PANEL MEMBER:  No.

21             THE COURT:  All right.  Thank you, ma'am.

22        No. 29 is next, please.

23             THE PANEL MEMBER:  My name is John Cohagen.  I live

24   in Hallsville.  I have four children, two adult and two that

25   are young enough to be my grandchildren.

1    I have -- I work for Progressive Insurance as a claims

2    adjustor.  I've been there for 24 years.  I have a Bachelor's

3    degree.

4    My wife is Stacy.  She is a nurse and a teacher at

5    Longview High School.  She's been there about a

6    year-and-a-half.

7    And I have never served on a jury.

8           THE COURT:  All right, sir.  Thank you.

9    No. 30 is next, Mr. Streed.

10          THE PANEL MEMBER:  Hi.  I'm Clay Streed, and I live

11   in Longview, Texas.  I've got six kids, six children.

12   Place of employment, I work at AITX.  It's a railroad

13   repair company, and we -- I put rail cars back out on the line

14   if they pass our inspections.  I've worked there for 44 years.

15   Education, I've had some college.

16   My spouse's name is Jerry.  She works for East Texas

17   Endodontics, and she's been for about 10 years and she's an

18   assistant.  How long -- let's see here.

19   I was on a civil jury between 10 to 15 years ago.  It's

20   been a long time.

21          THE COURT:  Where was it, sir?

22          THE PANEL MEMBER:  It was in Upshur County.

23          THE COURT:  Thank you very much.

24   Next is?

25          THE PANEL MEMBER:  My name is Linda Smith-Minor.  I

1    have three children, two by birth.  I have a special needs

2    stepdaughter.  She's autistic, blind, epileptic, diabetic,

3    hypertension.  She's got a lot of needs, but God blessed me

4    with her and I love her very much.  I have five grandchildren

5    and my great grandbaby will be induced today.

6        I work for Aleura Caring home health.  I've worked with

7    them since 2014.  Prior to that, I worked home health from

8    2001 at different places and even self-employed.  I have a

9    Bachelor of Science degree in business administration, and I

10   lack two courses having a Master's degree in business

11   administration with educational.

12       My spouse's name is Ronald Minor.  He is a veteran from

13   Vietnam.  He is disabled.  He has a programming degree, and he

14   worked in programming for many years.

15              THE COURT:  Have you ever served on a jury before?

16              THE PANEL MEMBER:  I have never served on a jury.

17              THE COURT:  All right.  Thank you very much, ma'am.

18       Next is Mr. Richardson, No. 32?

19              THE PANEL MEMBER:  My name is Michael Richardson.  I

20   have three stepchildren, 10 grandchildren, and just heard

21   yesterday we are expecting our first great grandchildren,

22   grandchild.

23       I retired from Cooper Tire and Rubber Company at

24   Texarkana December 2015 after 35-and-a-half years.

25       My wife's name is Laura.  She has -- we have a little --

1    I guess you'd say a hobby farm.  And my education, I had a

2    high school diploma, some college.  And my wife's been a

3    housemaker the whole time we've been married for 35 years.

4              THE COURT:  Any jury service?

5              THE PANEL MEMBER:  Jury service.  I served on a

6    criminal in Cass County, but no federal.

7              THE COURT:  And you've never served on a civil case?

8              THE PANEL MEMBER:  No.

9              THE COURT:  All right, sir.

10             THE PANEL MEMBER:  No, sir.

11             THE COURT:  Thank you very much.

12        Next is No. 33, Mr. Carrell?

13             THE PANEL MEMBER:  My name is Kellan Carrell.  I

14   live in Gilmer, Texas.  I have two children, two little boys,

15   ages 2 and 1.

16        Currently employed by Ark-La-Tex, and I'm a project

17   manager.  And it's been about a year-and-a-half there.  My

18   educational background, I graduated college with a bachelor in

19   science.

20        My spouse's name is Jaimie.  She works at Region 8, the

21   service center, and she is an accountant there.  She's been

22   there right at five years.

23        And I have no prior jury services.

24             THE COURT:  All right, sir.  Thank you very much.

25        Thank you, ladies and gentlemen, for that information.

1    Now, I need to say a couple of things to you before I turn the

2    questioning over to the lawyers.

3         The jurors who are actually selected to serve in this

4    case will serve in the role as the judges of the facts.  And

5    the jurors selected will make the sole determination about

6    what the facts are in this case.

7         Now, my job as the judge is to rule on questions of law,

8    evidence, and procedure, to maintain the decorum of the

9    courtroom, and to oversee an efficient flow of the evidence

10   over the course of the trial.

11        Also I want to say a couple of things to you about our

12   judicial system that I hope will put things in a proper

13   perspective for you.

14        In any jury trial besides the parties themselves, there

15   are always three groups of participants--the jury, the judge,

16   and the lawyers.  Now, with regard to the lawyers, I think

17   it's important for you to understand that our judicial system

18   in this country is an adversary system, which simply means

19   that during the course of the trial the parties through their

20   counsel will seek to present their respective cases to the

21   jury in the very best light possible.

22        Now, it's no surprise to any of you that lawyers are

23   sometimes criticized in the media, but the Court's observed

24   that at least some of that is the result of a basic

25   misunderstanding of our adversary system, in which the lawyers

1    act as advocates for the competing parties.  And as an

2    advocate, a lawyer is ethically and legally obligated to

3    zealously assert his or her client's position under the rules

4    of our adversary system.

5        And by presenting the best case possible on behalf of

6    their clients, the lawyers hopefully will enable the jury to

7    better weigh the relevant evidence, determine the truth, and

8    arrive at a just verdict based on that evidence.  This system

9    of justice, this adversary system of justice has served our

10   nation well since its founding almost 250 years ago, and

11   America's lawyers have been, continue to be, and will in the

12   future be an indispensable part of this process.

13       So as we go forward with this trial, even though it's

14   possible I might from time to time frown or roll my eyes at

15   the lawyers, I'm simply trying to make sure that their

16   advocacy doesn't exceed the bounds of our adversary system.

17   But please keep in mind, ladies and gentlemen, they are simply

18   doing their jobs, and it's important, I think, for all of you

19   to be aware of that as we go forward.

20       Also, ladies and gentlemen, for those of you that are

21   selected to serve on this jury, over the course of the trial I

22   am going to do my very best to make sure that none of you know

23   what I think about the evidence, because determining the facts

24   in this case from the evidence is the jury's job; it is not my

25   job.  And if you're on this jury, you should not take any

1    expression or comment that you see or hear or think you see or

2    hear coming from me as something to decide as a part of

3    determining the ultimate facts in this case.

4        Now, with that, the lawyers will address the panel.

5        Plaintiff, you may address the panel at this time.

6        Ms. Smith, would you like a warning on your time?

7            MS. SMITH:  Please, Your Honor.  May I have a

8    warning at six minutes and one minute, please.

9            THE COURT:  I'll warn you with six minutes remaining

10   and one minute remaining.

11           MS. SMITH:  Thank you, Your Honor.

12           THE COURT:  You may proceed.

13           MS. SMITH:  Good morning, everybody.  In the way of

14   a reintroduction, my name is Melissa Smith, and I am proud to

15   represent Touchstream today.

16       The first question, when you-all got your jury summons,

17   who thought, Gosh, I'm kind of excited about jury service?

18   Anybody?  We have a few in the back, a couple in the back.

19   Okay.

20       Tell me about that, Juror No. 27.

21           THE PANEL MEMBER:  I had the right to vote, I live

22   in the United States, and I think it's my job to serve on the

23   jury if so selected.

24           MS. SMITH:  We appreciate that.

25           THE PANEL MEMBER:  I take pride in that.

1        MS. SMITH:  We appreciate that.  Thank you, ma'am.

2    Now, for the rest of you-all that may have been more

3    hesitant or not as excited, I'll start with probably the most

4    important thing, frankly, that I'm going to do this morning,

5    and that's to thank you-all.

6        It's not lost on us that some of you traveled, that you

7    had an early morning this morning.  Some of you traveled I saw

8    from Kildare and Gilmer and Big Sandy and Diana.  So it was an

9    early morning.  It's also not lost on us that you took time to

10   fill out the questionnaires before arriving here this morning.

11   So every hour, every minute here is time away from your work

12   and your family and your obligations, and so on behalf of

13   Touchstream we appreciate you and we thank you.

14       Now, you've shared -- the Judge shared some information

15   about himself and you started to share some information about

16   yourselves as well so I'll share a little bit about myself.  I

17   went to the University of Texas at Austin for undergrad.

18   Right after that, I went to Baylor Law School, graduated from

19   Baylor, and about three days later I moved to Marion County

20   right outside of Jefferson and started practicing here on the

21   Marshall courthouse square.

22       That's been about 26 years ago.  So I've been practicing

23   in Marshall for the last 26 years.  My law firm name is Gillam

24   & Smith.  It's an old green house that sits right behind this

25   courthouse.  My law partner is Gil Gillam.  I've had the same

1    law partner -- he actually took a chance on me and hired me 26

2    years ago and then eventually he made me his partner.  So it's

3    a little bit unusual, but we've been partners for the last 26

4    years.

5         Personally, I'm married.  My husband's name is Steven.

6    We have an 11-year-old girl and a 13-year-old boy, so a sixth

7    and an eighth grader.  And weekends we all rodeo as a family.

8    So we all ride.  That's a little bit about me.

9         Now, His Honor gives us just a few minutes to introduce

10   our case, and what I want you to know about Touchstream is

11   Touchstream started back in 2011.  And you were already

12   introduced to Mr. David Strober.  Mr. Strober is not only the

13   founder of Touchstream, but he's also the inventor of about 16

14   patents, including the three patents that are at issue in this

15   case.  For those of you lucky enough to serve, you'll hear a

16   lot about those.

17        Now, at a very high level, the Touchstream patents, they

18   relate to the ability to take content from a mobile device

19   such as a home and to cast that content onto another device

20   such as a TV screen.  So that's really high-level and there's

21   a lot more to know about it, but that's generally what Mr.

22   Strober's inventions do.

23        So why are we here?  It's Touchstream's position that the

24   Defendant, the Charter folks over here, have a Charter

25   Spectrum TV app and that that app infringes Touchstream's

1     patents.  So on the Plaintiff's side, our case is going to be

2     showing you-all evidence of that infringement and then taking

3     a real good look at Charter's use of the technology and the

4     invention to determine how much in royalties they might need

5     to pay.

6         On the flip side, what I think you're going to hear from

7     Charter, I think you'll probably hear that they say they don't

8     infringe any of the three patents.  I think you also may hear

9     that if we don't infringe, then the patents aren't any -- if

10    we do infringe, the patents aren't any good, they're invalid

11    patents, each of the three, and if we infringe but the patents

12    are valid, then the patents or inventions just aren't that

13    valuable.  So I think that gives you an overview of what you

14    might hear from each side in this case.

15        Now, before I ask you some questions, I want to be

16    certain, have no doubt, that cases aren't one size fits all.

17    So, you know, you may be a great juror in one case but not a

18    great juror in another.  So what I'm going to explore for the

19    next few minutes is if you're the right fit for this specific

20    jury.

21        Judge -- His Honor told you in the questionnaires and he

22    told you again this morning there are no right or wrong

23    answers to any of the questions that I ask or any of the

24    questions that Mr. Dacus asks.  You know, I would rather hear

25    something that might be hard to hear for my client this

1    morning rather than hear it on Friday after the case is over.

2         And to be absolutely clear, His Honor talked about the

3    scales being equal.  What I am looking for in the next 20

4    minutes or so is for jurors that start out tipping those

5    scales in favor of Charter ever so slightly or in favor of

6    cable companies or you'll hear that Time Warner Cable actually

7    merged with Charter, so tipping slightly in favor of any of

8    those entities.  That's what we're going to talk about.

9         But before we do that, I want to talk a little bit about

10   the -- anyone that may know somebody on the other side.  I

11   mentioned Mr. Dacus, Deron Dacus.  He lives in Tyler now, but

12   he's originally from Gilmer, and I know some of you-all had

13   some Gilmer addresses.  He's married to a Mrs. Shannon Dacus.

14   She's also a lawyer.  Anyone know the Dacuses before you

15   walked in the courthouse today?  Okay.  I don't see any hands.

16        Mr. Dacus is helped in this case by a Mr. Todd Parish,

17   another Gilmerite.  Anyone know the Parish family?  Juror No.

18   6.  Tell me about that, sir.

19             THE COURT:  Wait to get a microphone, please, Mr.

20   Porter.

21             MS. SMITH:  Mr. Donley?

22             THE PANEL MEMBER:  Well, I pretty much growed up

23   with them.  They were -- I went to Harmony, they went to

24   Gilmer.  But Gilmer, it's a small town.

25             MS. SMITH:  Yes, sir.

1          THE PANEL MEMBER:  Lauren Parish?

2          MS. SMITH:  Yes sir.

3          THE PANEL MEMBER:  That's her brother.

4          MS. SMITH:  Absolutely.

5          THE PANEL MEMBER:  She was one grade behind me.  As

6     a matter of fact, she dated a friend of mine.  We went a lot

7     of places together.

8          MS. SMITH:  Well -- and you haven't been a lot of

9     places with anyone in my family.  Fair?

10          THE PANEL MEMBER:  Yeah.

11          MS. SMITH:  Okay.  So tell me, sir, does that

12     possibly make you, because you know the Parish family and

13     spent some time with Judge running around places, does that

14     cause you to start us out just ever so slightly behind in this

15     case?

16          THE PANEL MEMBER:  No.

17          MS. SMITH:  All right.  I appreciate that, sir.

18          THE COURT:  Mr. Porter, if you could turn that 6

19     right side up and make it a 9.

20          MS. SMITH:  I'm sorry.

21          THE COURT:  Thank you.

22          MS. SMITH:  I also can count.  I should have done

23     that.  I apologize, sir.

24       I apologize, Mr. Donley, as well.

25       All right.  We have some other folks at counsel table.

1    Arnold & Porter firm has folks that are going to be litigating

2    this case.  They're from New York City.  Anyone ever heard of

3    the firm Arnold & Porter?

4        All right.  I want to talk a little bit about your

5    experience to the extent you-all have any with either Charter

6    or Time Warner Cable, or Charter operates under the Spectrum

7    brand.  Anyone have any experience on the first row with any

8    of those entities?  Not seeing any hands.  Second row?

9        How about our third row?  All right.  Juror No. 20.

10   That's Mr. Ashburn.  Which company did you have experience

11   with?

12            THE PANEL MEMBER:  Spectrum.  I lived in Austin

13   seven years ago or so now.

14            MS. SMITH:  All right.

15            THE PANEL MEMBER:  And that's just who we had.  That

16   was just our internet provider.

17            MS. SMITH:  Okay.  Anything about that experience

18   that causes me to start out from behind?

19            THE PANEL MEMBER:  I don't think so.

20            MS. SMITH:  All right.  You think -- I mean, any

21   thought in your mind that they provided such great service,

22   that they can't possibly be infringers?

23            THE PANEL MEMBER:  No.  Definitely not.

24            MS. SMITH:  Tell me more about that.

25            THE PANEL MEMBER:  Just not great service in general

1    from them, so I don't know.

2            MS. SMITH:  Okay.  All right.

3            THE PANEL MEMBER:  Yeah.

4            MS. SMITH:  Thank you, sir.  I appreciate it.

5        All right.  And Juror No. 24, Mrs. Jacobs, I think I read

6    on your questionnaire that you might have had experience with

7    one of these companies?

8            THE PANEL MEMBER:  Yes.  I had -- Charter was my

9    internet.

10           MS. SMITH:  Okay.

11           THE PANEL MEMBER:  And the only reason I had left

12   them is I moved into a different area that wasn't -- didn't

13   have that service anymore.  And so I was probably with them

14   for probably about eight years, somewhere around there.

15           MS. SMITH:  Well, you know where I'm headed with

16   this, same as what I was discussing with Mr. Ashburn.

17   Anything about the eight years that you spent with them that

18   would cause me to start out a little bit behind?

19           THE PANEL MEMBER:  Not at all.

20           MS. SMITH:  All right.  Thank you, ma'am.  I

21   appreciate it.

22       All right.  I think we'll hear that the Charter entities

23   have about 32 million customers.  I'll tell you right now

24   you're not going to hear that Touchstream has 32 million

25   customers.  Is there anybody that thinks a smaller company

1    also can't have a good idea?  Anyone have that thought?

2         Everyone by show of hands think small companies can have

3    good ideas, too?  All right.  All right.  Thank you, ma'am.

4         All right.  It's a little bit unusual.  Juror No. 2, Mr.

5    Winchell, we have another flight nurse on the panel which I

6    found a little bit unusual.  Do you-all know each other, I

7    assume?

8              THE PANEL MEMBER:  Yes, we do.  We found it unusual

9    as well.

10             MS. SMITH:  I didn't know there were that many of

11   you out there quite frankly.

12             THE PANEL MEMBER:  There are not.

13             MS. SMITH:  Okay.  Well, we're glad to see you both.

14   But my question is this.  If you're both chosen to be on the

15   panel, is it a situation where you could go back there and if

16   you don't see eye-to-eye, you'd disagree with one another, or

17   is this kind of a bloc vote where you'd always vote the same?

18             THE PANEL MEMBER:  No, ma'am.  It wouldn't affect

19   it.

20             MS. SMITH:  Okay.  All right.  And you guys know

21   each other outside of work or just at work?

22             THE PANEL MEMBER:  We had met.  We're both volunteer

23   firemen.  We live in small towns that don't have fire

24   departments.  Austin and I both are on different fire

25   departments so we cross paths through that as well.

1          MS. SMITH:  Okay.  And when you introduced yourself,

2    you introduced yourself as being a part of a search-and-rescue

3    group that I think is -- is headed up by Texas A&M?

4          THE PANEL MEMBER:  Yes, ma'am.

5          MS. SMITH:  All right.  Here's what's going to

6    happen in this case.  You heard me introduce myself as a

7    Longhorn.  I never miss a game -- never miss a home game.  Mr.

8    Dacus is an Aggie, and he, you know, played baseball at A&M

9    and will probably tell everyone about that in a few minutes.

10       Am I going to start out a little bit behind in your mind

11   with that Aggie background you've got?

12         THE PANEL MEMBER:  No, ma'am.  I grew up in

13   Wisconsin, so it will not change it a bit.

14         MS. SMITH:  I appreciate that.  Thank you, sir.

15         THE PANEL MEMBER:  Yes, ma'am.

16         MS. SMITH:  Juror No. 3, Mrs. Skinner?

17         THE PANEL MEMBER:  Yes.

18         MS. SMITH:  I saw Aggie on your information as well?

19         THE PANEL MEMBER:  Yes, ma'am.

20         MS. SMITH:  Well, I'm a Longhorn.  When Mr. Dacus

21   stands up and starts saying things, I'm not always going to

22   agree with him.  Are you going to smile at your fellow good

23   Aggie and lean a little bit in his favor?

24         THE PANEL MEMBER:  No.  That's not going to affect

25   anything.

```
 1              MS. SMITH:  Sometimes you guys stick together so I
 2   had to ask.
 3              THE PANEL MEMBER:  Only in sports.
 4              MS. SMITH:  I hear you-all have a football team,
 5   but -- all right.  All right.  All right.
 6         Juror No. 11, Mr. Padilla, same questions I asked Juror
 7   No. 2.  If you guys are both lucky enough to serve on this
 8   panel, are you going to vote independently from Juror No. 2?
 9              THE PANEL MEMBER:  Absolutely.
10              MS. SMITH:  All right.  I appreciate it, sir.  Thank
11   you.
12         All right.  I also saw Juror No. 16, Mrs. Hart.
13              THE PANEL MEMBER:  Yes.
14              MS. SMITH:  My guess is, you know Juror No. 24?
15              THE PANEL MEMBER:  I do.
16              MS. SMITH:  All right.  Do you-all work in the same
17   office?
18              THE PANEL MEMBER:  We do not work in the same
19   office.  She is in internal medicine, and I'm in the business
20   office.
21              MS. SMITH:  You-all have an opportunity to cross
22   paths, I guess?
23              THE PANEL MEMBER:  We do.
24              MS. SMITH:  Anything about that going to cause y'all
25   to always be aligned in how you vote?
```

1          THE PANEL MEMBER:  Absolutely not.

2          MS. SMITH:  All right.  I appreciate that, ma'am.

3      I assume that's the same answer, Juror No. 24?  Okay.

4      All right.  By a showing of hands, who thinks--and I'm

5  raising mine--who thinks there are too many lawsuits?  I see a

6  lot of hands.  Not all the hands but a lot of hands.

7      Who thinks there are too many patent lawsuits?  Anyone

8  out there think there are too many intellectual property or

9  patent lawsuits specifically?  Sometimes I get some hands on

10  this.  Okay.

11      All right.  Let me talk to Juror No. 4, Ms. Giddings.

12  Ms. Giddings you said -- you told His Honor that you had some

13  prior civil jury service?

14          THE PANEL MEMBER:  Yes.

15          MS. SMITH:  How did -- which way did a verdict go,

16  for plaintiff or defendant?

17          THE PANEL MEMBER:  I'll be honest--I do not

18  remember.

19          MS. SMITH:  Okay.  I will accept that.  Thank you.

20      So I noticed on your questionnaire that you answered the

21  question about -- that you felt strongly that there were too

22  many lawsuits.  Tell me about that.

23          THE PANEL MEMBER:  I just think people are sue-happy

24  whenever, you know -- mainly car accidents, things like that.

25          MS. SMITH:  Okay.  We're not dealing with car

1    accidents and we're not dealing with hot coffee or anything

2    like that.  And I'll tell you, I mean, when someone -- when

3    someone infringes a patent, there is no patent police that you

4    can call.  So this is the only remedy and the only way we can

5    get justice is to come here.

6                THE PANEL MEMBER:  Right.

7                MS. SMITH:  Because you feel like there is a bunch

8    of lawsuits, am I starting at all behind in the courtroom?

9                THE PANEL MEMBER:  Not at all, no.

10               MS. SMITH:  Thank you, ma'am.  I appreciate it.

11          All right.  Juror No. 17, Mrs. Watson?

12               THE PANEL MEMBER:  Yes.

13               MS. SMITH:  I think you gave the same answer about

14   there being just too many lawsuits?

15               THE PANEL MEMBER:  Yes.

16               MS. SMITH:  Talk to me about that, ma'am.

17               THE PANEL MEMBER:  I kind of agree, individuals are

18   sue-happy, not so much I guess businesses, but

19   individual-wise.

20               MS. SMITH:  Okay.  And we have an individual

21   inventor here.  Mr. Strober has 16 patents to his name, and

22   we're going to talk about three of these.  He does have a

23   company, of course, but anything about that that would start

24   you leaning a little bit in favor of the cable companies?

25               THE PANEL MEMBER:  No, ma'am.

1          MS. SMITH:  Okay.  I appreciate it.  Thank you,

2     ma'am.

3          I think, Mr. Jolly --

4          THE PANEL MEMBER:  Yes, ma'am.

5          MS. SMITH:  -- I think you had a similar answer on

6     your questionnaire about there being just a whole lot or too

7     many lawsuits.  Tell me about that.

8          THE PANEL MEMBER:  Well, just false accusations.

9     They said this, they claim that, and none of it may be true,

10    so just a frivolous waste of resources.

11         MS. SMITH:  Okay.  Now, I told you -- you're talking

12    about they said this and they said that.  We are going to say

13    they infringe and they're going to say, you know, we don't

14    infringe, your patents aren't any good and your damages are

15    too high, probably.  Does that cause you any pause or any

16    hesitation with being on this jury?

17         THE PANEL MEMBER:  No, ma'am.

18         MS. SMITH:  All right.  I appreciate it.

19         THE PANEL MEMBER:  Thank you.

20         MS. SMITH:  Thank you, sir.

21         All right.  One more question for Mrs. Caraway.

22         I don't believe I've spoken with you yet.  I think I read

23    in your questionnaire, Mrs. Caraway, that you knew somebody

24    that had intellectual property.  Is that correct?

25         THE PANEL MEMBER:  That is correct.

1          MS. SMITH:  Tell me about that.

2          THE PANEL MEMBER:  The non-profit that I run has

3     business products based on intellectual property, and the man

4     that created them started the non-profit and he receives

5     dividends on that intellectual property.

6          MS. SMITH:  Okay.

7          THE PANEL MEMBER:  That does not go to the

8     non-profit itself.

9          MS. SMITH:  Okay.  Same kind of royalties that were

10    kind of royalties paid out that we're talking about here?

11         THE PANEL MEMBER:  Yes.

12         MS. SMITH:  I think you also said that you had known

13    somebody whose ideas had been stolen.  Is that the same

14    gentleman or is that a different instance?

15         THE PANEL MEMBER:  No.  That would be me.

16         MS. SMITH:  Well, tell me about that, if you can.  I

17    don't want to make you uncomfortable.

18         THE PANEL MEMBER:  No, it's fine.  I have a small

19    publishing company.

20         MS. SMITH:  Okay.

21         THE PANEL MEMBER:  And there were times when authors

22    had contacted me and we've entered into agreements, and then

23    they decided not to use my services but they took my ideas

24    with them.

25         MS. SMITH:  Okay.  And what did you do about it?

1          THE PANEL MEMBER:  I blessed them.

2          MS. SMITH:  Okay.  I know what that means because

3    I'm a Texan.  I bless you.

4       All right.  Well, and that's important.  But, you know,

5    do you have any problem with Mr. Strober and Touchstream doing

6    something about it, quite frankly?  I mean, you chose to only

7    bless them and not to file a lawsuit or anything of that

8    nature --

9          THE PANEL MEMBER:  I think intellectual property is

10   defensible as long as it's justified.

11         MS. SMITH:  Okay.  So let's pretend your work turned

12   out to be -- you know, was adopted and became the Harry Potter

13   series.  Okay?

14         THE PANEL MEMBER:  Okay.

15         MS. SMITH:  We're talking I don't know how many

16   millions of dollars.  Do you think it would be worth it to

17   perhaps pursue the person that took the intellectual property?

18         THE PANEL MEMBER:  On that level, yes.

19         MS. SMITH:  All right.  Thank you, ma'am.

20   Appreciate it.

21      All right.  What I think you guys will hear in the

22   evidence is that Touchstream and Charter had all kinds of

23   back-and-forth communication and presentations and meetings

24   and all kinds of stuff leading up to ultimately the Spectrum

25   TV app launch, which is what we say is infringement.

1          So my question is an easy one now.  I mean, you're going

2    to have to sort through the emails back and forth and look at

3    the dates and the people and the timing and timelines.  And

4    there are two kinds of people in the world.  There are these

5    big-picture kind of people that kind of just see everything

6    high-level, and then there are people that are kind of more

7    detail-oriented that kind of dig in and like the timelines and

8    like the dates and all that.

9          So I know there's a lot of gray area in between, but I

10   want you to kind of self-identify as one or the other.  So

11   just -- and I'm not going to call on you.  Just a raise of

12   hands:  On the first row, Mr. Dispenza's row, who would

13   identify as kind of a detail-oriented person?  Okay.  Juror

14   No. 2, 4, 4-and-a-half on No. 5?

15                THE PANEL MEMBER:  No.

16                MS. SMITH:  Okay.  And Juror No. 6.  Okay.

17         And on my second row, who are my detailed people on my

18   second row?  I knew that about No. 11.

19         10, you're a banker.  Is that correct?  Okay.

20         And Mrs. Caraway, No. 13.

21         What about Juror No. 15 over here Mrs. McCall's row, who

22   on that row identifies -- oh, we've got a bunch of you that

23   are detail-oriented.  The whole row.  Okay.  Thank you-all.

24         And, finally, row No. 19, Mr. Jolly's row, who likes to

25   dig into the details and is going to read the emails back and

1    forth and look at the timelines?  19, 20.  All right.  Thank

2    you-all.

3        And I'm not calling as much on the back two rows because

4    you-all are very unlikely to get reached in this process.

5    That's -- I didn't mean to rudely ignore you-all, but that's

6    kind of the process of how the seating works out.

7        All right.  His Honor talked to you a little bit about

8    the burden of proof.  The burden of proof for the Plaintiff,

9    which we gladly accept, is more likely than not, or a

10   preponderance of the evidence.  So when you look at Lady

11   Justice with the scales of justice, they're even, but to meet

12   our burden on the Plaintiff's side, it takes a grain of sand

13   or a feather to ever so slightly tip those scales more likely

14   than not.

15       Anybody take issue with that?  Anybody think, you know, I

16   heard the Judge's instruction and I understand it, but a

17   plaintiff should have to do more than that, more than just

18   barely more likely than not?  All right.

19       Now, on the flip side, as I've told you, the Defendant

20   may say, you know, those patents aren't any good.  Who thinks

21   the government gets it wrong sometimes?  I thought I'd get a

22   lot of hands on that one.  All right.  A little bit different.

23   Who thinks the government gets it wrong all the time?  Because

24   in this case the Defendant may say the Patent Office shouldn't

25   have issued the first patent, the second patent or the third

1    patent.

2        So when they say that, their presumption is going to be a

3    little bit different.  His Honor already talked to you about

4    this.  Their presumption is going to be a clear and convincing

5    presumption, which is a boulder on those scales of justice, a

6    boulder to prove that these patents, all three of them, are

7    not valid and the Patent Office made a mistake on every single

8    one of them.

9        Is there anybody thinking, you know, well, that's not

10    fair, because Ms. Smith's client only has to, you know, tip

11    the scales by a feather and they have to tip them with this

12    boulder?  Anybody take issue with that?

13              THE COURT:  Six minutes remaining.

14              MS. SMITH:  Thank you, Your Honor.

15        All right.  I don't see any hands.

16        Let's see.  Let's talk about damages.  Now, what's not

17    going to happen in this case is Touchstream is not going to

18    run from its damages number.  And what I'll tell you is that

19    we're going to be asking Charter to pay a little less than 50

20    cents, about 48 cents per month per subscriber.  And that's

21    what I call the Charter model because they charge their

22    subscribers a monthly fee each month for bundled services.

23        And what happens, though, is when you take that 48 cents

24    and you multiply it times the subscribers with access to the

25    Spectrum TV app and you multiply it over a bunch of months,

1    you come up with a number that's like a little over $400

2    million if everyone has just one cable box in their house.

3    And you come up with twice that or more than twice that if

4    people have more than one cable box in their house.

5        So my question is this:  You haven't heard any of the

6    evidence yet, but is there anyone out there sitting there

7    thinking, you know, I don't care what the evidence is; there

8    is no world where I could award, you know, $400 million to a

9    billion dollars for any case?  Anyone on the first row with

10   that thought?  Second row?  Anybody out in the gallery?  All

11   right.

12       Juror No. 10.  I'm going to pick on you for a little bit,

13   picking on you because you're a banker.  Okay?

14           THE PANEL MEMBER:  Yes, ma'am.

15           MS. SMITH:  And you're used to putting pen to paper

16   on money and things.  Any hesitation, and you haven't heard

17   any evidence yet, but, you know, Charter -- you may hear that

18   Charter has 15 million folks with the accused Spectrum TV app.

19   And when you start doing the math and you start applying 48

20   cents to their 15 million subscribers, you get a big number.

21       Any pause about putting a big number on a verdict form

22   before hearing the evidence?

23           THE PANEL MEMBER:  No, ma'am.

24           THE COURT:  All right.  Thank you.

25       I have not spoken to Juror No. 12, Mrs. Lynch.

1          THE PANEL MEMBER:  Yes.

2          MS. SMITH:  Same question for you.  When I start

3    talking about $400 million and a billion dollars, there's a

4    range here, and it will be in the jury's hands to operate in

5    that range.  Does that cause you to hesitate at all?

6          THE PANEL MEMBER:  No, not at all.

7          MS. SMITH:  All right.  Thank you, ma'am.

8      Mr. Winchell, coming back to you.  On your questionnaire,

9    you said that you thought verdicts recently, and, again, you

10   haven't heard the evidence, but had been a little on the high

11   side.  Tell me about that.

12         THE PANEL MEMBER:  I think it just -- those numbers

13   seem large to me because they aren't numbers I deal with every

14   day.

15         MS. SMITH:  And that's fair.  Does the 15 million

16   subscribers also seem large?

17         THE PANEL MEMBER:  That also is large, yes, ma'am.

18         MS. SMITH:  All right.  So you see where I'm going

19   with the math.

20         THE PANEL MEMBER:  Yes.

21         MS. SMITH:  Does that make you uncomfortable at all?

22         THE PANEL MEMBER:  No, ma'am.

23         MS. SMITH:  All right.  Thank you, sir.  Appreciate

24   it.

25      Mr. Dispenza, Juror No. 1, do you agree or disagree with

1    Mr. Winchell?

2              THE PANEL MEMBER:  I agree.

3              MS. SMITH:  All right.  No problem, if the evidence

4    supports it, looking at a number like that between $400

5    million and a billion dollars?

6              THE PANEL MEMBER:  I agree with him.

7              MS. SMITH:  All right.  Thank you, sir.

8              THE PANEL MEMBER:  Thanks.

9              MS. SMITH:  Who haven't I spoken to?  Let's see.

10   Juror No. 21, I haven't had the pleasure yet, sir.  I never

11   want to sit down not having spoken to just about everybody.

12   So I wanted to talk to you a little bit about damages.

13       I have a questionnaire from you.  It didn't look like you

14   took issue with the recent verdicts.  But what do you think

15   about a case where we're talking about between $400 million

16   and a billion dollars ultimately?

17             THE PANEL MEMBER:  I got no idea about, you know,

18   how much money that actually is, so, you know, I'm just East

19   Texas boy that, you know -- so, no, I don't think I'd have a

20   problem with the amount of money that's coming through.

21             THE COURT:  One minute remaining.

22             MS. SMITH:  Thank you, sir.

23       And thank you, Your Honor.

24       You know, I stay up late and work really hard to try to

25   figure out -- this is a bit of an intimidating process because

1    I try to figure out the exact right questions to ask each of

2    you when I come in here.  And I've been doing it a long time,

3    but I still don't get them right.  And so I'm just going to

4    throw the door wide open.

5        If there is someone sitting there thinking, you know, Ms.

6    Smith may have asked some decent questions, but if she had

7    just asked this one question, I would have told her that I'm

8    starting out leaning in favor of the cable company, whether it

9    be Time Warner or Spectrum or Charter, I'm really starting out

10   leaning.  Does anyone have that thought as you sit here?

11       All right.  Well, I started with a big thank you to

12   you-all and that's how I'll end.  On behalf of Mr. Strober, on

13   behalf of Touchstream, we thank you-all for your time today

14   and look forward to seeing the eight of you that are lucky

15   enough to serve.

16       Thank you, Your Honor.

17           THE COURT:  All right.  Defendants may now address

18   the panel.

19       Mr. Dacus, would you like a warning on your time?

20           MR. DACUS:  If you would let me know when I have

21   five minutes left, please, Your Honor.

22           THE COURT:  I will do that.  You may proceed when

23   you are ready.

24           MR. DACUS:  Thank you very much.

25       Good morning.  The morning is rapidly fading but good

1    morning.  I'll reintroduce myself.  I'm Deron Dacus.  And

2    along with Dan Reisner and Marc Cohn, we represent Charter

3    Communications and Dan Frusciano, who is here on behalf of

4    Charter.

5        I want to start exactly where Ms. Smith left off and that

6    is to say thank you.  It is not lost on me, it's not lost on

7    anyone at our table that you have other things you need to be

8    doing today--work, grandkids, kids tending to grandmothers,

9    all sorts of things.  The first thing that the folks at

10   Charter want us to say here, we would not be here if this case

11   is not important to Charter.  It is.

12       Now is not the time for evidence.  Now is not the time

13   for me to make my impassioned arguments that the Judge told

14   you I would.  But I am going to say this.  Charter has not and

15   has never used these patents, and that's why we're here to

16   defend ourselves.  It's just that simple.  It's no more

17   complicated than that.

18       Now, let me do a few things before I hear from you

19   because that's the primary purpose of today is for me to hear

20   from you.

21       I'll do what the Judge did and what Ms. Smith did and

22   I'll tell you a little bit about myself so that you know who's

23   asking you questions.  I wish I could tell you that it was

24   interesting enough that somebody's going to write a book or

25   make a movie about it.  It ain't so.

1          As Ms. Smith said, I grew up in Gilmer.  I was fortunate

2     enough to go to Texas A&M, fortunate enough to graduate, then

3     went to Baylor Law School where I was very fortunate to meet

4     my wife to whom I've now been married to for 30 years.  We

5     live over in Tyler.

6          I've got two adult kids.  Hard to say.  They're both --

7     they're 27 and 25.  I watch everybody stand up who says they

8     have grandkids and I watch that big smile come on your face.

9     And I don't yet have grandkids, but I tell you that's my major

10    goal in life at this point is to get some grandkids.  So

11    that's who's asking you questions this morning.

12         But let me close the loop on who knows who in this

13    courtroom this morning.  Ms. Smith introduced herself and her

14    partner Gil Gillam, and they practice and work here in

15    Marshall.  Does anybody know Ms. Smith or her partner, Gil

16    Gillam, would you raise your hand and let me know?  Okay.

17    Good.

18         She also introduced and Mr. Dykal introduced himself, and

19    Mr. Dykal told you that he works for the law firm of Boies

20    Schiller.  That's a law firm in Washington, D.C.  Anybody know

21    either Mr. Dykal or that Boies Schiller firm, that name, at

22    all?  Anybody?  Raise your hand.  Okay.  Good.

23         Now, the Judge told you that I was not going to ask

24    personal questions and pry into your personal business, and

25    he's exactly right.  I'm not.  So when I ask this next

1    question, I know I usually get a lot of hands on this, but

2    people are somewhat reluctant because they think I'm going to

3    pry into your personal business.  And I'm not going to do so.

4        But raise your hand if you have ever been falsely accused

5    of something?  And I'm not talking about in the courthouse.

6    I'm just talking about in your everyday life, if someone has

7    said -- accused you of doing something that just wasn't right?

8    I mean, most of us have had that happen.  Right?  Okay.

9        Let me ask you, I'll just start with Juror No. 1, Mr.

10   Dispenza.  I'm not going to ask you a single question about

11   the details.  Okay?  Here is what I want to know when somebody

12   falsely accused you of something how did you feel?

13            THE PANEL MEMBER:  I just felt wronged about it, you

14   know.

15            MR. DACUS:  Let me ask a more important question.

16   Did you feel like you had the right to defend yourself?

17            THE PANEL MEMBER:  Yes.

18            MR. DACUS:  Okay.  Did you have the experience, as

19   some folks do, that it's really easy to sort of point the

20   finger at someone and accuse them of wrongdoing, but it's

21   really hard if you're the one accused to get someone to take

22   the time to actually listen to your side of the story?

23            THE PANEL MEMBER:  There is some -- that's a good

24   point.

25            MR. DACUS:  That's a common occurrence.  Right?

1    Really easy to point your finger at someone and say, you did

2    wrong.  That doesn't take much, does it?

3              THE PANEL MEMBER:  No.

4              MR. DACUS:  But it takes time and someone willing to

5    listen to your side of the story to defend yourself.  Right?

6              THE PANEL MEMBER:  Right.

7              MR. DACUS:  Okay.  You understand that that's the

8    exact situation that Charter finds themselves in in this

9    courtroom?

10              THE PANEL MEMBER:  I can see where that could

11   happen.

12              MR. DACUS:  You don't -- or do you -- do you in any

13   way think that Charter's doing something improper by defending

14   itself?

15              THE PANEL MEMBER:  No.

16              MR. DACUS:  Okay.  You think we have the full right

17   to do that?  All right.  Thank you, sir.

18        Now, I'm just going to ask the panel in general, anybody

19   think that Charter does not have the right to come to the

20   courthouse and defend themselves?  Anybody in that camp at

21   all?  Okay.

22        Let me -- a few others of you raised your -- let's see.

23   Mr. Padilla, you had your hand in the air.  Right, sir?  What

24   can happen in these types of lawsuits at times, Mr. Padilla,

25   is the Plaintiff, who Ms. Smith already told you Charter's

1   bigger than the Plaintiff, we have more employees than the

2   Plaintiff does.  You heard her say that?

3          THE PANEL MEMBER:  Yes, sir.

4          MR. DACUS:  So what can happen in these lawsuits

5   sometimes is the people sitting at the Plaintiff's table can

6   sort of play this David versus Goliath.  Do you know what I

7   mean by that?

8          THE PANEL MEMBER:  Yes, sir.

9          MR. DACUS:  And they can either expressly or

10  implicitly say to jurors, hey, Charter's a lot bigger, we're a

11  lot smaller, can you ignore the facts and the evidence and

12  just go with the little guy?  Do you understand?

13         THE PANEL MEMBER:  Yes, sir.  Yes, sir.

14         MR. DACUS:  Now, is that something that you would

15  do?

16         THE PANEL MEMBER:  No.  Everything would be

17  factual-based for me.

18         MR. DACUS:  And that's my question.  And I'm going

19  ask the whole panel, I'll tell you, because this is an

20  important issue here.  We're not going stand up and tell you

21  that we're smaller than them.  We're not.  We're larger than

22  them.

23      But what we are going to tell you is we're here and what

24  we want are folks who will actually listen to the facts and

25  the evidence and make a decision based on that.  So my only

1    question to you is, will you do that even though we're larger

2    than they are?

3              THE PANEL MEMBER:  Yes, sir.

4              MR. DACUS:  Okay.  Thank you, sir.

5         So here's my question to the panel, and it's an important

6    one.  Is there anyone sitting there thinking, you know what?

7    I'd lean even a little bit just ever so slightly towards these

8    folks at this table because they're the smaller dog in the

9    fight?  Anybody just ever so slightly?  Okay.

10        Let me ask you, Mrs. Ormes.  I'll just ask you directly.

11   You would not lean towards these folks at this table if they

12   were to say to you, hey, we're smaller and we'd like for you

13   to give us the benefit of the doubt because of that.  Right?

14             THE PANEL MEMBER:  Right.

15             MR. DACUS:  Okay.  Thank you, ma'am.

16        Let's talk about one other thing that's going to happen

17   in this trial.

18        And can you hand the mic to Juror No. 13, Mrs. Caraway,

19   please?

20        Mrs. Caraway, did I hear you say you had five kids?

21             THE PANEL MEMBER:  Yes.

22             MR. DACUS:  Boys, girls?  What's the mix?

23             THE PANEL MEMBER:  Two girls, three boys.

24             MR. DACUS:  All right.  So you're the perfect person

25   for this question.  Those kids growing up, how old -- are

1    they -- how old are they now?

2              THE PANEL MEMBER:  They range from 22 to 35.

3              MR. DACUS:  All right.  So growing up, those kids

4    ever get in little squabbles?  I won't call them fights but

5    little squabbles and tussles?

6              THE PANEL MEMBER:  They were great at it.

7              MR. DACUS:  All right.  And here's what I bet

8    happened.  When they got caught squabbling or fussing and

9    fighting, when they got caught, I bet they ran to you to try

10   to tell their story first, did they not?

11             THE PANEL MEMBER:  Yes.

12             MR. DACUS:  Every time -- I have no idea what it is

13   in us that makes us do it, but that's what we all do as

14   kids--we want to tell our story first.  Right?  My guess is

15   that you were a really good mother.  Is that true?

16             THE PANEL MEMBER:  I was fantastic.

17             MR. DACUS:  I knew it.  I knew it.  Did you take

18   that story from that first kid and just accept it as true or

19   not?

20             THE PANEL MEMBER:  No.

21             MR. DACUS:  No.  What did you do?

22             THE PANEL MEMBER:  I listened to everyone's story.

23             MR. DACUS:  Listened to everyone's story.  You know

24   why I'm asking you these silly questions?

25             THE PANEL MEMBER:  Yes, I do.

1        MR. DACUS:  Okay.  Because these folks right here,

2   because they have the burden of proof, you heard the Judge say

3   that, they get to go first.  So today, tomorrow, part of

4   Wednesday, I'm going to have to sit there and bite my tongue

5   while they put on their evidence.  You understand that?

6        THE PANEL MEMBER:  Uh-huh.

7        MR. DACUS:  So my question to you is, if you're

8   selected on this jury, just like you did when you were the

9   good mother that you were, a fantastic mother?

10       THE PANEL MEMBER:  Fantastic.

11       MR. DACUS:  Pardon.  Will you wait until you've

12  heard all the evidence before you make a decision in this

13  case?

14       THE PANEL MEMBER:  Yes, I would.

15       THE COURT:  Okay.  Thank you very much, ma'am.

16       Now, look, I'm making a little bit light of this with

17  Mrs. Caraway, but it's actually a very serious topic, because

18  they get to put on all their evidence and then we go second.

19  And I'll tell you up front, it will be -- I mean, we'll have a

20  technical expert whose testimony is very important who will

21  not testify until Thursday, maybe late in the day Thursday.

22  We'll have other witnesses before that.

23       So what I want to make sure that I have a commitment from

24  everyone, I'm going ask you to raise your hand, will you

25  commit that you will wait until you hear every bit of the

1    evidence before you make a decision in the case?  Can

2    everybody agree to that?  Okay.  Perfect.  Thank you.

3        Let's talk about who has cable television.  And before I

4    ask this, let's draw a little distinction here.  We have cable

5    television, we have satellite television, and now we have

6    streaming services also.  Okay?  So who is it that is a cable

7    subscriber, you have cable television at your home?  One

8    person.  Okay.  Let's see.

9        I can't see your number, sir.  Can you tell me your

10   number?

11             THE PANEL MEMBER:  No. 22.

12             MR. DACUS:  Thank you, Mr. Foster.

13             THE PANEL MEMBER:  Yes.  I need -- can I ask

14   something?  You say cable.  It's coming in on a cable?  Just

15   to be clear.

16             MR. DACUS:  Yes, sir.

17             THE PANEL MEMBER:  Okay.

18             MR. DACUS:  Yep.  What service is it?  Who is the

19   provider?  Do you know?  It doesn't matter.

20             THE PANEL MEMBER:  Frontier.

21             MR. DACUS:  All right.  Do you know whether or

22   not -- Ms. Smith told you that what these folks at this table

23   accuse is an app.  Do you know what an app is on our phone?  I

24   left my phone over there.

25             THE PANEL MEMBER:  Yes, sir.

1            MR. DACUS:  Okay.  Does your cable service have an

2     app on the phone that you can download or do you know?

3            THE PANEL MEMBER:  I don't know a hundred percent.

4     But it may be to pay the bill, but that would be it.

5            MR. DACUS:  But not -- you're not aware of any app

6     that they have where you actually use it to select the things

7     on the --

8            THE PANEL MEMBER:  No.

9            MR. DACUS:  -- the programming on the television?

10           THE PANEL MEMBER:  No.

11           MR. DACUS:  Okay.  All right.  That's what I need to

12    know.  Thank you, sir.

13        Has anyone, and I asked a question about are you

14    currently a cable user, but has anyone ever had cable service

15    and downloaded the app from that particular cable service?

16    Anybody?  Okay.

17        And just so I know so that we take a full survey here,

18    who has satellite dish service for your television, raise your

19    hand.  Okay.  And who has one of the streaming services, Apple

20    TV, whatever it might be.  All right.  A good portion.  All

21    right.  Thank you.

22        Who has some expertise in computer programming or

23    software?  I think I know who is going to raise their hand.

24    All right.  That's right.  Mr. Thomasson.  And I heard -- I

25    think I heard you say that you were actually a web designer.

1    Is that right?

2              THE PANEL MEMBER:  Yes.  That's where I went to

3    college here in town for.

4              MR. DACUS:  Yes, sir.  So web, just so I'm -- that's

5    like a website design?

6              THE PANEL MEMBER:  Design of the website, you know,

7    all the buttons and text and do-dads.

8              MR. DACUS:  Okay.  Do you also, as part of your

9    background, do you have some programming experience like

10   writing of actual code?

11             THE PANEL MEMBER:  Yes.  Like I've done the back end

12   PHP and stuff, and I've played around with things here and

13   there, you know, just to...

14             MR. DACUS:  And if I said the word software, is that

15   a word you're familiar with?

16             THE PANEL MEMBER:  Yes.

17             MR. DACUS:  How -- tell me what you -- how you

18   understand soft -- what you understand software to be.

19             THE PANEL MEMBER:  It's a bunch of words that

20   magically make things happen on the computer.

21             MR. DACUS:  It's sort of the programming code --

22             THE PANEL MEMBER:  It tells it what to do.

23             MR. DACUS:  Okay.  Now, in your -- either in your

24   professional capacity or in your job, have you ever had

25   occasion to sign what they call a software license?

1          THE PANEL MEMBER:  Me personally?  No, not for like

2     a business purpose.  You know, sometimes you download a

3     program and it's like click here and you just go, okay, I'll

4     click here.

5          MR. DACUS:  Is that what -- and that was going to be

6     my next question.  Do you understand or know what a software

7     license is?

8          THE PANEL MEMBER:  It's a bunch of words telling you

9     stuff that you usually skim over so you can press yes and get

10    to using the program.

11         MR. DACUS:  Gotcha.  But you have to ask permission,

12    the license is permission for someone --

13         THE PANEL MEMBER:  I've heard of the different

14    licensing provisions like the strict copyright or GPL and

15    stuff like that, open source, close source.

16         MR. DACUS:  Gotcha.  Perfect.  That's what I need to

17    know, Mr. Thomasson.  Thank you.

18         THE PANEL MEMBER:  Okay.

19         MR. DACUS:  Who here has ever executed or signed a

20    software license?  Anybody ever done that?

21       Mr. Brown?  Under what circumstances or on what occasion

22    did you have to do that?

23         THE PANEL MEMBER:  Well, it's just like, you know,

24    if you do your cash app or whatever on your phone, you have to

25    sign that agreement.  I mean, the agreements are all there

 1     on -- all the apps on the phone where you have to sign

 2     basically if you use that app.

 3          My experience also has been is that as an electrician

 4     I've done quite a bit of programming and I've used quite a few

 5     touchscreens.  And I don't know if this touchscreen is the

 6     same company I used as far as my industrial work or not.

 7               MR. DACUS:  So let me be precise here because it's

 8     easy to confuse the words.  I'm understanding you to say

 9     screen, S-C-R-E-E-N?

10               THE PANEL MEMBER:  Right.

11               MR. DACUS:  These folks' name is stream S-T-R --

12               THE PANEL MEMBER:  Stream.

13               MR. DACUS:  Like a river or creek.

14               THE PANEL MEMBER:  So I never worked with anything

15     stream.

16               MR. DACUS:  Okay.  Thank you, sir.

17          Anyone here ever filed for or had a really close relative

18     file for a patent?  Anybody?  Nobody in that camp.

19          Now, you heard Ms. Smith on behalf of Touchstream say

20     that in this lawsuit after Charter got sued, Charter took a

21     close look at these patents and Charter believes that these

22     patents are invalid.  Not only do we not use them, but we

23     believe they're invalid.  Okay?

24          So who here knew before you came to the courthouse today

25     that a jury actually makes the final determination on whether

1    a patent is valid or invalid?  Did anybody know that?  I

2    didn't know it before I started doing this type of work.  I

3    think nobody knew that.  So now I've got some questions about

4    that.

5         So, Mrs. Lynch, may I talk with you, please, ma'am?  So

6    you watched the video that the Court played for you this

7    morning.  Right?

8              THE PANEL MEMBER:  Yes.

9              MR. DACUS:  Did you listen closely?

10             THE PANEL MEMBER:  Yes.

11             MR. DACUS:  All right.  Did you hear them say that

12   the Patent Office makes the preliminary determination on

13   whether or not to issue a patent, but a jury makes the

14   ultimate determination?  Did you hear them say that?

15             THE PANEL MEMBER:  I don't remember them saying

16   about the jury, but I do remember the Patent Office.

17             MR. DACUS:  Okay.  Fair enough.  So that's what I'm

18   telling you.  Part of this trial is going to be whether or not

19   these patents are valid and that's for the jury to decide.

20   Okay?

21             THE PANEL MEMBER:  Okay.

22             MR. DACUS:  Now, no doubt the Patent Office already

23   issued these patents.  So my question to you is, do you have

24   any reservation or hesitation about if we prove that to you

25   that under the law they're not valid, do you have any

1    hesitation about finding them invalid?

2            THE PANEL MEMBER:  Not if the proof was there, no.

3            MR. DACUS:  Okay.  All right.  That's what I need to

4    know.  Thank you, ma'am.

5        So I'll ask the panel, and think about this, does anybody

6    have any hesitation, even the slightest, about finding a

7    patent invalid when it's been issued by the Patent and

8    Trademark Office?  Would you let me know if you do?  Okay.

9            Ms. Paye, let me talk with you since I've not, if that's

10   okay.  Juror No. 5.  I apologize.

11       So did you listen to the video this morning?

12           THE PANEL MEMBER:  Yes.

13           MR. DACUS:  Okay.  Did you hear them say that this

14   process that these patents go through with the Patent Office

15   is sort of a secret process only between the person applying

16   for the patent and the Patent Office and that no one else

17   participates in it?

18           THE PANEL MEMBER:  Yes.

19           MR. DACUS:  Did you hear them say that?

20           THE PANEL MEMBER:  Yes.

21           MR. DACUS:  Did you know before?

22           THE PANEL MEMBER:  No, sir.

23           MR. DACUS:  If you sit on this jury, you're going to

24   hear evidence and information that the Patent Office did not

25   have.  Do you understand that?

```
 1                THE PANEL MEMBER:  Yes, sir.

 2                MR. DACUS:  So let me ask you this.

 3                THE COURT:  Ms. Paye, hold the microphone a little

 4     closer, please.

 5                THE PANEL MEMBER:  Okay.

 6                THE COURT:  Thank you.

 7                THE PANEL MEMBER:  Yes, sir.

 8                MR. DACUS:  Have you ever made a decision in your

 9     life where you felt like I absolutely know this is the right

10     decision, but once you got more information, you realized that

11     your initial decision was wrong?

12                THE PANEL MEMBER:  Yes, sir.  I think everyone has

13     done that.

14                MR. DACUS:  I think so, too.  That's why I asked it.

15     So that's kind of what we say is happening here.  Okay?  We

16     say, yeah, the Patent Office had some information, they made a

17     decision based on that, but there is additional information

18     that we didn't have a chance to present to the Patent Office,

19     and we think, based on the law His Honor gives you, that these

20     patents are invalid.  Would you have any hesitation about

21     finding that if we prove it?

22                THE PANEL MEMBER:  No, sir.

23                MR. DACUS:  All right.  Thank you, ma'am.

24        And I'll follow up one other thing on this invalidity

25     issue.  Who here has served on a criminal jury?  Some people
```

1    said they had.  Let's see.  Mr. Segers, am I pronouncing that

2    correctly, sir?

3                THE PANEL MEMBER:  Yes.

4                MR. DACUS:  No. 18.  In your criminal jury did

5    you-all find the defendant guilty?

6                THE PANEL MEMBER:  Yes.

7                MR. DACUS:  Okay.  Do you remember in that case that

8    the judge told you, I'm sure, that the defendant was presumed

9    innocent?

10               THE PANEL MEMBER:  Yes.

11               MR. DACUS:  But yet you-all found him guilty.

12   Right?

13               THE PANEL MEMBER:  Yes.

14               MR. DACUS:  So, likewise, here for these patents

15   this judge is going to tell you that there is a presumption

16   that the patent is valid because it's been issued.  Okay?

17               THE PANEL MEMBER:  Okay.

18               MR. DACUS:  And it's just like in a criminal

19   case--there is that presumption, but if we prove that it is,

20   in fact, valid, then we overcome that presumption.  Do you

21   understand that?

22               THE PANEL MEMBER:  Yes.

23               MR. DACUS:  And just like in your criminal case, if

24   we prove that, would you be willing to find that these patents

25   are invalid, if we prove it?

1           THE PANEL MEMBER:  Yes.

2           MR. DACUS:  All right.  Thank you, sir.

3      Ms. Smith asked you a question along these lines about

4  whether or not you're detail-oriented.  I'm going ask a

5  similar question, but it's slightly different.  And I'm going

6  let you think about it before I ask you to raise your hand.

7       And I'm going to ask you, who here is a quick

8  decision-maker--in other words, you see a set of facts and you

9  make decision like that--versus someone who likes to sort of

10  take your time, be more methodical, review the facts more

11  closely before you make a decision.  Okay?  Those are kind of

12  the two categories that folks fall into, generally.

13      Who is in that first category of, I see the facts, I make

14  the decision?  Anybody?

15      All right.  Mrs. McCall?

16           THE PANEL MEMBER:  Yes.

17           MR. DACUS:  I'm a little surprised you said that?

18           THE PANEL MEMBER:  Why is that?

19           MR. DACUS:  Because when you said you worked with

20  special ed, my impression of folks like that is you must have

21  the patience of Job.  Right?

22           THE PANEL MEMBER:  Maybe so, but sometimes it's

23  right there in front of your face, there's nothing else to do,

24  be about it, just get it done.

25           MR. DACUS:  Understood.  All right.  Understood.

1    You and I will leave our Foxworthy references out of the rest

2    of the courthouse.

3              THE COURT:  Please do.

4              MR. DACUS:  Thank you, Your Honor.

5         So, Mrs. McCall, let me ask a related question but

6    slightly different.  Do you find that the faster you do a

7    task, the more errors or mistakes you make in doing that task?

8              THE PANEL MEMBER:  Sometimes, yes.  It depends on

9    the task.

10             MR. DACUS:  Right.  In other words, if we get

11   rushed, so to speak, then we don't do as good a job as if we

12   took our time.  Fair?

13             THE PANEL MEMBER:  Maybe, uh-huh.

14             MR. DACUS:  Okay.  I'm going to ask you another

15   question.

16        But let me ask the whole panel--anybody disagree with

17   that, that sort of the faster we do things, in general, the

18   more mistakes we make?  Everybody raise your hand and tell me

19   if you agree with that.

20        Now, I also -- Mrs. McCall, the reason I kept you

21   standing is I saw on your questionnaire that you were, at

22   least at one point, a DIRECTV subscriber--is that right?--for

23   satellite?

24             THE PANEL MEMBER:  Yes.

25             MR. DACUS:  Are you still?

1          THE PANEL MEMBER:  No.  We are with Starlink.

2          MR. DACUS:  Gotcha.  Gotcha.  Okay.  And is there

3   any particular reason that you stopped using the satellite

4   companies?

5          THE PANEL MEMBER:  We live in the country, very

6   rural, and the service was just bad and internet was awful.

7   You know, the little circle that goes around and around and

8   around, we just got tired of that.

9          THE COURT:  Five minutes to go.

10          MR. DACUS:  Thank you, Your Honor.

11          THE PANEL MEMBER:  Starlink is not like that.

12          MR. DACUS:  I'll confess to you -- Ms. Smith said I

13   live in Tyler.  I actually live 15 miles outside of Tyler in

14   the middle of nowhere, so I'm very familiar with what internet

15   service is like, and it's tough to get reliable, fast internet

16   service.  Right?

17          THE PANEL MEMBER:  Sure.

18          MR. DACUS:  Anybody else live in the country and

19   have that problem?  Lots of folks.  Okay.  Great.

20      Thank you, Mrs. McCall.

21      One final topic to touch here, and Ms. Smith touched on

22   it sort of at the end of hers.  These folks, if they do what

23   they've been telling us they're going to do, they're going to

24   ask you for a billion dollars.  Okay?  And we don't think we

25   owe them a dime.  That's why we're here.  But ultimately

1    that's going to be your decision.  I don't get to make it.

2    Whatever eight jurors sit on this jury, you'll make that

3    decision.

4        Here's my question to you.  And I haven't had a chance to

5    talk to you, Mr. Donley, No. 6, so I'll ask you directly.  If

6    you sit on this jury, sir, and you find -- and I sure hope you

7    don't, but if you find that we use their patents, would you

8    make them prove what a reasonable amount of money is for the

9    use of those patents, or would you just say, Well, they used

10   them; I'll give them whatever they ask for?

11           THE PANEL MEMBER:  I don't know.  That's going to be

12   a hard decision there.

13           MR. DACUS:  Okay.  Why is it hard?  What makes it

14   hard for you?

15           THE PANEL MEMBER:  I don't know what they're asking

16   for, one thing, and I'm not familiar with the laws of that

17   until I see all the evidence and they have to prove their

18   case --

19           MR. DACUS:  Fair enough.

20           THE PANEL MEMBER:  -- so to speak.  And I know --

21   you mentioned something about a dog fight.  It's not the size

22   of the dog that's in the fight; it's the fight in the dog.

23           MR. DACUS:  Understood.  Understood.  So what I hear

24   you saying to me is, if you sit on this jury, you'll listen to

25   the evidence, take whatever law the Judge gives you, and

1    you'll make a determination based on that as to what the

2    reasonable amount of money is?

3                  THE PANEL MEMBER:  Yes, sir.

4                  MR. DACUS:  All right.  Let me just have you hand

5    the microphone to Ms. Franklin there.

6         You -- would you do the same thing, Ms. Franklin?  In

7    other words, would you actually -- if you decide that we

8    infringe--and I certainly don't think you will, and hope you

9    don't--but if you did, would you make them prove what a

10   reasonable amount of money is?

11                 THE PANEL MEMBER:  I'd have to look at all the --

12                 MR. DACUS:  Evidence.

13                 THE PANEL MEMBER:  -- evidence to make that choice.

14                 MR. DACUS:  Perfect.  That's what I need to know.

15   Thank you, ma'am.

16        I'll sit down now.  I want to end up by saying to

17   everyone a sincere thanks.

18        Before I sit down, I want to basically ask the same thing

19   that Touchstream's counsel did.  I don't know all the right

20   questions to ask.  There may be folks sitting there thinking,

21   You know what?  If that lawyer was smart enough, he'd have

22   asked me this and figure out I'm not the right juror, he

23   doesn't want me on this jury.

24        Is there anybody sitting there thinking

25   that--okay?--thinking that there's some question I should have

1    asked that I did not?  Raise your hands and let me know.  I'm

2    happy to hear from you.  Okay.  Great.  Thank you.  Thank you

3    very much for your time this morning.

4        Your Honor, thank you very much.

5             THE COURT:  All right.  Counsel approach the bench,

6    please.

7             (The following was had outside the hearing of the

8             jury panel.)

9             THE COURT:  Ms. Smith, does the Plaintiff have any

10   challenges for cause?

11            MS. SMITH:  I do not, Your Honor.

12            THE COURT:  Mr. Dacus, does the Defendant -- do the

13   Defendants have any challenges for cause?

14            MR. DACUS:  We do not, Your Honor.

15            THE COURT:  All right.  Then I have Mrs. Skinner who

16   has a scheduling problem and Mrs. Caraway.  I also have 23,

17   but without any challenges for cause I don't see that we get

18   to 23.

19            MR. DACUS:  I agree.

20            THE COURT:  So I'm going keep those two back and let

21   everybody else recess.  Do you-all see any problems?

22            MS. SMITH:  No, Your Honor.

23            MR. DACUS:  No, sir.

24            THE COURT:  All right.  Take your seats, please.

25            (The following was had in the presence and hearing

1           of the jury panel.)

2           THE COURT:  Ladies and gentlemen, I am about to

3    excuse most of you for a recess.  When I do, I'd like you to

4    go through the double doors in the back.  And once you exit

5    the courtroom through those double doors, if you continue

6    around to your left and go around the corner, you'll find the

7    restrooms and the water fountains.  Those might be of interest

8    to you.

9       I'm going ask you while you're on recess not to leave the

10   building and not to leave this floor.  Stay on this floor.

11   Stay in the building.

12      Also, ladies and gentlemen, while you're on recess, let

13   me remind you, you have heard zero evidence in this case; no

14   evidence whatsoever.  However, it is important that if you

15   have a discussion or a conversation with any other member of

16   the panel, it's important that you not discuss what's happened

17   in the courtroom this morning.

18      So if you'd like to have a conversation with people that

19   you know--we've got two helicopter nurses, we've got two techs

20   of some kind together seated right next to each other back

21   here--if you'd like to have a conversation with anybody that

22   you know or you just met for the first time today, feel free

23   to do that, but don't discuss anything that's happened in the

24   courtroom this morning.

25           Talk about the weather or your family or sports or your

1   job or whatever you'd like to talk about, but don't talk about

2   anything that's happened in the courtroom this morning.

3       All right.  With that, I'm going to ask two of you to

4   stay back and let me visit with you here at the bench briefly,

5   and they are Panel Member No. 3, Mrs. Skinner, and Panel

6   Member No. 13, Mrs. Caraway.

7       The rest of the panel with those instructions are excused

8   for recess.

9           (Whereupon, the jury panel left the courtroom.)

10          THE COURT:  All right.  Be seated, please.

11  Counsel, approach the bench.

12      And, Mrs. Skinner, would you come up and join us, please?

13          (The following was had at the bench.)

14          THE COURT:  Good morning, Mrs. Skinner.

15          THE PANEL MEMBER:  Good morning.

16          THE COURT:  This is the microphone, and we're just

17  going to talk quietly here.

18      When we started this morning, I asked if there was

19  anybody that had a serious impediment to being able to be here

20  all week to raise your hand and let me know, and you raised

21  your hand.  So can you tell me about your situation.

22          THE PANEL MEMBER:  So my children -- I made

23  arrangements today, but I don't have any arrangements to take

24  them to and from school the rest of the week.  I usually do it

25  because they go to school where I work.  So since I'm in

1    Longview dropping them off, I can't drop them off before 7:00,

2    and the earliest I could get here would be 8:00.  And I'd have

3    to leave by like 2:45 to go back and pick them up from the

4    bus.

5              THE COURT:  Okay.

6              THE PANEL MEMBER:  And if there's any reason this

7    goes into next week, it's spring break next week.

8              THE COURT:  I don't think it's going to go into next

9    week.

10             THE PANEL MEMBER:  I don't have anything for next

11   week, either.

12             THE COURT:  All right.  Let's talk about this week.

13   Is there anybody else that can handle this transportation

14   responsibility for you, a family member --

15             THE PANEL MEMBER:  My father and father-in-law are

16   here.  They are both in their 80s, and they should not be

17   driving.

18             THE COURT:  How old are your children?

19             THE PANEL MEMBER:  They are six.

20             THE COURT:  Are they twins?

21             THE PANEL MEMBER:  Yes.

22             THE COURT:  Okay.  Okay.  So they're in the first

23   grade?

24             THE PANEL MEMBER:  Well, kindergarten is next year.

25             THE COURT:  And which school do they attend?

1          THE PANEL MEMBER:  Pine Tree, the primary school.

2          THE COURT:  Okay.  And I know you told me you

3     usually take them because they're at the same school you work

4     at.

5          THE PANEL MEMBER:  Since -- so it's on the other

6     side from where we live, so I usually take them and drop them

7     off at pre-K, and then I go to work.  And then the bus drops

8     them off at my high school where I work.

9          THE COURT:  Is there anybody you can think of that

10    could pitch in and help you for a week, like a friend or

11    church member or anybody you know?

12         THE PANEL MEMBER:  We don't go to church.  Our only

13    family that's here, literally, literally I wouldn't.  Like my

14    dad, his driver's license is expired.  He really shouldn't be

15    driving.  My father-in-law, not so much either.

16         THE COURT:  All right.  Ms. Smith, do you have any

17    questions for Mrs. Skinner?

18         MS. SMITH:  I don't.

19         THE COURT:  Mr. Dacus?

20         MR. DACUS:  No, Your Honor.

21         THE COURT:  Okay.  Mrs. Skinner, I'm going let you

22    join the rest of the panel outside.  Just don't discuss

23    anything we talked about in here.

24         THE PANEL MEMBER:  Okay.

25         THE COURT:  Thank you.

1           THE PANEL MEMBER:  Thank you.

2           (The Panel Member left the courtroom.)

3           THE COURT:  We've got plenty of venire members,

4    counsel.  I'm going to excuse Mrs. Skinner.

5        Mrs. Caraway, would you come up, please?

6        Good morning.

7           THE PANEL MEMBER:  Good morning.

8           THE COURT:  This is the microphone, and we're going

9    to try to talk quietly here.

10          THE PANEL MEMBER:  Okay.

11          THE COURT:  First of all, is it Dr. Caraway?

12          THE PANEL MEMBER:  Yes.

13          THE COURT:  I thought you said terminal degree, but

14   anyway.  When we started, you raised your hand that you would

15   have difficulty being able to be here all week if you were

16   selected.  Can you tell me about that?

17          THE PANEL MEMBER:  Yes.  I'm contracted to be a

18   keynote speaker at a conference out of state at the end of the

19   week.

20          THE COURT:  Okay.  What does 'contracted' mean?

21   They're paying you money to go speak?

22          THE PANEL MEMBER:  Yes.

23          THE COURT:  Okay.  Can you give me any more detail

24   about it?

25          THE PANEL MEMBER:  Just that it starts on Friday.

1    I'm expected to leave on Thursday, so I'm there all day

2    Friday.  It's Friday through the weekend.

3                THE COURT:  Okay.  And where is it?

4                THE PANEL MEMBER:  And you said it would be Monday

5    through Friday, so that's why I raised my hand.

6                THE COURT:  I understand.

7         Where is this conference you're going to speak at?

8                THE PANEL MEMBER:  It's in Arkansas.

9                THE COURT:  Okay.  And you're the keynote speaker?

10               THE PANEL MEMBER:  Yes.

11               THE COURT:  All right.

12               THE PANEL MEMBER:  I know--shocking.

13               THE COURT:  What organization is it, just out of

14   curiosity?

15               THE PANEL MEMBER:  The Church of Christ.

16               THE COURT:  Okay.  All right.  Ms. Smith, do you

17   have any questions of Dr. Caraway?

18               MS. SMITH:  I don't, Doctor.

19               THE COURT:  Mr. Dacus?

20               MR. DACUS:  No, Your Honor.  Thank you.

21               THE COURT:  All right.  I'm going to let you join

22   the rest of the panel outside the courtroom.  Just don't

23   discuss anything we talked about in here.

24               THE PANEL MEMBER:  I understand.  I'm not adverse to

25   serving; I just was answering the question on the parameters

1   which you gave.

2          THE COURT:  I understand.  And if you don't serve on

3   this jury, you may get an opportunity to serve on a future

4   jury.

5          THE PANEL MEMBER:  Yes, sir.

6          THE COURT:  Okay.  Thank you.

7          THE PANEL MEMBER:  Thanks.

8          (The Panel Member left the courtroom.)

9          THE COURT:  All right.  I'm going excuse

10  Dr. Caraway.

11      That means we strike through No. 18.  Do you agree?

12         MR. DACUS:  Yes, sir.

13         THE COURT:  All right.  If you'll have your strike

14  list to Ms. Brunson by 11:45.

15         (The following was had in open court.)

16         THE COURT:  All right.  While counsel exercise their

17  peremptory challenges, the Court will stand in recess.

18                  (Brief recess.)

19         THE COURT:  Be seated, please.

20      All right.  Ladies and gentlemen, if you'll listen

21  carefully when your name is called and come forward and take

22  your position in the jury box, let me explain how I'd like to

23  position the jury.

24      There are eight of you that have been selected as jurors

25  in this case.  When the first name is called, if that person

1  would come forward, enter the front row of the jury box, walk

2  all the way down to the last chair and stand in front of the

3  last chair; then whoever is second, come forward, enter the

4  front row of the jury box, walk down and stand in front of the

5  third chair, and so forth and so on.  The first four of you

6  should be on the front row and there should be a vacant chair

7  between you and the juror next to you.

8      And then whoever is Juror No. 5, if you'll come and enter

9  the back row of the jury box, walk all the way down and stand

10 in front of the last chair, and No. 6 will stand in front of

11 the third chair on the back row, and so forth and so on.  That

12 way we'll have four of you on the front row, four of you on

13 the back row, and each juror will have a vacant chair or an

14 empty chair between yourself and the next member of the jury.

15 And those will be your positions throughout the trial.

16     And I'm going to ask that all eight of you remain

17 standing in the jury box until everyone is there, and when all

18 eight of you are in the jury box, I'll give you instructions

19 at that point.

20     So with that, if you'll listen carefully as our Courtroom

21 Deputy Ms. Brunson calls the names of the eight members of our

22 panel who have been selected to serve as jurors in this case.

23         THE CLERK:  Robert Dispenza, Sharon Paye, Todd

24 Donley, Cortina Franklin, Charles Porter, Haley Lohman, Paula

25 Ormes, Vicki McCall.

1          THE COURT:  All right.  Ladies and gentlemen, if you

2    will all raise your right hand, I'll ask Ms. Brunson to

3    administer the oath to you as jurors in this case.

4          (Whereupon, the oath was administered by the Clerk.)

5          THE COURT:  Please have a seat.

6       Those of you that were not selected to serve on the jury,

7    I am about to excuse you and release you in just a moment, but

8    before I do, I want to say a word of thanks to every one of

9    you.

10      It's not lost on the Court, it's not lost on the Court's

11   staff, and it's not lost on the parties or the lawyers in this

12   case that every one of you had other places to be today, other

13   things to do that were important in your lives, and you set

14   those responsibilities aside and you appeared here as

15   summonsed and presented yourself for jury duty.  And even

16   though you weren't selected ultimately, you've each performed

17   very real and important public service by being here.

18      We could not have chosen these eight citizens and we

19   could not have constituted this jury in this case without all

20   of you being here.  So you've all done very important public

21   service and the Court wants to recognize that and the Court

22   wants to thank you on behalf of everyone else involved in the

23   process.

24      Now, as you leave the courtroom in just a few minutes,

25   you'll exit through those same double doors, only this time

1    you'll go around to the right.  And as you go around to the

2    right, you'll pass the Clerk's Office.  Ms. Clendening will be

3    there.  She will answer any questions you have about your

4    service here today.  She has written documentation that

5    you're -- that's available to you if any of you need it to

6    show an employer why you were here today and not somewhere

7    else.

8        Also, she's going to collect these very expensive plastic

9    numbers you-all are wearing on your clothing.  Those are not

10   mementos or keepsakes; we'll keep those and use them with the

11   next jury that we select.

12       Again, ladies and gentlemen, those of you not selected to

13   serve on the panel, thank you for your presence and your

14   service.  And with that, you're excused.

15           (Whereupon, the jury panel left the courtroom.)

16           THE COURT:  All right.  Be seated, please.

17       Ladies and gentlemen of the jury, I have just a couple of

18   instructions to give you and then I'm going excuse you for

19   lunch.

20       I want you to know that the Court has ordered the Clerk's

21   Office to provide lunch to you each day that you're here in

22   trial.  So you are not going to have to worry about lunch.

23   You're not going to have to go out into the community and find

24   some lunch and then get back here.  It will save us some time,

25   it will make it more convenient for you, and so consider that

1    the Court's going to provide lunch for you each day and don't

2    worry about that on your own.  It will be taken care of.

3        Now, all the instructions I'm going to give you are

4    important.  This one is the first instruction.  I won't say

5    it's the most important, but it is very important, so I want

6    you to listen carefully to me.

7        Do not discuss this case with anyone.  You are not to

8    communicate in the broadest sense of the term with anyone

9    about this case.  And when I say anyone, that means among the

10   eight of yourselves.  You are not to communicate with anyone

11   about this case.

12       At the end of the process, after you've heard all the

13   evidence, and after I have given you my final instructions on

14   the law that you are to apply, and after counsel for the

15   competing parties have presented their closing arguments, I'll

16   say, "Ladies and gentlemen of the jury, you may now retire to

17   the jury room to deliberate on your verdict," and at that

18   point you will be looking at a document called the verdict

19   form.  It will be sent back with you and it will have a list

20   of questions in it that you are then to answer.

21       It is absolutely fundamental to this process that the

22   only information you have to draw upon as you determine how to

23   answer those questions in the verdict form must be limited to

24   the sworn testimony presented in this case from either live

25   witnesses on the witness stand or deposition witnesses that

1  will be presented to you--witnesses whose testimony is under

2  oath and subject to cross examination--as well as the exhibits

3  admitted into evidence by the Court.  The sworn testimony of

4  the witnesses and the exhibits admitted by the Court into

5  evidence, those, ladies and gentlemen, constitute the entire

6  and the sole universe of the information that you should have

7  to draw upon in answering the questions in the verdict form.

8       Consequently, it is absolutely fundamental that there be

9  no other information from any other source before you or a

10  part of your thinking or involved in your considerations when

11  you determine how to answer those questions in the verdict

12  form.  That's why it is absolutely foundational to the process

13  that you not communicate with anyone in any way about this

14  case, because if you do, that will inject other information,

15  other data into the case other than the sworn testimony of the

16  witnesses and the exhibits admitted into evidence by the

17  Court.

18       And should that happen at any point along the way, should

19  there be other outside information, other information from any

20  other source besides the witnesses and the exhibits which the

21  Court's admitted, then that jeopardizes the entire process;

22  may very well lead to the Court having to declare a mistrial,

23  excuse you, impanel a brand new jury, start the whole process

24  over again, and see as a part of that the absolute waste of

25  many, many hours of work, many, many resources, large amounts

1    of money, just a real travesty if that were to happen.

2        So it's absolutely fundamental that you limit

3    everything -- or that you are limited to having only the sworn

4    testimony of the witnesses and the exhibits the Court has

5    admitted into evidence as the entirety of the information that

6    you draw upon in addressing the questions and coming to

7    answers to the questions in the verdict form.  So please do

8    not communicate with anyone in any way about this case.

9        And when I say don't communicate, I mean it in the

10   broadest sense of the term.  Don't talk to anybody, don't

11   email anybody, don't send a text message to anybody, don't --

12   if you are a user of social media, for heaven's sake, don't go

13   on some social media platform and tell the whole world what

14   you're thinking about.  Don't communicate with anyone in any

15   way about this case, including the eight of yourselves.

16       Now, I do want you to understand this.  When you have

17   heard all of the evidence and when you've had my final

18   instructions on the law and when you've heard closing

19   arguments from counsel for the competing parties, and at that

20   point I say, "Ladies and gentlemen of the jury, you may now

21   retire to the jury room to deliberate on your verdict," when I

22   say those words, then you, the eight of you, will go from

23   being prohibited to discussing the evidence and the trial

24   among yourselves to being required to discuss the evidence and

25   the trial among yourselves as you work together to come to

1    answers to the questions in the verdict form.

2        That statement, "Ladies and gentlemen you may now retire

3    to the jury room and deliberate on your verdict," that's

4    almost -- in my mind I think of it like a light switch--before

5    I say that, the light switch is off and you must not discuss

6    among yourselves, communicate among yourselves about the trial

7    or the evidence or anything related to this proceeding; but

8    when I say at the end of all the evidence and after all the

9    instructions and argument are given, "Ladies and gentlemen,

10   you may now retire to the jury room to deliberate on your

11   verdict," then the light switch goes on and you go from being

12   prohibited to discussing the case among the eight of

13   yourselves to being required to discuss the case and the

14   evidence among the eight of yourselves as you work through the

15   questions in the verdict form and come to answers to those

16   questions.

17       And I'll just say this to you, ladies and gentlemen,

18   because I believe it to be absolutely true.  Unless you live

19   alone, when you get home tonight, and I don't care where it

20   is, whoever is there is going to ask you when you walk through

21   the door, Tell me what happened in federal court in Marshall

22   today.  It's just going to happen, I can promise you.  And

23   when it does happen, don't even try to answer that question,

24   because if you even try, you're probably going to violate this

25   instruction.

1        So when whoever it is meets you at the door and says,

2   Tell me what happened in federal court today, just say, That

3   very serious federal judge told me not to try to answer that

4   question at all.  After the case is over and after he's

5   excused me and after the verdict's been accepted and I'm no

6   longer a juror, then I can talk to you, but until then, I

7   can't say a word about it.  Blame it on me, ladies and

8   gentlemen.  Don't even try to answer that question.

9        Also, in keeping with the same premise that the only

10  information you're to draw upon must come from the sworn

11  testimony of the witnesses and the exhibits the Court admits

12  into evidence, you're not to do any research of any kind.

13  You're not to go home and get on your computer and do a search

14  for either these parties, any of the products you're going

15  hear about, any of the claims you're going to hear about, any

16  of lawyers involved; not anything related to this case.

17       Do not do any outside research of any kind.  Even if you

18  have an old encyclopedia, don't pull a book off the shelf,

19  don't go to the library, don't do any kind of research in any

20  way about anything related to this process and this trial,

21  because, again, the fundamental premise is when you answer

22  those questions in the verdict form, the only information that

23  you should draw upon is the evidence that was elicited and

24  presented in open court, under oath subject to cross

25  examination, and the exhibits the Court has determined comply

1    and meet the Federal Rules of Evidence and are properly

2    admitted as exhibits in this case.

3         Also, ladies and gentlemen, I don't think this is likely,

4    but I want you to know, this is an important case and there

5    are just -- simply put, there are no unimportant cases that

6    make it to a jury trial in a United States District Court.  If

7    during the course of this trial if any outside person in any

8    way approaches you about anything and discusses or tries to

9    discuss anything about this case and you feel uneasy or

10   awkward in any way about that, you should immediately let

11   Ms. Clendening know, she'll advise the Court, and the Court

12   will deal with it.

13        I'm not saying someone's going to try to bribe you as a

14   juror in this case, but I'm saying this is an important case,

15   there is a lot at stake for both sides, and you should be

16   aware that if someone comes and approaches you and attempts to

17   discuss this case, which I just instructed you clearly about

18   not doing, that that's not proper, and if that should happen,

19   you should let the Court staff know and I'll deal with it.  I

20   don't think it's likely, but I need to tell you it's not

21   beyond the realm of possibility.

22        Also, ladies and gentlemen, over the course of this

23   coming week and we try this case, you're going to be coming

24   and going, coming in the mornings, leaving in the evenings.

25   There are going to be times when as you come in and out of the

1    building and you're close by in the parking lot or on the

2    front sidewalk, you're going to come in close physical contact

3    with some of these lawyers, some of these witnesses, some of

4    the people involved in this case on one side or the other.

5         And when that happens, they're not going communicate with

6    you.  They're not going speak, they're not going to be

7    friendly, they're not going to say, Good morning, Mr.

8    So-and-So, or, Good evening, Ms. So-and-So, how are you today,

9    they're not going to be gregarious like we're used to in East

10   Texas, and that's because I've instructed them not to, and

11   that's because you're not to have anything before you except

12   the sworn testimony of the witnesses and the exhibits admitted

13   into evidence as a part of what you gather and you receive as

14   a part of this trial and as the jury in this case.

15        So if you're passing somebody involved in this trial

16   coming in the building, you're walking up the steps and

17   they're walking down, you pass right past each other and they

18   act like they are ignoring you and they don't speak to you and

19   they don't acknowledge you in any way, don't hold that against

20   them, don't think they're being rude or unfriendly; understand

21   that they are simply following the instructions that the Court

22   has given you.

23        Now, with that, ladies and gentlemen, I'm going to have

24   additional instructions for you after lunch, but at this point

25   I'm going excuse you to the jury room.  And lunch should be

1    waiting for you there.

2        It is about 10 minutes after 12:00.  We'll try to

3    reconvene close to or maybe a little bit before 1:00.  And

4    I'll have additional instructions for you at that time.

5        So with that, ladies and gentlemen of the jury, you are

6    excused for lunch.

7            (Whereupon, the jury left the courtroom.)

8            THE COURT:  All right, counsel.  Is there anything

9    from either Plaintiff or Defendants before we recess for

10   lunch?

11           MR. DYKAL:  No, Your Honor.

12           MR. DACUS:  No, Your Honor.  Thank you.

13           THE COURT:  All right.  I will see you shortly

14   before 1:00, and I'll proceed with my preliminary instructions

15   to the jury at that time.

16       The Court stands in recess.

17                   (Lunch recess.)

18           THE COURT:  Be seated, please.

19       Do we have any idea where Plaintiff's counsel is?  I said

20   a little bit before 1:00.  It's two minutes until 1:00.

21           MR. DACUS:  I do not, Your Honor.

22           THE COURT:  Well, we'll wait on them.

23                   (Pause in proceedings.)

24           THE COURT:  Mr. Barnett, do you want to step out and

25   see if we have Plaintiff's counsel in our near future?

1           Where's the rest of your trial team, Ms. Smith?

2                MS. SMITH:  They're in security, Your Honor.

3                THE COURT:  Okay.  Did I not say a little bit before

4       12:00?

5                MS. SMITH:  You did, and I apologize.

6                       (Pause in proceedings.)

7                THE COURT:  Let's bring the jury in, Mr. Barnett.

8                (Whereupon, the jury entered the courtroom.)

9                THE COURT:  Welcome back from lunch, ladies and

10      gentlemen.  Please be seated.

11           Members of the jury, I now have some instructions, some

12      preliminary instructions that I want to give you on the record

13      before we start with opening statements from the attorneys and

14      then get on to the evidence.

15           You've now been sworn as the jury in this case, and as

16      the jury, you are the sole judges of the facts.  And as such,

17      you will decide and determine what all the facts are in this

18      case.  As the Judge, I will give you instructions on the law

19      to apply, I'll decide questions of law that might arise during

20      the trial, and I'll handle all matters related to evidence and

21      procedure.

22           I'm also responsible for maintaining an efficient flow of

23      the evidence and the trial itself and maintaining the decorum

24      of the courtroom.

25           At the end of the evidence, I'll give you detailed

1    instructions about the law to apply in deciding this case, and

2    I'll give you a list of questions that you are then to answer.

3    As I've already mentioned to you, this list of questions is

4    called the verdict form, and your answers to those questions

5    in the verdict form will need to be unanimous, and those

6    unanimous answers to all the questions in the verdict form

7    will constitute the jury's verdict in this case.

8         Now, I want to briefly tell you what this case is about.

9    This case involves a dispute regarding three separate United

10   States patents.  I know you all saw the video prepared by the

11   Federal Judicial Center, but I need to give you some

12   instructions here and on the record about a patent and how one

13   is obtained.

14        Patents are either granted or denied by the United States

15   Patent and Trademark Office, sometimes simply called the PTO,

16   sometimes simply called the Patent Office.

17        Come in and find a seat, gentlemen.

18        A valid United States patent gives the patent holder the

19   right for up to 20 years from the date the patent application

20   is filed to prevent others from making, using, offering to

21   sell, or selling the patented invention within the United

22   States, or from importing it into the United States without

23   the patent holder's permission.

24        A patent is a form of property called intellectual

25   property, and like all forms of property, a patent can be

1    bought or sold.

2        The violation of a patent holder's rights is called

3    infringement.  And a patent holder may try to enforce a patent

4    against persons it believes to be infringers by filing a

5    lawsuit in federal court, and that's what we have in this

6    case.

7        Now, the process of obtaining a patent is called patent

8    prosecution.  To obtain a patent, one must first file an

9    application with the United States Patent and Trademark

10   Office, the PTO.  The PTO, ladies and gentlemen, is an agency

11   of the United States government.  It's a part of the U.S.

12   Department of Commerce, and it employs trained examiners to

13   review applications for patents.

14       The application filed with the PTO contains within it

15   something called a specification.  A specification contains a

16   written description of the claimed invention telling what the

17   invention is, how it works, how to make it, and how to use it.

18   Now, the specification concludes or ends with one or more

19   numbered sentences, and these numbered sentences are the

20   patent claims.  And when a patent is granted by the Patent

21   Office, it is the claims that define the boundaries of its

22   protection and give notice to the public of those boundaries.

23       Now, patent claims exist in two forms.  They are known as

24   independent claims and dependent claims.  An independent

25   patent claim does not refer to any other claim within the

1    patent--it's independent.  It's not necessary to look at any

2    other claim within the patent to determine what an independent

3    patent claim covers.

4         But on the other hand, a dependent claim refers to at

5    least one other claim within the patent.  A dependent claim

6    includes each of the limitations or elements of that other

7    claim from which it depends, or as we sometimes say, from it

8    refers, as well as the additional elements or limitations

9    recited within the dependent claim itself.

10        As a result, to determine what a dependent claim covers,

11   it's necessary to look at both the dependent claim itself and

12   the independent claim or claims from which it refers or from

13   which it depends -- to which it refers or from which it

14   depends.

15        Now, the claims of the patents in this suit use the word

16   "comprising".  "Comprising" means including or containing a

17   claim that includes the word 'comprising' is not limited to

18   the methods or devices having only the elements recited in the

19   claim, but also covers other methods or devices that add

20   additional elements.

21        Let me give you an example.  If you take a claim that

22   covers a table, if the claim recites a table comprising a

23   tabletop, legs, and glue, then that claim will cover any table

24   as long as it contains those structures, even if the table

25   also contains other structures such as leaves that would

1    expand the size of the tabletop or wheels that would go on the

2    ends of the legs.  Now that's a very simple example using the

3    word 'comprising' and what it means.  In other words, it can

4    have other features in addition to those that are covered by

5    the patent.

6        Now, after the applicant files their application with the

7    PTO, the PTO assigns an examiner and the examiner reviews the

8    application to determine whether or not the claims are

9    patentable--that is to say, appropriate for patent protection;

10   and whether or not the specification adequately describes the

11   invention that is claimed.

12       In examining the application, the examiner reviews

13   certain information about the state of the technology at the

14   time the application was filed.  The Patent Office searches

15   for and reviews this type of information that is publicly

16   available or that was submitted by the applicant.  And this

17   type of information, ladies and gentlemen, is called prior

18   art.  The examiner reviews this prior art to determine whether

19   or not the invention is truly an advance over the state of the

20   art at the time.

21       Now, prior art is defined by law, and I'll give you

22   specific instructions at a later time as to what constitutes

23   prior art.  However, in general, prior art includes

24   information that demonstrates the state of the technology that

25   existed before the claimed invention was made or before the

1    application for a patent was filed.

2        A patent contains a list of certain prior art that the

3    examiner has considered, and the items on this list are called

4    the cited references.  And this list is included in the patent

5    when it is issued.

6        Now, after the prior art search and an examination of the

7    application by the examiner, the examiner then informs the

8    applicant in writing of what the examiner has found and

9    whether the examiner considers any claim to be patentable, in

10   which case it would be allowed.  And this writing from the

11   examiner to the applicant is called an office action.

12       Now, if the examiner rejects the claims, the applicant

13   has an opportunity to respond to the examiner to try to

14   persuade the examiner to allow the claims, and the applicant

15   also has the opportunity to change or amend the claims or to

16   submit new claims.  And the papers generated in this

17   back-and-forth between the examiner and the applicant are

18   called the prosecution history.

19       And this process may go back and forth for some time

20   between the applicant and the examiner until the examiner is

21   ultimately satisfied that the application meets the

22   requirements for a patent and in that case the application

23   issues as a United States patent, or in the alternative, if

24   the examiner ultimately concludes that the application should

25   be rejected, then no patent is issued.  Sometimes patents are

1    issued after appeals within the PTO or to a court.

2         Now, the fact that the PTO, the Patent Office, grants a

3    patent, does not necessarily mean that the invention claimed

4    in the patent, in fact, deserves the protection of a patent.

5    While issued United States patents are presumed to be valid

6    under the law, a person accused of infringement has the right

7    to argue here in federal court that a claimed invention in a

8    patent is invalid.  It is your job as the jury to consider

9    evidence presented by the parties and determine independently

10   and for yourselves whether or not the Defendants have proven

11   that a patent claim is invalid.

12        Now, to help you follow the evidence, I'll give you a

13   brief summary of the positions of the parties.

14        As you know, ladies and gentlemen, the party that brings

15   a lawsuit or initiates a lawsuit is called the plaintiff.  In

16   this case the Plaintiff is Touchstream Technologies, Inc.,

17   which you'll hear referred to over the course of this trial

18   simply as the Plaintiff or as Touchstream.  You may also hear

19   it referred to as Shodogg, which is another name the company

20   used when it was doing business under that name.  These are

21   sometimes called assumed names.

22        Now, as you know additionally, the party against whom a

23   lawsuit is brought is called the defendant, and there are

24   several Defendants in this case.  And they are Charter

25   Communications, Inc.; Charter Communications Operating, LLC;

1    Spectrum Management Holding Company, LLC.;  Time Warner Cable

2    Enterprises, LLC.; Spectrum Gulf Coast, LLC.; and Charter

3    Communications, LLC.  And all of these entities will be

4    referred to throughout the trial collectively as either the

5    Defendants or simply as Charter.

6         Now, as I told you during jury selection, this case

7    involves allegations of patent infringement brought by

8    Touchstream against Charter.  And as I've already mentioned,

9    there are three separate United States patents at issue in

10   this case which have been asserted by Touchstream.

11        The first of these patents is United States Patent No.

12   8,356,251.  And as you probably heard in the video, patents

13   are commonly referred to by their last three digits, so in

14   this particular Case U.S. Patent No. 8,356,251 will be

15   referred to and you'll hear it called throughout the trial

16   simply as the '251 Patent.

17        Now, the second patent-at-issue in this case is United

18   States Patent No. 11,048,751, and you'll hear that referred to

19   as the '751 during the course of this trial.

20        And the third and final patent asserted in this case is

21   Patent No. -- United States Patent No. 11,086,934, which

22   you'll hear referred to as the '934 Patent.

23        And these three patents together you'll hear referred to

24   at various times during the trial as the patents-in-suit, or

25   you may hear them referred to collectively as the asserted

1    patents.  Patents-in-suit and the asserted patents means the

2    same thing--these three particular patents that I've

3    identified for you.

4        And these asserted patents, ladies and gentlemen,

5    generally relate to technology controlling how to stream or

6    cast content like videos from a mobile device like a cellular

7    phone to a display device like a television.

8        Now, Plaintiff Touchstream contends that the Charter

9    Defendants are infringing certain claims of the

10   patents-in-suit by making, using, importing, selling, or

11   offering for sale in the United States certain products that

12   include its patented technology.

13       Touchstream contends that it's entitled to money damages

14   as a result of that infringement.  And Touchstream also

15   alleges that Charter's infringement is willful.

16       Now, Charter denies that it infringes any of the asserted

17   claims of the three patents-in-suit.  It also denies that any

18   infringement has been willful.  It further contends that the

19   asserted claims of the patents-in-suit are invalid.  And

20   Charter denies that it has willfully infringed any of the

21   patents-in-suit, and it denies that Touchstream is entitled to

22   any money damages.

23       Now, I know there have been a lot of new words and new

24   concepts that have been thrown at you since you arrived at the

25   courthouse this morning.  I am going to define a lot of these

1    words and explain these concepts to you as we go through these

2    instructions, the attorneys for the parties are going to

3    discuss them with you in their opening statements, and the

4    witnesses are going to help you as they go through their

5    testimony to understand these words and concepts.

6        So, please, ladies and gentlemen, do not feel overwhelmed

7    at this stage; I promise you it is all going to come together

8    as we go through the trial.

9        Now, your job is to decide whether or not the asserted

10   claims of the patents-in-suit have been infringed.  If you

11   decide that any claim of the patents-in-suit has been

12   infringed by the Charter Defendants, then you'll need to

13   decide whether the asserted claims of the patents-in-suit are

14   invalid and whether or not the infringement by the Defendants

15   has been willful.

16       You'll also need to decide what amount of money damages

17   should be awarded to the Plaintiff as compensation for that

18   infringement.

19       Now, it's my job to tell you what the law is, it's my job

20   to handle rulings on evidence and procedure, and it's my job

21   to oversee the conduct of the trial efficiently and

22   effectively, and to maintain the decorum of the court.  In

23   determining the law, it is specifically my job to determine

24   the meaning of any language from the asserted claims from

25   within the patents-in-suit that needs to be interpreted.

1        I've already determined the meanings of certain language

2   from the asserted claims from the patents-in-suit, and you

3   must accept those meanings or constructions that I give you

4   and use those meanings when you decide whether any particular

5   claim has or has not been infringed and whether or not any

6   claim is or is not invalid.

7        And you're going to be given a document in a few minutes,

8   ladies and gentlemen, that sets out these constructions or

9   definitions that I've already given and which reflects these

10  meanings that I've already found.

11       Now, for any language from the claims where I did not

12  provide you with a specific definition or a construction,

13  those are usually considered the same terms, you should apply

14  in that case the plain and ordinary meaning of that language.

15  But if I provided you with a definition or a construction, you

16  are to apply my construction to those terms throughout the

17  case.

18       However, my interpretation of any of the language from

19  the asserted claims should not be taken as an indication by

20  you that the Court has any personal opinion or any opinion at

21  all regarding the issues of infringement and the issues of

22  invalidity, because those issues, ladies and gentlemen, are

23  yours and yours alone to decide.

24       I'll provide you with more detailed instructions on the

25  meaning of the claims before you retire to deliberate and

113

1    reach your verdict.

2        Now, in deciding the issues that are before you, you'll

3    be asked to consider specific legal rules, and I'll give you

4    an overview of those rules now and then at the conclusion of

5    the case I'll give you much more detailed instructions.

6        The first issue that you are asked to decide is whether

7    the Charter Defendants have infringed any of the asserted

8    claims of the patents-in-suit.  Infringement, ladies and

9    gentlemen, is assessed on a claim-by-claim basis, and

10   Touchstream the Plaintiff must show by a preponderance of the

11   evidence that a claim has been infringed.  As a result, there

12   may be infringement as to one claim but no infringement as to

13   another claim.

14       There are also a few different ways that a patent can be

15   infringed, and I'll explain the requirements for each of these

16   types of infringement to you in detail at the conclusion of

17   the case.  But, in general, a defendant may infringe the

18   asserted patents by making, using, selling, or offering for

19   sale in the United States or importing into the United States

20   a product meeting all the requirements of a claim of the

21   asserted patents or that practices all of the required steps

22   of a claim.  And you'll be asked to decide whether certain

23   claims of the asserted patents are invalid.

24       Invalidity, ladies and gentlemen, is a defense to

25   infringement.  Even though the United States Patent and

1    Trademark Office has allowed the asserted claims as a part of

2    issuing the patents-in-suit, and even though an issued United

3    States patent is presumed to be valid, you, the jury, must

4    decide whether those claims are, in fact, invalid after

5    hearing all the evidence presented during this trial.

6        And you may find the patent claim to be invalid because

7    it lacks a sufficient written description.  And that's the

8    basis upon which these Defendants have challenged the

9    patents-in-suit.

10       Now, for a patent claim to be invalid because it lacks an

11   adequate written description, the Defendants must prove by

12   clear and convincing evidence that an asserted patent's

13   specification does not describe the claimed invention in

14   sufficient detail so that one skilled in the art can

15   reasonably conclude that the inventor actually had full

16   possession of the invention that they're claiming.

17       Invalidity, ladies and gentlemen, is assessed and

18   determined on a claim-by-claim basis.  Accordingly, one claim

19   may be invalid while another claim is not invalid.  And you'll

20   need to consider a number of questions in deciding whether a

21   patent-in-suit contains a sufficient written description.  And

22   I'll provide you with those more detailed instructions at the

23   conclusion of the trial.

24       If you decide that any claim of the patents-in-suit has

25   been infringed and is not invalid, then you'll need to decide

whether the Defendants' infringement was willful.  The

Plaintiff has the burden to prove willful infringement by a

preponderance of the evidence.  If you decide that any

infringement that you found was willful, that should not

affect any damages amount that you might award, and I will

take willfulness into account later.

Also, if you decide that any of the claims of the

patents-in-suit have been infringed, you'll then -- and that

those claims are not invalid, you'll also need to decide what

amount of money damages should be awarded to the Plaintiff

Touchstream to compensate it for that infringement which you

have found.

A damages award, ladies and gentlemen, must be adequate

to compensate the patent holder for the infringement, and in

no event may a damages award be less than what the patent

holder would have received if it had been paid a reasonable

royalty for the use of its patent.

However, any damages that you award are meant to

compensate the patent holder and they are not meant to punish

the Defendants.  And you must not include in any damages that

you might award an additional amount as a fine or a penalty

above what is necessary to fully compensate the patent holder

for the infringement.

Further, ladies and gentlemen, every asserted claim in

this case is a method claim.  Patent claims generally fall

1    into two groups--method claims or apparatus claims.  The

2    example I gave you about a table with a tabletop, legs, and

3    glue, is an apparatus claim.  It generally tells you how to

4    build something.

5        A method claim is different.  A method claim includes a

6    series of steps that must be met in order to accomplish

7    something.  I like to think of a method claim as a recipe for

8    how to bake a cake.  You don't make any of the things, but you

9    put the ingredients together in a certain way to come out with

10   the end result.  And the claims in this case, ladies and

11   gentlemen, are all method claims.

12       Unlike apparatus claims, method claims are not infringed

13   by the sale or distribution of a product merely capable of

14   performing the claimed process.  To find infringement of a

15   method claim, all the steps of the claimed method must be

16   performed, and the damages for infringement of a method claim

17   should be based on the products that are actually used to

18   perform the claimed method or reasonable approximation of the

19   infringing use.

20       Also, ladies and gentlemen, damages awarded in a patent

21   case like this may not be speculative, and Touchstream the

22   Plaintiff must prove the amount of its damages for any alleged

23   infringement by a preponderance of the evidence.  However, the

24   fact that I'm instructing you on damages now does not mean

25   that Touchstream is or is not entitled to recover damages.

1          Now, you're going to be hearing from a number of

2     witnesses over the course of this trial, and I want you to

3     keep an open mind while you're listening to all the evidence

4     and not decide any of the ultimate facts in this case until

5     you've heard all of the evidence.

6          And this is important, ladies and gentlemen.  While

7     you're listening to the witnesses testifying, remember you

8     will have to decide the degree of credibility and

9     believability to allocate to each of the witnesses and to all

10    the evidence presented over the course of this trial.

11         So while the witnesses are testifying, you should be

12    thinking about and asking yourselves things like this:  Does

13    the witness impress you as being truthful?  Does he or she

14    have a reason not to tell the truth?  Does he or she have any

15    personal interest in the outcome of the case?  Does the

16    witness seem to have a good memory?  Did he or she have the

17    opportunity and the ability to observe accurately the things

18    that they've testified about?  Did the witness appear to

19    understand the questions clearly and answer them directly?

20    And, of course, does the witness' testimony differ from the

21    testimony of other witnesses?  And if it does, how does it

22    differ?

23         These are some of the kinds of things that you should be

24    thinking about while you're listening to each of the witnesses

25    testify over the course of this trial.

1          Also, ladies and gentlemen, I want to talk to you briefly

2     about expert witnesses.  When knowledge of a technical subject

3     may be helpful to you as the jury, a person who has special

4     training or experience in that particular field--we refer to

5     them as an expert witness---is permitted to testify to you

6     about his or her opinions on those technical matters.

7          However, you're not required to accept any expert or any

8     witness' opinions at all.  It's up to you to decide whether

9     you believe what an expert witness has to say, whether it's

10    correct, or whether it's incorrect, and whether or not you

11    want to give it any weight.

12         Now, I anticipate that there will be expert witnesses

13    testifying in support of each side in this case.  But when

14    they do, it will be up to you to listen to their

15    qualifications, and when they give you an opinion and explain

16    the basis for that opinion, you will have to evaluate what

17    they say and whether you believe it and to what degree, if

18    any, that you want to give that opinion weight.

19         Remember, ladies and gentlemen, judging and evaluating

20    the credibility and believability of each and every witness is

21    an important part of your job as jurors.

22         Now, during the trial it's possible that there will be

23    testimony from one or more witnesses that's going to be

24    presented to you through what's called a deposition.  In

25    trials like this, it's difficult to get every live witness at

1    the courthouse at the right time so they can all testify from

2    the witness stand in open court.

3         So before the trial, the lawyers for each side take the

4    depositions of the witnesses.  In a deposition, a court

5    reporter is present, the witness is sworn and placed under

6    oath just as if he or she were personally in court, and then

7    the parties ask them questions and then those questions and

8    the answers from the witness are taken down and recorded.

9    Often they are video recorded.  They are always recorded in

10   writing or transcribed, but often they will be video recorded

11   as well.

12        Now, it's important for you to understand, ladies and

13   gentlemen, that when a witness is presented to you through a

14   deposition, it is often likely that there will be certain

15   glitches or skips or irregularities that you might see if a

16   video -- a portion of video deposition is played back to you

17   as testimony in this trial.

18        Let me explain it to you this way.  When a witness is

19   deposed in advance of a trial like this, they usually are

20   questioned for about seven hours.  And it may be that after

21   seven hours of questions and answers, the lawyers in the case

22   determine, I'll say, for example, that there's 20 minutes of

23   that testimony that's really relevant and should be presented

24   to the jury during the trial.

25        While none of us want to listen to seven hours of

1    testimony to get 20 minutes of information, so before the

2    trial the recordings of those depositions are cut and sliced

3    and pasted back together to get -- to segregate or to cut out

4    that particular 20 minutes of relevant information that then

5    can be presented to the jury so that the jury doesn't have to

6    listen to seven hours of testimony to get 20 minutes of

7    information.

8        But the process of pulling a little bit here and there

9    and putting it together to create that 20 minutes that's going

10   to be presented to you is going to have certain irregularities

11   and splices and glitches as a part of putting it all together.

12   The important thing for you is not to focus on any

13   irregularities or any glitches or any skips.  The important

14   thing for you to focus on is the questions and the answers

15   from the witness that are presented to you through that

16   deposition testimony.

17       So when that happens, when you're presented with

18   deposition testimony, don't focus on any of those

19   irregularities; focus on the questions, focus on the answers.

20       Remember, ladies and gentlemen, deposition testimony is

21   entitled to the same consideration by you and insofar as

22   possible is to be judged as to its credibility, weight, and

23   otherwise considered by the jury in the same way as if the

24   witness had appeared in person in court and testified from the

25   witness stand.

1        Also, ladies and gentlemen, over the course of the trial

2   you're going to be shown several documents, and it is possible

3   that some of those documents may have words or sentences or

4   whole paragraphs that have been blacked out or redacted.  You

5   should know that if you're shown a document that has

6   redactions in it, those redactions are there because the Court

7   ordered them in advance of the trial.

8        If you're shown documents that have redactions in them,

9   don't focus on what you can't see, don't try to guess what's

10  been redacted or blacked out.  Focus on what you can see and

11  pay attention to what is in the document that you can see and

12  read and consider.  Don't be distracted by those redactions.

13       Also, during the course of the trial the lawyers are

14  probably going to from time to time make certain objections.

15  And when they do, I'll issue rulings on those objections.

16  Remember, it's the duty of an attorney to object when the

17  other side offers testimony or other evidence that the

18  attorney believes is not proper under the orders of the Court,

19  the Rules of Civil Procedure, or the Rules of Evidence.

20       Now, upon the Court allowing the testimony or other

21  evidence to be introduced over the objection of an attorney,

22  the Court does not in so doing express any indication as to

23  the weight or effect of that evidence.

24       Also, ladies and gentlemen, as a part of certain pretrial

25  proceedings that took place before you were impaneled today,

1    the Court has determined that certain information is not

2    appropriate and should not be brought up during this trial.

3    And in those cases the Court issues something called an order

4    in limine that tells the lawyers, you should not bring up this

5    subject or this material unless the Court gives you express

6    permission.

7         I want you to be aware of this term because you might

8    hear the reference during the trial to the word 'limine'.

9    When someone moves to keep certain types of information out of

10   the trial, it's called a motion in limine.  And if the Court

11   agrees and grants it, that's called an order in limine.

12        But I don't want the word 'limine' to confuse you or

13   distract you.  That's what it means, and I'm giving you that

14   explanation just so you'll be aware of it.  Sometimes lawyers

15   refer to it in short motion in limine, M-I-L, and you'll hear

16   some lawyers call it a MIL.  All that means is that is

17   something that the Court already determined should not come

18   into the trial unless the Court gives express prior consent or

19   approval of it.

20        So in advance of the trial, ladies and gentlemen, several

21   things like this took place outside of your hearing, and all

22   of it was done to save you time during this trial.  All of the

23   exhibits that will be shown to you during this trial have

24   already been presented to the Court, I've heard arguments on

25   to them as whether they're admissible or not, and the Court

1    has issued rulings pre-admitting all the appropriate exhibits.

2         That means when a document is a pre-admitted exhibit in

3    this trial, counsel can simply present it to you through a

4    witness, put it in the proper context, and ask questions about

5    it.  The process of offering it and hearing any objections to

6    it and the Court hearing argument on those objections and then

7    ultimately ruling to admit it or not admit it, all that's been

8    done in advance through pretrial procedures with counsel

9    outside of your presence.

10        And let me just tell you, you may not understand it, but

11   all these matters that I'm describing to you handled through

12   these pretrial procedures have saved you many, many hours

13   during this trial.  And we, the Court working with the

14   parties, have done what we can to streamline the process so

15   that these matters were addressed in advance of the trial.

16        And I want to compliment counsel for the parties for

17   working with the Court to accomplish that.  But I want you to

18   know each side has worked diligently to streamline the

19   process.

20        However, all of that notwithstanding, it's still possible

21   that objections will come up over the course of the trial.  I

22   want you to know that if I should sustain an objection to a

23   question addressed to a witness, then you must disregard the

24   question entirely and you may draw no inference from its

25   wording or speculate or guess what the witness would have said

1    if the Court had permitted them to answer the question.

2        On the other hand, if I overrule an objection regarding a

3    question addressed to a witness, then you should consider the

4    question and the answer just as if no objection had been made.

5        You should also know, ladies and gentlemen, that the law

6    of the United States permits a United States district judge to

7    comment to a jury on evidence in the case, but such comments

8    from the judge on the evidence are only expressions of the

9    judge's opinion as to the evidence and the jury is free to

10    disregard those in their entirety because, as I've told you,

11    you, the jury, are the sole judges of the facts.

12        You, the jury, are the sole judges of the credibility of

13    each and every witness, and you, the jury, are the sole judges

14    as to how much weight, if any, to give to all of the evidence

15    presented during the trial.

16        And even though the law permits me to comment to you on

17    the evidence introduced and presented over the course of the

18    trial, as I told you during jury selection, I'm going to work

19    very diligently not to comment to you in any way about the

20    evidence over the course of the trial, because these issues

21    about what the facts are are solely yours to decide, and they

22    are not the Court's to decide.

23        Now, our court reporter, Mr. McRoberts, takes down

24    everything that is said in the courtroom.  Every word that's

25    uttered by anybody is typed and presented and transcribed in

1    the record in this case.  But the written transcription of

2    everything that's said over the course of the trial is not

3    going to be available for you to review and refresh your

4    recollection of when you retire to the jury room to deliberate

5    on your verdict.  That means, ladies and gentlemen, you're

6    going to have to rely on your memory of all the evidence from

7    all the witnesses presented over the course of this trial.

8        Now, in a moment you're each going to be given a juror

9    notebook, and in those notebooks there are going to be places

10   for you to take notes, if you choose to, over the course of

11   the trial.  It's up to each of you to decide whether you want

12   to take notes during this trial, and if you do, how detailed

13   you want those notes to be.

14       But, remember, any notes that you take are for your own

15   personal use only.  You still have to rely on your memory of

16   the evidence, and that's why you should pay close attention to

17   the testimony of each and every witness.

18       And you should not abandon your own recollection because

19   some other juror's notes indicate something differently.

20   Notes, if you take them, are simply to refresh your

21   recollection and that's the only reason that you should be

22   keeping them.

23       I'll now ask our Court Security Officer to pass out these

24   juror notebooks to each of the members of the jury.

25                        (Pause in proceedings.)

1          THE COURT:  If you'll look at these notebooks

2    briefly with me, ladies and gentlemen, you will see that

3    inside the notebooks you each have a copy of each of the three

4    patents-in-suit in this case, each of the three patents that

5    are at issue.

6          You'll also find behind the patents-in-suit a ledger or a

7    chart showing the various language from the asserted claims

8    that the Court has already interpreted or construed for you.

9    And as I've told you, it's your responsibility to apply my

10   constructions regarding that language and those meanings

11   throughout what you're asked to do in this case regarding the

12   determination of infringement or non-infringement and as well

13   as determining the issues of validity or invalidity.

14        Also, behind this claim construction ledger, we'll call

15   it, you should find a section of tabbed pages for each of the

16   witnesses that might testify in this case.  And on these

17   witness pages, you should have a head-and-shoulders photograph

18   of the witness themselves with their name underneath and then

19   ruled lines below that that you can use to take notes with or

20   notes there, if you choose to do so.

21        The Court's found over the course of several years that

22   if the jury can go back and see a picture of each of the

23   witnesses that they've heard testify during the trial, it's

24   helpful in you recalling the testimony and remembering the

25   testimony of the witnesses that testified.

1          Now, behind these witness pages, you should also find a

2     new legal pad that's been three-hole punched so they'll fit in

3     your notebooks, and you can use this legal pad if you wish to

4     to take additional notes during the course of the trial.  And

5     there should be in the front pocket of each of these a pen for

6     you to use in taking notes if you don't have one of your own.

7          And these notebooks, ladies and gentlemen, should be in

8     your possession at all times.  They are not meant to be left

9     lying around, they are not meant to be such that somebody who

10    is not a member of the jury could pick them up and access

11    them.  So most of the time when you leave the jury box, I will

12    tell you to take those notebooks with you.

13         Now, there may be short periods when we're going to have

14    a recess or a quick break and you're not going to be out of

15    the jury box very long, I may simply say that you may close

16    and leave your notebooks in your chairs in the jury box.  And

17    if I do, that's what you should do with them.  But I'll give

18    you instructions about that.

19         If I don't give you instructions, then every time you

20    leave the jury box, take those notebooks with you.  And when

21    you leave at the end of each day, I want you to take them to

22    the jury room and leave them closed on the table in the jury

23    room so they'll be there waiting for you the next morning when

24    we continue with the trial.

25         Now, in a moment you're going to hear opening statements

1    from the attorneys.  These opening statements are designed to

2    give you, the jury, the roadmap about what each side expects

3    to offer by way of its intended evidence.  And you should

4    remember, ladies and gentlemen, throughout the trial that what

5    the lawyers tell you is not evidence.

6        The evidence is the sworn testimony of the witnesses

7    presented under oath and subject to cross examination from the

8    witness stand, or any sworn deposition testimony that's

9    presented to you, as I've already described it, as well as the

10   exhibits that the Court has already found to be admissible

11   under the Rules of Evidence and which are admitted as exhibits

12   in this case.  That is the evidence in this case.

13       What the lawyers tell you is their impression of what the

14   evidence is, and they have a duty to point out what they

15   believe the proper evidence is.  But, remember, what the

16   lawyers tell you is not itself evidence.

17       Now, after the opening statements from both sides, the

18   Plaintiff will have an opportunity to call its witnesses and

19   to put on its evidence.  We call this the Plaintiff's case in

20   chief.  The Plaintiff will call each of its witnesses, the

21   witnesses will testify under direct examination from

22   Plaintiff's counsel, then Plaintiff's counsel will pass the

23   witness and the witness will be cross-examined by Defendants'

24   counsel.

25       And when their examination and cross examination is

 1    finished, they'll step down and the Plaintiff will call their

 2    next witness.  And we'll go through that process for each of

 3    the Plaintiff's witnesses.  And when the Plaintiff has called

 4    all of its witnesses and those witnesses have testified, then

 5    the Plaintiff will rest the Plaintiff's case in chief.

 6        And when that happens, we will transition to the

 7    Defendants' case in chief, and the Defendants will call their

 8    witnesses, and their witnesses will testify under direct

 9    examination by Defense counsel.  And then they'll be

10    cross-examined by Plaintiff's counsel.  And we'll go through

11    that for each witness.

12        When they've been fully examined, then they will step

13    down and the Defendants will call their next witness, and

14    we'll go through the same process for each of the Defendants'

15    witnesses until all of the Defendants' witnesses have

16    testified.  And in that case when that happens, then the

17    Defendant will rest the Defendants' case in chief.

18        Now, the Plaintiff has an option at that point to call

19    what are known as rebuttal witnesses to rebut what the

20    Defendants have put on in their case in chief.  The Plaintiff

21    does not have to call rebuttal witnesses.  If they do, then

22    we'll let the Plaintiff call their rebuttal witnesses after

23    the Defendant rests its case in chief, one at a time, until

24    we've heard each of the Plaintiff's rebuttal witnesses.

25        If the Plaintiff elects not to call rebuttal witnesses,

1    then you will have heard all the evidence at the close of the

2    Defendants' case in chief.  If the Plaintiff does call

3    rebuttal witnesses, then when all the Plaintiff's rebuttal

4    witnesses have testified, that will complete the evidence in

5    this case.

6         And once you've heard all the evidence in this case, then

7    I will give you final instructions on the law that you are to

8    apply.  You'll then hear closing arguments from the attorneys

9    for the competing parties.  And after you've heard closing

10   arguments and my final instructions, that is when I will say

11   those words that are, "Ladies and gentlemen of the jury, you

12   may now retire to the jury room to deliberate on your

13   verdict."

14        And that is the moment in time, ladies and gentlemen,

15   when you go from being prohibited from discussing any of the

16   evidence in this case with anyone, including among the eight

17   of yourselves, to at that point being required to discuss the

18   evidence among the eight of yourselves in the jury room as you

19   deliberate about how to answer the questions that are included

20   in the verdict form.

21        So with that, ladies and gentlemen, I do want to remind

22   you one more time, as I did earlier, that over the course of

23   this week there are going to be times when you're going to

24   come in close contact with some of the people involved in this

25   trial on either the Plaintiff's side or the Defendants' side.

1    And when that happens, none of those people are going to

2    engage you in a conversation, none of them are going to speak

3    to you, none of them are going to be friendly and outgoing.

4    And when they're not, don't hold that against them, don't

5    think they're being rude.  Simply remember that they are

6    simply following the Court's instructions and don't hold that

7    against them.

8         So with those instructions, we're now going to proceed to

9    hear opening statements from the attorneys for the parties.

10        Mr. Dykal, are you prepared to present the Plaintiff's

11   opening statement at this time?

12             MR. DYKAL:  Yes, Your Honor.

13             THE COURT:  Would you like a warning on your time?

14             MR. DYKAL:  Yes, Your Honor.  May I have multiple

15   warnings?

16             THE COURT:  Tell me what you'd like.

17             MR. DYKAL:  Could I have 15, 7, and 2?

18             THE COURT:  I'll warn you when you have 15 minutes

19   remaining, when you have 7 minutes remaining, and when you

20   have 2 minutes remaining.

21             MR. DYKAL:  Thank you.

22             THE COURT:  All right.  You may proceed to present

23   Plaintiff's opening statement from the podium.

24             MR. DYKAL:  Thank you.

25        May I use the white board?

1          THE COURT:  You may pull it up to the side of the

2     elmo and use it from there.

3          MR. DYKAL:  And may I also use the elmo?

4          THE COURT:  Yes, you may.

5          MR. DYKAL:  Thank you.

6       Do I need to test the elmo?  Just to make sure I know how

7     to use it.  Do I need to push anything?  I can't see it on my

8     screen?  Can anybody else see it?

9          THE COURT:  It's apparently not working, counsel.

10         MR. DYKAL:  Okay.

11         THE COURT:  Probably none of you would realize this,

12    but over the weekend the entire ceiling in this courtroom was

13    ripped out and all new lighting fixtures and all new ceiling

14    was put in.  It looks brand new because it is brand new.  I

15    don't know if there's been some unintentional disconnecting or

16    problem with that device.

17       Can we get our IT person to come in and check on this,

18    Ms. Brunson?

19       Why don't you have a seat, Mr. Dykal.  As soon as our IT

20    person looks at the elmo, then we'll go back to where we were.

21         MR. DYKAL:  Thank you, Your Honor.

22                   (Pause in proceedings.)

23         THE COURT:  I'll tell you what, ladies and

24    gentlemen.  Why don't we take this opportunity to let you have

25    a short recess.  If you'll simply close your notebooks and

1      leave them in your chairs, I'll let you retire to the jury

2      room.  You can stretch your legs, get a drink of water, and as

3      soon as we have this up and running, I'll have you back in

4      here and we'll proceed with opening statement.

5           The jury should excuse themselves to the jury room.

6                (Whereupon, the jury left the courtroom.)

7                THE COURT:  All right.  Be seated, please.

8           We'll go off the record while our technician checks the

9      overhead projector.

10                          (Off the record.)

11               THE COURT:  All right.  We'll go back on the record.

12     It looks like the elmo is working now.

13          If you'll bring in the jury, please, Mr. Barnett.

14               (Whereupon, the jury entered the courtroom.)

15               THE COURT:  All right.  Please be seated, ladies and

16     gentlemen.

17          All right, counsel.  You may now present Plaintiff's

18     opening statements.  I'll give you the warnings you requested.

19     Proceed when you're ready.

20               MR. DYKAL:  We are here for one simple reason.

21     Charter Communications is infringing Touchstream's patents,

22     and they refuse to stop and they refuse to pay.

23          We are here exercising our Seventh Amendment

24     constitutional right to a jury to hold Charter accountable for

25     their infringement and to prove that the rules apply to

1    everybody, even a cable company like Charter.

2        You met me earlier.  My name is Ryan Dykal, and my office

3    is in Washington, D.C.  But I'm from Kansas City, and I'm very

4    proud to be down here representing Touchstream Technologies

5    with my co-counsel, Ms. Smith, and the rest of my team.

6        Now, to understand how we got here, you need to go back

7    to 2010.  In 2010, Charter had a major problem.  You have to

8    understand what Charter is to understand that problem that

9    brought us here.  Charter, as you know, is a cable company.  A

10   cable company is what we call a bundler.

11       Cable companies take content, different services,

12   different offerings, and they bundle them up into a package

13   and they offer that package, that bundle to customers.

14   Customers pay Charter month after month, year after year, for

15   that bundle.  Included in that bundle can be internet,

16   telephone, television, apps that you can put on your phone.

17       But, importantly, in a bundling business model, not

18   everybody uses everything in that bundle.  What's important to

19   a bundler is to have enough in that bundle to keep everybody

20   interested, enough to keep paying month after month that cable

21   bill.  Inside the cable package, there might be ESPN.  A

22   sports fan might pay for that whole bundle just to get ESPN

23   month after month.  He doesn't care if HGTV is in that bundle,

24   but he'll pay.  Similarly, someone who watches HGTV might not

25   care about ESPN, but they pay that bundle month after month.

1    Cable companies take that monthly revenue, pay their

2    suppliers, the people who own those channels, the people whose

3    intellectual property the cable company is using, that money

4    goes to them, and the cable company keeps what's left over.

5    Now, what was happening in 2010 that was such a big

6    problem for bundlers like Charter?  Cord-cutting.  You might

7    have heard that term.  Around 2010, streaming television

8    became something that was popular.  Netflix was getting more

9    popular, broadband was getting faster and people could stream

10   TV.

11   And what was happening was people decided they didn't

12   need the whole bundle; they could just get an antenna and get

13   Netflix and that was enough.  And why would I pay $65, $100 a

14   month when I can pay Netflix and use over-the-air television?

15   Cable, the cable industry knew that was a problem because if

16   people leave that bundle, they miss that revenue.

17   So in 2010 Charter was trying to figure out how to keep

18   these potential cord-cutters in their package.  They knew one

19   of the reasons people were cutting the cord is because they

20   could use their smartphones to stream TV.  The iPhone came out

21   in 2007.  It was getting more and more popular.  So Charter

22   knew it needed an app, and you will hear they started building

23   their own app.  That wasn't going that well.

24   In 2011, they heard about a company with a fantastic new

25   invention that tied telephone -- that tied mobile phones

1    together to TV, together to streaming, and they were pitching

2    themselves as the anti-cord cutter, the way to keep people in

3    that bundle month after month.

4        You're going to hear that Charter met with Touchstream

5    again and again to learn about this technology.  And then

6    you're going to hear that Charter launched an infringing app

7    in 2016.

8        Now, over the course of the next week, we are going to

9    provide evidence that is going to help you decide this case,

10   and we're going to prove three things.  First, we're going

11   prove that Touchstream owns the patents for casting.  What's

12   casting?  Casting is where you can use your smartphone to find

13   content, live TV and video-on-demand and DVR.  And you can

14   watch it on your phone and you can tap a button and cast it to

15   your TV instantly like magic.

16       You'll hear from Mr. Strober about how he came up with

17   this idea and how he filed patents for it.  That's the first

18   thing we'll prove.

19       Apologies for my handwriting.

20       Two, we're going prove that Touchstream's royalty rate is

21   98 cents per month per subscriber.  Now, the importance of

22   owning the patents, as you heard in the patent video, patents

23   are like a property right.  It's like a deed to your land.  If

24   you were in an argument with your neighbor about where the

25   fence was, you would have to prove that you own the land and

1     the deed would have the boundaries.  That's like the patent.

2         Well, a royalty rate is like the rent that you would

3     charge to use that land.  Let's say you owned a pasture and

4     someone wanted to ride horses on it.  You could rent it to

5     them for a certain rate, maybe $300 a month.  That's your

6     royalty rate.  And if someone else wanted to use that, you

7     could charge them 300, too.  We're going to prove that

8     Touchstream's royalty rate is 48 cents per month per

9     subscriber.

10        Number three, we're going to prove that Charter infringes

11    Touchstream's patents.  Now, you heard in the patent video

12    what infringement is.  I think it helps to use an example.  So

13    think about if you invented a cookie and you got a patent on

14    that cookie.  At the end of the patent, there would be claims,

15    and they would look something like this:  a cookie comprising.

16    That means a cookie including.  These are the ingredients in

17    the cookie.  This is your cookie patent.  Your cookie includes

18    eggs, butter, sugar, and flour.  Now, that's the boundaries of

19    your patent right.

20        Let's say someone comes out with a cookie and you say,

21    hey, you're infringing my patent.  How would you prove it?

22    Well, it certainly looks like a cookie, but that's only part

23    of it.  You have to prove with evidence that that cookie has

24    eggs, butter, sugar, and flour.  If it has all of those

25    things, the cookie infringes that patent.  Now, if someone

1    figured out how to make a cookie without flour, a flourless

2    cookie, it wouldn't infringe.  It has to contain every

3    ingredient.

4        What if someone added something to the cookie, though?

5    What if they made a chocolate chip cookie?  That would still

6    infringe.  Adding something does not get around infringement.

7    If it includes all the ingredients, it infringes.  You can't

8    add chocolate chips.

9        So we will prove by walking through Touchstream's patents

10   that Charter's app includes every single ingredient, and we'll

11   do it with evidence.

12       So how are we going to do number one?  Number one, we're

13   going to prove that Touchstream owns the patents for casting.

14   We're going to call Mr. David Strober.  He's going to take an

15   oath to tell the truth, and he will tell you his story.

16   You'll hear Mr. Strober's background.  He has various

17   technical degrees in programming and computer science.

18       And in 2010 Mr. Strober was working at Westchester

19   Community College teaching web programming.  And in this time

20   Mr. Strober had an iPhone.  And on his lunch break, he'd watch

21   videos, lectures to help him with his classes, and he noticed

22   something.  In that cafeteria, the school was installing these

23   brand new high definition TVs.  And Mr. Strober thought, why

24   am I watching the video on this little phone when I could be

25   watching it on that TV?

1          And this got Mr. Strober to thinking.  Well, you could do

2    the obvious solution.  You could go get a remote control, load

3    up the YouTube app, use the clunky number pad to try to type

4    in the video that you're watching, scroll through and find it

5    and tap it and get it working.  That is a way it could be

6    done.

7          Mr. Strober also thought, you know, maybe there's an app

8    for that.  Maybe someone else has thought of this before, so

9    he looked.  You'll hear that he saw some things out there that

10   were kind of what he wanted but not really.  One thing he saw

11   was mirroring.  Mirroring is when you can connect your phone

12   to the TV, and they show the exact same things, they're

13   mirrored, but there were some problems with this.  If your

14   screen of your phone is being mirrored on the TV, you can't

15   use it for other things.  You can't send text messages, you

16   can't browse the web.  And it also eats up your battery

17   because your phone is still also streaming that content and

18   then streaming to the TV.  So that wasn't right.

19         He also saw some remote control apps.  You'll hear that

20   the cable companies were working on remote control apps, but

21   that didn't work, either.  A remote control app would

22   essentially -- a lot of them, it would look like a remote

23   control on your smartphone with the buttons and the arrows and

24   you could use it just like you could a remote control, but

25   that didn't get around the original problems.

1    So the thing about Mr. Strober is when he has a problem

2    like this, he starts thinking about it.  And you'll hear from

3    him that he got very obsessed with this problem.

4    And then one day in a flash, it hit him how to solve it.

5    And if you think about the problem, it's actually a fairly

6    tricky problem.  How do you take a phone and get it to send

7    content to a high definition television?  The phone doesn't

8    know the TV exists.  The TV doesn't know the phone exists.

9    They speak different languages.  There's iPhones; there's

10    Samsung phones.  There's Vizio TVs and Sony TVs.  How can you

11    have them communicate and get that video from one to the

12    other?  And Mr. Strober kept thinking about this.

13    And then one day when he was teaching his class, you'll

14    hear that it hit him.  He was thinking about it too narrowly.

15    There needed to be a third piece of the puzzle, something in

16    between the phone and the TV that could understand and

17    communicate with both of them, that was specifically

18    programmed to be able to talk to the phone, figure out how to

19    talk to the TV in the right language, and get the TV to take

20    over that phone.

21    And I'm going illustrate a high-level diagram of what Mr.

22    Strober came up with, and this is called an architecture.

23    These patents cover the architecture that's required for

24    casting.

25    Okay.  So on the left, if you can see it, that's a

1    smartphone.  Up at the top, that's video content out on a

2    network or in the cloud or on the internet.  On the right is

3    the TV.  What Mr. Strober came up was the idea for the

4    architecture to have something in between, and this is called

5    a server, and here's how this works.

6        The phone you connect it out to the internet, you load up

7    YouTube, you get a video playing.  The phone also connects to

8    the server, and the server is specially programmed with Mr.

9    Strober's code to be able to understand the phone.

10        The phone sends a message to the server that says, I'm

11    watching YouTube, here's the internet address, here's the

12    commands you need to get it playing, here's the app that

13    you're using, various pieces of content data that go to that

14    server.

15        The server, using the code that Mr. Strober programmed,

16    can process that code and then talk to the TV in the TV's

17    language and say, hey, I want you to start playing this

18    YouTube video.  And it gives the TV the instructions it needs

19    to start playing that video.

20        With those instructions, the TV can reach out to the

21    internet or the network, any kind of content, and start

22    playing that content.  And once that happens, the server can

23    tell the phone, you don't need to do it anymore; it's gone to

24    the TV.  That server's behind the scenes.  But when you use

25    it, it's like magic.  And you'll hear witnesses testify when

1    they first saw it, it was like magic--you tap a button,

2    (clicking tongue), on the TV.  Behind it is Mr. Strober's

3    patented architecture.

4         So when Mr. Strober first got this working, you're going

5    to hear that he was extremely excited and he had to tell

6    somebody, and he will testify that he ran to tell his big

7    brother to show him what he had just created.  And his

8    brother, you'll hear, was also very impressed, but you'll also

9    hear something very important happened.  Mr. Strober's brother

10   was a TV executive.

11             THE COURT:  Counsel, you've used 15 minutes.  You

12   have 15 remaining.

13             MR. DYKAL:  Thank you, Your Honor.

14        Mr. Strober's brother was a TV executive, and he said,

15   Before you show this to anybody, you need to patent it.  Mr.

16   Strober's brother knows how business works, and it's

17   cutthroat.  If you don't have a patent protecting an invention

18   like this, you're a sitting duck.

19        And so Mr. Strober took his savings and he hired an

20   attorney and he filed for patent protection.

21        These are the three patents that are in this case.  These

22   are called ribbon copies.  After the Patent Office examines

23   your invention, sometimes for years, they will mail you these

24   official copies.  These patents are valid sitting here today.

25   These are the patents in this case.

 1          Having these patents, then what happened?  Well, Mr.

 2     Strober is an inventor, but he's not a businessman and he

 3     won't claim to be.  But talking with his brother and other

 4     people to give him advice, he teamed up with a number of

 5     people who could do business.  You'll meet some of these

 6     people through depositions and through live testimony.

 7          They'll tell you a couple of things.  First of all, these

 8     were experienced people.  They were experienced in IP; they

 9     were experienced in licensing deals.  And they, too, knew an

10     invention without a patent is just a sitting duck.

11          So they talked to Mr. Strober, they saw his invention,

12     and they said it's amazing, but, you know, do you have a

13     patent?  When he filed for the patent, you'll hear that that

14     was important to them and they joined Mr. Strober.  They

15     founded Touchstream.

16          Some of them, they'll tell you they quit their jobs, they

17     had little kids at home, but the patents gave them the comfort

18     to take that risk that that would protect their invention of

19     casting.

20          Together, that team--you'll meet them--they raised money,

21     they put together marketing materials, they hired engineers,

22     they rented office space, and they built this product.  And

23     when they were ready to debut it, they went to Las Vegas, the

24     Consumer Electronics Show, and it was a hit.  You'll hear that

25     they won awards, mobile excellent awards.  They met with many,

1    many companies, huge companies that were interested in this

2    technology.  And you'll hear from all of them.  They always

3    said it's patented because they know how it works.  You need

4    to tell these companies we've got protection or it's patent

5    pending.

6         You'll hear that they met with Time Warner Cable.  Not

7    once--many times.

8          Okay.  One company they met with was called Quadriga,

9    and this is going to be very important to this case.  Quadriga

10    is a hotel technology company.  When you check into a hotel,

11    there's a TV there, and you can watch cable channels, you can

12    do streaming.  Companies like Quadriga put that technology in

13    a hotel, and they charge the hotel for it month after month.

14    They bundle up internet, they bundle up channels.  It's very

15    similar to the bundling model of cable companies, and you will

16    hear that was the model Quadriga had.

17         Quadriga knew this was a great technology, and you'll

18    hear from our witnesses Quadriga and Touchstream sat down and

19    they struck a deal.  Quadriga was much bigger than Touchstream

20    and had a lot of power.  This was just a tiny start-up, but

21    they struck a deal, Touchstream wanted as much as they could;

22    Quadriga wanted to pay as little as they could.  You are going

23    to hear that the deal they signed was 48 cents per month per

24    hotel room.

25         This is the deal they signed.  This is evidence between

145

1    Quadriga and Touchstream in 2013.  And you can see the deal

2    was signed by both companies, and you can also see right there

3    in black and white 48 cents per room per month.  Black and

4    white.  That's evidence.

5        How does this work?  I think it helps to do a smaller

6    example.  Let's say you had a hotel with just 10 hotel rooms

7    that Quadriga put this technology in.  After one month, they

8    owe 10 times 48.  That's $4.80.  The next month they owe

9    another $4.80.  That's $9.60.  Over the course of a year, you

10   can even see right there, we did some of the math right there

11   in that agreement from 2013--per year it adds up to 576.  For

12   three years, it's 1728.  That's one room.

13       What if there are a hundred rooms?  What if there were a

14   thousand?  What if there were 10 million rooms?  Ten million

15   rooms is $4.8 million a month.  That was contemplated by the

16   deal.  If you get it out there that widespread, you owe a lot

17   of money.  If you don't put it out there, you don't owe that

18   much money.  That's called a royalty.  This is the Quadriga

19   agreement.  Okay.  So that's how we will establish that

20   Touchstream's royalty rate is 48 cents per month.

21       Now, finally, number three, we're going to prove that

22   Charter infringes Touchstream's patents.  So how are we going

23   to do this?  Well, I mentioned that when Touchstream debuted

24   at CES, they met with a bunch of companies, including Charter,

25   and we have receipts.  We've got emails to prove it.  Here is

 1    one.

 2              THE COURT:  You have seven minutes remaining,

 3    counsel.

 4              MR. DYKAL:  Thank you, Your Honor.

 5         You can see the top from Chris Cholas at Time Warner

 6    Cable.  Now, remember, Time Warner Cable merged with Charter.

 7    They're the same now.  They merged to form a bigger company.

 8         Two, Herb Mitschele, "It was great to meet you at the

 9    conference."  That's evidence.  2011.

10         Here's another one.  "Hi, Herb.  Nice to virtually meet

11    you.  Interested in learning more about Shodogg."  Shodogg was

12    another name for Touchstream back then.  That was the name of

13    their app.  This is 2012.  They're still talking.

14         Here is another one in 2014, "Ahh, yes, I remember them

15    well.  Will follow up."  They met again and again for years

16    stringing Touchstream along, all the while building the app

17    behind the scenes without us knowing.

18         Here's one.  Look at this, see here, regarding Shodogg.

19    "They got to me via Alan."  Right here, "I do think that there

20    may be something there, although we might not be ready for it.

21    I think it's still good for our engineers to be thinking about

22    it for a future is revision of Hydra or the Time Warner Cable

23    TV app."  In 2013, internal emails.  This wasn't to us; this

24    is inside saying, I think we should put it in our future

25    version of our app.  And guess what?  They did, without

1    telling us.

2        One other important thing, as I mentioned earlier, you're

3    going to hear that Touchstream would always tell companies its

4    technology was patent pending because it knew it was

5    important.  This is a presentation that Touchstream/Shodogg

6    gave to Time Warner Cable.  It works on set-top boxes.  That's

7    the cable boxes the cable companies had.  Our technology works

8    on your stuff.  Patent pending architecture.  We told them

9    it's patent pending and they were working on it anyways

10   without telling us.

11       So when we get down to it, how are we actually going to

12   prove they infringe?  We're going to run through the recipe.

13   So at the back of the patents--the claims.  Do you see that?

14   This is claim 1 of the '251 Patent.  It's like the cookie

15   recipe.  What is claimed?  "A machine-implemented method of

16   controlling presentation of a video content on a display

17   device."  This is computer science.  This is complicated

18   stuff.

19       And so what we do after we file the lawsuit, we got

20   access to internal Charter documents.  We got to see how their

21   architecture looks.  We got their documents.  We got to put

22   their engineers under oath and learn how their architecture

23   works in the background.  We'll introduce those into evidence.

24   That's evidence of infringement.

25       And then we hired Dr. Wicker.  Dr. Wicker is in the back

1    of the courtroom.  He will come up here.  And his job was to

2    take that evidence and put it together and match it to these

3    claims.

4         And then one by one we will go through "assigning by a

5    server system a synchronization code to the display device."

6    We're going to come with the receipts, internal Charter

7    documents, sworn testimony, and Dr. Wicker will tie them

8    together and will check it off, just like the ingredients of

9    this cookie.

10        Once he does the first one, we'll go to the second

11   one--"assigns in the server system a message from a personal

12   computing device," one by one through all the claims that

13   we're asserting in this case to prove for sure Charter

14   infringes the '251 Patent.

15        We're going to do it for the '751, too.

16             THE COURT:  Two minutes remaining.

17             MR. DYKAL:  We'll also do it for this one, the '934.

18        After that, what's left?  Calculate the damages owed by

19   Charter.  How will we do that?  We've already shown you how

20   we're going to prove the royalty rate--48 cents per room per

21   month.

22        Now, the question is, how many rooms for how many months?

23   Again, we went to internal Charter documents.  We found how

24   many set-top boxes they had, how many subscribers dating back

25   all the way to when they first started infringing, and you

1    multiply it out by 47 cents a month and it adds up -- just as

2    an example, 10 million customers times 50 cents is 5 million a

3    month.  Over a year that's 60 million.  Seven years, you can

4    see how the math adds up.

5        Some households have more than one cable box.  Some have

6    one in the living room and one in the master bedroom.  That's

7    an extra cable box.  If you multiply them by all the cable

8    boxes, you get just over a billion dollars.  So the subscriber

9    math is about 464 million, all the set-top boxes are a little

10   over a billion, and we will show you the math and prove it

11   with evidence.

12       Now, in our system the other side gets a chance to

13   explain their side, too, so what will you hear from them?  I

14   suspect they'll say, We don't infringe.  We contend those are

15   chocolate chips.  We're only going to prove the architecture's

16   there.  Chocolate chips don't matter.

17       They're going to say the patents are invalid.  That's not

18   going to hold up.

19       Then they're going to say the invention isn't worth that

20   much; not that many people use it.  They might say only two

21   percent of people use it.  The problem is, remember what their

22   business model is--bundling.  You ever ask for a discount if

23   you don't watch HGTV one month?  That is not how it works.

24   People pay for access to the apps and the technology, and they

25   pay for that bundle month after month.  And then, remember,

1    Charter pays their suppliers and they keep what's left over.

2            THE COURT:  Counsel, your time's expired.  Finish up

3    and have a seat.

4            MR. DYKAL:  Touchstream is one of those suppliers

5    without our permission.

6        Thank you for your time and attention.

7            THE COURT:  And if you will, return the easel to

8    where it was, and turn it to a clean sheet, please.

9            MR. DYKAL:  Yes, Your Honor.

10            THE COURT:  All right.  Defendants may now present

11    their opening statement to the jury.

12        Would you like a warning on your time, Mr. Dacus?

13            MR. DACUS:  Yes, Your Honor.  If you'd let me know

14    when I have five minutes left, please.

15            THE COURT:  I will let you know with five minutes

16    remaining.

17        You may proceed with Defendants' opening statement.

18            MR. DACUS:  Thank you very much, Your Honor.

19        Good afternoon.  It's my privilege to represent the men

20    and women who work at Charter.  And I know the very first

21    thing they want me to say to you is a very sincere thank you

22    for giving them a chance to defend themselves.

23        Like you, Charter did not choose to be here, but once

24    they were drug here, they had a choice, just like we talked

25    about this morning.  When you're falsely accused of something

1    you have a choice--you can either accept it, turn your tail,

2    and run, or you can stand up and defend yourself.  And they

3    chose the latter.

4        And we would not be here, Charter would not be here, if

5    this case was not important.  It is important.  It's extremely

6    important to Charter as a company, and from our perspective it

7    has much broader ramifications, and I think those broader

8    ramifications will be clear to you as we go through the trial.

9        Now, you may be thinking that because Charter finds

10   itself sued in a federal courthouse over patent infringement,

11   that Charter either is mad at the patent system or doesn't

12   respect the patent system; and I know the very first thing

13   these folks want me to say to you is nothing could be further

14   from the truth.  In fact, it's 180 degrees opposite.  And

15   here's why.

16       Charter itself is a technology company.  They have

17   thousands of patents.  The integrity and the purpose of the

18   patent system is at the forefront of what Charter wants to

19   protect and it's at the forefront of why they're here.

20       There's two very fundamental principles of our patent

21   system that are at play here, and to be perfectly candid with

22   you, our system asks you, the jury, to protect these

23   fundamental principles.

24       The first is this.  You remember that a patent is just

25   like a deed to property.  You remember that from the patent

1    video this morning.  Many of us have seen a deed.  You see

2    there on the right this very specific description?  We call it

3    a metes and bounds description in a deed.  From that deed you

4    have a very specific piece of land that's granted to

5    you--here, 21.413 acres.  It works exactly the same in

6    patents.  The claims that the Judge has been talking to you

7    about, those define the boundaries.

8        The problem occurs once the patent owner receives their

9    patent and their boundaries are defined, some patent owners

10   want to move their fence lines.  And you may say why?  And the

11   answer is simple--it's because others are operating just

12   outside of those fence lines.  Right?  All you own is 21.413

13   acres.  You don't get to move your fence and claim 21.42 or 22

14   acres.  What's the incentive to do that?  Well, there's many,

15   the first of which is money.

16       The second thing that's going on here, and the second

17   fundamental principle that you're here to protect is closely

18   related and it's this:  When you as the patent owner receive a

19   patent, the promise you make to the government is that you

20   will teach the public -- as the Judge just told you, in this

21   thing called a specification within the patent, you will teach

22   the public how to make that invention, and you will teach them

23   fully, and you can't claim something broader or bigger than

24   what you actually described in your patent.  If you do, your

25   patent's invalid.  And that fundamental principle is something

1    that's very much in play here.

2        Now, who are the companies involved?  Charter.  I know

3    some of you said this morning you'd heard of Charter before.

4    Charter is a cable company.  It's a company that provides

5    internet service.  It's a company that provides, to some

6    extent, phone service.  They do it in many states throughout

7    the country, and they've done it in Texas for years and years

8    and years.  They are particularly proud of their service in

9    Texas.

10       As we talked about in jury service this morning, folks

11   who live out in the country have a continuous problem of

12   trying to get and receive reliable and fast internet service.

13   Charter has spent millions of dollars over the last -- just

14   the last couple of years installing broadband internet service

15   to rural communities, folks out in the country, in the state

16   of Texas.

17       Who sits at the other table?  It's a company by the name

18   of Shodogg, now known as Touchstream, and they have a very

19   different story.  As their lawyer said, they were started in

20   2011, started on this idea that Mr. Strober had where he was

21   trying to take internet videos that he was watching on his

22   phone at lunchtime and then put those same internet videos

23   onto a larger screen.

24       With that idea, he went to several folks, just as

25       Mr. Dykal said, pitched his idea to them, and they

1    started a company in 2012.  In fact, they had a product.  They

2    had an app in 2012, a consumer app, just like all of us see on

3    our phones.  That app, which allowed you to take an internet

4    video on your phone and show it on a larger screen, was

5    unsuccessful.  And I don't say that with any great smile or

6    anything, but I think they'll admit to you from a business

7    perspective it was not successful.  Folks just didn't want it.

8         They created a second product and a third product, all

9    based on this same general technology of taking an internet

10   video on your phone and then transmitting that to a larger

11   screen.  They created one for a business application.  They

12   created one for a hotel application for this Quadriga.  And

13   what you'll come to know is that each one of those was

14   unsuccessful.

15        I just heard Mr. Dykal say that all of this technology

16   was a hit.  I want you to remember that as we go through the

17   evidence, because the evidence will be that the marketplace,

18   people out in the market to whom they tried to sell this, just

19   didn't want it.  And the fact is by 2017, Shodogg and

20   Touchstream shut down their operations, stopped making

21   products, and turned solely, unfortunately, like many

22   companies do today, to the courthouse.  They decided to solely

23   go into the business of litigation.

24        This lawsuit resulted in 2023.

25        Now, just as Touchstream's lawyer said, Charter and

1    Shodogg/Touchstream, weren't strangers to each other.

2    Touchstream -- but let me say this.  By 2023 when this lawsuit

3    was filed, they had not talked to each other in close to seven

4    years; close to seven years.  No one from Shodogg/Touchstream

5    came to Charter before they filed this lawsuit.  It is true

6    that between 2011 and 2015, Touchstream contacted Charter

7    numerous times.  Touchstream paid consultants and paid

8    contacts in the industry to reach out to Charter.

9         To the extent that you were left with the impression that

10   Charter was reaching out to Touchstream and wanted more

11   information about Touchstream's products and Touchstream's

12   technology, listen to the evidence in the case and see if that

13   actually bears out to be.

14        What you'll see is it was one contact after another by

15   Touchstream, each time Charter was courteous and willing to

16   talk to them and each time the answer was we, Charter, don't

17   need your technology.

18        Now, what is it that the folks at Shodogg and Touchstream

19   were presenting to us?  This is an excerpt from a presentation

20   by Touchstream to Charter, and you'll see this over and over

21   again.  This is how Touchstream described their technology.

22   It's a patent web-based technology that allows any mobile

23   device to connect and share any digital content to any other

24   web-enabled internet-enabled screen.  That's what they said

25   they had.  And that was consistent with what the purpose in

1       the patent said.

2            This is the background section of the patent.  And they

3       described it as the desire to watch various worldwide web

4       media, that's internet media, on a family's primary television

5       set, and to control this operation from the comfort of your

6       couch.  There's a need to operate a television set or other

7       display remotely from a personal computing device, such as a

8       mobile phone.  That's how they described what they were trying

9       to pitch to us and what they were selling to us.

10           But Charter didn't need that.  Charter's system is

11      different.  Charter's system is what's known as a closed

12      system.  The video content that is coming from this Send-To-TV

13      feature that they accuse of infringing is not coming from the

14      internet; it's coming from Charter's servers.  Whether or not

15      that content is live cable television or video-on-demand, that

16      content is coming from a Charter server and through the

17      Charter network, not through the internet.

18           I mean, we all know of services that come through the

19      internet like Hulu, YouTube, Netflix, Apple TV, but Charter's

20      a very different situation and a very different network.

21      That's not something that Charter just says today; it's

22      something that Charter said back at the time they met with

23      Touchstream.

24           What happens in these lawsuits is this Court requires

25      both sides to go back and produce documents, including emails,

1    from as far back as you have them.  So we've produced our

2    internal documents.

3        Here is an email from 2012 from a gentleman by the name

4    of Alan Lui, who works at Charter who had met with Touchstream

5    multiple times.  He's reporting to his boss, Peter Stern,

6    about his meetings with Touchstream, and he says, Their value

7    proposition is less clear for us.  If you look at the first

8    sentence, he says, I'm not surprised that Shodogg is getting

9    traction in hospitality in hotels, but their value proposition

10   is less clear for us.

11       And he goes on to say if you look at the highlighted

12   wording down below, it solves two issues--that's Touchstream

13   solves two issues--that I do not believe we feel like we need

14   help with--authentication and this user interface.

15       This is an email written by a Charter employee more than

16   a decade ago at a time where he certainly never thought it was

17   going to be presented in a federal courthouse, and he's saying

18   exactly what we say today--Touchstream may have some

19   technology, it may have applications in certain places, but it

20   doesn't for us.

21       In addition to that, Charter knew that it didn't need

22   this alleged Touchstream application because Charter was

23   developing its own app with a remote control on the phone.  I

24   mean, you'll see from Charter witnesses that Charter actually

25   developed for their phone and for an iPad a set-top box remote

1    control.  That remote control could send Charter video content

2    to a customer's television.  In fact, Charter's work around

3    this Send-To-TV app resulted in Charter's own patent being

4    issued, filed in January of 2012.

5        Now, the important part of all of this is all of this was

6    done before Charter even met Touchstream.  The features that

7    they -- that Touchstream accuses of infringing, this

8    Send-To-TV feature, those features Charter had starting in

9    2010 and were developed in 2011, before we even met, before we

10   even talked to Touchstream.  So when Mr. Dykal said to you

11   that we needed their technology to create a new app in 2016,

12   he left out of his timeline the fact that we had these

13   features that they accuse today of infringing, we had them

14   before we ever even talked to Touchstream.

15       Now, despite those facts, they brought this lawsuit in

16   2023.  And when they do, you know from what the Court has said

17   to you and from the Court's video this morning that the way

18   you resolve this dispute is by answering a couple of

19   questions.  The first is, does Charter infringe this patent,

20   and the second is, is this patent actually valid.  So let's

21   talk about this first question.

22       I'm confident that before you came to court today you

23   probably had never done an infringement analysis by looking at

24   a patent, so I want to talk about that process so that when

25   you hear the evidence from the witness stand, you know how to

1    apply it.

2         Very similar to the cookie example you were given, assume

3    that there's a patent on a soccer ball, and assume that the

4    claims of that patent say it's a ball filled with air made of

5    leather and round.  And assume that the owner of that soccer

6    ball patent sues the maker of a football.  Well, the football

7    maker would come to court and say, yes, it's a ball, it's

8    filled with air, it's made of leather, but it's oblong, it's

9    not round.  And because all the words and elements of the

10   claim are not met, there's no infringement, and they'd be

11   exactly right.

12        Now, how do you take that concept and apply it here?

13   They have three patents.  What you're going to find out about

14   those patents is they're very similar.  They're not identical,

15   but they're very, very similar.  You're going to look at the

16   words of each patent claim.  What I'm showing you is an

17   example here.  This is claim 1 from the '251 Patent.  All of

18   these words have to match up to the Charter system.  And you

19   see some of these words I've highlighted in different colors,

20   and what you'll come to know is those are parts of the patent

21   that Charter does differently.

22        When Charter got sued, they retained Dr. Michael Shamos.

23   Dr. Shamos is one of the leading experts in the country on

24   this type of technology.  And we asked him to compare our

25   Charter closed system using this Send-To-TV feature that they

1    accuse to the words of the patent claim because that's what

2    you have to do.

3        I'm going to give you a roadmap.  I can't go through the

4    details now.  I'm going give you a roadmap of what to listen

5    to in the testimony so that you can do this for yourself.  And

6    no doubt, Touchstream's going to call their expert just like

7    they said, Dr. Wicker, and he's going to get up there and

8    check off these boxes as if we have everything.  And then

9    we're going to put on witnesses, fact witnesses to describe

10   how our network actually works, and ultimately Dr. Shamos to

11   tie that all together for you.  And he's going to show you

12   that we don't have all these things, and you're going to have

13   to make a decision on who's right.

14       Here's what we're going to show you we don't have.  The

15   patent requires assigning by a server system a synchronization

16   code to the display device.  And just as Touchstream's lawyer

17   said, that makes sense in what they were trying to design

18   because you had a television and a phone, neither of which had

19   ever met each other or knew each other before.  So you've got

20   to assign some sort of code so that these can talk to each

21   other.

22       But within the Charter system, Charter doesn't have that

23   need.  Its customer's phone knows the television.  Charter

24   knows what set-top box that controls the television is in that

25   customer's house.  There's no assigning of a code.

1          You'll hear Dr. Wicker on behalf of Touchstream say that

2     there's this thing called a MAC code in the Charter set-top

3     box that is assigned by the server.  But this MAC address in

4     the set-top box is actually given to the set-top box by the

5     manufacturer of that box, here a company called ARRIS.  We

6     don't make the box.  That MAC address is actually provided by

7     the manufacturer.

8          The patent describes exactly this, and that is, an

9     example of the server providing a sync code to the larger

10    display device like a television and then that sync code being

11    typed into the phone.  That's what they needed for their

12    invention.  But the Charter system works very differently.

13         The patent also requires a plurality of different media

14    players.  Now, plurality is just a fancy lawyer word for more

15    than one.  So any time you see plurality, you can just think

16    that it means multiple or more than one.

17         This media player is something just -- that the Court has

18    defined for us.  You remember that the Court said earlier that

19    he's given certain definitions.  This is one of those words,

20    and the Court's definition is that a media player means

21    software for playing media.  That's the Court's definition.

22         And it's true that the patent used software for playing

23    media, and they had very good reasons to--because under their

24    invention, what they were trying to do, they didn't know where

25    the media would be coming from, they didn't know what type of

1    media would be coming when you have any phone connecting to

2    any television to provide any type of video content.

3        Charter's very different.  Charter knows exactly what

4    media it's playing, whether it's live television, or

5    video-on-demand, or digital video recording, DVR.  Charter

6    already knows.  They don't need the flexibility of software.

7    So Charter's video content comes not in software but in

8    hardware.  And because of that, we don't infringe the patent.

9        One other thing the patent requires.  The patent requires

10   something called a universal playback control command.  What

11   is a playback control command?  That's things like play,

12   rewind, pause, fast forward.  Those are playback control

13   commands.  The patent requires those commands be universal.

14   Now, we all know what universal means.  That means everybody

15   can understand it.  Right?  Everyone in the universe can

16   understand it.

17       Think about why Touchstream has that in their patent.

18   Because, just as their lawyer described, the invention

19   allegedly was hooking up any phone to any television they had

20   never met before, with this thing in the middle called a

21   server, which they've never talked to before, so you have to

22   have them speaking a universal language.  Right?  They can't

23   be speaking different languages or they can't speak to each

24   other.  They need to speak a universal language.

25       Well -- and that's exactly what the patent -- this is an

1     excerpt from the patent and as you'll see in the evidence,

2     that's exactly what the patent describes is this universal

3     commands that the patent requires.

4          Well, does Charter have that?  No.  And let's first talk

5     about why.  Charter doesn't need to speak a universal

6     language.  The Charter network is only talking within the

7     Charter network, so they only -- it only needs to speak a

8     language that Charter understands.

9          And what you'll see from the evidence, this is an excerpt

10    from a technical manual at Charter, an excerpt from the

11    computer code.  So, for example, if we look up here at the top

12    where it says VOD, that's video-on-demand, and you see that

13    word flick, that's Charter's word for play.  Same thing for

14    linear television, which is live television.  If you look in

15    Charter's computer code, it has the term flick.  That's the

16    term that Charter uses for play.

17         It's not a universal term.  It's not a universal playback

18    control command as the patent requires.  It's a playback

19    command idiosyncratic to Charter because they don't need

20    universal.  And because of that, the Charter system works

21    differently than what the patent describes.

22         So this is one patent.  And within that patent, the '251

23    claim 1, there are three reasons why Charter does not

24    infringe.  Now, you remember the way this works is if any one

25    of those -- if you find that any one of those is correct, then

1    we don't infringe.  We'll show you and prove to you that all

2    three of those are, in fact, differences between how our

3    Charter system operates and how the patent functions.  But if

4    you just find that one doesn't, then there's no infringement.

5         Let's talk about the second question.  And by the way, we

6    will go -- for each claim that they assert, in each patent

7    that they assert, we will go through each one and show you

8    where the Charter system and network operates differently than

9    what the patent describes.

10        The second question you'll answer is whether or not this

11   patent is valid.  And remember we talked about this concept

12   that a patent is a promise by the patent owner to write in

13   their patent, just like the Judge described to you in his

14   instructions, within this thing in the patent called a

15   specification.  And you can look at that in your notebook when

16   you have time.

17        Within the specification, the patent owner has to fully

18   describe what it is, the invention that they claim in the

19   claims.  Okay?  If they don't do that, then it's a violation

20   of what we call the written description rule.  The Judge just

21   said that to you, and he'll give you more instructions on it.

22   But that's the premise behind it.  You have to fully describe

23   what it is you now claim.

24        So let's talk about the roadmap of the evidence you're

25   going to see here.  What you're seeing now is an excerpt from

1    the patent.  Okay?  The specification.  This is from the

2    background part of the patent.  What it is -- what is it that

3    Touchstream says they were trying to invent?  It says

4    worldwide web media, so internet media, on a family's primary

5    television, and then if you look further down, they were

6    capturing web media to control the television or other display

7    remotely using a personal computing device.

8         What else does the specification say?  When you look in

9    the specification, you'll see some things called figures.

10   This is -- on the left there is figure 1 from the patent.

11   It's a diagram of an example of what the patent is describing.

12   And then there is just lots and lots of words, column after

13   column of language.  And what you'll see is the specification

14   only describes video content being transferred from the

15   internet, from the internet.  That's it.

16        This is another example.  The patent describes video

17   content coming from the internet.  In fact, you can look all

18   through the patent, and we will in the course of this trial,

19   and there is no description of video content from any source

20   other than the internet.  Yet the patent claims and they claim

21   sources beyond the internet.

22             THE COURT:  Five minutes remaining.

23             MR. DACUS:  Thank you, Your Honor.

24        The Send-To-TV video content coming from Charter is not

25   from the internet; it's Charter's video content.  Yet they

1    claim in the patent things that Mr. Strober, with all due

2    respect to him, did not describe and teach.  He taught and

3    described for the public how to transfer video content from

4    the internet, and now they claim and then they claimed sources

5    beyond it.

6        I'll wrap up here.  This question of infringement and

7    invalidity is for you.  If you find there is infringement,

8    you'll be asked to determine what a reasonable value is to pay

9    as a royalty.  I'm not going talk about damages or the amount

10   of royalty right now because Charter doesn't believe it owes

11   Touchstream anything.  We don't use their patent today, and we

12   never have.

13       But this is what I would ask you to do.  When we talk

14   about damages in this case and when their witnesses take the

15   stand, I want you to pay particular attention to the method

16   and the processes they go through to get to these hundreds of

17   millions of dollars that they're asking for.  And here's why.

18       Because if you listen closely to the methods and the

19   processes that they go through, which we think are not

20   consistent with the law and exaggerated, it will tell you what

21   this lawsuit is really about.  They've told you what they want

22   you to think this lawsuit is about, but if you'll listen to

23   the damages evidence and listen to how they get to that, I

24   think it will tell you a whole lot about why we're really here

25   and whether or not this is really about the promotion or the

1    progress of science.

2        We appreciate your time and attention again both for the

3    day and the week.  We look very much looking forward to

4    presenting evidence to you over the course of this week and at

5    the end returning of your verdict.

6        Thank you, Your Honor.

7            THE COURT:  All right.  Does either party wish to

8    invoke the Rule?

9            MR. DYKAL:  Yes, Your Honor.

10            THE COURT:  And do I understand it's the request

11    that the Rule be invoked such that expert witnesses are

12    excluded from the Rule as well as corporate representatives

13    but fact witnesses are covered by the Rule?

14            MR. DYKAL:  That's what we would do.

15            THE COURT:  All right.  Then the Rule is invoked on

16    that basis.  If you're a fact witness in this case, you're not

17    a corporate representative and you're not an expert witness,

18    you're required to be outside the courtroom until you are

19    called to actually testify.

20        And, counsel, I'll rely on you to let me know if there's

21    anybody who remains in the courtroom that needs to be outside

22    under the Rule.  If you're an expert witness or if you're

23    corporate representative of one of the named parties, you're

24    permitted to be in the courtroom during other witnesses'

25    testimony.

 1          All right.  Is the Plaintiff prepared to call its first

 2     witness?

 3              MR. BERGSTEN:  Yes, Your Honor.

 4              THE COURT:  Call your first witness, please.

 5           Call your first witness, Plaintiff.

 6              MR. BERGSTEN:  Yes, Your Honor.  Jordan Bergsten for

 7     Touchstream.

 8          Touchstream calls David Strober to the stand.

 9              THE COURT:  All right.  Mr. Strober, if you'll come

10     forward and be sworn by the Courtroom Deputy.

11              (Whereupon, the oath was administered by the Clerk.)

12              THE COURT:  Please have a seat on the witness stand,

13     Mr. Strober.

14          Counsel, are there witness binders to distribute?

15              MR. BERGSTEN:  Yes.

16              THE COURT:  Then you have leave to distribute them.

17              MR. BERGSTEN:  Thank you.  I've given one to

18     counsel.  How many copies would the Court like?

19              THE COURT:  I need at least one.

20              MR. BERGSTEN:  May I approach?

21              THE COURT:  That's what I'm asking you to do.

22          All right.  You may proceed with direct examination of

23     the witness.

24                          DAVID STROBER, SWORN,

25     testified under oath as follows:

<u>DIRECT EXAMINATION</u>

BY MR. BERGSTEN:

Q.    Could you please introduce yourself to the jury?

A.    My name is David Strober.  I was CTO of Touchstream

Technologies.

Q.    And what is a CTO?

A.    Chief technology officer.

Q.    And how did you come to be the CTO of Touchstream

Technologies?

A.    I started the company and I was the first technology

person and I was the inventor that the company was started

under.

Q.    Can you explain a little bit more what you mean when you

say that the company was started under an invention?

A.    So after I came up with the invention and filed for a

patent, I wanted to start a company based on that.

        THE COURT:  Mr. Strober, pull the microphone a

little closer to you, please.  Thank you.

    Go ahead, counsel.

Q.    (BY MR. BERGSTEN)  Can you please explain to the jury at

a high level what your invention does?

A.    So it basically allows you to take your mobile phone,

look for some videos on your phone, and when you find a video

that you want to watch, you can tap on it and it will play it

on a larger screen for you.

1    Q.   Did coming up with this invention require you to create

2    any computer code?

3    A.   It did.

4    Q.   When was the first time you remember ever creating

5    computer code?

6    A.   A long time ago.  Probably about 12 or 13 I got a

7    computer and I wanted to build games on it.

8    Q.   And what made you think that you would like building

9    games on a computer at that time?

10   A.   I used to tinker around with a lot of electronics and

11   they would be littered all over my basement, and so computer

12   programming seemed a little bit cleaner and I could PROBABLY

13   do a little bit more with that.

14   Q.   And how did you go about trying to program this game

15   using computer code?

16   A.   I found a couple of magazines, and I saw there was one

17   that had games in it.

18   Q.   And did you find a way to get ahold of one of those

19   magazines?

20   A.   I did.  I bribed my brother to take me down to 7-Eleven

21   and I got the magazine.

22   Q.   Can you explain, just in case somebody doesn't know, what

23   7-Eleven is?

24   A.   7-Eleven is a -- was a convenience store that wasn't too

25   far from my house.

1    Q.    And what did you bribe your brother with?

2    A.    A Slurpee.  That's like a frozen drink.  It was the

3    middle of the winter so it wasn't a great bribe, but he still

4    took me.

5    Q.    And so once you got a copy of this magazine, did you, in

6    fact, try to code a game of Tic-Tac-Toe?

7    A.    I did.

8    Q.    And what was that experience like for you?

9    A.    Initially it was great.  It took me a long time to type

10   in the code, but then it got somewhat frustrating because

11   after all that time I hit play and instead of playing a

12   Tic-Tac-Toe game, I just got errors.  So I spent almost as

13   much time fixing the errors, but once it was done it was a

14   nice accomplishment.

15   Q.    And after that experience, did you continue programming?

16   A.    It was more of a hobby, yes.

17   Q.    And what kind of stuff did you do with programming as a

18   hobby?

19   A.    At that time I spent a lot of time just programming so

20   that I can print out banners.  It used to be the paper wasn't

21   just one sheet, but like these long stretches of paper, and so

22   I programmed to be able to print my name, or anything that I

23   wanted, on these bigger banners.

24   Q.    And did you attend any school after high school,

25   Mr. Strober?

1    A.    I did.

2    Q.    Can you explain to the jury a little bit about your

3    post-high school education?

4    A.    I went to college and graduated, and then I went on for a

5    Master's and my Ph.D.

6    Q.    And did you end up getting your Ph.D. degree?

7    A.    I did not.

8    Q.    Can you explain why that occurred?

9    A.    Just kind of time ran out.  I was working, family

10    responsibilities, and just wasn't able to do both.

11    Q.    And what kind of things were you studying in those

12    programs?

13    A.    Educational technology.

14    Q.    Can you please explain to the jury a little bit what that

15    means?

16    A.    That's when you think about like online learning, when

17    you have textbooks that are available on the web, that's what

18    I was studying.

19    Q.    And did any of your course work involve using computers?

20    A.    Quite a bit.  So it was like half of it was on computers

21    and the other half was on education.

22    Q.    And before coming up with this job, did you have -- or

23    this invention, did you have any jobs that required you to

24    work with computer code?

25    A.    I was working at the college and I required quite a bit

1    of computer programming.

2    Q.    And can you explain a little bit what you did with

3    computer programming at that job?

4    A.    Building student management system, web pages, and also

5    instructed faculty on how to teach online.

6    Q.    And other than instructing faculty, as you just

7    described, did you ever teach anything that had to do with

8    computers before coming up with this invention?

9    A.    Yes.  I was a night adjunct lecturer teaching web

10   programming.

11   Q.    And how did you like teaching web programming?

12   A.    I enjoyed it a lot.  It was very fulfilling.

13   Q.    What did you like about it?

14   A.    It's a great experience when you can show someone how to

15   develop a web page, and the first time that they create the

16   very simple 'hello world', that's like the first project, and

17   when they can just put in there and then also see it on the

18   web and realize that they were able to do that and they had

19   that power, it was nice to be able to impart that on them.

20   Q.    Can you please explain a little bit more by what you mean

21   by the 'hello world' project?

22   A.    So basically a simple web page that just had the two

23   words.  They could put whatever color they wanted in the

24   background, but it was theirs.  They were able to program it

25   and then save it to the server and then anyone on the web

1  would be able to see it.

2  Q.   And where were you working when you came up with the idea

3  for your invention?

4  A.   I was still at the college.

5  Q.   And what were you doing at the college at that time?

6  A.   I was doing instructional design, teaching, and helping

7  professors.

8  Q.   And how did you come up with the idea for your invention?

9  A.   Well, I want -- I had nice lunch breaks, I had a nice

10  office with a large TV and a conference table, and during my

11  lunch breaks I would watch videos on my phone.  And it kind of

12  was frustrating to think I'm watching it on this small phone

13  when I could watch it on this larger screen that was in front

14  of me.

15  Q.   At that time did you look to see if there were any

16  solutions out there that already did what you wanted to do?

17  A.   I did.  I mean, I just wanted to be able to watch the

18  videos.  At that point I wasn't thinking about inventing

19  anything.

20  Q.   And what did you find out there?

21  A.   There was some software that was out there, and there was

22  also at that time Apple TV, which was like this hardware

23  device you could plug into a TV.

24  Q.   Did Apple -- did you find Apple TV sufficient to do what

25  you were trying to do?

1    A.    It didn't.  I mean, besides being very expensive, my

2    campus was kind of restrictive, so I couldn't bring my own

3    personal hardware onto the campus.

4    Q.    Are you familiar with the concept called mirroring?

5    A.    I am.  That's kind of what Apple TV was doing.

6    Q.    Can you please explain to the jury what mirroring is?

7    A.    Mirroring is when you are able to get a video or anything

8    on your phone and then have the same thing appear on a larger

9    screen.  But what it does is it requires you to take a video,

10   or whatever you have, and have it on your mobile phone and

11   then that same thing is presented on a screen.

12   Q.    So after doing this research, did you set out to create

13   something that would satisfy your goals?

14   A.    Yeah.  I didn't like that determining that I wasn't able

15   to find something, so just as my mind kind of goes around and

16   I was kind of thinking that what would be a different way to

17   approach this.

18   Q.    And did you feel like you ever had a breakthrough moment

19   that helped you solve this problem?

20   A.    I did.

21   Q.    And can you please explain that to the jury?

22   A.    I remember it clearly because I was in the middle of

23   teaching class, I was explaining -- it was the beginning of

24   the semester, and I explained how you create your web page,

25   and then when you save it you save it to a server and

1    somewhere else -- someone else, you know, can see exactly what

2    you did, and when you want to make a change you make a change,

3    say, to a server and then that change happens on that other

4    device.  And as I was, like, drawing this on the white board

5    and I was going up, about halfway through the triangle I had

6    that 'aha' moment.  I saw the complete the triangle, and

7    completed teaching the class, but right after class I started

8    thinking about and working on it.

9    Q.    And did you end up pursuing that idea?

10   A.    I did.

11   Q.    Did you do any research at that time to aid you in coming

12   up with your invention?

13   A.    I had to do a lot of research, yes.

14   Q.    And what kind of research was that?

15   A.    Programming, networking, just figuring out how I can make

16   each of these steps work and to build a final product.

17   Q.    How much time, all told, did you spend working on this

18   invention?

19   A.    I really had started this probably beginning of October;

20   took me to mid November, late November; and every chance I

21   had, if I wasn't working or sleeping or eating, I was working

22   on this.

23   Q.    And did you work to try to create a prototype of your

24   invention?

25   A.    I did.

177

1    Q.    And did you develop any computer code for that prototype?

2    A.    I did.

3    Q.    And what is -- we've talked a little bit about it today.

4    What is computer code?

5    A.    Computer code is basically the instructions that tells

6    the computer what to do.

7    Q.    If you saw some of the code for that prototype, would you

8    recognize it today?

9    A.    I would.

10         MR. BERGSTEN:  Mr. Green, could we please pull up

11   PTX 75?

12   Q.    (BY MR. BERGSTEN)  Do you recognize PTX 75?

13   A.    I do.

14   Q.    And what is it?

15   A.    It's a piece of software code that I wrote.

16   Q.    And it doesn't say it here on the document, but do you

17   recall what you named this piece of software code when you

18   wrote it?

19   A.    Yes.

20   Q.    And what did you name it?

21   A.    Mattie.

22   Q.    And why did you name this piece of code Mattie?

23   A.    That's the name of my daughter.  And I could see here

24   that this was probably sometime during the iteration of this

25   where I got the code to work, and I must have been using it to

1   play videos for her because I can see up at the top it says

2   Sesame Street, which allowed me to get a list of Sesame Street

3   videos and play it for her on a TV.

4   Q.   And how old was your daughter at this time?

5   A.   Probably around two years old.

6   Q.   And how did it feel to be able to share your invention

7   with your daughter in this way at this time?

8   A.   I mean, it was great.  It was convenient, but also just

9   the -- to use my own invention for my own use was pretty good.

10  Q.   And around what time period did you prepare this code?

11  A.   Probably around the same time--October -- this would

12  probably be more like mid November of 2010.

13  Q.   And did you write every single word of your code files

14  like this?

15  A.   I did not.

16  Q.   And can you please explain why that is?

17  A.   In basic programming you don't start from a blank slate;

18  you use a lot of tools to help you get started, to make the

19  setup process a little bit quicker.

20  Q.   Was there any code existing out there that solved all the

21  problems that you needed to solve?

22  A.   No, it did not.

23  Q.   Are you familiar with the concepts of hardware and

24  software?

25  A.   I am.

1    Q.    And what do you understand hardware to mean?

2    A.    Hardware are the physical devices that are what performs

3    the functions.

4    Q.    And what do you understand software to mean?

5    A.    Software is basically the instructions that tell the

6    hardware what to do.

7    Q.    So what kind of hardware, if any, was needed for your

8    prototype?

9    A.    So obviously that was the phone part, and then a TV,

10   which could be a computer monitor or just any larger screen,

11   and then there's a third part which was the server that

12   communicated between the two devices; so three altogether.

13   Q.    And what type of things did you use as a server for your

14   prototype?

15   A.    I could use -- install server software on a laptop, so I

16   used that.  I also paid to use like this -- servers that were

17   on the web.

18   Q.    And what kind of networks could be used for your

19   prototype to connect these devices?

20   A.    It was flexible.  I mean, you could pretty much connect

21   over any network that had the standard internet protocols.

22   Q.    Did you eventually succeed in building a prototype that

23   did everything you set out to do?

24   A.    I did, yes.

25   Q.    And when did that occur?

1    A.    Late November.

2    Q.    And what was that experience like for you?

3    A.    It was a huge accomplishment.  I remember that day

4    vividly.

5    Q.    Can you please explain what you mean by that?

6    A.    Just, you know, when I -- it was at a time where I was

7    able to get the videos I had -- was able to find videos on my

8    phone, and then I hit and all of the sudden started playing on

9    screen.  And then I was able to go to another video and hit

10   play again, and magically the second video.  And sitting here

11   today I could say that my -- I had the chills when that

12   happened, and it was just a -- I was a very proud of that

13   moment, yes.

14   Q.    And once that moment occurred, what was -- what did you

15   do after that?

16   A.    Well, I wanted to show off, so I immediately called my

17   big brother.

18   Q.    And what did you do once -- did you get ahold of him?

19   A.    I did, yes.

20   Q.    And what happened next?

21   A.    I told him to go to this website, and I didn't tell him

22   what I was going to do, and then I also just started playing a

23   video on his TV in his house, and then I switched the videos.

24   Thinking about it now, it was just kind of a moment of silence

25   and then he was like, How did you do this.  So I think he was

181

1    pretty amazed at what I just did.

2    Q.    And after observing his reaction, did you have any

3    impressions going forward about what you should do next?

4    A.    We did.  We talked about that, and I asked him some --

5    for his advice, knowing he was in the media space, and after

6    that I immediately filed for a patent.

7    Q.    And what made you think that it would be important to

8    file for a patent at that time?

9    A.    Based on his advice and the thought I would actually want

10   to start a business, this would be the best way to protect my

11   invention.

12   Q.    And did you, indeed, set out to get a patent?

13   A.    I did.

14   Q.    And how did you go about doing that?

15   A.    I looked for a patent attorney.

16   Q.    Did you find a patent attorney?

17   A.    I did.

18   Q.    And how did you go about finding a patent attorney?

19   A.    Again, Michael and I -- my brother and I talked, and he

20   gave me good advice, so I went out and I said who -- which is

21   the biggest tech company that I could think of, and that was

22   Apple, and so I just looked for any lawyers that I could find

23   that worked with Apple.

24   Q.    And were you happy with those attorneys?

25   A.    One, I was surprised they took me on, and I was very

1   happy with the work they did, yes.

2   Q.   And how did you finance hiring these attorneys for your

3   patent?

4   A.   I used my savings.

5   Q.   And can you give the jury an indication of what portion

6   of your savings you used?

7   A.   It wasn't a lot, but it was all I had.

8   Q.   Did you speak to -- were you married at the time you made

9   this decision?

10  A.   I was, yes.

11  Q.   And did you speak to your wife about it?

12  A.   I did.

13  Q.   And what were the concerns, if any, at that time?

14  A.   We had a two-year-old.  I had just -- I was working at a

15  secure job I worked very hard to get to, and it was a very

16  difficult decision to take that chance.

17  Q.   And what was it about the prospect of getting a patent

18  that led you to take that chance at that time in your life?

19  A.   I -- it provided that security, gave us that comfort that

20  we can take that chance but have some protection.

21  Q.   Did the United States Patent Office eventually issue a

22  patent based on your application?

23  A.   It did.

24  Q.   And when did you get that application on file?

25  A.   I think it was April 2011.

1    Q.    And have you had other patents granted on your invention

2    since then?

3    A.    I do.

4    Q.    Is your understanding that some of your patents are

5    involved in this case?

6    A.    Yes.

7    Q.    And would you recognize some of those patents if you saw

8    them today?

9    A.    I would.

10            MR. BERGSTEN:    Mr. Green, could we please pull up

11   JTX 013?

12   Q.    (BY MR. BERGSTEN)  Mr. Strober, do you recognize this

13   document?

14   A.    Yes.

15   Q.    And what is it?

16   A.    It's my patent.

17   Q.    Can you tell from this what date your patent was granted

18   by the Patent Office?

19   A.    Yes.  It's written on the top right.  It says January

20   15th, 2013.

21   Q.    And can you tell the jury what the last three numbers are

22   of the U.S. patent number?

23   A.    '251.

24   Q.    Is it sometimes referred to as the '251 Patent?

25   A.    Yes.

1    Q.   And who is the listed inventor on this patent?

2    A.   I am.

3    Q.   Is this the first patent that you were ever granted on

4    one of your inventions?

5    A.   Yes.

6    Q.   How did it feel to you when the United States Patent

7    Office granted this patent in your name in January 2013?

8    A.   It was a huge milestone for me.  I've always tinkered

9    around and thought of myself as a wannabe inventor, and this

10   made me a true inventor.

11   Q.   At some point did you end up leaving the job that you had

12   at the school when you came up with the invention?

13   A.   I did.

14   Q.   And how did you come to leave that job?

15   A.   I had started the company and was looking for investors,

16   and some of the investors actually signed on and joined up

17   with the company.

18   Q.   And what company is that?

19   A.   Touchstream Technologies.

20   Q.   And what did you start that company to do?

21   A.   Basically to monetize the invention.

22   Q.   And how did you go about forming that company?

23   A.   So I give credit to my big brother again.  My brother had

24   someone at work that he showed what I'd just done and he

25   seemed very interested in it, and so I had a meeting with

1  Mr. Cohen and demoed the technology to him, and right after I

2  demoed it he actually stopped me on the way to the bathroom

3  and took out a check and said he wants to invest.

4  Q.   And who was that person?

5  A.   That was Mr. Jamie Cohen.

6  Q.   Did you end up bringing anyone else into the company

7  after Mr. Cohen?

8  A.   Yes.  So we met out at a lounge where I demoed it, and

9  his friends were in town and so he invited the friends to meet

10 with me.  And I demoed it again for them, and they were both

11 very interested and they ended up investing and joining the

12 company.

13 Q.   And what were the names of those individuals?

14 A.   Herb Mitschele and Michael Rinzler.

15 Q.   Did the company Touchstream ever end up going by a

16 different name?

17 A.   Yes--Shodogg.

18 Q.   And what was the reason for the second name?

19 A.   Branding and marketing.  I'm a tech person, so I came up

20 with Touchstream Technologies, which I think a lot of people

21 have a hard time remembering.  Shodogg is a much more

22 memorable more of a marketing, easier name to remember.

23 Q.   In the early days of the company, what was the company's

24 plan for monetizing the technology you invented?

25 A.   We always thought this would be a licensing play, but

1    since it was such a revolutionary technology, most people

2    deemed that -- had never seen it before, we thought we would

3    have to build our own product to be able to demonstrate it.

4    Q.    Can you please explain a little bit more what you mean by

5    'a licensing play'?

6    A.    That they would pay to use our technology.

7    Q.    And what was the first product, if any, that Shodogg

8    tried to develop?

9    A.    We developed a consumer app called Shodogg.

10   Q.    And what kind of device, if any, did that app run on?

11   A.    It was available on the IOS phones and the Android

12   phones.

13   Q.    At some point did that app become available for the

14   public to download?

15   A.    Yes.  It was available for the public to use.

16   Q.    And around what time did it become available?

17   A.    Say about beginning of 2013, I believe.

18   Q.    Did Shodogg charge users for downloading that app?

19   A.    No, we did not.

20   Q.    Did Shodogg charge users for using that app?

21   A.    No, we did not.

22   Q.    So what was Shodogg's plan, if any, to make money off

23   that app?

24   A.    It wasn't really a money-maker.  Again, it was just to

25   demonstrate the technology to be able to showcase what we do.

1  Q.   Are you familiar with the concept of a set-top box?

2  A.   A little bit, yes.

3  Q.   And what's your understanding of what a set-top box is?

4  A.   A set-top box is a piece of hardware that takes cable

5  from a cable company and then is able to play that onto a TV.

6  Q.   And did that consumer app work on TVs that had a set-top

7  box connected to them?

8  A.   It could.

9  Q.   Did Shodogg ever end up getting an office space for the

10  company?

11  A.   We did.

12  Q.   Can you please describe what Shodogg's first office was

13  like?

14  A.   So I was still working at the college and I wanted to

15  find an office that was close by, so -- and there wasn't a lot

16  of traditional office spaces, so there's a little bit of a

17  strip mall with a couple of stores, and there was a storefront

18  that used to be a donut shop.

19  Q.   About how many people, all told, worked in that first

20  office?

21  A.   We were able to squeeze about like nine people in there.

22  Q.   Did you ever expand into a bigger office?

23  A.   We did.

24  Q.   And what was that office like?

25  A.   That was fortunately a little bit bigger, and it had more

1    of a start-up vibe, so just a lot of open space, nice computer

2    screens, and places for people to collaborate and to work on

3    their code.

4    Q.    And can you please explain -- you used the word

5    'start-up'.  Can you is a explain what that means, please?

6    A.    'Start-up' is just when you are starting up a brand new

7    company that didn't exist before.  It's typically somewhat

8    underfunded, a lot of passionate people who believe in it, and

9    you're just trying to get into the market.

10   Q.    And how -- what years were Shodogg in that second office?

11   A.    We were there till I believe around 2016.

12   Q.    All right.  And what happened at that point?

13   A.    We ended up having to move out of the office.

14         MR. BERGSTEN:  At this point, Your Honor, I would

15   like to approach on a potential MIL issue.

16         THE COURT:  You may approach the bench, counsel.

17         (The following was had outside the hearing of the

18         jury.)

19         THE COURT:  For purposes of going forward, just tell

20   me you want to approach the bench; don't tell the record and

21   the jury what's it about.

22       What is it?

23         MR. BERGSTEN:  All right.  So we're currently under

24   an order saying that we can't mention the Google litigation

25   that Google infringed our patents between 2016 and this case

1     and were found to infringe.  But Judge Payne left that issue

2     open and said in an order that said if we believed they opened

3     the door we should approach the bench and ask to mention it.

4     And I believe some of the statements Mr. Dacus made in his

5     opening when he said the app was unsuccessful, folks didn't

6     want it, the evidence will be that the marketplace didn't want

7     it, in 2017 they shut down their business and turned solely to

8     the courthouse, and saying that by 2023 Touchstream hadn't

9     talked to them for seven years.

10         In other words, for us to defend ourselves fairly, I

11    think we should be able to point out that, one, we weren't

12    doing nothing during that time--we were suing Google; and two,

13    a major reason why we failed at business was because Google

14    put 100 million devices on the market that had been found by a

15    jury to infringe his patents, and that the post-trial motions

16    by Google on that issue have been denied from the bench.

17              THE COURT:  What's your response, Mr. Dacus?

18              MR. DACUS:  Yes.  So all of those things that I said

19    in opening are factual with respect to the demand for this

20    particular product.  The Google product is a different

21    product.  This is a marketplace for cable and media companies,

22    so two different industries.  And those facts -- I mean, we

23    have a fight here about what's the value of this invention,

24    part of the facts related to that invention.

25              THE COURT:  Let me say this.  I think to grant

1    leave to talk about the Google verdict would be excessively

2    prejudicial to the Defendant.  That doesn't mean that door

3    can't be opened.  I don't believe it's been opened at this

4    point.  If there is a reckless disregard for that and it's

5    opened as we go forward, I may grant leave, but I'm not going

6    to grant leave now.  Okay?

7              MR. DACUS:  Understood, Your Honor.

8              THE COURT:  Now, we've been back from lunch about

9    two and a half hours.  Where are you in your direct?

10             MR. BERGSTEN:  About two thirds of the way through.

11             THE COURT:  Okay.  We're going to take a short

12   recess since we've already broken to have you-all at the

13   bench, and then we'll finish your direct when we come back.

14             MR. DACUS:  Yes, Your Honor.

15             MR. BERGSTEN:  Thank you.

16             (The following was had in the presence and hearing

17             of the jury.)

18             THE COURT:  Ladies and gentlemen of the jury, this

19   examination has got some additional length and we've been back

20   more than two hours since lunch, so we're going take a short

21   recess at this time.  This is one of those times when you can

22   simply close your juror notebooks and leave them there in your

23   chairs.

24        Let me remind you to follow all the instructions I've

25   given you about your conduct as jurors, including not to

1    discuss the case among each other or with anyone else.  And

2    we'll be back shortly to continue with the direct examination

3    of the witness by Plaintiff's counsel.

4         The jury's excused for recess.

5              (Whereupon, the jury left the courtroom.)

6         THE COURT:  Be seated, please.

7    Mr. Dykal, during jury selection I gave the parties 20

8    minutes to strike their venire list and get them back to the

9    Courtroom Deputy.  I gave you a specific time on the clock.

10   Plaintiffs did not do that.  Somebody had to go to the

11   conference room where you were and knock on the door five

12   minutes after you were supposed to have them back and get

13   them.

14        I told you we would start back from lunch a little before

15   1:00.  At 12:58 I was on the bench.  You were nowhere to be

16   found.

17        You are going to have to be on time.  Your trial team is

18   going to have to be on time.  And we are not going to wait for

19   you going forward.  And if this kind of dilatory practice

20   continues, I will reduce your trial time, I'll reduce your

21   closing argument time, I will take appropriate steps to get

22   your attention.

23        This is your last warning.  Understood?

24             MR. DYKAL:  I understand.

25             THE COURT:  Okay.  We will take about a seven- or

1    eight-minute recess.  We will keep it short.  We'll be back on

2    the bench after that, and then we will continue with this

3    examination.

4         Court stands in recess.

5                         (Brief recess.)

6              THE COURT:  Be seated, please.

7         All right.  Before I bring the jury in, one other thing,

8    Mr. Dykal, I'd like to cover with you.  When you go back and

9    forth from the counsel table to the podium, I would prefer you

10   go around the Defense table and not walk between the Defense

11   table and the jury.

12             MR. DYKAL:  Yes, Your Honor.

13             THE COURT:  All right.  Let's bring the jury in,

14   please.

15             (Whereupon, the jury entered the courtroom.)

16             THE COURT:  Welcome back, ladies and gentlemen.

17   Please be seated.

18        And just so you'll know, members of the jury, it's a

19   little chilly in this courtroom.  I have no control over the

20   temperature.  The temperature is controlled out of the

21   headquarters of the district in Tyler, Texas.  So if you're

22   chilly this afternoon and tomorrow, you might bring a sweater.

23   I'm happy for you to bring a shawl or something and lay across

24   your lap if you'd like to.  Do whatever you need to, but don't

25   ask me to change the temperature because that's one thing I

1    can't do.

2         All right.  Let's continue with the direct examination of

3    Mr. Strober by Plaintiff's counsel.

4         Counsel, if you'll go to the podium and continue with

5    your examination, please.

6    Q.   (BY MR. BERGSTEN)  Mr. Strober, what, if any, role did

7    you have at Touchstream after 2016?

8    A.   I was on the board.  I was consulting and was helping

9    with the development of future patents.

10   Q.   And you still perform those tasks today?

11   A.   I do.

12   Q.   And are you compensated for your time at these tasks?

13   A.   I am.

14   Q.   And how are you compensated by Touchstream for these

15   tasks?

16   A.   I have a consulting agreement.

17   Q.   All right.  And what is the compensation term for you

18   under that consulting agreement?

19   A.   So any licensing or settlements, I get 2.5 percent.

20   Q.   Does that also apply to judgments?

21   A.   Yes, it would.

22   Q.   In the early days of Touchstream, was the company looking

23   to partner with other organizations?

24   A.   Yes, very much so.

25   Q.   And what kind of partnerships with other organizations

```
 1    were you looking for?

 2    A.    Really a partnership where the larger partner would be

 3    able to license our technology.

 4    Q.    And did you participate in pitch meetings with potential

 5    partners?

 6    A.    I did.

 7    Q.    And what would usually happen in a meeting like that?

 8    A.    I would usually go along and I was -- I would be the one

 9    that would set up the technology and get everything ready for

10    a demo, so then pretty much my part was done and our CEO would

11    take over and do the pitch part.

12    Q.    What was -- was there a demonstration of the technology

13    that was live at these meetings?

14    A.    Yes, absolutely.

15    Q.    And how did that live demonstration go?

16    A.    That was one of the main things that we did, because when

17    people saw the technology it was kind of like magic, and so

18    that was really -- that got their attention.  We'd be able to

19    walk in and a little bit about -- Herb Mitschele, the CEO,

20    what he liked to do was in the beginning of the meeting he

21    would ask whoever he was speaking to what their favorite

22    musician was, and while they were talking --

23              MR. DACUS:  Your Honor, I hate to object, but this

24    is hearsay--describing what Mr. Mitschele said.

25              THE COURT:  What's Plaintiff's response?
```

195

 1              MR. BERGSTEN:  I think he's just talking about

 2    actions from Mr. Mitschele, and he's not asserting any

 3    statement from Mr. Mitschele that had an assertion that we are

 4    trying to prove the truth of.

 5              THE COURT:  Well, he is reciting what is, in effect,

 6    an outside statement from a different person.

 7        I'm going sustain the objection.  You can rephrase the

 8    question and perhaps put it in a format that will elicit an

 9    acceptable answer, but I'm going to sustain the hearsay

10    objection.

11    Q.   (BY MR. BERGSTEN)  Mr. Strober, can you please explain

12    what Mr. Mitschele did in these demonstrations?

13    A.   Certainly, yes.  So Mr. Mitschele would be able to ask

14    the person we were speaking to what their favorite music was,

15    and I would watch Mr. Mitschele --

16              MR. DACUS:  Objection.  We're describing what

17    Mr. Mitschele said to folks.  It's hearsay.

18              THE COURT:  Well, he can testify as to what he

19    observed from -- and those matters which he has personal

20    knowledge of.  He can't repeat outside statements from someone

21    differently.

22        So to the extent he's reciting what another person said

23    at another time and place, that is hearsay and I'm going

24    sustain that.  To the extent he can testify about what he

25    observed and what he witnessed and has personal knowledge of,

 1    that's not hearsay.

 2        So if you want to take another shot at the question,

 3    counsel, with that guidance, you can; otherwise, let's move

 4    on.

 5    Q.    (BY MR. BERGSTEN)  Mr. Strober, did you ever witness

 6    Mr. Mitschele obtain information spontaneously from people in

 7    these meetings?

 8    A.    Yes, I did.

 9    Q.    And what would he do with that information?

10    A.    Well, we would be able to select a video on our phone and

11    be able to play that on their computer or their TV right in

12    front of them, and when they saw that, they were blown away.

13    It was a very important part of our presentations.

14    Q.    What role, if any, did Touchstream's patents play in

15    these meetings?

16    A.    They were crucial.  That was the value that we were -- as

17    a small company that we were bringing to the table.

18    Q.    And what made you think that at that time?

19    A.    One, it was the -- our invention.  The patent is what

20    really was the driving factor to try to get licensing.

21    Q.    And how frequently did Touchstream mention the status of

22    its patents in meetings?

23    A.    It was part of the presentation.  It was one of the key

24    things that we said early on was the value proposition that we

25    brought to the table.

1   Q.   And did you -- did you attend some of these meetings

2   yourself?

3   A.   I did.

4   Q.   About what portion of them did you attend yourself?

5   A.   A large amount of those, yes.

6   Q.   When you did not attend a meeting, did you typically help

7   prepare others for those meetings?

8   A.   I usually would be, yes.

9   Q.   And when you did not attend a meeting, did you typically

10  become involved in some kind of recap of that meeting?

11  A.   Almost always, yes.

12  Q.   Did Touchstream put out marketing materials for its

13  products while you were there?

14  A.   It did.

15  Q.   And did you have a role in deciding what those materials

16  would say?

17  A.   I assisted in the marketing material development.

18  Q.   Can you please explain a little more to the jury how that

19  process would work of deciding what those materials would say?

20  A.   Typically Herb Mitschele and Jamie Cohen, who are going

21  out on the sales calls and presenting, would ask me my

22  opinions of the marketing material.

23  Q.   And did you have a chance to provide input to those

24  marketing materials?

25  A.   I usually would be able to, yes.

1    Q.   Were you always satisfied with the result of, you know,

2    that process and what went out?

3    A.   I'm a technologist, so how I would describe something is

4    not necessarily how a salesperson would describe something, so

5    there was always a give and take when we created those

6    marketing materials.

7    Q.   Did Touchstream describe its technology the same way to

8    every audience?

9    A.   No.  Like I said, if I was describing this to somebody

10   who was more technologically experienced, I probably would

11   describe it a little bit different than someone that's maybe

12   in business or in sales.

13   Q.   Do you recall earlier when we talked about something

14   called a set-top box?

15   A.   Yes, I do.

16   Q.   Did Touchstream ever talk about set-top boxes in its

17   marketing materials?

18   A.   Yes, we did.

19   Q.   And what did Touchstream say in those marketing materials

20   about set-top boxes?

21   A.   That our technology can work with set-top boxes.

22   Q.   Did Touchstream succeed in entering into any

23   partnerships?

24   A.   We did.

25   Q.   And who did you enter your partnerships with?

1    A.    Quadriga and Hewlett-Packard.

2    Q.    What type of company was Quadriga?

3    A.    Quadriga provided and supplied in-room entertainment in

4    hotels.

5    Q.    And what kind of partnership did Touchstream enter into

6    with Quadriga?

7    A.    They licensed our technology.

8    Q.    And what did that end-product of that look like?

9    A.    So it gave the users the ability when they went to a

10   hotel room to be able to take videos from their phone and be

11   able to play that on the screen in the hotel room.

12   Q.    Did that implementation that Quadriga made under that

13   license include the use of set-top boxes?

14   A.    It did.

15   Q.    Were you involved in preparing computer code for that

16   implementation?

17   A.    I wasn't directly involved in the software development.

18   At that point I kind of moved on.  And we had developers, but

19   I did manage the developers.

20   Q.    Was it your understanding that Quadriga had received a

21   license to your patents?

22   A.    Yes.

23   Q.    And do you consider that deal between Quadriga and

24   Touchstream to be a fair deal for both parties?

25   A.    Yes, I did.

```
 1   Q.   And why did you feel that way?

 2   A.   We got a license and we were paid for our technology and

 3   they got something valuable that they could use to further

 4   their business.

 5   Q.   And what kind of company was HP?

 6   A.   Hewlett-Packard, it's a very large company that supplies

 7   hardware and they make computers.

 8   Q.   And what was the nature of Touchstream's partnership with

 9   HP?

10   A.   They were using our technology to -- for sales

11   presentations.

12   Q.   And what kind of networks did HP use when implementing

13   Touchstream's technology?

14   A.   Various networks.  Obviously they wanted to use their own

15   closed system.  It's the HP servers, so they wanted to use

16   their own technology as well as other technologies as well.

17   Q.   And why did they want to do that, to your understanding?

18   A.   Probably security.

19   Q.   Did Touchstream ever seek to partner with any cable

20   companies?

21   A.   We did.

22   Q.   And what did Touchstream envision for its partnerships

23   with cable companies?

24   A.   We were hoping for a licensing deal.

25   Q.   Did Touchstream have meetings with any cable companies?
```

 1    A.    Yes, we did.

 2    Q.    Did Touchstream ever meet with a company called Time

 3    Warner Cable?

 4    A.    Yes.

 5    Q.    Is it your understanding that Time Warner Cable has since

 6    merged with Charter in this case?

 7    A.    Yes.

 8    Q.    Do you know what something called CES is?

 9    A.    Yes, I do.

10    Q.    And what is CES?

11    A.    It's the Consumer Electronics Show.  It's a very big show

12    that happens once a year in Las Vegas where people go and rent

13    booths and demonstrate their technology.

14    Q.    Did Touchstream ever participate in CES?

15    A.    We did.

16    Q.    And when was the first time you did so?

17    A.    January of 2012.

18    Q.    Did Touchstream have any interactions with Time Warner

19    Cable in connection with that event?

20    A.    Yes, we met with them.

21    Q.    And what was that meeting like?

22    A.    I wasn't -- I was busy working with other people and

23    doing other presentations, but I read the -- I don't want to

24    get -- sorry.  I'm concerned that I may be saying something

25    that someone else said.

1   Q.    Okay.  Did Touchstream do a demonstration of its

2   technology for Time Warner Cable at that event?

3   A.    We did.

4   Q.    And how did that demonstration go?

5   A.    It went very well.

6   Q.    Did Touchstream ever talk to Time Warner Cable before

7   CES?

8   A.    We did.

9   Q.    Did Touchstream view Time Warner Cable as a competitor at

10  that time?

11  A.    Not necessarily.  We were looking at them more as a

12  partner.

13  Q.    And why is that?

14  A.    We kind of -- from understanding the media space and the

15  landscape, we felt that they really could benefit from our

16  technology and they would be willing to partner with us.

17  Q.    Did Touchstream continue to have communications with Time

18  Warner Cable after CES?

19  A.    We did.

20  Q.    Do you believe that Touchstream told Time Warner Cable

21  about its patents in those meetings?

22  A.    Oh, most certainly.

23  Q.    And why do you say that?

24  A.    Again, it was a valuable proposition.  That's one of the

25  reasons we were having that meeting.

1    Q.    Do you remember everything that was said in every meeting

2    that Touchstream had between Time Warner Cable?

3    A.    No.

4    Q.    All right.  Do you recall the general business

5    interactions between Touchstream and Time Warner Cable and

6    what that conversation looked like?

7    A.    I do.

8    Q.    What is your understanding of where that business

9    relationship went after CES?

10   A.    We had a number of meetings and they just -- we never

11   ended up with a partnership.

12   Q.    What types of things was Time Warner Cable communicating

13   to Touchstream about Touchstream's technology?

14   A.    They were happy with their current business model and

15   they weren't looking to make any significant changes.

16   Q.    Did Time Warner Cable ever communicate to Touchstream

17   that it was developing its own app that did what Touchstream

18   was presenting on?

19   A.    No, they did not.

20   Q.    Did they communicate anything close to that to

21   Touchstream?

22   A.    No.

23   Q.    When did you learn about Charter's app that's accused in

24   this case?

25   A.    Around 2019.

```
 1    Q.   And what was your reaction about learning about that?

 2    A.   I was shocked.

 3    Q.   And why do you say that?

 4    A.   Just after having so many meetings with them and thinking

 5    they were going to go in a different direction, and then find

 6    out that they went -- kind of used our technology, I was -- I

 7    didn't expect that to happen.

 8    Q.   Looking back, do you perceive any ways that Charter

 9    developing its own app impacted Touchstream's business?

10    A.   I mean, if we partnered we'd be in a different position.

11    Q.   What do you mean by that?

12    A.   Financially we would have a partnership, we would have

13    revenue, and I'd probably still be working there.

14    Q.   Would you like to still be working there?

15    A.   Absolutely.

16    Q.   How do you feel sitting in this courtroom today about

17    your decision all those years ago to empty out all of your

18    savings and apply for that first patent?

19    A.   Proud.

20    Q.   And why do you say that?

21    A.   Despite everything, I took a shot, and so I would do it

22    again.

23    Q.   Mr. Strober, did you ever want to be a plaintiff in a

24    patent case?

25    A.   No, not at all.
```

 1    Q.   And how do you feel today about the company you founded

 2    being the Plaintiff in this case?

 3    A.   Hopeful.  I hope that the facts will come out and justice

 4    will be served.

 5              MR. BERGSTEN:  I pass the witness.

 6              THE COURT:  All right.  Cross examination by the

 7    Charter Defendants.

 8              MR. DACUS:  May we approach with binders, Your

 9    Honor?

10              THE COURT:  You may distribute binders, counsel.

11         All right.  Mr. Dacus, you may proceed with cross

12    examination.

13              MR. DACUS:  Thank you, Your Honor.

14                        CROSS EXAMINATION

15    BY MR. DACUS:

16    Q.   Good afternoon, Mr. Strober.

17    A.   Good afternoon.

18    Q.   I don't think you and I have ever had the opportunity to

19    meet before, sir.  Have we, sir?

20    A.   No, we haven't.

21    Q.   I'm Deron Dacus.  I represent Charter.  And it's nice to

22    meet you.

23    A.   Nice to meet you, too.

24    Q.   Let's just pick up right where you left off.  You're not

25    here to say, sir, that Charter infringes.  Correct?  You've

1    not done that analysis.  Correct?

2    A.   No, I'm not a -- I could not do a legal analysis, no.

3    Q.   Okay.  And you agree, sir, that if it is, in fact, the

4    case that Charter's app does not use your patent, then Charter

5    shouldn't have to pay anything.  Correct?

6    A.   I will respect the jury's decision.

7    Q.   Okay.  I mean, you're not attempting to say to this jury

8    that just because you spent your money to get a patent and

9    worked hard to get one, that Charter should pay if they do not

10   infringe, are you, sir?

11   A.   No, I'm not.

12   Q.   Okay.  Now, let's go back in time to your invention.  The

13   idea for these patents started while you were working at

14   Westchester Community College in New York.  Correct?

15   A.   That's correct.

16   Q.   And as I understood what you said, the idea came from the

17   fact that at lunch you liked to watch videos from the internet

18   on your phone.  Fair?

19   A.   Videos in general; but yes, they were coming from the

20   internet.

21   Q.   Okay.  And this was a college setting, I think you said,

22   that there were some big screen televisions available.

23   Correct?

24   A.   That's correct.

25   Q.   And your idea from wanting to watch those videos is what

1  led to the filing of these patents, and specifically the '251,

2  which is the earliest patent.  Fair?

3  A.   It led to the invention which then led to the patents.

4  Q.   And I think you said that you built a prototype and then

5  you showed it to others, including Mr. Mitschele.  Fair?

6  A.   That's correct.

7  Q.   And you showed them that prototype, I think you said, at

8  a lounge.  We know specifically from this case you showed it

9  to them at a bar called Lounge 48 in New York City.  Right?

10  A.   Yes, that sounds familiar.

11  Q.   Okay.  And it's true, sir, that that prototype that you

12  demonstrated, that larger display screen where the video was

13  being shown, it showed a numeric code on that screen, and then

14  you would punch or type in that code into your phone.

15  Correct?

16  A.   That was one iteration of it, yes.

17  Q.   Well, that's what you showed Mr. Mitschele at the Lounge

18  48 bar.  Correct?

19  A.   I'm not sure at that time.  Probably.

20  Q.   Okay.  Now, this display device that was -- it was

21  connected to the internet.  Right?

22  A.   Yes, that's correct.

23  Q.   And the display device, so that we're clear, that could

24  be the large screen television you're showing it on, or it

25  could be -- in the case of what you showed at the bar, it

1    could be just a computer screen on your laptop.  Correct?

2    A.    That's correct.

3    Q.    In fact, the display screen had to be connected to the

4    internet.  Correct?

5    A.    Yes, that's correct.

6    Q.    It's true, sir, that all of Touchstream's products were

7    based on using the internet.  True statement.

8    A.    Might not be all cases, but I would agree with the

9    statement.

10   Q.    Well, let's be clear.  I'm not sure I understand your

11   answer.  It is true, sir, that all of Touchstream's products

12   were based on using the internet.  That's a true statement.

13   Correct?

14   A.    Okay.  So if I understand it, you're saying products but

15   not implementations, and that would be accurate, yes.

16   Q.    Now, I want to ask a few questions, if I could, about

17   these patents.  Is that okay?

18   A.    Sure.

19   Q.    You are familiar with the process, of course, of

20   obtaining a patent from the Patent Office.  Right?

21   A.    That's correct.

22   Q.    You know, of course, you have to apply for a patent by

23   submitting an application.  Correct?

24   A.    Correct.

25   Q.    And in that application you submit claims that you're

 1    asking the Patent Office to grant you a patent on.  Fair?

 2    A.   Fair.

 3    Q.   And sometimes the Patent Office will actually reject

 4    those claims.  True?

 5    A.   Yes.  It's usually part of the process I understand.

 6    Q.   Right.  And oftentimes that rejection is based on the

 7    fact that the claims you submitted actually are not something

 8    that was new.  Correct?

 9    A.   I'm not exactly sure if that's the entire process.

10    Q.   Well, you -- let's talk about your process.  In 2011, you

11    and these lawyers that you hired, you wrote a patent

12    application to try to get a patent on your idea.  Fair?

13    A.   That's correct.

14    Q.   And as part of that application, you actually signed and

15    submitted an oath to the Patent Office.  True?

16    A.   Yes.

17    Q.   And you swore that you had reviewed and understood the

18    contents of the application, including the original claims

19    that were submitted.  Fair?

20    A.   That's fair.

21    Q.   And you, of course, know, based on your personal

22    knowledge, that a patent contains what we call a

23    specification.  Right?

24    A.   That's correct.

25    Q.   And in that application and specification, you did your

1    very best to describe what you thought you invented at the

2    time.  Fair?

3    A.    That's accurate.

4    Q.    And you know that when you first -- when you submitted

5    this to the Patent Office, they rejected your original claims.

6    True?

7    A.    That's correct.

8    Q.    I'm sorry?

9    A.    We went through the review process, yes.

10   Q.    And they rejected those claims.  Correct?

11   A.    I don't think I have any record of specific claims, but

12   yes, we went to that process.

13   Q.    I want to be clear, sir.  The Patent Office rejected the

14   original claims that you submitted for your patent.  True?

15   A.    True.

16   Q.    And they rejected those claims because they were not new.

17   True?

18   A.    I don't think I had information as to why they were

19   rejected; just that we had to have a discussion about it.

20   Q.    You are not here to dispute under oath that they rejected

21   those claims because the invention was not new, are you?

22   A.    I don't have a reason of why -- I wasn't given a reason

23   why they rejected the claims.

24   Q.    Okay.  And then your lawyers actually changed the words

25   in those claims, or they did what we call amended them.  Fair?

1    A.    That's correct, yes.

2    Q.    And only then was your patent granted.  Fair?

3    A.    That's fair, yes.

4    Q.    And you recall, sir, that those original claims that you

5    submitted, they had no mention of this thing called a

6    synchronization code.  Right?

7    A.    I think it was in the claims, but we had to move it

8    around a little bit.

9    Q.    You think the word 'synchronization codes' were in the

10   original claims that you submitted that were rejected?

11   A.    It was a long time ago, but I'd have to look at the

12   examination to be a hundred percent accurate.

13   Q.    Isn't it the case, sir, that actually when those words

14   'synchronization code' were added, that's when the Patent

15   Office granted the claim?

16   A.    I think those were the steps in the process, yes.

17   Q.    Yet you know, sir, that you did not invent

18   synchronization codes.  Correct?

19   A.    No, I did not.

20   Q.    Synchronization codes were around before your patent.

21   Fair?

22   A.    That's fair, yes.

23   Q.    Now, I want to make sure we're clear on what it is you

24   and your lawyers claim that you invented.  Do you claim that

25   you invented casting?

1    A.    I don't think that was a term that was even used when I

2    created the invention.

3    Q.    Well, do you claim that you were the first to take

4    internet video content from a phone, pass it through an

5    intermediary like a server, and then display it on a larger

6    screen like a television?  Do you claim you were the first to

7    do that?

8    A.    I think it's an oversimplification, but I wouldn't claim

9    that particular process.

10   Q.    I mean, that is what you told your lawyer that you

11   described as casting.  Correct?

12   A.    Casting -- the way that the invention works is that it

13   goes from the mobile phone, to a server, to a display device,

14   and it was able to play different media players, so that was

15   the entire process if we're talking about that.

16   Q.    And you know, sir, that you were not the first to do

17   that.  Correct?

18   A.    I don't remember seeing anyone else that was doing that.

19   Q.    Okay.

20           MR. DACUS:  Ms. Brunson, can I have the document

21   camera, please?

22   Q.    (BY MR. DACUS)  You were here for the opening that your

23   lawyer gave.  Correct?

24   A.    That's correct.

25   Q.    And you remember one of the things he said that you were

1    going to prove--he wrote it in handwriting, but I've got it

2    typed it--says "Touchstream owns the patents for casting."

3    That's what he said you-all were going to prove.  Correct?

4    A.    That's correct.

5    Q.    But you will admit that others had casting before you

6    did.  Fair?

7    A.    Again, I don't remember the term 'casting' being used

8    prior to my invention.

9            THE COURT:  Counsel, approach the bench, please.

10           (The following was had outside the hearing of the

11           jury.)

12           THE COURT:  Am I correct, Mr. Dacus, the only

13    invalidity theory presently in this case is the lack of an

14    adequate written description under § 112?  You keep asking

15    about, You didn't invent this, you didn't invent this.

16           MR. DACUS:  This all goes to damages, Your Honor.

17    We're going to show -- so they left the jury with the

18    impression that he invented casting.  I am about to show he

19    did not, and all he invented, if anything, was an incremental

20    improvement on it.  It all goes to damages.

21           THE COURT:  How does that go to damages?

22           MR. DACUS:  Because they have to only value -- and

23    you'll see this in the damages.  They have to only value the

24    incremental invention within the patent, not --

25           THE COURT:  It sounds a lot like a § 102 or § 103

1    defense to me.

2              MR. DACUS:  Well, it could be.

3              THE COURT:  It couldn't be because that's not a live

4    issue in the case.

5              MR. DACUS:  I understand, Your Honor, and that's why

6    there's no risk of confusion here.  We're not asserting a

7    § 102 or § 103.  I'm not even implying that.  We'll tell them

8    that we're not.  But this does directly go to damages and the

9    incremental invention of the patent.

10             THE COURT:  All right.  Plaintiff have some comment

11   on this?

12             MR. BERGSTEN:  Yes.  We're deeply concerned and do

13   find this deeply prejudicial.  I mean, the jury has heard

14   about, you know, prior art based invalidity this morning, and

15   I don't know how they can -- I mean in the patent video.  I

16   don't know how they can possibly keep that straight as a

17   damages argument when he keeps telling them that the patent is

18   not new.

19        I see in his binder a patent that I believe was submitted

20   as invalidating prior art in this case and then withdrawn

21   before trial, so I don't know how they can fairly stand up

22   here and basically accuse Mr. Strober's invention of being

23   invalid when they abandoned that argument before trial.

24             MR. DACUS:  We're not saying it's invalid, Your

25   Honor; not in any way.  I am about to show him background art.

1  We had this whole discussion with Judge Payne in pretrial.

2  They tried to exclude this background art.  We said to Judge

3  Payne exactly what I'm saying to you--that this goes to

4  damages, because they failed.  What they're trying to tell the

5  jury is that they invented casting.  I'm about to show not

6  even close, so --

7          THE COURT:  Well, I am certainly not going to

8  interfere with whatever pre-admitted exhibits Judge Payne

9  admitted in the pretrial process.  However, this continued

10  series of questions about, You didn't invent this, this came

11  before you, I don't see how that goes to damages.  I think it

12  is strictly or it is predominantly an invalidity argument

13  based on prior art, which is not part of this case.

14      So if you can find some way to overtly tie it to damages

15  in your question so there's no confusion, I might allow it,

16  but just to continue to ask, You didn't invent this, this came

17  before you, this was already there, that line of questioning

18  on a stand-alone basis is confusing and prejudicial when there

19  is not a § 102 or § 103 line in this case.  So I'm instructing

20  you to avoid those kind of isolated questions to the witness.

21          MR. DACUS:  So my problem here, Your Honor, is this

22  is a lay witness.  I can't really tie it to damages without

23  expert opinion.  I'm just laying a factual basis for what I

24  will do with the damages expert later on.

25          I would ask the Court to consider -- there's no risk of

1   confusion for § 102 or § 103 because we're not even submitting

2   a question to him on § 102 or § 103.  So the sole basis is for

3   damages and to show that they -- they've already told the jury

4   they invented casting and they've described it.

5           THE COURT:  I'm going to stick with this ruling.  I

6   mean, the questions in the verdict form don't suddenly give

7   you license to go into anything else you want to and say it's

8   not confusing because it won't be specifically asked in the

9   verdict form.  This to me is confusing when there's not a

10  § 102 or § 103 prior art invalidity defense.

11          MR. DACUS:  So let me ask this, Your Honor.  The

12  next thing I'm going to do is show him a pre-admitted exhibit

13  of a patent that is, for a lack of a better term, casting

14  before his patent; something we talked to Judge Payne about.

15  Judge Payne admitted the exhibit.

16          MR. BERGSTEN:  May I?  So if I can respond, I mean,

17  if it's pre-admitted, I think it would be much more

18  appropriate to have the damages expert, if they opined on it,

19  talk about it in a way that's not confusing to the jury.  The

20  challenging the inventor with it is --

21          THE COURT:  Neither opposing counsel nor I are going

22  to tell this lawyer how to try this case, and he and I are not

23  going to tell you how to try your case.  If it's pre-admitted,

24  I'll allow it, but I don't particularly want it used to

25  continue to beat the drum of § 102/§ 103 prior art invalidity,

1    because you're going to need to find some way to use it in a

2    way that ties to the damages case even if it's pre-admitted.

3    I don't want this jury confused.

4              MR. DACUS:  Understood.  And I will.  It's just

5    how -- the Court can appreciate it's hard to tie with this

6    witness, but I want to lay -- they have just told this jury

7    that he invented casting.  We unequivocally think that is a

8    gross overstatement, so I just want to lay factually with

9    him --

10             THE COURT:  If you want to lay a predicate with this

11   witness that you understand he doesn't have the ability to

12   give you opinions about damages, but so that the damages

13   expert will know --

14             MR. DACUS:  I'll do that.

15             THE COURT: -- you can be clear about that.

16             MR. DACUS:  I'll do that.

17             THE COURT:  But just to ask this isolated, This came

18   before your patent, this existed before you got the patent

19   issued, that's inherently confusing, Mr. Dacus.  That needs to

20   stop.

21             MR. DACUS:  I'll do that.

22             THE COURT:  All right.

23             MR. DACUS:  Thank you, Your Honor.

24             (The following was had in the presence and hearing

25             of the jury.)

1                    THE COURT:  Let's proceed, please.

2                    MR. DACUS:  Thank you, Your Honor.

3    Q.   (BY MR. DACUS)  So Mr. Strober, you, of course,

4    understand that Touchstream is asking for a significant amount

5    of money in this case.  Correct?

6    A.   Yes, I am.

7    Q.   And you understand that at some point, if the jury were

8    to reach that question, they would have to determine, in part,

9    what the value of your invention is.  Fair?

10   A.   That's fair, yes.

11   Q.   And do you understand -- even though you're a layperson,

12   not a damages expert, you understand that part of what the

13   damages expert is supposed to look at is what you invented and

14   was it just an improvement over what already existed.  You

15   understand that?

16   A.   Yes, I think that's what the damage expert will do, yes.

17                   MR. DACUS:  Okay.  So can we pull up JTX 22,

18   Mr. Jay?

19   Q.   (BY MR. DACUS)  Do you see, sir, that JTX 22 is a patent

20   with the inventor as Mr. Redford?  Do you see that?

21   A.   I do.

22   Q.   And do you see that that patent was filed January 6th of

23   2010?  Do you see that?

24   A.   Yes, I do.

25   Q.   And that was before your patent application.  Correct?

219

```
 1   A.   That's correct.
 2            MR. DACUS:  All right.  Now, can we go to figure 3A,
 3   please?
 4   Q.  (BY MR. DACUS)  All right.  This is a figure from the
 5   patent.  Do you see that, Mr. Strober?
 6   A.   I see the figure, yes.
 7   Q.   Okay.  And do you see down here in the lower left we have
 8   what is a smartphone or a cell phone.  Correct?
 9   A.   I see there's a cell phone there, yes.
10   Q.   Okay.  And then do you see from that cell phone there is
11   information going up in what's called a video request?  Do you
12   see that?
13   A.   I see there's an arrow that's going from the mobile phone
14   to an antenna.
15   Q.   And then from that antenna it goes through a wireless
16   network, a video request over to a computer system.  Correct?
17   A.   I see that, yes.
18   Q.   So so far we have a phone, and now we have an
19   intermediary computer system, like what you described as a
20   server.  Correct?
21            MR. BERGSTEN:  Objection.  Object under 403 at this
22   point.
23            THE COURT:  Overruled.
24   Q.  (BY MR. DACUS)  Is that correct, sir?
25   A.   I see there is a computer system there, yes.
```

1    Q.    Okay.  Then after that intermediary, we have what's

2    called user selected video.  Do you see that?

3    A.    I see the user selected video.

4    Q.    And that user selected video is being displayed on what,

5    sir?

6    A.    It says internet-enabled television.

7    Q.    Okay.  This patent came before your patent.  True?

8    A.    That was the date that was on the patent.

9    Q.    This patent contains a phone, an intermediary device like

10   a server, user can select video content, displayed on an

11   internet-enabled television.  Correct?

12   A.    I see those -- that represented in the figure, yeah.

13   Q.    You would agree that sounds very similar to what you

14   described to the jury just a few minutes ago as the basis of

15   your invention.  Fair?

16   A.    I would have to take more time to look at this, but I see

17   where you are representing on the display.

18   Q.    Okay.

19          MR. DACUS:  We can take that down, Mr. Jay.  Thank

20   you.

21   Q.    (BY MR. DACUS)  Now, let's go back to your idea, and I

22   want to ask you some questions about what happened after you

23   had the idea and the business that you set up.  Is that fair?

24   A.    That's fair.

25   Q.    You said you took this technology and you started a

1    company with a few other founders, and you-all called the

2    company Shodogg.  Right?

3    A.    Correct.

4    Q.    And you actually had a product, this thing called the

5    Shodogg app.  True?

6    A.    That's true, yes.

7    Q.    Okay.  And that was an app for individuals or consumers

8    as opposed to businesses.  Right?

9    A.    That's correct.

10   Q.    You were the chief technology officer at Shodogg at the

11   time, I think you said.

12   A.    Yes.  Yes.

13   Q.    And by the way, before we ask about the app, did you or

14   anyone at Touchstream before you released this consumer app to

15   Apple and the Android phones as you described, did you do any

16   analysis to make sure that Touchstream was not infringing

17   someone else's patent?

18   A.    No.  We did not have a legal department.

19   Q.    Okay.  This Redford patent that I just showed you, is

20   that the first time you'd ever seen that?

21   A.    It's possible.

22   Q.    Now, I think you said you and Shodogg created marketing

23   materials for your product.  Fair?

24   A.    That's correct.

25   Q.    And I assume, of course, you wanted the marketing

1    materials to be accurate and honest.  True?

2    A.   Yes, very much so.

3         MR. DACUS:  Can we pull up JTX 28, Mr. Jay?

4    Q.   (BY MR. DACUS)  This is a Touchstream presentation that

5    Shodogg created and you actually helped create.  Fair?

6    A.   I contributed to it, yes.

7    Q.   And as you said, you wanted this to be as accurate as

8    possible.  Fair?

9    A.   Yes, that's fair.

10        MR. DACUS:  Can we go to page 3, Mr. Jay?

11   Q.   (BY MR. DACUS)  In this presentation that Touchstream

12   made to potential customers or partners, you see the second

13   paragraph here on page 3?

14   A.   Yes, I do see it.

15   Q.   And Touchstream or Shodogg described the technology as

16   "patent-pending system enables any smartphone to deliver any

17   streaming media content to any connected screen without the

18   use of wires or boxes."  Correct?

19   A.   I see that.

20   Q.   So 'connected screen', that meant connected to the

21   internet.  Correct?

22   A.   It could be, yes.

23   Q.   And without use of wires or boxes.  Correct?

24   A.   That's correct.  We didn't require them.

25        MR. DACUS:  We can take this down, Mr. Jay.

1  Q.    (BY MR. DACUS)  Now, you agree with me the Shodogg app

2  was not successful, from a commercial or a business

3  standpoint.  Correct?

4  A.    We did not make any money with it.

5  Q.    Right.  It didn't generate or sustain any money, or

6  certainly not enough to sustain a business.  Fair?

7  A.    That's fair.

8  Q.    And as a result, Touchstream actually developed a new

9  product that was just based on the same technology, and that

10  new product was called Screen-Direct.  Fair?

11  A.    That was one of the products, yes.

12  Q.    And that was the product that you described that was to

13  be focused on a business application.  Right?

14  A.    That's correct.

15  Q.    In other words, a salesperson from a business could take

16  their phone to a potential customer and display the video on

17  their phone onto a larger screen.

18  A.    That's fairly accurate, yes.

19  Q.    Okay.  You-all tried to market this to lots and lots of

20  companies.  Correct?

21  A.    Probably, yes.

22  Q.    Fair to say that it was not successful--correct?--from a

23  business standpoint?

24  A.    From a business standpoint, no.

25  Q.    Then you came up with another product called MyMedia.

1    Right?

2    A.    That's correct.

3    Q.    This product was the one that you described related to

4    hotels where you would have an app where someone who was

5    staying at a hotel could take their phone into a room, have

6    the internet video on their phone, and then display that on

7    any television in any hotel.  Correct?

8    A.    That's correct.

9    Q.    And that's the thing that you-all partnered with Quadriga

10   on.  Fair?

11   A.    The same -- similar concept, yes.

12   Q.    Okay.  I'd like to ask you a few questions about that

13   Quadriga arrangement, if that's okay.

14   A.    Sure.

15   Q.    You were the chief technology officer/product manager for

16   Shodogg when that partnership was ongoing with Quadriga.

17   True?

18   A.    That's correct.

19   Q.    Quadriga was out there trying to sell this technology to

20   hotels.  Fair?

21   A.    That's correct.

22   Q.    And it's true, sir, that the -- well, let me back up.

23         Quadriga was actually the second largest provider of

24   hotel services in the world.  True?

25   A.    That's my understanding.

1    Q.    And despite Quadriga's clout in the industry and despite

2    their best efforts, they only deployed this technology in less

3    than 10 hotels in the entire world.  Fair?

4    A.    I believe so.

5    Q.    I mean, it's fair to say that, again, that product was

6    not successful, from a business and a commercial standpoint.

7    Fair?

8    A.    That's a fair statement.

9    Q.    So we've got to consumer app, we've got the business

10   application, and we've got this MyMedia application for hotels

11   all based on this technology that your lawyer described as

12   people knocking down the door to want, and there was not

13   enough demand to succeed.  Correct?

14   A.    I don't know if the demand was the issue that caused the

15   problems.

16   Q.    Okay.  You know, sir, that in that arrangement with

17   Quadriga, Touchstream actually had problems getting its

18   product to work.  Fair?

19   A.    We had some issues.

20   Q.    Issues meaning you had a difficulty making your product

21   work.  Correct?

22   A.    Our product worked but we did have issues.

23   Q.    One of the issues was this thing called latency.  Right?

24   A.    Yes.

25   Q.    Latency basically means the time it takes for something

1    to happen.  Right?

2    A.   That's a general definition, yes.

3    Q.   And in this network area, we've all seen latency.  When

4    we look at our phone and we see that little wheel spinning, or

5    we see our television and we see that wheel spinning, that's

6    what latency is.  Correct?

7    A.   Yeah.  The wheel spinning is an indication that there's

8    latency.

9    Q.   Right.  And you know that in that arrangement between

10   Quadriga and Touchstream, Quadriga complained that the

11   product, the Touchstream product, didn't work because it had

12   too much latency.  Fair?

13   A.   We did receive a few calls about latency.

14   Q.   There were times, sir, that Quadriga reached out to

15   Touchstream to say that the device would not even download the

16   video.  Correct?

17   A.   I believe that was one email that referenced that.

18   Q.   So the answer is yes, that's correct?

19   A.   That's correct.

20   Q.   And it's true, sir, at the end of the day this Quadriga

21   agreement, because of its lack of success, only lasted what?

22   A couple of years?

23   A.   I think that's approximately the time frame.

24   Q.   So we've had the app, we've had the business application,

25   and we've now had the hotel application, all based on this

1    same technology and all, from a business standpoint,

2    unsuccessful.  Correct?

3    A.   It did not produce the financial results we wanted.

4    Q.   It's true, sir, that Touchstream last had a product in

5    the marketplace in about 2017.  Right?

6    A.   That sounds about right.

7    Q.   Now, by that time, so that we're all clear, you had

8    actually left the company.  Right?

9    A.   I was no longer with -- I was still helping with the

10   company, but I did have to look for a full time job.

11   Q.   Yeah.  You left the day-to-day operations of the company

12   somewhere in around 2015.  True?

13   A.   Around that time frame; maybe a little bit later.

14   Q.   Now, to sort of complete this whether or not the

15   marketplace wanted this product, there's one more thing that

16   Touchstream did to try to promote its product and it was to a

17   company called Turner.  Correct?

18   A.   That's correct.

19   Q.   And to kind of set the stage here, you told us about your

20   brother Michael Strober.  Fair?

21   A.   Yes, I did.

22   Q.   Your brother I think you said, and I think it's true, he

23   was an executive senior vice president at Turner.  Fair?

24   A.   Yes, he was.

25   Q.   He also at the same time that he worked at Turner had a

1  Shodogg address, a Touchstream/Shodogg email address?

2  A.    Email address, yes.

3  Q.    And, in fact, actually Michael Strober was a co-founder

4  with you.  Correct?

5  A.    Yes.

6  Q.    He's actually the one who gave the company the name

7  Shodogg.  Right?

8  A.    He was, yes.

9  Q.    And even though your brother was a senior executive at

10  Turner, the Turner deal never happened.  Correct?

11  A.    We never got a deal with Turner.

12  Q.    Touchstream had an opportunity and did present its

13  technology to Turner.  Fair?

14  A.    We did present to Turner, yes.

15  Q.    And ultimately Turner, despite the fact that you had an

16  insider there--your brother--Turner said, Thanks but no thanks

17  to the Touchstream technology.  That's all true.  Correct?

18  A.    That's true.

19  Q.    And that was sort of the last ditch effort.  When you

20  couldn't get your own brother to engage in your technology,

21  Touchstream made a decision to turn solely to the litigation

22  business--courthouse.  Fair?

23  A.    My brother was very engaged, I think, in referring to

24  Turner.

25  Q.    I'm saying after that, after Turner said no to

1   Touchstream, Touchstream quit trying to sell its product and

2   basically turned to the courthouse and solely to litigation

3   and lawsuits.  Fair?

4   A.   At that point we did have to turn to litigation.

5   Q.   Now, they've -- Touchstream filed this lawsuit against

6   Charter in 2023.  Right?

7   A.   I believe that's the date.

8   Q.   Touchstream and Charter had had no contact with each

9   other since at least 2016, seven years before.  Correct?

10  A.   That's my understanding.

11          MR. BERGSTEN:  Objection.  May we approach?

12          THE COURT:  Approach the bench.

13          (The following was had outside the hearing of the

14          jury.)

15          THE COURT:  What's the objection, counsel?

16          MR. BERGSTEN:  Judge Payne granted our MIL No. 4

17  saying they couldn't make any argument about that we delayed

18  in filing suit, but that they could establish relevant dates.

19  It's one thing to establish relevant dates, but to connect the

20  two by saying we hadn't had any communication runs afoul of

21  that MIL order.

22          MR. DACUS:  I'm not saying anything about undue

23  delay; I'm just saying they hadn't talked to us.

24          THE COURT:  I can find the exact wording of the MIL

25  order if I need to.

1          MR. DACUS:  It says we can't use delay as an attempt

2     for infringement.  I'm not attempting to do that at all.

3          THE COURT:  All right.  Well, I'll allow you to go

4     forward, Mr. Dacus, but you need to be mindful of that MIL

5     ruling.  And if there's a perception on the Plaintiff's side

6     that there is a further intrusion across the line, then raise

7     it with me.  Okay?

8          MR. DACUS:  Understood.

9          THE COURT:  All right.  How much longer on your

10    cross, do you think?

11         MR. DACUS:  Ten or fifteen minutes.

12         THE COURT:  All right.  Let's go.

13         (The following was had in the presence and hearing

14         of the jury.)

15         THE COURT:  Let's continue.

16         MR. DACUS:  Thank you, Your Honor.

17    Q.   (BY MR. DACUS)  So just so we're clear, Mr. Strober, you

18    understand that when Touchstream sued Charter in 2023,

19    Touchstream had had no interaction, no contact, didn't reach

20    out to Charter since at least 2017.  Fair?

21    A.   That's fair.

22    Q.   Okay.  Now, there were these meetings or interactions

23    between Charter and Touchstream between 2011 and 2015.  True?

24    A.   That's correct.

25    Q.   But it's also true that you're not the best person to

1    talk to about those meetings.  Fair?

2    A.    Probably not.

3    Q.    Because you know, sir, you personally have no specific

4    recollection of any meeting that you may have attended with

5    Charter.  Fair?

6    A.    That's right.  It's been a long time.

7    Q.    Right.  And you know who Herb Mitschele is.  Right?

8    A.    I do.

9    Q.    You know he's going to testify tomorrow.  Right?

10    A.    I believe so, yes.

11    Q.    He's a good person to talk to about those meetings and

12    interaction.  Correct?

13    A.    I'm not sure what he knows, but he was the CEO.

14    Q.    It's true, sir, that you have no recollection or memory

15    as to what Charter's reaction was to Touchstream's technology

16    and presentation of the technology to Charter, do you?

17    A.    I remember general reactions.

18    Q.    Can you pull -- do you have a binder in front of you?

19    A.    Yes, I do.

20    Q.    A binder like this?  You have one in front of you?

21    A.    Yes.

22    Q.    Do you see the tab that says "Strober Dep TR 6624"?  Do

23    you see that?

24    A.    Yes, I do.

25    Q.    Okay.  Can you turn to page 251 of that document, please?

1    Let me know when you're there, please.

2         Are you there, sir?

3    A.   Yes I'm on page 251.

4    Q.   Okay.  You know, sir, and you understand this is your

5    sworn deposition testimony that you gave in this case.

6    Correct?

7    A.   That's correct.

8    Q.   Do you remember the Judge talking about earlier -- you

9    were here when he said we take depositions and we ask

10   questions of witnesses?  You were one of those people.  Right?

11   A.   That is correct.

12   Q.   And you were sworn to tell the truth in this deposition.

13   Correct?

14   A.   Yes, I was.

15   Q.   Now, if you look at page 251, starting at line 24 --

16   A.   Uh-huh.

17   Q.   -- and I'm going to ask you to read silently to yourself

18   all the way through page 252, line 6.  Would you let me know

19   when you've done that and you're finished, please?

20        Have you finished?

21   A.   I did.

22   Q.   Does that refresh your recollection, sir, that under oath

23   when you were asked whether you have any recollection as to

24   what Charter's impression or reaction to Touchstream during

25   any of those meetings were --

1          THE COURT:  Mr. Dacus --

2          MR. DACUS:  Yes, Your Honor.

3          THE COURT:  -- that's not proper impeachment.  Ask

4   him the original question, and then if he answers

5   inconsistent, you can ask for leave to publish.

6          MR. DACUS:  I'll do that, Your Honor.

7   Q.   (BY MR. DACUS)  You agree, sir, that you have no specific

8   recollection or memory as to what Charter's reaction was to

9   Touchstream's idea and technology.  Fair?

10  A.   I have a generalized idea of what they were thinking.

11  Q.   But no specific recollection?

12  A.   No specific recollection.

13  Q.   I assume, sir, that since you poured so much of your time

14  into Touchstream, that when you were trying to sell and

15  promote this technology to Charter, you did some research on

16  Charter, did you not?

17  A.   That was probably more on the business side.

18  Q.   So you didn't do any?

19  A.   I don't recall any specific research on Charter.

20  Q.   Here's why I ask this, sir.  All this pitching, trying to

21  sell Charter the Touchstream services occurred between 2011

22  and 2015.  Correct?

23  A.   That's correct.

24  Q.   Did you know that Charter had an app for the world to

25  download, and certainly its customers, during that time?

1    A.   I wasn't aware that they had an app.

2    Q.   Right.  And that's my point.  That's what I understood

3    you to say on direct.  You didn't even know that Charter had

4    an app.  Right?

5    A.   I personally did not know that.

6    Q.   So is it your testimony that you're trying to sell to

7    Charter this technology, this remote controlled technology

8    that would allow them to take a video and display it on a

9    larger television, and you didn't even bother to look to see

10   if they had an app that already did that?

11   A.   Personally I did not do that.

12   Q.   I mean, in hindsight, does that seem like a reasonable

13   and prudent thing to do?

14   A.   Well, I would leave that up to the business when they

15   were making the presentation.

16   Q.   Well, I mean, to be fair to you, sir, and I'm not being

17   critical, but this was your baby, was it not?

18   A.   It was.

19   Q.   It's true, sir, that Touchstream never told Charter

20   before this lawsuit was filed that Touchstream thought Charter

21   took any of Touchstream's technology.  Correct?

22   A.   I think it's a general fair statement.

23   Q.   And it's true, sir, that even among the people within

24   Touchstream, before 2019 there was never any conversation

25   about whether or not Charter had taken Touchstream's

1    technology, was there?

2    A.    I don't believe so.

3    Q.    So just to make sure we all understand the picture here,

4    Touchstream's been out there trying to sell its technology to

5    Charter.  Correct?

6    A.    Yes.

7    Q.    Charter has an app in the public domain that anyone can

8    download and use.  Correct?

9    A.    Yes, that's accurate.

10   Q.    Including people from Touchstream.  Correct?

11   A.    That's correct.

12   Q.    And yet no one within Touchstream is saying, Hey, these

13   guys at Charter took our stuff.  No one's even saying that,

14   are they, sir?

15   A.    I don't recall any conversations at that time.

16   Q.    I mean, you understand and you've heard that a patent is

17   just like a piece of property.  Right?

18   A.    Yes.

19   Q.    If somebody walked -- cut your fence and walked onto your

20   piece of property, you'd get them off, would you not?

21   A.    Yes, I would.

22   Q.    If you really thought they were on your property.

23   Correct?

24   A.    We weren't guarding our property at that time.  I had --

25   I didn't use that analogy.  I think that's a bad analogy,

 1    but...

 2    Q.   I'll wrap up here, sir, and that is I think you told the

 3    jury that you have a consulting agreement with Touchstream?

 4    A.   I do.

 5    Q.   And that entitles you to 2.5 percent of whatever they

 6    might get in this lawsuit.  Is that fair?

 7    A.   That's my understanding, yes.

 8    Q.   You also have ownership of 2.5 percent of Touchstream?

 9    A.   I do.

10    Q.   So those two combined are about 5 percent?

11    A.   2.5 -- yes, if you add those up.

12    Q.   So we hadn't seen for sure, but Touchstream is asking --

13    if they're asking for a billion dollars, that's roughly

14    $50 million of financial interest that you have in this case.

15    Right?

16    A.   Sounds about right.

17             MR. DACUS:  That's all the questions I have, Your

18    Honor.  I pass the witness.

19             THE COURT:  All right.  Does Plaintiff have

20    redirect?

21             MR. BERGSTEN:  Yes, Your Honor.

22             THE COURT:  All right.  Let's proceed with redirect.

23       Let's proceed, counsel.

24                      REDIRECT EXAMINATION

25    BY MR. BERGSTEN:

```
 1    Q.    I forgot to ask you before, where do you work today?

 2    A.    I work at Pearson Education.

 3    Q.    Do you remember earlier when Mr. Dacus asked you whether

 4    all of Touchstream's products use the internet?

 5    A.    Yes, I do.

 6    Q.    All right.  And do you recall what your answer was to

 7    that?

 8    A.    The products were, but not the -- but not -- I believe it

 9    was the -- the products were, but not our implementation, I

10    think.

11    Q.    Can you please expand on what you meant by that?

12    A.    That our products -- our technology is one thing and what

13    it can do.  The products are built on that.  And so they use

14    the technology, but they don't have to use all of the

15    technology, or they're flexible and they're able to apply that

16    technology that suits the requirements for that product.

17    Q.    And you recall talking with Mr. Dacus a little bit about

18    the Quadriga agreement?

19    A.    I do.

20    Q.    When Touchstream signed that agreement, did you have high

21    hopes for how broadly Quadriga would implement that

22    technology?

23    A.    Yes.

24    Q.    And do you have cause to have high hopes?

25    A.    Yes.  When we were talking with them, they explained how
```

1    many hotels they had and the plans they had to take our

2    technology into those hotels.

3    Q.   And so what's your understanding of why that deal ended

4    up winding down?

5    A.   I believe there was some other product in the market that

6    they were competing with.

7    Q.   About how much money did Touchstream end up making from

8    the Quadriga deal?

9    A.   I think in total about $2 million.

10   Q.   And how much money did Touchstream end up making from the

11   HP deal?

12   A.   Roughly about $2 million.

13   Q.   Was it your understanding that Quadriga was overall happy

14   with Touchstream's technology?

15   A.   Yes.

16   Q.   And what made you think that?

17   A.   We delivered.  We certainly had some issues along the

18   way, but for a small company and the product we built, they

19   were very happy with the product and the way it functioned.

20   Q.   When Quadriga did call that they were having an issue on

21   a particular day, how did Touchstream typically handle that?

22   A.   White glove service.  If they had an issue, we jumped to

23   it.  We wanted to make sure they were very happy with what we

24   were doing.

25   Q.   And what typically ended up being the cause of the

1  technology problem that Quadriga was calling about?

2  A.   A lot of the time--we're going back a number of

3  years--the WiFi the networks in the hotel were pretty slow,

4  so that usually was the culprit for a lot of our issues.

5  Q.   Did Touchstream have control over how fast the WiFi was

6  in hotels?

7  A.   We did not.

8  Q.   Mr. Dacus asked you about a potential deal with Turner.

9  A.   Yes.

10 Q.   What's your understanding of why Touchstream did not get

11 that deal with Turner?

12 A.   There was another company that was competing for the

13 Turner deal and they were infringing on our patent.

14 Q.   What was the name of that company?

15 A.   Visbee.

16 Q.   And did -- and did Visbee end up getting that deal with

17 Turner?

18 A.   They did.

19 Q.   And what did Touchstream do then?

20 A.   We had to sue them.

21 Q.   And what was the result of that suit?

22 A.   I believe it was a settlement.

23 Q.   Did you ever want to be in the position to have to sue

24 Visbee?

25 A.   Not at all.

1    Q.   Is it easy to compete against a company that is paying

2    for your -- or is using our IP without paying you for it?

3    A.   No, no.

4    Q.   When Touchstream was meeting with Charter, was the point

5    of that meeting for Charter to tell Touchstream about

6    Charter's technology?

7    A.   No.  We were bringing our technology to them.

8    Q.   Did Charter typically tell you very much about their

9    technology in those meetings?

10    A.   No, not at all.

11    Q.   When was the last time, to your recollection, that Time

12    Warner Cable and Touchstream met?

13    A.   I think around 2013.

14    Q.   And what was Touchstream focused on during that time?

15    A.   We had our Quadriga implementation, we were working on

16    Hewlett-Packard, as well as some other initiatives.

17    Q.   Did Touchstream have resources to try to explore

18    potential patent suits at that time?

19    A.   No.  We were heads down on the work that we had.

20    Q.   And do you know if Touchstream accuses Charter of first

21    infringing these patents before or after 2013?  Sorry.  I'll

22    start --

23         You said that the last meeting you recall with Time

24    Warner cable was in 2013?

25    A.   That's correct.

241

1    Q.   Does Touchstream accuse Charter of first infringing the

2    patents after that date?

3    A.   No, we're not.

4    Q.   Do you recall when -- I'll start over.

5         Did Charter ever tell you that they were working on an

6    app to later release in those 2013 meetings?

7    A.   No, they did not.

8    Q.   Last topic.  You remember Mr. Dacus asked you about some

9    marketing materials?

10   A.   Yes, I do.

11   Q.   From that marketing materials that he showed you, could

12   you tell who they were presented to?

13   A.   Typically we had a slide on the front page.

14   Q.   All right.

15        MR. BERGSTEN:  If we could pull up JTX 28 briefly,

16   please.

17   Q.   (BY MR. BERGSTEN)  All right.  So from this front page,

18   can you tell who this presentation was presented to?

19   A.   No, I could not.

20        MR. BERGSTEN:  Now, I would like to turn to JTX 8,

21   which is tab 3 in the cross binder for those who have them.

22   Q.   (BY MR. BERGSTEN)  Do you recognize this document?

23   A.   Yes.  That's a clearly Time Warner Cable.

24   Q.   And do you believe this was a presentation that was

25   presented by Shodogg to Time Warner Cable?

242

```
 1    A.   Yes.

 2              MR. BERGSTEN:  If we could please turn to page 4 of

 3    that document.

 4    Q.   (BY MR. BERGSTEN)  Do you see the phrase "platform

 5    agnostic" in the middle there?

 6    A.   I do see that.

 7    Q.   And can you please read the bullet point below that?

 8    A.   "Works on all browsers, set-top boxes, and gaming

 9    platforms."

10    Q.   And what do you understand that to mean?

11    A.   We're very flexible.  Our technology can be applied to

12    many different devices.

13    Q.   Would that include set-top boxes?

14    A.   Yes.

15              MR. BERGSTEN:  Pass the witness.

16              THE COURT:  Is there additional cross?

17              MR. DACUS:  Very briefly, Your Honor.

18              THE COURT:  Proceed with additional cross.

19              MR. DACUS:  Thank you, Your Honor.

20         Can we pull up JTX 28, Mr. Jay?

21                         RECROSS EXAMINATION

22    BY MR. DACUS:

23    Q.   This is that presentation that you said you weren't quite

24    sure who it was given to.  Correct, sir?

25    A.   Not from this slide.
```

1    Q.    Okay.

2              MR. DACUS:  Can you go to page 3, Mr. Jay?

3    Q.    (BY MR. DACUS)  This description right here, sir, see

4    that?

5    A.    Yes.

6    Q.    Where you describe that it's any smartphone deliver any

7    streaming media content to any internet connected screen.

8          Do you see that?

9    A.    I do.

10   Q.    You know, sir, that's the language that Touchstream used

11   to describe their technology to everyone they presented to.

12   Correct?

13   A.    Yes.  That's the benefit that we were offering.

14   Q.    Right.  This is the common language that Touchstream

15   presented to everyone to describe what they thought was the

16   benefit of their technology.  True?

17   A.    That's our benefit, yes.

18   Q.    So whether or not this particular one shows that it went

19   to Charter, this is what you said to everybody.  Fair?

20   A.    It was one of the selling points that we had.

21             MR. DACUS:  That's all the questions I have, Your

22   Honor.  Thank you.

23             THE COURT:  Any additional direct?

24             MR. BERGSTEN:  No, Your Honor.

25             THE COURT:  All right.  Mr. Strober, you may step

1    down.

2              THE WITNESS:  Thank you.

3              THE COURT:  Plaintiff, call your next witness.

4              MR. DYKAL:  I apologize, Your Honor.  Plaintiffs

5    call Jamie Cohen by deposition.

6              THE COURT:  And can you identify Mr. Cohen for the

7    ladies and gentlemen of the jury?

8              MR. DYKAL:  Jamie Cohen was a former founder and

9    vice president of Touchstream.

10             THE COURT:  Let's proceed with this witness by

11   deposition.

12                          JAMIE COHEN

13                      BY VIDEO DEPOSITION

14   Q.   Can you state for the record your full name, please?

15   A.   My name is Jamie Cohen.

16   Q.   Are you currently employed by Shodogg?

17   A.   No.

18   Q.   Are you currently employed by Touchstream Technologies,

19   LLC?

20   A.   No.

21   Q.   I'm sorry.  Touchstream Technologies, Inc.?

22   A.   No.

23   Q.   Do you currently provide any services for Touchstream

24   Technologies, Inc.?

25   A.   Nope.

1  Q.   Are you being compensated for your deposition testimony

2  today?

3  A.   No.

4  Q.   Are you being compensated for your time in taking --

5  A.   No.

6  Q.   What is your percentage ownership in Touchstream?

7  A.   Currently it's just under 6 percent.

8  Q.   Mr. Cohen, as an investor in Touchstream, you stand to

9  benefit from the outcome of this litigation.  Correct?

10  A.   Yes.  This litigation or -- yes.  Yes.

11  Q.   Mr. Cohen, what is your understanding of your upside as

12  an investor with respect to the outcome of this litigation

13  against Charter?

14  A.   You know, it's different layers of feelings and emotions

15  about it.  You know, there is some personal, there is some

16  professional.  You know, this didn't just affect my business

17  life; this also affected my personal life in terms of how much

18  we dedicated to this company.

19  Q.   Let's talk about the financial interest that you expect

20  or at least has been communicated to you.

21      So, Mr. Cohen, what is your understanding of the

22  financial upside to you as an investor in the outcome of the

23  litigation between Shodogg and Charter?

24  A.   That the investment that we made back in 2011 in support

25  of the patents that we had issued would protect us and, thus,

1    that was the upside that we were investing in.

2    Q.    So at what time did you leave Shodogg?

3    A.    I left in 2017.

4    Q.    Mr. Cohen, it was your job to talk to investors about the

5    value of the company.  Correct?

6    A.    Yes.

7    Q.    And it was your job at Touchstream to talk about the

8    value of the Touchstream intellectual property.  Correct?

9    A.    Yes.

10   Q.    What did you base that valuation on?

11   A.    The fact that we had patents.  That's really what the

12   security was in every conversation we had.  People didn't care

13   how much the value of the technology was; they cared about the

14   impact that they saw it would have on the industry.  And so

15   the patents in and of itself, that's the value, and that word

16   carries with it a ton of monetary value.

17   Q.    How much is a ton of monetary value?

18   A.    Just, in the mind, sorry, of an investor.  When you tell

19   them -- maybe I shouldn't say tons.  It gives them a sense of

20   security, a sense of value, and they're not just buying

21   something that's a wish; it's something that's tangible that

22   has paperwork that the government said you own this.

23   Q.    Mr. Cohen, what is your experience in the testing of

24   Touchstream's products?

25   A.    I would go out, whether it be in front of investors or

1   potential clients, and I would use the technology to show them

2   exactly how it worked in real-time.

3   Q.   Were you involved in the testing of any Touchstream

4   products before it was shown to an investor?

5   A.   Yes.   Touchstream products or the technology?   Because

6   there is a difference I think between the two.

7   Q.   Okay.   Why don't -- what's the distinction between

8   testing products and testing technology?

9   A.   Well, the technology was -- before we built the products,

10  we were out there saying this is the patents that we have,

11  this is what they're capable of, and versus this is the

12  product that we're going to wind up building.   So I definitely

13  gave somebody a presentation before we ever had a product, is

14  all I'm trying to say.

15  Q.   Were you involved in the 2012 CES for Touchstream?

16  A.   Yes.

17  Q.   Were you there in the booth?

18  A.   Yes.

19  Q.   You mentioned you first saw the technology of Touchstream

20  in 2011.   Correct?

21  A.   Correct.

22  Q.   Where were you when you saw the first, I'm assuming it

23  was a demo of the technology?

24  A.   That's correct.   I was in Michael Strober's office at

25  Turner Broadcasting.

1   Q.   Was all the equipment in Mr. Strober's office?

2   A.   No.

3   Q.   Were you operating an application on a mobile device for

4   the demo?

5   A.   No.  Not me.  David was on his side executing from his

6   mobile device to the screen that was in front of us.

7   Q.   How were those two screens paired up?

8   A.   And that's the value of the technology.  And when we say

9   do I tell people the value, I explain the patent, and this is

10  where I think they begin to see it because it's a unique

11  connection.

12  Q.   Was the Shodogg application--and I'm going to do a

13  capital A like the Shodogg app--was that something that was

14  used in the hotel industry?

15  A.   The technology was; the back-end technology, yes.

16  Q.   How did the front-end technology change?

17  A.   It never changed.  Just it was -- if I'm correct, it was

18  their application, so it was their experience.  We were just

19  powering the back-end experience of it.

20  Q.   And when you say 'their application', are you referring

21  to a company called Quadriga?

22  A.   That's correct.

23  Q.   Are there any other hotels that created an application

24  using the Touchstream technology?

25  A.   The only other company that we worked with was LodgeNet.

1    I know we had sent them demos, but I don't believe -- it was

2    never a contractual agreement.

3    Q.   What's your understanding of Quadriga's implementation of

4    the Shodogg technology?

5    A.   It was game changing for them.  The patents, again, gave

6    their consumers an opportunity to do something in a hotel room

7    that was not capable at that time, and so it was a great

8    relationship.

9    Q.   How long was the commercial relationship with Quadriga?

10   A.   It was probably like less than two years.

11   Q.   Why wasn't it renewed?

12   A.   I wasn't part of the negotiation.

13   Q.   Would you still consider that a successful relationship?

14   A.   Yes.

15   Q.   How much money did Touchstream make off the Quadriga

16   relationship?

17   A.   I'm not exactly sure, but definitely in the multiple six

18   figures.

19   Q.   So it was not over a million dollars.  Correct?

20   A.   I'm not positive of that, but I don't believe so.

21   Q.   Did you use the Quadriga implementation of the

22   Touchstream technology to entice investors?

23   A.   No.

24   Q.   Why not?

25   A.   Because we weren't using a forward-facing application at

1    that time to show our investors what we were doing.  It was

2    about the technology and the verticals that we were after with

3    media being always our front and center.

4    Q.   So in your entire time at Touchstream, you never saw any

5    documentation about the number of actual users of the Quadriga

6    application.  Correct?

7    A.   Just hotel rooms.  That is correct.  All I have is the

8    number of hotel rooms that are using it, not the number of

9    consumers.

10   Q.   And when you say "the number of hotel rooms that are

11   using it," you mean the number of hotel rooms that make it

12   available, but you have no information that anyone actually

13   used it?

14   A.   That's correct.  Our concern was only based on

15   implementing the technology for them to use within their

16   space.  We didn't have any say in how they were using it with

17   their consumers.

18   Q.   Can you give me an example of one consumer case where

19   someone actually used the Quadriga application with the

20   Touchstream technology?

21   A.   Again, I never spoke to anybody personally who stayed at

22   a hotel that used it, but it was in enough hotel rooms, I

23   imagine somebody did.

24   Q.   Why do you imagine someone did?

25   A.   Because the technology was so cool and it could do things

1    for your phone and your entertainment experience that nothing

2    else could.  And that delivered a new innovation for hotels to

3    bring to their customer, which it was cool.

4    Q.    And you, as you sit here today, you can't give me an

5    example of any actual user of the Quadriga application, a

6    hotel guest that actually used the technology.

7    A.    I don't know of any hotel guest, correct, that used this

8    technology personally.

9    Q.    What was the charge to enterprise customers for the

10   Shodogg application?

11   A.    It depends.  It was on a per-seat license.  And so

12   Hewlett-Packard used it for their purposes, you could see that

13   Quadriga used it for their purposes, and then we obviously

14   tried to Screen-Direct as well.

15   Q.    Did you document your business development efforts with

16   potential customers leading up to your meetings with potential

17   customers?

18   A.    Yeah.  I mean, there were always conversations internally

19   about, you know, almost all the time Herb and I were together

20   in terms of going to those -- a lot of the meetings.

21   Q.    Was it important to you as EVP of business development to

22   document what occurred at the meetings with potential

23   customers?

24   A.    No, not necessarily.

25   Q.    So you didn't document what occurred after a meeting.

1    Correct?

2    A.   I'm sure there's emails that do.  I mean, but, you know,

3    there wasn't a standard practice for us to send each other

4    emails to say here's exactly how this happened.

5    Q.   Are you aware of any analytics with respect to a cable

6    company's usage of the Shodogg technology?

7    A.   No, I'm not.

8    Q.   So you're not aware of any analytic information with

9    respect to the usage of the Touchstream technology by a cable

10   company.  Correct?

11   A.   Correct.

12   Q.   So here the business plan was to continue selling the

13   Touchstream technology, and an advantage of that is that it

14   didn't have -- it didn't require a set-top box.  Correct?

15   A.   It didn't require an extra piece of hardware.  Correct.

16   Q.   And then the same here on the next slide 5, there's an

17   image of the new way.  It says no wires or hardware.

18        Do you see that?

19   A.   Yes.

20   Q.   So did you rely on Mr. Lulla to provide the information

21   about what was going on in the cable industry?

22   A.   We thought we could.  He was a huge disappointment for

23   us.  I mean, literally, Rajiv, we thought he would be the

24   smartest guy in the room, and instead he just turned out to be

25   pretty much of a lame duck--not showing up to meetings, not

1    returning to phone calls, and really never having -- we really

2    never had an understanding of where he value was.

3    Q.   He's listed as a key advisor and a key senior executive.

4    Do you believe that's correct?

5    A.   When we first started the company, that was our

6    thought--that Rajiv would be a senior executive and a guy that

7    we could turn to, and it turned out not to be the case on

8    every front possible.

9    Q.   Do you see the presentation Exhibit 13?

10   A.   I do.

11   Q.   How would this presentation be used in your role as EVP

12   of business development?

13   A.   This is -- I would actually even use this to potentially

14   raise some money.  But also if I'm sitting with clients, or a

15   potential client, this is all great, great stuff and not only

16   validates the fact that we have this technology and it's

17   patented, but this is the applications that we're using it

18   for.  And then, you know, we were obviously pitching people

19   that we were making a pivot to hotels.  And so this is all

20   around that time, yeah.

21   Q.   When was the first time anyone at Shodogg communicated

22   with Time Warner Cable about the Touchstream technologies?

23   A.   So we were at CES in 2012, and about 20 cable companies

24   came to our booth, and Herb and I gave a short presentation.

25   This was the first one of the entire event.

1          And as we were telling them the benefits of our

2     technology but also the future applications for it, that it's

3     virtual and, thus, MPVDs, or cable companies, could eventually

4     see a different way of distributing their content, Time Warner

5     Cable was the company that stepped in in front of the 20 or so

6     other cable companies and said, You think you're going to move

7     the 800 pound gorilla?

8          And we said, Yes, we think that there's a chance that

9     that's where the -- the technology's going to take you.

10         And he laughed at us and he said, We're all the kings of

11    this -- not the kings.  We're all in charge of these big

12    companies that have been around for a long time.

13         And that was it, but it was on a microphone he was

14    talking to everybody in the crowd as well as Herb and I up

15    front.

16    Q.   And who was that?

17    A.   I have no idea.  There were 20 people from various cable

18    companies.  They were part of a group like NAB or VAB.  They

19    were walking around together to get -- so everybody could hear

20    the same pitches at the same time.

21    Q.   And what -- and this was at the 2012 CES show?

22    A.   That's correct.

23    Q.   And what day during the 2012 CES show?

24    A.   It was the first one.  They were the first people to our

25    booth in the morning.

1    Q.    And do you have -- and you don't have a recollection of

2    who, if anyone, from Charter was there.  Correct?  Or Time

3    Warner Cable.  Excuse me.

4    A.    I know Time Warner Cable was definitely there.  I don't

5    know who the representatives were for each of the cable

6    companies.

7    Q.    How many people from Time Warner, Inc., were there?

8    A.    I have no idea.  There was, again, a whole group of 10 to

9    20 people of different companies.

10   Q.    Did the mobile device at the CES demo need to have a

11   numeric code inputted?

12   A.    Yes.  Every screen and every device in front of it, the

13   code changed every time somebody would relog in to view

14   content.

15   Q.    After the group of 20 or folks you said walked through,

16   what happened next with the interactions with respect to Time

17   Warner Cable?

18   A.    I forgot when we met, like how the follow-up happened,

19   but I remember going to the Time Warner Building, because I

20   was so familiar with the area, and meeting with a gentleman

21   there.

22   Q.    Who did you meet with at Time Warner Cable?

23   A.    I believe his name was Alan Lui.

24   Q.    How did you get involved in setting up that meeting at

25   Time Warner Cable?

1   A.   I don't recall.  Again, they're obviously on our list

2   given their space within the cable industry, but I don't

3   recall how I was specifically introduced.

4   Q.   What list are you referring to with respect to folks in

5   the cable industry?

6   A.   Just the mental stuff that we talk about.  Like when you

7   think about the top cable companies, you think about Cable

8   Vision, you think about Suddenlink, you think about Comcast,

9   you think about Charter.  Charter, Comcast, Spectrum,

10  Suddenlink, these are all companies whose business models

11  would clearly benefit from using our technology.

12  Q.   So did you communicate to folks at the 2012 CES that the

13  technology was patent pending?

14  A.   Absolutely.  There is no -- that was a standard -- as

15  much as saying hello to somebody, it was this is patented

16  technology, or patent pending technology.

17  Q.   So there was a patent application pending on the

18  technology?

19  A.   Yes, there was.

20  Q.   Do you have a list of other people that attended the 2012

21  booth at CES?

22  A.   In my head I have, you know, a lot of companies that I

23  know that came that were important to us.  Google, Quadriga,

24  the cable companies, content distributors, other tech

25  companies.  We were known as -- coming into CES, *Forbes* listed

1    us as a top-five technology going into this event.  People

2    knew about us.  We had something special, and there was a -- I

3    mean, for a small company to go to CES and have an article

4    talking about them, that was very impressive.

5    Q.   Mr. Cohen, how much money were you paying for articles

6    and press releases at the time you went to CES?

7    A.   I don't think we really were paying anybody for articles.

8    I think we -- you know, we've gotten a couple of PR pieces of

9    like winning tech week and a couple of other things, but it's

10   nothing that I saw.

11   Q.   Mr. Cohen, after the group you mentioned came by the

12   Touchstream booth at the 2012 CES, did you have any other

13   interaction with Time Warner Cable?

14   A.   Yes.

15   Q.   And I believe you said the next interaction with Time

16   Warner Cable was with a gentleman named Alan Lui.  Is that

17   correct?

18   A.   I believe, yes.

19   Q.   Was there an in-person meeting with Mr. Lui?

20   A.   Yes.

21   Q.   Who from Time Warner Cable was at that meeting?

22   A.   Alan, and I know Alan wanted to introduce us to somebody

23   but I don't remember the name of the person; somebody more on

24   I think the tech side.

25   Q.   So I just want to talk about this first meeting.  Okay?

1  So it's an in-person meeting at Time Warner Cable's offices.

2  Is that correct?

3  A.    Yes.

4  Q.    And you and Mr. Mitschele was there for Touchstream.

5  Correct?

6  A.    Yes.

7  Q.    And only Mr. Lui was there for Time Warner Cable?

8  A.    Yes.

9  Q.    And other than the demo of the technology, were there any

10  other presentations at this first meeting with Mr. Lui and

11  Time Warner Cable?

12  A.    I'm not sure if there were any presentations or if it was

13  video that we were showing them how the patents work for the

14  swappable media player and the universal API.

15  Q.    Do you know if you followed up with Time Warner Cable

16  after your meeting?

17  A.    I remember having some correspondence with Alan, but I

18  don't remember what the substance of that was.  He was a

19  really nice guy.  That's what I remember.  I really remembered

20  that about him.

21  Q.    Okay.  So that first meeting was I would say May 2012?

22  A.    Yeah.  Would have been one of my first meetings then.

23  Q.    And during that year between May of 2012 and May of 2013,

24  you had no contact with Time Warner Cable.  Is that correct?

25  A.    Based on this, it looks like I didn't.  Correct.

1    Q.    At this time of May of 2013, had Time Warner Cable

2    demonstrated interest in the Touchstream technology?

3    A.    Interest, yes.

4    Q.    Was Mr. Lui just being nice?

5    A.    I don't know.  I think I saw him in this email where he

6    said something along the lines of how impressed he was with --

7    can you scroll down?

8    Q.    Sure.

9    A.    "And you're definitely on our radar."  So, you know,

10   obviously something that he saw, whether it's just words or

11   it's not, you know, that's what it says.

12   Q.    After this exchange with Greg King in May of 2013, do you

13   know the next time you communicated with Time Warner Cable

14   with respect to Touchstream technology?

15   A.    I don't.

16   Q.    So the top email that you read, and it's referencing an

17   article down at the bottom.  Do you see that?

18   A.    So this is an Apple TV article.  Okay.  Okay.

19   Q.    Do you recall understanding from Time Warner Cable that

20   the set-top boxes are a good business for them?

21   A.    Yes.

22   Q.    And what did you understand that to mean?

23   A.    That people pay rent for the boxes in every home for

24   every TV.

25   Q.    In August of 2012, did you understand that Time Warner

1    Cable was looking to keep its set-top boxes for its services?

2    A.   I don't know that that was really a discussion as much as

3    it was a place for revenue for them, and the fact that people

4    had to have repair people come to their homes to fix their

5    boxes and deliver their services was an upside for them.

6    Q.   And the Shodogg technology was pitched as something that

7    you didn't need a set-top box.  Is that correct?

8    A.   Or it enhances the set-top box, yes.

9    Q.   How would it enhance the set-top box?

10   A.   By allowing our technology to be embedded within the box

11   and that becomes the hardware between the mobile device and

12   the connected screen, and so you get the benefits of the

13   Shodogg technology without an additional piece of hardware.

14   Q.   I'm sorry.  I think you said you participated or have a

15   vague recollection of participating in a pitch day to Time

16   Warner Cable?

17   A.   Yeah.  And the more that I think about it, I do remember

18   the theme of it, yeah.

19   Q.   Okay.  Do you recall the materials that were presented at

20   the pitch day?

21   A.   No, I don't.  But given how every demo went, it was

22   videos showing them how, again, the patents -- swappable media

23   player, the universal API, and that's really the demo, and to

24   show them how many different way it can apply to their

25   business.

1    Q.    Do you know if the issued patent application from

2    Touchstream was disclosed to Time Warner Cable at the pitch

3    day?

4    A.    I doubt in front of a room of all those people that they

5    saw the patent numbers, but I can guarantee they saw the words

6    'patent' or 'patent pending', depending on the time.  And then

7    we would review exactly what the patents were and the value to

8    them.

9    Q.    You would review the patents with Time Warner Cable?

10   A.    Not like the actual architecture.  So we would say like,

11   you know, you can use this to connect to YouTube server, and

12   then you can move over to APC server and we can show you this

13   demo that shows how the universal API plays, pauses, stops,

14   rewinds --

15   Q.    Sir, you got to slow down.

16   A.    I'm sorry.  So it shows you that the phone -- it's the

17   remote control.  It can pause, it can play, it can stop.

18   That's the universal API.  The ability to switch from one

19   content to another was the swappable media player and jaws

20   would drop when people would see it.

21   Q.    But you never disclosed the patent number or the issued

22   patent?

23   A.    I don't know that it wasn't issued at that point, but no,

24   I didn't.

25   Q.    I'm showing as Exhibit 17 this is a presentation that --

1    from the metadata it appears to be presented pitch day.  Does

2    it look familiar to you, Mr. Cohen?

3    A.    Yes, it does.

4    Q.    Did you prepare this presentation?

5    A.    I'm sure that I was a part of the strategy, yes.

6    Q.    Do you recall who from Touchstream attended the pitch

7    day?

8    A.    It's almost always Herb and I.

9    Q.    Do you recall specifically at this pitch day whether Herb

10   attended?

11   A.    I don't.

12   Q.    Do you recall at this pitch day presentation anyone else

13   other than you being there?

14   A.    I wouldn't have gone alone, especially from a tech's

15   perspective.  In case there were technology questions, I would

16   have a tech person with me, so it could have been David.

17   Q.    So looking at this demo on the slide, it's got Bates

18   number TS_Charter00014080.  Do you see that?

19   A.    Yes.

20   Q.    You were pitching to Time Warner Cable that the Shodogg

21   technology could work on any web-enabled screen.  Correct?

22   A.    Yes.

23   Q.    And did you understand that to mean any web-enabled

24   screen of a Time Warner Cable subscriber?

25   A.    Of any individual -- of any device anywhere in the world.

1    There is no limitations.  If the device is connected and has

2    an internet connection, we can get to the screen.

3    Q.    The Time Warner Cable system was a closed system.

4    Correct?

5    A.    That's correct.  Based on the contracts that they had

6    with all of their carriers.

7    Q.    And the Touchstream technology business proposition was

8    to get outside of that Charter closed system.  Correct?

9    A.    No, it was to enhance the consumer experience so that the

10   consumer could use their mobile device and leave their home

11   watching Time Warner Cable on their TV, go on a train or a bus

12   and could pick up directly on their mobile device.  Through

13   their Time Warner account they could be verified that they

14   were a Time Warner customer.  Everything about this was

15   protecting Time Warner while enhancing the consumer experience

16   in order to help them compete.  The cable companies at that

17   time were going through a lot of transition.  They all needed

18   something to differentiate themselves.  This was definitely

19   one of those things.

20   Q.    Do you see this?

21   A.    Yeah.

22   Q.    Do you see that as feedback from --

23   A.    Yes.

24   Q.    -- Time Warner Cable from pitch day that you're not a

25   perfect fit?

```
1    A.   But that they still believed there is a major opportunity

2    with the corporate video team.  I do see that.

3    Q.   And what did you do in response to receiving Time Warner

4    Cable's decision to pass on the Touchstream technology after

5    pitch day?

6    A.   I probably didn't think twice about it and just moved

7    onto the next one.

8    Q.   Did you ever contact Time Warner Cable again?

9    A.   Not that I recall.

10   Q.   Mr. Cohen, who is Chadd Hunt?

11   A.   Chadd was somebody who we met early on and is just a

12   well-connected guy to some people at Staples, DIRECTV.  You

13   know, he's a connector.

14   Q.   Was he an employee of Shodogg?

15   A.   No.

16   Q.   Is he an investor in Shodogg?

17   A.   No.

18   Q.   Is it possible just because they, frankly, didn't want

19   the Touchstream technology?

20   A.   No.  I mean, because I think you saw emails that followed

21   this that suggested they were still -- thought that what we

22   had was really interesting.

23   Q.   At the time of Exhibit 20, did you have an understanding

24   of what Time Warner Cable's offerings were?

25   A.   I don't believe so, because if I recall, April 2012 is
```

1    when I just started at the company.

2    Q.   And were they a pain at -- a huge pain at CES?

3    A.   I wouldn't call them a pain, but they were the only

4    company that spoke up out of all the cable companies in

5    regards to what we were telling them.

6    Q.   Mr. Cohen, during your testimony today you were not able

7    to identify an instance where you, on behalf of Shodogg,

8    communicated to Time Warner Cable any patent application

9    number.  Is that correct?

10   A.   As far as I'm aware, there was no patent application

11   number.  There was always mention of the patent as part of the

12   opportunity.

13   Q.   But you never disclosed an issued patent number to Time

14   Warner Cable.  Correct?

15   A.   I personally have -- don't recall giving them a patent

16   number; just talking about the patents, giving them a demo.

17   Q.   Do you have a technical understanding of Touchstream's

18   patents?

19   A.   I can explain them, but I don't know that I could draw

20   you a diagram and tell you exactly how it happens.  My

21   background is in media, and so once I heard what the value of

22   these patents was, I understood -- or the technology before

23   the patents, I understood the impact it had.

24   Q.   Did you ever read the patents?

25   A.   No.

1    Q.    So your understanding of the patents is based on what

2    other people would have told you about the technology.  Is

3    that right?

4    A.    Based on what -- why I invested in the company was

5    because I understood, not the technical side, but the actual

6    application for why it was valuable to consumers and to these

7    media companies.

8    Q.    Okay.  And when did Shodogg launch the consumer app?

9    A.    That was really our first mindset out of the gate was to

10   build a consumer app that allowed consumers to use their

11   mobile device to watch the videos on a larger screen

12   controlled by their mobile device.

13   Q.    And would the consumer need a set-top box?

14   A.    No.  That's one of the benefits of working with us.  They

15   could work through to a set-top box or they could work without

16   any type of hardware between their phone and the TV.

17   Q.    So then the other product was the hospitality product.

18   A.    Correct.

19   Q.    All right.  And was that called MyMedia?

20   A.    Yes.

21   Q.    Okay.  And the only actual customer for the hospitality

22   product was Quadriga.  Right?

23   A.    The second largest provider of in-room hotel

24   entertainment in the world.  Quadriga, that's correct.

25   Q.    Well, I'm just going to ask you to answer my question

```
 1    which --

 2    A.   Yes.

 3    Q.   -- is the only actual customer for the hospitality

 4    product was Quadriga.  True?

 5    A.   Yes.

 6    Q.   And Quadriga had hotel rooms in Europe and Australia.

 7    True?

 8    A.   I believe so, yes.

 9    Q.   And you're not aware of any use by Quadriga of the

10    MyMedia product in the United States.  Right?

11    A.   They didn't have hotel rooms in the United States.

12    Q.   You're not aware of any use by Quadriga of any

13    Touchstream product in the United States.  True?

14    A.   True.

15    Q.   And as you say, that's because Quadriga doesn't have

16    hotel rooms in the United States.  Right?

17    A.   I believe that the team we were working with, and maybe

18    even still today, they don't.  I don't know.

19    Q.   And then we had the enterprise product.  Right?

20    A.   Yes.

21    Q.   And the enterprise product was primarily directed to

22    sales teams.  Is that fair?

23    A.   Yes.  Sales enablement.

24    Q.   Okay.  And the idea was that a salesperson could walk in

25    to a potential customer and put a presentation on any screen.
```

1    Right?

2    A.    That's right.  To any screen.  They just met.

3    Q.    Okay.  And HP was the only customer for the enterprise

4    product.  Is that right?

5    A.    That's correct.

6    Q.    So the cable companies were more of a partner than a

7    competitor, in your view.  True?

8    A.    Well, it depends.  If they started their own application

9    that allowed them to cast to a TV, they would be competitors

10   of ours.  I'm even going to say that at the -- these were --

11   they were competitors, but the technology wasn't out there for

12   them to be competitive to us.  They didn't have this

13   technology that they were even working with.

14   Q.    When did you make your initial investment in Touchstream?

15   A.    As soon as I saw the technology, within a day of it.

16   Q.    So 2011?

17   A.    Yes.

18   Q.    So at the very top of Exhibit 34, do you recognize this

19   exhibit to be an email from you to Alan Lui at Time Warner

20   Cable?

21   A.    Yes.

22   Q.    On the second page of the email ending Bates 050, do you

23   see that that is an email from you to Mr. Lui on May 2nd of

24   the 2013?

25   A.    Yes.

1    Q.    And do you recall discussing this email earlier today?

2    A.    Yes.

3    Q.    Now, I don't believe that the rest of this thread was in

4    the exhibit that was shown to you, so I'm going to direct your

5    attention to the top email in the thread.

6         The top email reads, "Hi, Alan, thanks for the email.

7    Good to hear you are doing well."

8         "Hi, Greg, nice to E-meet you."

9         Do you see that.

10   A.    Yes.

11   Q.    And who is Greg?

12   A.    Greg King is the person that the prior attorney

13   referenced that Alan introduced us to.

14   Q.    At Time Warner Cable?

15   A.    Correct.

16   Q.    Next you say, "At its core, we own patented technology

17   that allows any mobile device to connect and direct any

18   digital content to any web-enabled screen.  We require no

19   wires or boxes and are platform agnostic."

20        Do you see that?

21   A.    Yes.

22   Q.    Is that representation consistent with the

23   representations that you had made with Time Warner Cable in

24   various other meetings about Touchstream's patented

25   technology?

```
1    A.    Yes.

2    Q.    And then you wrote, "I would like to introduce you to the

3    technology.  We can do it remotely, as I can present anywhere

4    that I have a mobile device to anywhere as long as you are in

5    front of a web-enabled screen that supports a browser.  We can

6    start there, and if the demo and the product we are launching

7    interests you, we can further the discussion.  Look forward to

8    hearing from you."

9          Do you see that?

10   A.    Yes.

11   Q.    Mr. Cohen, did you ever identify to Greg King a patent

12   application number?

13   A.    I don't recall.

14   Q.    Mr. Cohen, did you ever identify to Alan Lui that you

15   thought Time Warner Cable infringed a Touchstream patent?

16   A.    No.

17   Q.    Did you ever communicate to Greg King that you thought

18   Time Warner Cable infringed a Touchstream patent?

19   A.    No.

20   Q.    Did you tell anyone at Time Warner Cable that you thought

21   Time Warner Cable infringed a Touchstream patent?

22   A.    I mean, I don't know who I would tell, but no.

23   Q.    Did -- are you aware of anyone at Touchstream

24   communicating to Time Warner Cable that Time Warner Cable

25   infringed a Touchstream patent?
```

1   A.   I'm not aware of that, but I can't speak for the other

2   guys.

3   Q.   But here's the question.  Okay?  So yes or no:

4   Mr. Cohen, are you aware of anyone at Touchstream

5   communicating to Time Warner Cable that Time Warner Cable

6   infringed a Touchstream patent?

7   A.   No.

8   Q.   Are you aware of anyone at Touchstream communicating to

9   anyone at Charter that Charter infringed a Touchstream patent?

10  A.   No.

11          THE COURT:  Does this complete this witness by

12  deposition?

13          MR. DYKAL:  Yes, Your Honor.

14          THE COURT:  Am I correct, counsel, that with regard

15  to Mr. Cohen's deposition, 26 minutes and 26 seconds of that

16  was allocated to Plaintiff and 7 minutes and 17 seconds is

17  allocated to Defendant?

18          MR. DYKAL:  That's correct, Your Honor.  I'm sorry

19  for not saying that.

20          THE COURT:  All right.  Call your next witness,

21  please.

22          MR. DYKAL:  Plaintiff calls Alan Lui.  Mr. Lui was

23  formerly the group vice president of video strategy at Time

24  Warner Cable, which, in part, later merged with Charter

25  Communications.  And the Plaintiff's run time is 24 minutes

 1    and 37 seconds and Defendant's is 3 minutes and 8 seconds.

 2            THE COURT:  All right.  Proceed with this witness by

 3    deposition.

 4                            ALAN LUI

 5                       BY VIDEO DEPOSITION

 6    Q.   Good afternoon, Mr. Lui.

 7    A.   Good afternoon.

 8    Q.   Are you presently employed?

 9    A.   Yes.

10    Q.   Did you used to work for Charter?

11    A.   Yes.  Well, actually not for Charter, but for Time Warner

12    Cable, who then got acquired by Charter.

13    Q.   And so your understanding is Time Warner Cable became a

14    part of Charter?

15    A.   Yes.

16    Q.   When did you work for Time Warner Cable?

17    A.   From 2011, October, till I think it was May 2016.

18    Q.   What was your role at Time Warner Cable?

19    A.   My first year there I was the group vice president for

20    video strategy, and then I became the senior vice president of

21    HR.

22    Q.   What were your responsibilities as group vice president

23    video strategy?

24    A.   So I was reporting to both the head of the video business

25    as well as the head of corporate strategy.  And in that role,

1  my job was to support the head of the video business, just to

2  devise, you know, basic -- basic business strategy.

3  Q.   Did part of your responsibilities include evaluating new

4  features for Time Warner Cable's video products?

5  A.   So no, not -- not down at that level of detail.  I was up

6  kind of at a higher elevation than that in terms of I didn't

7  -- I definitely knew of features, as they were, you know,

8  bandied about, but that was not my -- my primary focus.

9  Q.   Do you recall meeting with a start-up named Shodogg, also

10  referred to as Touchstream?

11  A.   I do recall the name Shodogg as the people I met with.

12  Q.   And was this a technology that Time Warner Cable was

13  interested in adopting into its own systems?

14  A.   You know, we didn't -- we didn't follow up on that or

15  have any particular interest in that -- in that technology.

16  And, you know, as I said earlier, that was something that I

17  didn't -- you know, it was outside of my -- mostly outside of

18  my purview at that level of detail.

19  Q.   Do you recall Shodogg ever mentioning that they had filed

20  for patent protection on their technology?

21  A.   Definitely not.

22  Q.   Do you remember Shodogg ever announcing that they had

23  been awarded patent protection for their technology?

24  A.   I don't have a recollection of that.

25  Q.   Do you ever recall discussions within Time Warner Cable

1    about Touchstream's patents?

2    A.    No.

3    Q.    Do you recall arranging any meetings between Touchstream

4    and Time Warner Cable in the 2007-2012 time frame?

5    A.    I recall taking a meeting in Time Warner Center, which is

6    where Time Warner Cable was headquartered.

7    Q.    What do you recall about that meeting?

8    A.    Very little; you know, that we had it.  I think it was

9    a -- what's the right word?  It's -- you know, it's just us

10   trying to be polite and open-minded, sure.

11   Q.    Did you have an understanding of what you would be doing

12   at Time Warner Cable if you were to join?

13   A.    Yes.

14   Q.    And what was your understanding?

15   A.    That my main focus was trying to develop a strategy for

16   the video business in the context of what was at the time the

17   brand new phenomenon of cord cutting, which is streaming your

18   video content online rather than getting it through the cable

19   company, your cable company subscription.

20   Q.    Was your impression that this was an important strategic

21   area for Time Warner Cable to explore?

22   A.    Yes.

23   Q.    Did you have an understanding of why Time Warner Cable

24   felt that that was an important area to explore?

25   A.    Yes.

1    Q.    And what was your understanding?

2    A.    Well, I mean, it -- it's as simple as it was a pretty big

3    threat to revenue, so if people went and got their video

4    content from some place else, then they would potentially

5    cancel their cable subscriptions.

6    Q.    Yeah.  Was it your understanding that when Time Warner

7    Cable perceived a threat to their revenue, that it was a

8    strategic goal of theirs to prevent the loss of that revenue,

9    if possible?

10   A.    Yes.  This is, yes, a profit-making enterprise that

11   definitely did not want to lose revenue.

12   Q.    Are you familiar with something called CES?

13   A.    Yes.

14   Q.    What is CES?

15   A.    The Consumer Electronics Show in Las Vegas.

16   Q.    Have you ever been to the Consumer Electronics Show?

17   A.    Yes, I have.

18   Q.    Did you ever go to the Consumer Electronics Show on

19   behalf of Time Warner Cable?

20   A.    Yes.

21   Q.    Do you know if you went to the January 2012 Consumer

22   Electronics Show on behalf of Time Warner Cable?

23   A.    Yes.

24   Q.    And do you recall whether you knew that Shodogg was

25   presenting at CES in January 2012?

276

1    A.    I have no recollection of Shodogg or any interactions

2    with Shodogg at the Consumer Electronics Show.

3    Q.    Mr. Lui, I'm showing you what's been marked as Exhibit

4    No. 3.  This is a spreadsheet that bears the Bates stamp

5    Charter_TS0058898.  I'll represent that it appears to be the

6    attachment to Exhibit 2.

7        Do you see this document?

8    A.    Yes, I do.

9    Q.    Do you recognize this document?

10   A.    I do not.

11   Q.    Does this look like a schedule relating to CES?

12   A.    I mean, it looks like a schedule, yeah, for sure.

13   Q.    I'm going to scroll down to the 28th row.  Do you see it

14   says "Tuesday, January 10, from 4:00 to 5:00, Shodogg, video

15   to all devices," and the attendees are for Time Warner Cable

16   are Chris, Dean, and Eric, and the attendee for Shodogg is

17   Herb Mitschele, and that is at the Venetian second floor?  Do

18   you see that?

19   A.    Oh, yes.  Yes, I do.

20   Q.    Did you work with someone named Chris at Time Warner

21   Cable around this time that might have had responsibilities

22   relating to video strategy?

23   A.    Yeah, I think -- so there was someone named Chris that I

24   would go to for technical information.

25   Q.    And do you recall that particular Chris' last name?

1    A.    Chris Cholas.

2    Q.    Chris was a technical person, you said?

3    A.    Yes.

4    Q.    Was he an engineer?

5    A.    I think so.  I'm pretty sure, yeah.

6    Q.    Do you recall Time Warner Cable being interested in

7    second screen capabilities in March of 2012?

8    A.    Yes.

9    Q.    And I think earlier you recalled meeting with Shodogg in

10   Time Warner Cable's offices?

11   A.    Yes.

12   Q.    Mr. Lui, I'm showing you an exhibit that's been marked

13   Exhibit No. 6.  It bears the Bates stamp TS_Charter_00081440.

14   It is an email from Chadd Hunt at Shodogg to herb Mitschele

15   and Jamie Cohen sent May 5th, 2012.

16         Do you see that.

17   A.    Yes.

18   Q.    Now, if you look down the chain, there's an earlier email

19   from Chadd Hunt on May 16th, 2012.  And Chadd writes, "Hey,

20   Alan.  Can you have an IT person on hand 10 minutes early

21   prior to our meeting?  I want to ensure we do not have any

22   firewall issues for the demonstration."

23         Do you see that?

24   A.    Yes.

25   Q.    Is it -- strike that.

1          Does it comport with your recollection that you may have

2    had the meeting with Shodogg in May of 2012?

3    A.   It comports with my recollection that we had a meeting.

4    I don't -- I wouldn't be able to conjure up a time.

5    Q.   Do you know one way or the other whether Jamie Cohen was

6    part of that meeting that you recall with Time Warner Cable

7    and Shodogg?

8    A.   I don't.

9    Q.   You write back on June 11th, 2012, "Hi Jamie, let's

10   definitely do a follow-up, but we've got a number of related

11   balls in the air right now and I don't think I can

12   realistically get the attention of the right folks aimed at

13   the Shodogg opportunity until a few other things settle.

14   Please keep me posted on developments on your end and you're

15   definitely on our radar."

16        Do you see that?

17   A.   Yes.

18   Q.   And do you recall whether Time Warner Cable was

19   developing its own solution to send content from a mobile

20   phone to a television?

21   A.   I definitely don't have any recollection of that.

22   Q.   Do you have any recollection of whether Shodogg mentioned

23   that they had applied for patents around this time?

24   A.   None.  No recollection of that.

25   Q.   Do you recall keeping Shodogg on your radar?

1    A.   I don't recall that, no.

2    Q.   Who is Peter Stern?

3    A.   He was my boss.

4    Q.   And do you recall ever discussing Shodogg with Peter

5    Stern?

6    A.   I don't have any direct recollection of it.

7    Q.   Any indirect recollection?

8    A.   Definitely saw that the Shodogg introduction was asked

9    from him to me via email.

10   Q.   Mr. Lui, I'm showing you what's been marked as Exhibit

11   No. 8.  This is a document that bears the Bates stamp

12   Charter_TS0059721.  At the top it is an email from you to

13   Peter Stern on July 13th, 2012, "Subject re:  Shodogg in the

14   news."

15        Do you see that?

16   A.   Yes.

17   Q.   And you write, "I'm not surprised that Shodogg is getting

18   traction in hospitality and at the DOD, but their value

19   proposition is less clear for us."

20        Do you see that?

21   A.   Yes.

22   Q.   Do you recall Shodogg getting traction in hospitality?

23   A.   I don't recall, no.

24   Q.   So at the beginning of the email -- the first email in

25   the chain, rather, is an email from Chadd Hunt to Peter Stern,

1    with the subject "Shodogg in the news."

2        Do you see that?

3    A.    Yes.

4    Q.    And towards the bottom, Chadd writes, "I will continue to

5    keep you posted of our progress and am looking forward to

6    resuming our initial talks at some point in regards to how we

7    can work together.  I strongly believe that as Time Warner

8    Cable customers experience the Shodogg platform in their hotel

9    rooms, they will ultimately want to experience it in the home

10   as well via their set-top box."

11       Do you see that?

12   A.    Yes.

13   Q.    Do you ever recall evaluating whether you thought Time

14   Warner Cable customers would be interested in experiencing

15   Shodogg's technology via their set-top box?

16   A.    No.

17   Q.    And then, the next email chain, it appears that Peter

18   Stern forwarded the email to you and said, "Alan, can you

19   brief me on what you learned about this company?"

20       Do you see that?

21   A.    Yes.

22   Q.    Mr. Lui, I'm showing you what's been marked as Exhibit

23   No. 9.  This is a document that beers the Bates stamp

24   Charter_TS0059728.  And at the top is an email from Chadd Hunt

25   to Peter Stern, CCing Alan Lui dated August 25th, 2012.

1      Do you see that?

2    A.   Yes.

3    Q.   And Chadd writes, "Peter, hope you are enjoying the

4    summer and are doing well.  Below is an update on Shodogg and

5    our patent.  I will keep you posted on our deals with the

6    hotel industry rollout, Viacom, and the Department of Defense.

7    Be well and hope to catch up with you soon."

8      Do you see that?

9    A.   Yes.

10   Q.   Did Time Warner Cable have any policies in place in the

11   August 2012 time frame upon receiving notice that another

12   company had obtained patent protection?

13   A.   I don't have any recollection of any such policies.

14   Q.   Do you recall any protections that Time Warner Cable put

15   in place to avoid replicating or using technology, such as

16   Shodogg's, that Time Warner Cable may have learned about in

17   its meetings with Shodogg?

18   A.   I don't have any recollection of protections of that

19   sort.

20   Q.   Going down to the email that Mr. Hunt forwarded to you,

21   there's an announcement that says, "Shodogg is now an

22   officially patented technology."  And it says, "It is with

23   great pleasure that we announce Shodogg has been awarded its

24   patent by the U.S. Patent and Trademark Office."

25     Do you see that?

1    A.    Yes, I do.

2    Q.    And does this cause you to recall the fact that Shodogg

3    had provided Time Warner Cable notice that it had received a

4    patent for its technology?

5    A.    No, it doesn't really ring any bells.

6    Q.    And then on the next page there's a paragraph that

7    starts, "Since the original patent application."

8         Do you see that?

9    A.    Yes.

10   Q.    It says, "Since the original patent application, our

11   technology team has applied for additional patents based on

12   our earlier work which was just approved.  Also, Shodogg is

13   working to extend our patent protection internationally with

14   the help of Geoff Sykes, president Shodogg Australia and EVP

15   International."

16        Do you see that.

17   A.    Yes.

18   Q.    Do you recall learning that Shodogg had applied for

19   additional patents, both in the United States and throughout

20   the world?

21   A.    I don't recall that.

22   Q.    Mr. Lui, I'm showing you what's been marked as Exhibit

23   No. 10.  This document bears the Bates stamp

24   Charter_TS0060060.  At the top it's an email from Jamie Cohen

25   to Greg King, Alan Lui, and Mary Courage.  The subject is "re:

1    Shodogg."

2        Do you see that?

3    A.   Yes, I do.

4    Q.   So scrolling down, the first email in the chain says, "Hi

5    Alan.  Hope you are well and had a great weekend.  I don't

6    believe we ever connected after our initial meeting."

7        And then following that you reply, "Let's definitely do a

8    follow-up"."  And that was June 11th, 2012.

9        And this was an email chain we discussed earlier today.

10   Do you recall that?

11   A.   Yes, I do.

12   Q.   On May 9th, 2013, you write, "Hi Jamie, good to hear from

13   you.  Since we last talked, I've taken on a new role in HR, so

14   let me introduce you to the best contact for your new

15   direction.  Greg King is our SVP leading both strategy and

16   product for our B2B business.  I've given him a quick hallway

17   overview of what I remember from our last meeting and I think

18   it would be good for the two of you to connect.  Good luck and

19   I hope you're able to find some rich opportunities."

20       Do you see that?

21   A.   Yes, I do.

22   Q.   Do you recall introducing Mr. Cohen to Greg King?

23   A.   I don't recall that directly.

24   Q.   Do you recall knowing someone named Mr. Greg King?

25   A.   Yes.

284

1    Q.   And is it fair to say that when you transitioned to your

2    role in HR, you were no longer involved in evaluating new

3    technologies for Time Warner Cable's video products?

4    A.   Yes.

5    Q.   And did Greg King take over that role?

6    A.   Yeah, I guess I wouldn't phrase it like that.  His role

7    was different from the role that I had.

8    Q.   Can you elaborate on how his role was different from

9    yours?

10   A.   He was in the -- the what we call the -- I don't remember

11   what we called it, actually, but he was in the part of the

12   business that served other businesses, so business-to-business

13   and up, yeah.

14   Q.   And so is it fair to say you, before you went to HR, were

15   on the consumer side of the business?

16   A.   Yes, that's correct.

17   Q.   Mr. Lui, I'm showing you what's been marked Exhibit

18   No. 11.  It this is an email chain that bears the Bates stamp

19   Charter_TS006085.  And the first email in the chain is from

20   Greg King to Peter Stern CCing Sumeet Sabharwal.

21        Do you see that.

22   A.   Yes.

23   Q.   Now, the next email in the chain is from Peter Stern.  He

24   says, "Thanks, guys.  I'm so glad Fluid is back on the radar.

25   I had Alan Lui meet with Shodogg a couple of times last year,

1    so you may want to close the loop with him on that."

2        Do you see that?

3    A.   Yes, I do.

4    Q.   And then Greg writes, "I do think that there may be

5    something there, and although we might not be ready for it, I

6    think it's still good for our engineers to be thinking about

7    it for a future rev of Hydra or the TWCTV app."

8        Do you see that?

9    A.   Yes.

10   Q.   First of all, do you know what Hydra is?

11   A.   So Hydra was a concept for a set-top box, a consumer

12   premises equipment.

13   Q.   Okay.  And what about the TWCTV app?

14   A.   That was -- yes, that was Time Warner Cable's app for

15   getting cable television on consumer electronic devices.

16   Q.   So was that like a mobile phone app, smartphone app?

17   A.   Yes.

18   Q.   And Peter Stern writes back to Greg King on May 20th,

19   2013, "Let's discuss Shodogg when we're next together so I can

20   assess the right place for it to start in residential."

21       Do you see that?

22   A.   Yes.

23   Q.   And do you recall that Peter Stern was a recipient of the

24   email from Shodogg announcing that it had obtained a patent on

25   its technology and it filed for additional patent protection

 1    in the United States and throughout the world?

 2    A.    I recall seeing that email a few minutes ago, yes.

 3    Q.    Do you know whether Mr. Stern informed Greg King or

 4    anyone else that Shodogg had announced it had obtained a

 5    patent and had filed for additional patents in discussing the

 6    potential to start Shodogg in Time Warner Cable's residential

 7    offerings?

 8    A.    I do not know that.

 9    Q.    What presence did Time Warner Cable put in place to avoid

10    replicating or otherwise using what it learned about

11    Touchstream in its own products?

12    A.    I don't have any recollection of any specific presence

13    that Time Warner Cable put in place.

14    Q.    And that's Charter's corporate testimony?

15    A.    I don't think I understand the question.

16    Q.    You were designated to testify on the topic of what

17    presence Time Warner Cable/Charter put in place to avoid

18    replicating or otherwise using what it learned about

19    Touchstream's technology.  So on behalf of Charter, is that

20    your answer?

21    A.    So, yes.

22    Q.    Mr. Lui, I have put on the screen what's been marked as

23    Exhibit No. 12.  It's an email chain that bears the Bates

24    stamp Charter_TS0061265.  And at the top it's an email from

25    you to Peter Stern and Joan Gillman.

1    Do you see that.

2    A.   Yes.

3    Q.   Mr. Cohen writes -- and the subject is "Time Warner Cable

4    follow-up."

5         Mr. Cohen writes, "Hi hope everyone is well.  Check out

6    the article on Comcast's new app.  This is very in tune with

7    the Channel 700 idea we presented at your event.  We have the

8    technology, we just need the partner.  In fact, this type of

9    experience is already being offered in hotels by our partners

10   in Australia and Europe."

11        And then there's a link to Quadriga.  Do you see that?

12   A.   Yes.

13   Q.   Had you ever heard of Quadriga before?

14   A.   No.

15   Q.   Mr. Gupta writes, "Mike, Alex and Greg, hope all is well.

16   My name is Sean Gupta.  I work on Sean Coar's team here in

17   Joan's organization."  And then he writes, "Two weeks ago we

18   had a couple of start-ups present to us as part of our first

19   ever pitch day where various entrepreneurs exemplified other

20   technology could benefit Time Warner Cable media and address

21   our specific long-term growth objectives.  There was one

22   start-up specifically that was less media focused and they are

23   extremely interested in meeting with you, so we wanted to make

24   is the introduction given they did a great job presenting our

25   division."

1    Do you see that?

2    A.    Yes.

3    Q.    And then underneath that it says, "Shodogg positions

4    itself as the Chromecast without hardware."

5    Do you see that?

6    A.    Yes.

7    Q.    Had you ever heard of a pitch day for Time Warner Cable

8    media?

9    A.    I -- not prior to preparing for this deposition.

10   Q.    It says, "They seamlessly and securely want users to be

11   able to send any content to any web-enabled screen or  device

12   anywhere directly from the cloud, no hardware required.  Their

13   newly patented technology makes the connection in the cloud,

14   thus allowing for any content to flow from anywhere to any

15   web-enabled screen without friction."

16   Do you see that?

17   A.    Yes.

18   Q.    Above that there's an email from Joan Gillman forwarding

19   it to Peter Stern saying, "FYI, see below."  And then above

20   that, Peter Stern responds, "Copying you," and said, "Thanks.

21   Alan knows these guys quite well.  Copying Alan here."

22   Do you see that?

23   A.    Yes.

24   Q.    Then above that you reply, "Ahh, yes, I remember them

25   well.  I will follow up with Alex."

1          Do you see that?

2    A.   Yes, I do.

3    Q.   Do you recall seeing this email which mentions, again,

4    Shodogg's patented technology?

5    A.   I saw it in preparation for this, but prior to that I

6    didn't recall it.

7    Q.   Do you recall ever discussing with anyone at Time Warner

8    Cable the fact that Shodogg had patents that protected its

9    technology?

10   A.   No, I don't; not prior to preparing for this.

11   Q.   Mr. Lui, I'm showing you what's been marked as Exhibit

12   13.  It's a document that bears the Bates stamp

13   TS_Charter000258583.  The top is an email chain from Herb

14   Mitschele to a number of people, forward "TWC pitch day."  Do

15   you see that?  Do you see this document?

16   A.   Yes.

17   Q.   So going down to the bottom, the first email, this is an

18   email from Alexa DePasquale, who we saw in the previous

19   exhibit.

20        Do you recall that?

21   A.   Yes.

22   Q.   She says, "Hi, Jamie.  This is a long email.  Please read

23   it in its entirety as it's an important email regarding Time

24   Warner Cable pitch day."

25        Do you see that?

```
 1    A.   Yes.

 2    Q.   And then you see she says, "Additionally, please see list

 3    below."  And No. 2, "we have a handful of questions from the

 4    client that would be helpful to know in preparation for the

 5    evening.  Please send back ASAP."

 6         Do you see that?

 7    A.   Yes.

 8    Q.   And then the first bullet under that says, "Do you have

 9    any patents or technology you believe is completely

10    proprietary?"

11         Do you see that?

12    A.   Yes.

13    Q.   Going to the next email in the chain, Jamie Cohen

14    responds to Alexa DePasquale and to other people, he writes,

15    "Hi, Alexa.  Below are some answers" -- "below are answers to

16    some of your questions.  Please let me know if there's

17    anything else I am missing."  Then he writes to the question,

18    "Do you have any patents or technology you believe is

19    completely proprietary," Jamie Cohen writes, "Yes, we own

20    three patents and have more pending."

21         Do you see that?

22    A.   Yes.  Yes.

23    Q.   Do you recall Time Warner Cable receiving confirmation

24    that Touchstream had three patents and more pending around May

25    15th, 2014?
```

1    A.   I recall seeing that -- that email, but that's all I

2    recall.

3    Q.   After receiving this email, do you know what, if

4    anything, Time Warner Cable did to avoid replicating or

5    otherwise using anything it learned about Touchstream or

6    Shodogg's technology in relation to these meetings?

7    A.   I don't know how to answer that.  I don't have any

8    knowledge of that.

9    Q.   You don't have any knowledge of Time Warner Cable putting

10   protections in place to avoid replicating Shodogg's technology

11   after being presented on Time Warner Cable pitch day?

12   A.   That's correct.

13   Q.   So Mr. Lui, during the deposition today we saw emails

14   indicating that Time Warner Cable first met with Shodogg in

15   January 2012 at CES.  Would you agree with that?

16   A.   I mean, I saw the schedule, yes.

17   Q.   And you testified that you recalled meeting with Shodogg

18   in May of 2012 at Time Warner Cable's facilities.  Correct?

19   A.   That's correct.

20   Q.   And then we saw a couple of emails where Jamie Cohen

21   followed up with you.  Is that right?

22   A.   Yes, we saw those emails.

23   Q.   And then would you agree that in July 2012 Time Warner

24   Cable was sent an email notifying Time Warner Cable that

25   Touchstream had received a patent on its technology?

1    A.    I did see that email.

2    Q.    And did you also see an email where Touchstream said that

3    it had filed for additional patent protection in the United

4    States and throughout the world?

5    A.    Yes, I saw that.  That's -- I thought it was the same

6    email, yes.

7    Q.    And then we saw an email where Touchstream presented its

8    technology in 2013 -- strike that.

9         Then we saw an email regarding Time Warner Cable media

10   pitch day where Touchstream presented its technology.

11        Do you recall that?

12   A.    I recall seeing the email, yes.

13   Q.    And as part of that exchange, Time Warner Cable asked

14   Touchstream if it had any patents, and Touchstream responded

15   that it had three.  Do you recall -- do you agree with that?

16   A.    I recall seeing that email, yes.

17   Q.    And then we saw just recently, as late as 2015, the topic

18   of Shodogg came up again between you and Peter Stern.  Would

19   you agree with that?

20   A.    Yes, I do recall seeing that email.

21   Q.    And we also saw an email that indicated there was

22   interest at Time Warner Cable in Shodogg's technology and

23   future revisions of the Time Warner Cable TV app.  Do you

24   recall that?

25   A.    I do recall seeing that email, yes.

1    Q.   And you'd agree that throughout this time frame Time

2    Warner Cable did not make any efforts to ensure that the

3    technology that it had learned about through its interactions

4    with Touchstream were not replicated or otherwise incorporated

5    into Time Warner Cable's products.  Would you agree with that?

6    A.   I cannot say that one way or the other.

7    Q.   When you joined Time Warner Cable in 2011, did Time

8    Warner Cable have a TWC app?

9    A.   TWCTV app, yes.

10          THE COURT:  Does that complete this witness by

11   deposition?

12          MR. DYKAL:  Yes, Your Honor.

13          THE COURT:  All right.  Ladies and gentlemen of the

14   jury, we're going to stop for the day at this juncture.  There

15   are at least a couple more similar deposition witnesses to be

16   presented, I'm told, but we'll save those until tomorrow

17   morning.

18      I should have explained this to you earlier, ladies and

19   gentlemen, and I apologize for not, but consistently on my --

20   over my time on the bench, juries have told me that they would

21   much rather work long days every day but be away from their

22   homes and their families and work a fewer number of days than

23   have shorter days each day but take twice as many days away

24   from their homes and family.  So we're going to work longer

25   days.

1     It's almost 6:00, and I think going forward you can

2  probably plan that somewhere around, give or take, this time

3  each day we'll bring things to a close for the day.  And we're

4  going to start each morning at 8:30.  And I'm going to ask you

5  to be in the jury room assembled and ready to go before 8:30

6  in the morning.  We're supposed to have some inclement weather

7  sometime tomorrow, so make your plans, check your gas gauge

8  and all the things you need to do so that there is no reason

9  you can't be here by 8:30 in the morning.

10     I typically tell juries that during World War II my dad

11  was in the Navy in the Pacific, and one of the things he

12  learned during his time in the Navy that he beat into his two

13  sons, me being one of them, growing up was that a convoy is a

14  group of ships that only moves as fast as its slowest ship.

15  And a jury is kind of like that.  I can't start in the morning

16  if seven of you are here.  I have to have all eight of you

17  here.  So a jury moves as fast as its slowest juror, so please

18  make sure you-all are here assembled and ready to go before

19  8:30 in the morning.  If I know Ms. Clendening, she'll have

20  pastries and juice and things for you each morning to make it

21  easy on you, but please make sure you arrange your travel so

22  you can be here ready to go by 8:30.

23     Please take your notebooks as you leave the jury box in

24  just a minute and leave them closed on the table in the jury

25  room.

1    Let me remind you again, ladies and gentlemen, of all the

2    instructions I've given you, including not to discuss the case

3    with anyone.  And unless I miss my guess, and I bet I don't,

4    you're going to get a question when you walk in the door this

5    evening when you get home about what happened today in court.

6    Just blame it on me.  Don't try to answer it.  And please make

7    sure that you don't communicate in any way with anyone about

8    this trial or anything related to this trial.

9    Please travel safely to your homes.  We'll see you

10   tomorrow morning ready to go by 8:30.

11   And with that, the jury's excused for the evening.

12   (Whereupon, the jury left the courtroom.)

13   THE COURT:  Be seated, please.

14   Counsel, so you'll know, we have used 2 hours, 38

15   minutes, and 42 seconds of designated trial time today.  An

16   hour, 47 minutes, and 6 seconds of that is chargeable to the

17   Plaintiff, and 51 minutes and 36 seconds are chargeable to the

18   Defendants.

19   Let me ask you, counsel, I understand we have a

20   deposition witness scheduled tomorrow regarding Rinzler.  I

21   heard in chambers this morning that you-all were going to work

22   out any disputes about designations or counterdesignations on

23   Rinzler.  Was that optimistic?  Has that happened?  Where are

24   we on that particular deposition?

25   MR. DYKAL:  I personally don't know, but I know we

1    are doing our best.

2              THE COURT:  Do you have any input on this,

3    Mr. Dacus?

4              MR. DACUS:  A person on our team who knows, Your

5    Honor, is not here, but we would be happy to email the Court

6    promptly and let you know the status.

7              THE COURT:  All right.  Well, I'll look for a report

8    along with the other possible issues that need the Court's

9    guidance based on the timetable I've already given you.  I

10   need you to be on time.  The kind of delays that we've

11   experienced up until now are just not acceptable.

12       Also I'll remind you that before I bring the jury in in

13   the morning, I will ask each side to go to the podium through

14   a representative and read into the record those items from the

15   list of pre-admitted exhibits used during today's portion of

16   the trial.  So be sure you have a team member prepared and

17   ready to do that before I bring in the jury in the morning.

18       Is there anything that either Plaintiff or Defendants

19   need to raise with the Court before we recess for today?

20              MR. DYKAL:  Nothing for Plaintiff, Your Honor.

21              MR. DACUS:  Nothing from us, Your Honor.  Thank you.

22              THE COURT:  All right.  We stand in recess until

23   tomorrow morning.

24              (The proceedings were concluded at 5:55 p.m.)

25

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2          CORRECT TRANSCRIPT FROM THE RECORD OF

3          PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4          I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5          FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6          COURT AND THE JUDICIAL CONFERENCE OF THE

7          UNITED STATES.

8

9          S/Shawn McRoberts       03/03/2025

10      _____DATE_____

          SHAWN McROBERTS, RMR, CRR

11      FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25