IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

TOUCHSTREAM TECHNOLOGIES, INC.,( CAUSE NO. 2:23-CV-059-JRG
                                )
         Plaintiff,             (
                                )
vs.                             (
                                )
CHARTER COMMUNICATIONS, INC.,   (
et al.,                         )  MARSHALL, TEXAS
                                (  MARCH 7, 2025
         Defendants.            )  8:30 A.M.
_____

VOLUME 5

_____

TRIAL ON THE MERITS


BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE
and a jury
_____

SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

A P P E A R A N C E S

FOR THE PLAINTIFF:    BOIES SCHILLER FLEXNER, LLP
                      1401 NEW YORK AVENUE, NW
                      WASHINGTON, DC 20005
                      (202) 274-1109
                      BY: MR. RYAN DYKAL
                          MR. JORDAN BERGSTEN
                          MR. MARK SCHAFER
                          MS. ANITA LIU

                      BOIES SCHILLER FLEXNER
                      55 HUDSON YARDS, STE. 2046c
                      NEW YORK, NEW YORK  10001
                      (212) 754-4541
                      BY: MS. SABINA MARIELLA

                      GILLAM & SMITH, LLP
                      303 SOUTH WASHINGTON AVENUE
                      MARSHALL, TEXAS  75670
                      (903) 934-8450
                      BY:  MS. MELISSA SMITH

FOR THE DEFENDANT:    ARNOLD & PORTER KAYE
                      SCHOLER, LLP
                      250 WEST 55TH STREET
                      NEW YORK, NEW YORK  10019
                      (212) 836-8132
                      BY:  MR. DANIEL REISNER

                      ARNOLD & PORTER KAYE
                      SCHOLER, LLP
                      601 MASSACHUSETTS AVE, NW
                      WASHINGTON, DC 20001
                      (202) 942-5797
                      BY:  MR. MARC COHN

                      ARNOLD & PORTER KAYE
                      SCHOLER, LLP
                      70 WEST MADISON STREET
                      SUITE 4200
                      CHICAGO, ILLINOIS  60602-4231
                      (312) 583-2394
                      BY:  MS. DINA HAYES

                      THE DACUS FIRM, PC
                      821 ESE LOOP 323, SUITE 430
                      TYLER, TEXAS  75701
                      (903) 705-1117
                      BY:  MR. DERON DACUS

OFFICIAL REPORTER:     SHAWN M. McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546

THE COURT:  Be seated, please.

Counsel, are there exhibits that were used during yesterday's portion of the trial from the list of pre-admitted exhibits that have not been previously read into the record?

MR. DYKAL:  I don't believe so, Your Honor.

THE COURT:  Well, let's find out.

MR. DACUS:  I'm being told, Your Honor, that there are none to read into the record.

THE COURT:  All right.  both sides believe that there are no additional items from the list of pre-admitted exhibits to read into the record.  Correct?

MR. DYKAL:  Yes, Your Honor.

THE COURT:  All right.  Let me say this to those of you that are present, particularly those of you behind the bar in the gallery.  The Court views its final instructions to the jury and counsel's closing arguments as the most serious part of an inherently serious process.  Consequently, I don't want people coming and going from the gallery, I don't want papers rustled, I don't want notes passed, I don't want whispering back and forth.  In other words, I want complete silence and, by all means, nothing that would interrupt or disrupt the Court's instructions or counsel's arguments or would in any way divert the jury's attention from what is going on.  So if there's anything you need to do that might possibly disrupt the process, do it now before I bring the jury in.

All right.  Mr. Estes, would you bring in the jury, please?

(Whereupon, the jury entered the courtroom.)

THE COURT:  Good morning, ladies and gentlemen. It's good to have you back.  Please have a seat.

Ladies and gentlemen of the jury, you've now heard all the evidence in this case, and I'll now instruct you on the law that you must apply.

As I've mentioned, each of you will have your own written copy of these final jury instructions that I'm about to give you orally, and you'll have these with you when you retire to the jury room for your deliberations, and you can review them and reflect on them then if you wish to.  Accordingly, there is really no need for you to take notes while I give you these instructions orally since you'll have your own written copy to review later if you want to.

Now, it's your duty to follow the law as I give it to you.  But on the other hand, and as I've told you, you, the jury, are the sole judges of the facts in this case.  Do not consider any statement that I have made over the course of the trial or may make in the course of these instructions as an indication that I have any opinion about the facts in this case.

Now, you're about to hear closing arguments from the attorneys for both of the competing parties.  Statements and

arguments of the attorneys, ladies and gentlemen, are not evidence, and they are not instructions on the law.  They are intended only to assist you, the jury, in understanding the evidence and the parties' competing contentions.

A verdict form has been prepared for you and you will take this verdict form with you when you retire to the jury room.  And when you have reached a unanimous agreement about the answers to the questions in the verdict form, you will have your foreperson fill in those unanimous answers in the verdict form, date the verdict form, sign it, and then advise the Court Security Officer you have reached a verdict.  Answer the questions as directed in the verdict form from the facts as you find them to be.  Do not decide who you think should win this case and then answer the questions to reach that result.  Let me remind you, your answers to the questions in the verdict form, ladies and gentlemen, must be unanimous.

Now, in determining whether any fact has been proven in this case, you may, unless otherwise instructed, consider the testimony of all the witnesses, regardless of who may have called them, and you may consider all the exhibits received and admitted into evidence, regardless of who may have produced them or used them during the trial.

You, the jury, are the sole judges of the credibility and believability of all the witnesses and the weight and effect to give to the evidence.  In deciding the facts in this case,

you may have to decide which testimony to believe and which testimony not to believe. You alone, ladies and gentlemen, are to determine questions of credibility or truthfulness as to the witnesses. And in weighing the testimony of the witnesses, you may consider the witness' manner and demeanor on the witness stand, any feelings or interest they may have in the case or its outcome, any prejudice or bias about the case that the witness may have, and the consistency or inconsistency of their testimony, considered in the light of the circumstances. Has the witness been contradicted by other evidence? Has he or she made statements at other times and places contrary to what he or she said on the witness stand? You must give the testimony of each witness the amount of credibility and weight that you think it deserves.

You must also keep in mind, ladies and gentlemen, that a simple mistake does not mean that a witness is not telling the truth intentionally. You should consider whether any misstatement was an intentional falsehood or a simple lapse in memory and what significance should be attached to that testimony.

Now, as I've previously told you, the attorneys in this case are acting as advocates for their competing clients, and they have a duty to raise objections when they believe evidence is being offered during the trial that should be not be admitted under the rules of the Court. When the Court

sustained an objection to a question addressed to a witness, you must disregard the question entirely, and you may draw no inference from its wording or speculate or guess about what the witness said if I had allowed them to answer the question. On the other hand, if I overruled an objection, then you must treat the answer to that question just as you would any other question and answer as though no objection had been made.  And by allowing the testimony or other evidence to be introduced over the objection of an attorney, the Court, in so doing, did not indicate any opinion as to the weight or effect of that evidence.

Now, at various times during the trial it's been necessary for the Court to talk to the lawyers outside of your hearing either here at the bench or by calling a recess and talking to them while you were outside of the courtroom.  This happens during trials because there are sometimes things that arise that do not involve the jury.  You should not speculate or guess about what was said during any of these discussions that took place outside of your presence.

Now, there are two types of evidence that you may consider in properly finding the truth as to the facts in this case.  One is direct evidence, such as the testimony of an eyewitness.  The other is indirect evidence, sometimes called circumstantial evidence--that is, the proof of a chain of circumstances that indicates the existence or the

non-existence of certain other facts.  As a general rule, ladies and gentlemen, the law makes no distinction between direct evidence or circumstantial evidence, but simply requires that you find the facts based on all the evidence presented, both direct and circumstantial.

Now, certain testimony has been presented to you in this case through what are called depositions.  A deposition is the sworn, recorded answers to questions asked of a witness in advance of the trial.  If the witness cannot be here in person to testify or if the rules of procedure allow otherwise, then the witness' testimony may be presented in the form of a deposition.

Before the trial began, the attorneys for the parties questioned these deposition witnesses under oath.  At that time, a court reporter was present, the witness was sworn, and their testimony was given under oath.  Deposition testimony is entitled to the same consideration as testimony of a witness who testifies in person in open court from the witness stand, and you should judge the credibility and importance of deposition testimony to the best of your ability just as if the witness had testified in person in open court.

Now, while you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience.  Let me say that another way,

ladies and gentlemen.  You may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and the evidence in this case.  However, you're not to base your decision on any evidence not presented by the parties during the trial.

Now, unless I instruct you otherwise, you may properly determine that the testimony of a single witness is sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if, after considering all the evidence, you believe that single witness.

Now, when knowledge of a technical subject may be helpful to the jury, a person who has special training or experience in that technical field--we call them an expert witness--is permitted to state his or her opinions on those technical matters.  However, ladies and gentlemen, you are not required to accept the opinions of any expert witness.  As with any witness, it's solely up to you whether or not to rely upon what they tell you.

Now, certain exhibits have been shown to you over the course of the trial that were illustrations.  We call these types of exhibits demonstrative exhibits, or simply demonstratives for short.  These demonstrative exhibits were a party's depiction, picture, or model to describe something involved in the trial.  If your recollection of the evidence

differs from the demonstratives, you should rely on your recollection of the evidence. These demonstratives are sometimes called jury aids, and they are not themselves evidence, but a witness' testimony concerning a demonstrative exhibit or using a demonstrative exhibit is evidence. These demonstratives, ladies and gentlemen, will not be available for you to review or consider during your deliberations in the jury room.

Now, in any legal action, facts must be proven by a required amount of evidence known as the burden of proof. The burden of proof in this case is on the Plaintiff for some issues and on the Defendants for other issues. And there are two burdens of proof that you will apply in this case. They are the preponderance of the evidence and clear and convincing evidence.

The Plaintiff in this case, Touchstream Technologies, Inc., which you've heard referred to during the trial simply as the Plaintiff or Touchstream, or you may have heard them called Shodogg, it has the burden of proof of proving patent infringement by a preponderance of the evidence. Touchstream also has the burden of proving willful patent infringement by a preponderance of the evidence. And Touchstream has the burden of proving damages for patent infringement by a preponderance of the evidence. A preponderance of the evidence means evidence that persuades you that a claim is

more probably true than not true.  This is sometimes talked about as being the greater weight and degree of credible testimony.

Now, the Defendants in this case, Charter Communications, Inc.  Charter Communications Operating, LLC, Spectrum Management Holding Company, LLC, Time Warner Cable Enterprises, LLC, Spectrum Gulf Coast, LLC, and Charter Communications, LLC, which you've heard referred to collectively throughout the trial as the Defendants or simply as Charter, has the burden of proving invalidity of the asserted claims by clear and convincing evidence.  Clear and convincing evidence means evidence that produces in your mind an abiding conviction that the truth of the party's factual contentions are highly probable.  Although proof to an absolute certainty is not required, the clear and convincing evidence standard requires a greater degree of persuasion than is necessary for the preponderance of the evidence standard. If proof establishes in your mind, ladies and gentlemen, an abiding conviction in the truth of the matter, then the clear and convincing evidence standard has been met.

Now, as I've previously told you, these two burdens of proof are not to be confused with a third and altogether different burden of proof known as beyond a reasonable doubt. That's the burden of proof applied in a criminal case and it has no application in a civil case such as this.  Beyond a

reasonable doubt is a higher standard or burden of proof than both the preponderance of the evidence and clear and convincing evidence.

Now, as I did at the beginning of the case, I'll first give you a summary of each side's contentions in this case, and then I'll provide you with detailed instructions on what each side must prove in order to win on each of its contentions.

As I've previously advised you, this is an action for patent infringement. Touchstream contends that Charter infringes certain claims of the patents-in-suit. Remember, there are three patents-in-suit: United States Patent 8,356,251, which you've heard referred to throughout the trial as the '251 Patent; United States Patent No. 11,048,751, which you've heard referred to during the trial as the '751 Patent; and United States Patent No. 11,086,934, which you've heard referred to during the trial as the '934 Patent. And you've heard these referred to and I will collectively refer to them as the asserted patents. I may also refer to them collectively as the patents-in-suit.

Now, Touchstream, the Plaintiff, contends that Charter, the Defendants, infringes the following claims of the patents-in-suit:  Claim 1 and 7 of the '251 Patent, claims 12 and 13 of the '751 Patent, and claims 17, 18, and 20 of the '934 Patent.  And these are collectively called the asserted

claims.  Touchstream contends that Charter has infringed these asserted claims by performing the methods described in these asserted claims to deliver media (such as video) to customers when using Send-To-TV in the Spectrum TV mobile application, and this functionality is sometimes referred to as Watch-On-TV, Flick-To-TV, or a similar, through Charter's servers, on Charter set-top boxes running certain guides. Now, I will refer to Charter's performance of these methods using its mobile application, servers, and set-top boxes as using the accused functionalities.  Touchstream further alleges that Charter's infringement of the asserted patents was willful.  Touchstream contends that it's entitled to money damages in the form of a reasonable royalty for Charter's infringement.  Touchstream seeks a reasonable royalty in the form of a running royalty.

Now, Charter denies that any use of the accused functionalities infringes any of the asserted claims.  Charter denies any willful infringement of the asserted claims, and Charter also denies that it owes Touchstream any money damages.  Further, Charter contends as a defense to infringement that the asserted claims are invalid for a lack of of an adequate written description.  Charter also contends that if any reasonable royalty is awarded, it should be in the form of a lump-sum royalty and not a running royalty.

Now, invalidity and infringement are separate and

distinct issues.  And your job, ladies and gentlemen, is to decide whether Charter has infringed the asserted claims, whether that infringement, if you find it, was willful, and whether the asserted claims are invalid.  If you decide that any claim has been infringed and is not invalid, you'll then need to decide the amount of money damages to be awarded to Touchstream to compensate it for that infringement.  If you decide that there was any infringement and it was willful, your decision on willfulness should not affect any damages that you might award.  The Court will take willfulness into account later, if you find it.

Now, before you can decide many of the issues in this case, you'll need to understand the role of the patent claims. The patent claims are those numbered sentences at the end of each patent.  The claims are important because it's the words of the claims that define what a patent covers.  The figures and the text in the rest of the patent provide a description and/or examples of the invention and they provide a context for the claims, but it is the claims themselves, ladies and gentlemen, that define the breadth of the patent's coverage. Each claim is effectively treated as if it were a separate patent, and each claim may cover more or cover less than another claim.  Therefore, what a patent covers depends, in turn, upon what each of its claims covers.

You'll first need to understand what each claim covers in

order to decide whether or not there is infringement of the claim and to decide whether or not the claim is invalid.  Now, the law says that it is my role to define the terms of the claims and it's your role to apply my definitions to the issues that you are asked to decide in this case.  As a result, and as I've explained to you at the beginning of the case, I have already determined the meanings of certain claim terms or language, and I have provided to you my constructions or definitions of those claim terms.  These definitions are set forth and included in your juror notebooks, and you must accept my definitions as to the words and the language in the claims as being correct.  It's your job to take these definitions or constructions and apply them to the issues that you are asked to decide, including the issues of infringement and invalidity.

And you should disregard any evidence at trial that contradicts or is inconsistent with the constructions and definitions that the Court has given you.  For claim limitations or language that I have not specifically defined or construed--that is, limitations I have not interpreted--you are to use and apply the plain and ordinary meaning of those limitations as understood by a person of ordinary skill in the art, which is to say, in the field of the technology of the patent, at the time of the alleged invention.  Now, the meaning of the words of the patent claims must be the same

when deciding both infringement and when deciding invalidity. And you've already been provided with copies of each of the three asserted patents, which are inside your juror notebooks and you may refer to them frequently during your deliberations, if you choose to.

Now, several times throughout my instructions I have and will refer to a person of ordinary skill in the field of the invention, or a person of ordinary skill in the art.  Here the parties agree that a person of ordinary skill in the art would have the equivalent of a four-year degree from an accredited institution (usually denoted as a Bachelor of Science degree) in computer science, computer engineering or the equivalent, with experience and with exposure to internet-based video delivery systems.  A person of ordinary skill in the art would also have approximately two years of professional experience with these topics.  Additional graduate education could substitute for professional experience, while significant experience in the field might substitute for formal education.

Now, the claims are intended to define in words the boundaries of the inventor's rights.  Only the claims of a patent can be infringed.  Neither the written description nor the drawings in the patent can be infringed.  And for infringement, each of the claims must be considered individually.

I'll now explain to you how a claim defines what it

covers.

The coverage of a patent is assessed on a claim-by-claim basis. In patent law, the requirements of a claim are often referred to as the claim elements, or they're referred to as the claim limitations. When a method meets all of the requirements of a claim, the claim is said to cover that method, and that method is said to fall within the scope of that claim. In other words, a claim covers a method where each of the claimed elements or limitations is present in that method, and if a method is missing even one limitation or element of a claim, the method is not covered by the claim. And if the method is not covered by the claim, that method cannot infringe that claim. A claim sets forth all of the requirements of the claim so that if something is not recited by the claim language, it is not required for infringement or invalidity.

And the beginning portion or the preamble of a claim often uses the word 'comprising'. The word 'comprising', when used in the preamble, means including but not limited to or containing but not limited to. When 'comprising' is used in the preamble, if you decide that the accused functionalities include all of the requirements of the claim, the claim is infringed. And this is true even if the accused functionalities contain additional elements.

For example, a claim to a table comprising a tabletop,

legs, and glue, would be infringed by a table that includes a tabletop, legs, and glue, even if that table also contains other structures, such as leaves that would expand the size of the tabletop or wheels that might go on the ends of the legs.

Now, this case involves two types of patent claims: independent claims and dependent claims.

An independent claim, ladies and gentlemen, sets forth all the requirements that must be met in order to be covered by the claim. It's not necessary to look to any other claim in the patent to determine what an independent claim covers.

On the other hand, a dependent claim does not itself recite all the requirements of a claim, but refers to another claim for some of its requirements. In this way the claim is said to depend from another claim. A dependent claim incorporates all of the requirements of the claim to which it refers, or stated alternatively, from which it depends. The dependent claim then adds its own additional requirements. So to determine what a dependent claim covers, it's necessary to look at both the dependent claim and any other claim to which it refers, or from which it depends. A method that meets all the requirements of both the dependent claim and the claim to which it refers is covered by that dependent claim.

Now, for the '251 Patent, claim 1 is an independent claim and claim 7 is a dependent claim that depends from independent claim 1. For the '751 Patent, claim 12 is an independent

claim and claim 13 is a dependent claim that depends from independent claim 12.

And for the '934 Patent, claim 17 is an independent claim, and claims 18 and 20 are dependent claims that depend from independent claim 17.

I'll now instruct you on infringement in more detail. If a person or a corporation makes, uses, sells, or offers to sell within the United States or imports into the United States what is covered by a patent claim without the patent owner's permission, that person or corporation is said to infringe the patent claim.

Now, in reaching your decision on infringement, keep in mind that only the claims of a patent can be infringed, and you must compare the asserted claims as I have construed them to the accused functionalities to determine whether or not there is infringement. And this, ladies and gentlemen, is the only correct comparison; a comparison between the asserted claims and the accused functionalities.

You should not compare the accused functionalities with any specific examples set out in the patent or Touchstream's own products in reaching your decision on infringement. In deciding infringement, the only correct comparison is between use of the accused functionalities and the limitations of the asserted claims as the Court may have construed or defined them. You must reach your decision as to each assertion of

infringement based on my instructions about the meaning of the evidence presented to you by both of the parties during the trial.

Now, you've also heard of independent development by Charter of its own app. Evidence of independent development is not relevant to the issues of infringement, but may be relevant to rebut Touchstream's evidence on damages and on willfulness. Additionally, you may not consider any alleged delay in filing suit when determining whether the accused functionalities infringe the asserted claims.

I'll now instruct you on the specific rules that you must follow to determine whether Touchstream has proven that Charter has infringed one or more of the asserted claims involved in this case.

A patent claim can be infringed even if the alleged infringer did not have knowledge of the patent and without the infringer knowing that what it did was infringement of the claim. A patent claim can also be infringed even though the accused infringer believed in good faith that what it did is not infringement of the patent. Infringement does not require proof that a party copied its method from the asserted claims. For purposes of finding infringement, the proper comparison is between the language of the asserted claims and the accused functionalities. The fact that Charter has its own patents is not to be considered when making this comparison.

And you must determine separately for each asserted claim whether or not there is infringement.  However, if you find that an independent claim on which other claims depend is not infringed, there cannot be infringement of any dependent claim that refers to or depends from that independent claim.  On the other hand, if you find that an independent claim has been infringed, you must still decide separately whether the accused functionalities meet the additional requirements of any claims that depend from that independent claim--that is, whether those claims have also been infringed.  A dependent claim includes all the requirements of any of the claims to which it refers, or from which it depends, plus the additional requirements of its own.

Touchstream only asserts method claims in this case. The fact that an apparatus or device has the capability of performing all the steps of the claimed method is not enough to establish infringement of a claimed method or a method claim.  In order to prove infringement of the asserted claims, Touchstream must show by a preponderance of the evidence that the use of the accused functionalities results in performance of each and every step of the claimed method.  In determining whether the use of the accused functionalities infringes a patent claim in this case, you must compare use of the accused functionalities with each and every one of the required steps of that claim to determine whether such use performs each and

every step recited in the claim.  Infringement of a method claim occurs only where all the steps of a claimed method are performed or are attributable to a single party.

A claim requirement is present if the accused functionalities perform the method just as it is described in the claim language, either as I have explained or construed that language to you, or if I did not explain it or construe it, as it would be understood by its plain and ordinary meaning to one of ordinary skill in the art.  If the accused functionalities do not perform any element recited in a claim, then you must find that the accused functionalities do not infringe.

So long as the accused functionalities perform each and every one of the claimed steps, infringement of that claim is shown, even if the accused functionalities perform additional steps not required by the claim.  However, if you find that even one element of a particular claim has not been performed by the accused functionalities, then you must find that the accused functionalities do not infringe that claim.

Touchstream also contends that Charter has willfully infringed the asserted patents.  If you decide that Charter has infringed, then you must go on to address and consider the issue of whether or not that infringement was willful. Touchstream has the burden of proving willful infringement by a preponderance of the evidence.  You may not determine that

any infringement was willful just because Charter knew of the asserted patents and infringed them.  While knowledge of the existence of a patent can be relevant to the question of willful infringement, you may not find the infringement was willful just because Charter knew of the asserted patents, nor can you find willful infringement just because Charter knew of a pending patent application.  However, you may find Charter willfully infringed if you find that Charter deliberately or intentionally infringed the asserted patent claims.

You may find that Charter's actions were willful if Charter acted in reckless or callous disregard of, or with indifference to, the rights of Touchstream.  A defendant is indifferent to the rights of another when it proceeds in disregard of a high or excessive danger of infringement that is known to it or was apparent to a reasonable person in its position.

To determine whether Charter acted willfully, consider all the facts and assess Charter's knowledge at the time of the challenged conduct.  Facts that may be considered include whether or not Charter reasonably believed that it did not infringe or that the asserted patents were invalid.

Your determination of willfulness, ladies and gentlemen, should incorporate the totality of the circumstances based on the evidence presented during the trial.  Willfulness can be established by circumstantial evidence.  And if you decide

that any infringement was willful, that decision should not affect any damages that you might award. The Court will take willfulness into account later, if you find it, as I have mentioned.

I'll now instruct you on the rules that you must follow in deciding whether or not Charter has proven that any of the asserted claims of the asserted patents are invalid.

An issued United States patent is accorded a presumption of validity based on the presumption that the United States Patent and Trademark Office, which you've heard referred to as the PTO or the Patent Office, acted correctly in issuing the patent. This presumption of validity extends to all issued United States patents.

Now, the fact that the PTO grants a patent does not necessarily mean that the invention claimed in the patent, in fact, deserves the protection of a patent. As I've just told you, issued United States patents are presumed valid under the law. However, a person accused of infringement has the right to argue here in federal court that a claimed invention in a patent is invalid. It's your job as the jury to consider the evidence presented by the parties and to determine independently and for yourselves whether or not Charter has proven that a patent claim is invalid.

In order to overcome this presumption of validity, Charter must establish by clear and convincing evidence that a

claim is invalid.

Claims are construed in the same way for determining infringement as for determining invalidity. You must apply the claim language consistently and in the same manner for the issues of infringement and for the issues of invalidity.

Now, Charter contends that the accused claims are invalid for failure to satisfy the written description requirement. Specifically, Charter contends that the asserted patents are invalid due to a lack of an adequate written description relating to non-internet video or non-internet content. This is the only invalidity theory presented in this case by Charter.

As I previously explained to you, to obtain a patent, one must first file an application with the PTO. And the process of obtaining a patent is called patent prosecution. The application submitted to the PTO includes within it what is called a specification. The specification is required to contain a written description of the claimed invention telling what the invention is, how it works, how to make it, and how to use it. The written description requirement is designed to ensure that the inventor was in possession of the full scope of the claimed invention as of the patent's priority date.

To succeed on its claims of lack of adequate written description as to the asserted claims, Charter must show by clear and convincing evidence that a person having ordinary

skill in the field reading the patent specification as of the priority date of that patent would not have understood that the specification describes the full scope of the invention as it is claimed in the claims of the patent.  If a patent claim lacks an adequate written description, it is invalid.

Now, in deciding whether the patents-in-suit satisfy the written description requirement, you must consider the description from the viewpoint of a person having ordinary skill in the field of the technology of the patent as of the filing date of the patents-in-suit, as I've previously instructed.  The specification, ladies and gentlemen, must describe the full scope of the claimed invention, including each element thereof, either expressly or inherently.  A claimed element is disclosed inherently if a person having ordinary skill in the field as of the priority date would have understood that the element is necessarily present in what the specification discloses.

The only proper comparison for evaluating whether a patent satisfies the written description requirement is comparing the specification to the claims.  You may not consider Touchstream's theories of infringement when deciding whether Charter has proven lack of adequate written description.

The written description does not have to be in the same exact words as the claim.  The requirement may be satisfied by

any combination of the words, structures, figures, diagrams, formulas, et cetera, contained in the patent specification. Adequate written description does not require either examples or an actual reduction to practice the claimed invention. However, a mere wish or plan for obtaining the claimed invention is not adequate written description.  Rather, the level of disclosure required depends on a variety of factors, such as the existing knowledge in the particular field, the scope and content of the prior art, the maturity of the science or technology, and other considerations appropriate to the subject matter.

If you find that Charter has infringed any valid claim of the asserted patents, you must then consider what amount of money damages, if any, to award to Touchstream.

I'll now instruct you about the measure of damages.  But by instructing you on damages, ladies and gentlemen, I am not suggesting which party should win this case on any issue.  If you find that Charter has not infringed any valid claim of the patents-in-suit, then Touchstream is not entitled to any money damages.

Touchstream has the burden to establish the amount of its damages by a preponderance of the evidence.  In other words, you should award only those damages that Touchstream establishes that it more likely than not suffered as a result of Charter's infringement.  While Touchstream is not required

to prove the amount of its damages with mathematical precision, it must prove them with reasonable certainty. Touchstream is not entitled to damages that are remote or that are only speculative.

As I've noted, every asserted claim in this case is a method claim. Damages for infringement of a method claim should be based on the products that were actually used to perform the claimed method or a reasonable approximation of the infringing use.

The damages you award, if any, must be adequate to compensate Touchstream for any infringement that you have found. You must not award Touchstream more damages than are adequate to compensate it for the infringement. And you must not include any additional amount for the purpose of punishing Charter or for the purpose of setting an example.

Now, the parties in this case agree that the damages period for any infringement of the '251 Patent in this case begin on February the 16th, 2017. The damages period for any infringement of the '751 Patent in this case begin on June the 29th, 2021. And the damages period for any infringement of the '934 Patent in this case begin on August the 10th, 2021.

Touchstream seeks damages in the form of a reasonable royalty, and I'll now instruct you on how to calculate reasonable royalty damages.

The patent laws specifically provide that damages for

infringement may not be less than a reasonable royalty.  If you find that Touchstream has established patent infringement and that Charter has not established patent invalidity, Touchstream is entitled to at least a reasonable royalty to compensate it for that infringement.

A royalty is a payment made to a patent holder in exchange for the right to use the claimed invention.  A reasonable royalty is the amount of a royalty payment that a patent owner and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time prior to when infringement first began.

In considering this hypothetical negotiation, you should focus on what the expectations of the patent holder and the alleged infringer would have been had they entered into an agreement at that time, and had they acted reasonably in their investigations.  In determining this, you must assume that both parties believed the patents were valid and infringed, and that both parties were willing to enter into an agreement.

The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation and not simply a royalty that either party would have preferred. Evidence of things that happened after infringement first began can be considered in evaluating the reasonable royalty only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation

just prior to the first infringement.  Although evidence of the actual profits of an alleged infringer may be used to determine the anticipated profits at the time of the hypothetical negotiation, the royalty may not be limited or increased based on the actual profits the alleged infringer made.

The law requires that any royalty awarded to Touchstream correspond to the value of the alleged inventions within the accused functionalities, as distinct from other unpatented features of the accused functionalities.  And this is particularly true where the accused functionalities have multiple features and multiple components that are not covered by the patent, or where the accused functionalities work in conjunction with other non-patented items.  If unpatented features contribute to the accused functionalities, you must apportion that value to exclude any value attributable to unpatented features.  You must determine the appropriate royalty rate and an appropriate royalty base that reflect the value attributable to the patented invention alone.  Touchstream bears the burden to establish the amounts attributable to the patented functionalities.

A reasonable royalty, ladies and gentlemen, is the amount of royalty payment that a patent owner and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time immediately prior to when the first

infringement began.

You may have heard reference throughout this trial to whether Touchstream should be entitled to a running royalty or a lump-sum royalty. If you find that Touchstream is entitled to damages, you must decide whether the parties would have agreed to a running royalty or a fully paid-up lump-sum royalty at the time of the hypothetical negotiation. So in addition to determining the reasonable royalty, you must also determine the type or form of royalty that Touchstream and Charter would have agreed to in a hypothetical negotiation regarding Charter's alleged use of the asserted patents.

Now one type of reasonable royalty is a lump-sum royalty. A lump-sum royalty is when the infringer pays a single price for a license to use the patent throughout the life of the patent. As such, a lump-sum royalty compensates the patent holder for damages for both past infringement and for future infringement throughout the life of the patent.

Another type of royalty is a running royalty. A running royalty is a fee paid for the right to use the asserted patent for each use of the asserted patents. If there are additional uses in the future, any damages for these sales will not be addressed by you. If you decide that a running royalty is appropriate, then the damages that you award, if any, should reflect the total amount necessary to compensate Touchstream for Charter's past infringement through the end of 2023,

understanding that Charter will still have to pay Touchstream for any use of the asserted patents after the end of 2023 and throughout the remaining life of the patents even though you should not have to factor those future amounts into any award that you may make in your verdict in this case.

In determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the alleged infringement began.

Some of the kinds of factors that you may consider in making your determination are:

1.  The royalties received by the patentee for licensing of the patents-in-suit, proving or tending to prove an established royalty;

2.  The rates paid by the licensee for the use of other patents comparable to the patents-in-suit;

3.  The nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold;

4.  Whether the patent owner had an established policy of granting licenses or retaining the patented invention as its exclusive right or whether the patent owner had a policy of granting licenses under special conditions designed to preserve its exclusivity;

25.  The nature of the commercial relationship between

the patent owner and the licensee, such as whether they are competitors in the same territory in the same line of business;

6.  The effect of selling the patented specialty in promoting sales of other products of the licensee, the existing value of the invention of the patent owner as a generator of sales of his non-patented items, and the extent of such derivative or convoyed sales --

7.  The duration of the patent and the term of the license;

8.  The established profitability of the product made under the patents, its commercial success, and its current popularity;

9.  The utility and advantages of the patented inventions over the old modes or devices, if any, that had been used for working out similar results;

10.  The nature of the patented invention, the character of its commercial embodiment of it as owned and produced by the licensor, and the benefits of those who have used the invention;

11.  The extent to which the infringer has made use of the invention and any evidence probative of the value of that use;

12.  The portion of the profit or of the selling price that may be customary in the particular business or in

comparable businesses to allow for the use of the invention or analogous inventions;

13.    The portion of the realizable profits that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer;

14.    The opinion and testimony of qualified experts as to what would be a reasonable royalty; and

15.    The amount that a licensor (such as the patent holder) and a licensee (such as the alleged infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement--that is, the amount which a prudent licensee who desired as a business proposition to obtain a license to the patented invention would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable to the patent owner who was willing to grant a license.

Now, you may have heard these factors referred to during the trial as the *Georgia-Pacific* factors.  No one of these factors is dispositive, ladies and gentlemen, and you can and you should consider the evidence that's been presented to you in this case on each of these factors.  You may also consider any other factors which, in your mind, would have increased or decreased the royalty the alleged infringer would have been

willing to pay and the patent owner would have been willing to accept, acting as normally prudent business people.

Comparable license agreements are one factor that may inform your decision as to the proper amount and form of the reasonable royalty award, similar to the way in which the value of a house is determined relative to comparable houses sold in the same neighborhood.

Whether a license agreement is comparable to the license under the hypothetical negotiation scenario depends on many factors, such as whether they involve comparable technologies, comparable economic circumstances, comparable structure, and comparable scope.  If there are differences between a license agreement and the hypothetical license, you must take those into account when you make your reasonable royalty determination.

The hypothetical license is deemed to be a voluntary agreement.  When determining if a license agreement is comparable to the hypothetical license, you may consider whether the license agreement is between parties to a lawsuit and whether the license agreement was a settlement influenced by a desire to avoid further litigation.

In determining a reasonable royalty, you may also consider whether Charter had commercially acceptable non-infringing alternatives to taking a license from Touchstream that were available at the time of the

hypothetical negotiation and whether that would have affected the reasonable royalty that the parties would have agreed upon.  A non-infringing alternative is a way of providing the same or comparable functionality or achieving the same or a comparable result that does not require using the asserted claims.

The party's asserting that there is a non-infringing alternative, here Charter, has the burden to show by a preponderance of the evidence that a proposed non-infringing alternative was available at the time of the hypothetical negotiation and during the damages period.  You should not consider for damages purposes any alternatives that Charter has not shown were available at the time of the hypothetical negotiation.

Now, with these instructions, ladies and gentlemen, we'll proceed to hear closing arguments from the attorneys in the case.

Mr. Dykal, you may present Plaintiff's first closing argument.  Would you like a warning on your time?

MR. DYKAL:  Yes, Your Honor--15 minutes, please.

THE COURT:  I'll warn you when you have used 15 minutes --

MR. DYKAL:  Yes, Your Honor.

THE COURT:  -- or when you have 15 minutes remining?

MR. DYKAL:  Fifteen minutes remaining.

THE COURT:  I'll warn you when you have 15 minutes remaining.

You may proceed with Plaintiff's closing argument.

MR. DYKAL:  At the beginning of this trial I stood up here and I told you it was about holding Charter accountable for its infringement and proving that the rules apply to everyone, even companies like Charter.

Now, I'm going to talk about the rules first.  The rules that apply in this courtroom are the patent laws of the United States of America.  As Judge Gilstrap told you, those patent laws come from the Constitution itself.

Mr. Green -- I'm sorry.

As Judge Gilstrap told you, those patent laws come from the United States Constitution itself.  The Constitution says, "Congress shall have the power to promote the progress of science and useful arts by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries."

Now, right after our Constitution was signed, our very first president, George Washington, told Congress we needed to pass patent laws.  George Washington wrote that to grow this country, we need to encourage new invention by those with the, quote, skill and genius in producing those inventions.  President Washington signed our first patent laws into effect on April 10th, 1790, almost exactly 235 years ago today.  235

years later, we came to this court to protect the genius and the skill of Mr. Strober by asking the jury to faithfully apply the patent laws of the United States to the facts in this case.

Is there any really doubt that Mr. Strober possesses those skills that George Washington talked about?  Mr. Strober took the stand and swore an oath and he told you his story.  Do you remember what he said?  He said he always wanted to be an inventor and he always wanted to start a business.  He told you that when he was a kid he bribed his older brother Michael with a slushy to take him to 7-Eleven so he could buy that computer magazine and program that Tic-Tac-Toe game and how satisfying he found that.  He talked about the degrees he got, the technical degrees and the studying he did of web technologies that eventually took him to a community college to teach web technology to others.  Those are the very skills that George Washington was talking about when he urged Congress to pass our first set of patent laws.

George Washington also talked about protecting genius. Mr. Strober told you about his moment of genius.  Do you remember that?  He was teaching a class -- well, he'd been thinking about this problem for months and months.  Remember the problem?  He was in the cafeteria, and he had his phone and those new TVs, and he was thinking, I should be able to get my video content from this phone to that TV.  But how can

this be done?  There are so many different models of phones, so many different TVs, they don't know the other exists--how can you make this work.  And he thought about it obsessively month after month after month.

And then he had his moment of genius.  He was teaching his class and up at the chalkboard he was drawing that line up to the server and it hit him.  Remember he said it was his 'aha' moment.  In that moment he knew how to solve the problem.  Then he spent the next month and a half after class after work programming, trying to make that prototype. Mr. Strober's 'aha' moment is that genius that President Washington sought to protect with the patent laws of this country.

Then what did Mr. Strober do?  He built that prototype obsessively.  And remember when he finally got it working, he said he got the chills and how proud he was that he got it working.

Now, one thing I do want to point out is that when Mr. Strober was on the stand we showed you the code for that prototype.  That's evidence.  We're not asking you to take our word for it, even though I think Mr. Strober is completely credible.  We brought that to court and we showed it to you.

Then what did Mr. Strober do?  You heard that he had to show it to his big brother Michael.  After talking to his brother, he felt that he had to get it patented, so he went

out and he found a patent attorney, one that had worked for some of the biggest technology companies in the country, and then he took almost all of his savings and he paid that lawyer and he paid the Patent Office fees to apply for that patent.

Think about the courage that decision took.  A two-year-old daughter at home and he had a stable job.  He talked to his wife and she said, You have to go for it; you've always wanted to do this.  So he took his savings and he applied for that patent.  That, ladies and gentlemen, is the American dream.

Then what happened?  He didn't just sit around waiting for that patent to issue; he wanted to make that dream a reality.  He met with successful business people, people that knew how to license technology and how to market it.  You heard the testimony from those people.

Jamie Cohen.  Remember Jamie Cohen worked with Michael Strober, David Strober's brother.  Jamie Cohen said he came into Michael Strober's office and Mr. Strober showed him a demo.  Then do you remember what he said?  As Mr. Strober left to got to the bathroom, he stopped him, pulled out his checkbook, and said, I want to invest in this right then and there.  Why?  Because he said it was magical.

Herb Mitschele and Michael Rinzler, Jamie Strober -- Jamie Cohen introduced them to Michael Strober.  They saw the demo and they did the same thing; they couldn't believe how

cool it was, and they knew they immediately needed to do this.

What do those facts tell you?  Charter says Mr. Strober's invention wasn't that great.  Maybe it just wasn't worth that much.  Does that ring true with facts of this case?  All of these successful business people quitting their jobs, spending their savings, joining Mr. Strober to start this company, does that ring true to you?

And remember what every single one of these people said about why they had the comfort and the confidence to make that decision--because they believed in the patent system to protect the risks that they took.

We are here to prove that the patent system works; the bargain that you make when you file for a patent will be upheld.

Now, I've been thinking a lot about this case over the last week, and something occurred to me last night. Mr. Strober said he spent months and months thinking about how to solve this problem.  Remember, obsessively after he realized he wanted to do it and there was nothing out there like it, he kept thinking about it and thinking about it.  But once he had his 'aha' moment, it only took him a month and a half to program the first prototype.

Now, ladies and gentlemen, that's the patent bargain. The patent bargain, if you remember, you tell the world about your invention and in exchange you are protected by the patent

laws of the United States.  Mr. Strober could have kept his invention secret, his 'aha' moment, and tried to build a business like that, but that's not what he did.  He made a choice to apply for a patent to tell the world how his 'aha' moment worked.  In exchange he's asking for protection.

This is the protection Mr. Strober received.  These are his patents.  The Patent Office examined them for years, issued them, and mailed him these ribbon copies.  These are the official copies.

Now, when the Patent Office decides you deserve a patent, it will give you a monopoly on that invention, 20 years. Mr. Strober filed for his patents in April of 2011.  Twenty years after that is 2031.  He's got six more years on these patents and then the whole world can use them for free. That's the bargain.  But until then he has the right to this invention and no one else.

Now, the thing is, as I mentioned, once Mr. Strober filed for his patent the whole world can see his 'aha' idea.  It's right there in black and white.  You saw the drawings, you saw the columns and columns of text teaching people, one of ordinary skill, how to build Mr. Strober's invention.  They didn't have to spend all that time thinking about it.  They didn't have to have that 'aha' moment; they could just look in the patent and see it.

And I think what happened in this case is sort of like a

puzzle or a riddle.  When someone shows you a puzzle or they tell you a riddle, the whole point is that it's hard to think of what the solution is at first.  You can sit there and think and think and think.  Once you hear the answer, you go, Right; of course.  Well I think that's what happened here.  You heard about Touchstream, after they got their patents they met with over a hundred companies.  And yes, sadly, only about four of them actually made a deal--Quadriga, HP, Mash Music, and Fetchit.  The rest of them -- maybe some of them went on their way and never thought about it again.  But the thing is once they saw the solution Mr. Strober came up with, they could have built it in a couple of months.  They knew how to do it.

And remember the Touchstream founder said that they'd always say that their invention was patented or patent pending?  Remember the slide that was shown in the deck prepared for Time Warner Cable showing Mr. Strober's patented architecture?  It shows the mobile device and a server and it shows the television and it talks about the universal API and it talks about the programming code and the software.  Those related to the claims in this case.

Now, Charter, too, had a choice after it met with Touchstream, and I think we know the choice Charter made.  Mr. Strober, Herb Mitschele told you they didn't start Touchstream to end up in this courtroom.  They wanted a business to be successful and they believed in the patent

system to help them make that happen.  That's -- being here in this courtroom, that's not the American dream.  Charter took that away from them.  But here we are and we are counting on the Seventh Amendment and our right to a trial by jury to try to make it right, as right as it can be.

Now, thankfully, you heard from Mr. Strober and Mr. Mitschele that they had the drive and the follow-through to keep it going.  Some companies don't.  If someone takes their invention, maybe they don't have the resources or the follow-through to pursue it all the way.  But Mr. Strober had the courage to come in here and tell his story to protect his property rights.  What did Charter do?  They belittled him. They said his invention wasn't worth anything, they were bad at business, maybe the demos failed sometimes, and now they even want to take his patents away by claiming they're invalid.

All right.  So now I want to talk about the job that you have to do when you go back to deliberate.

You will have a verdict form and I'm going to walk through it to talk about how to do your job.

Can I use the elmo?

This will be your verdict form.  The first questions you have to answer relate to infringement.  "Did Touchstream prove by a preponderance of the evidence that Charter infringed claims 1 and/or 7 of the '251 Patent?"  Preponderance of the

1147

evidence.  Remember Lady Justice, the scales?  Preponderance of the evidence is a feather on the scale in favor of Touchstream.  That's all we need.  We have provided you with evidence that absolutely proves that, way more than a feather.

I'd like to talk a little bit about some of that evidence.  To help you with your task, we brought in Dr. Steve Wicker.  Dr. Wicker has the experience necessary to help you do your jobs.  He has the degrees, he worked for Texas Instruments and AT&T and Motorola, and he told you how to do -- how he did his analysis.  He compared the claims to the accused products.  Then he showed you the evidence, and there was a lot of it.

You've got the Touchstream patent documents, all of the patents, you've got the claim constructions from this Court, you've got the internal documents we were able to get from Charter after we filed this lawsuit, the architecture diagrams, the call trace he put on that board and walked you through, the source code that he found for those set-top boxes.  You heard sworn testimony from Charter's witnesses and engineers talking about how that functionality worked.  And Dr. Wicker told you about the testing he did with the app to see that that functionality was really performed.  This is some of the information he provided.

This is Charter's architecture.  You see over on the left he talked about No. 1, user application--that's the mobile

phone; No. 2, the IPVS servers, that's the server configured in the way that Mr. Strober conceived.  On the right side are the set-top boxes, the various different kinds.  And remember he talked about you have multiple apps for different kinds of phones.  You have the server that can translate the commands, the universal commands that come from the phone so that each of the set-top boxes can understand it.  That's Mr. Strober's invention.

Dr. Wicker applied that evidence to every single element of the claims, and he checked them off one by one, and it took I think almost two hours, maybe over two hours.  But he did the work and gave you the proof.  He walked through claim 18 and 20.

Then he went to the '751 Patent and he did the same thing.  Remember he said a lot of these elements are very similar to the '251, but there's a few that are different, and he walked you through those.  He explained why they're different and he showed you the evidence and applied it to those differences.

He did it with the '251.

All of the claims were proven by preponderance of the evidence easily by Touchstream.

And what was Charter's response?  They said they don't infringe for three reasons.  First, they talked about the code.  Remember the MAC address that the manufacturer puts on

that set-top box?  And they said, Well, we don't do it, the manufacturer does.  But look at what the testimony was, the evidence.  Charter's witnesses said when a set-top box is first plugged into Charter's network, it tells Charter, Here's my number, my special code, so that the information can get through the network to me.  And what does Charter's network do?  It assigns that code to that set-top box within the network so that later when the phone wants to send a message to the set-top box to play that video, it knows where to go.

I kind of think of this argument, like when you're born you're assigned a social security number by the Social Security Office.  That's your original assignment of that number.  When you go to get a driver's license, some states will use that social security number for your driver's license number.  Charter would say the DMV didn't assign that number to that driver's license because the social security did it first.  The claims don't say first assigning a number; they just say assigning.  The manufacturer gave it the number, and after that the box tells Charter's network it assigns it for the purposes of infringement.

Dr. Wicker showed you his testing.  On the left there's a screenshot of the app he tested.  And you see that number circled in red?  It's the same number over on the right, the MAC address of that set-top box.  Charter's network told the app, Here's the number you can use to cast to that box.  When

a customer taps the cast button, the Watch-On-TV, that number takes those messages--it's like an address on an envelope--it goes through Charter's network and Charter's network knows which box to send it to.  That's part of Mr. Strober's invention.

Charter also said, Well, these aren't universal commands.  That's its second excuse.  But actually I noticed something.  Dr. Shamos admits that DVR uses 'play'.  There's no question that's a universal command.  So DVR infringes.  That means Charter infringes even under their own expert's testimony.

Then Dr. Shamos said 'flick' isn't a universal command; only Charter knows that, only Charter uses that word; I've never heard that before.  Well, two points on that.  First, that's not what 'universal command' means.  Do you recall when Charter was questioning Dr. Wicker, they analogized a universal command to a universal remote.  A universal remote can control all the different kinds of TVs.  The actual signals that come out of that remote, do you think those are universal, that everyone would understand the infrared beeps coming out of that remote?  No.  It's universal because it can control many TVs.  That flick command, whether you're using an iPhone or an Android phone, a Samsung Galaxy, if you put that Charter app on there, they all use the word 'flick'.  And that's universal across every set-top box because that IPVS server gets a flick command, using Mr. Strober's technology it

1151

says, Okay, which set-top box am I talking to and what specific code do I need for that box.  That's what makes 'flick' universal.

I'd also like to point out one other thing I noticed. Dr. Shamos said he'd never heard anyone use the word 'flick' before in this context, but look what is right here in the '934 Patent.  You see this?  This is a piece of prior art that the Patent Office looked at before issuing Mr. Strober's patents.  "The web to your TV with a flick of a wrist."  It is simply not credible.

Then you heard from Dr. Wicker.  He said, "What is your understanding of what 'flick' means?

"It just means play.

"It's just a synonym for play?

"Yes."

That was Charter's second infringement excuse.

Its third infringement excuse, if you remember, they said they don't use media players, they said they don't use software for playing media; they use hardware.  Well, Dr. Wicker showed you the files that do the playing of that media, and they're called TVplayer.java, VODplayer.java, DVRplayer.java.  Dr. Shamos admitted that java is software. There's no question there's software.  Their position is it's not software for playing media.

But Dr. Wicker said something really important.  "Is it

1152

pretty common for computer systems and computers to have both hardware and software?

"Yes.  In fact, software needs hardware on which to run, and most complicated hardware requires some software to control it."

"Okay.  So a media player can exist in software and it just tells the hardware how to decode?

"That's exactly right."

David Strober said something very similar.  "And what do you understand hardware to mean?

"Hardware are the physical devices that are what performs the functions.

"And what do you understand software to mean?

"Software is basically the instructions that tell the hardware what to do.

The hardware are the chips and the memory, the things in your phone.  If you were to open up that set-top box, there's all sorts of hardware in there.

THE COURT:  You have 15 minutes remaining.

MR. DYKAL:  Thank you, Your Honor.

The software is what tells that hardware what to do.

And this is a diagram Dr. Shamos used.  He admitted the software tells the hardware to play.  That's what software is. It is software for playing media.  It says, Hardware, start playing this media.  Without it it wouldn't work.  Even

1153

Dr. Shamos admitted that TVplayer.java is involved in playing live TV.

So all of those excuses don't add up.

We proved that every claim is infringed. So when you go back to do your job, you can take this verdict form and you can check 'yes' to each and every question. They are absolutely infringed by way more than a feather.

The next question, "Did Charter prove by clear and convincing evidence that the claims are invalid?" First of all, remember, patents are presumed valid. Sitting here today the Patent Office looked at these patents, examined them for years, and sent them to Mr. Strober. Sitting here today, they are valid. And Charter's burden is much higher than ours. They have the burden to prove by clear and convincing evidence. They need a boulder on the scale, not a feather.

You remember Dr. Shamos' testimony here? He said that content would only come from the internet; no one would understand that it could come from a private network. Well, that is simply not credible. Remember the patent said that that doesn't have to be the internet; that bubble could just be a network. Dr. Wicker noted that Dr. Shamos skipped over various passages. And Herb Mitschele told you that Touchstream's technology could cast to set-top boxes even content that wasn't on the internet. That is not a credible argument.

1154

Willfulness.  Willfulness is another thing that Touchstream needs to prove by a preponderance of the evidence, a feather on the scale.  If you look at the instruction, it says that all we need to show is that Charter acted recklessly.  Well, I think that's pretty obvious.  David Bell: "And then Comcast demoed this app to Time Warner Cable executive" -- I'm sorry.  Wrong slide.

Herb Mitschele told you he always referenced the patents.  Charter knew about those patents.  We showed you the Time Warner Cable slide deck that said patent pending architecture with the diagram.  You can find that in your evidence.  Here it is.  Now, you may need to see -- you may need to look at this when you're back there, so if you want you can write down JTX 8.  That is the exhibit that shows the slide presentation that Touchstream presented to Charter.  And if you look at that Shodogg method, you see the patented architecture.  The competitors' method, there's no server in between.  Do you see that?  Mr. Strober's method, you've got the server in between.  And look at the advantages--universal API, swappable media player, unique sync technology.  Those are all of the things we've been talking about.  Touchstream told the world about its invention because it believed in the patent system.

Then you heard testimony the video of Alan Lui.  "You don't have any knowledge of Time Warner Cable putting

protections in place to avoid replicating Shodogg's technology after being presented on Time Warner Cable pitch day."

That's correct."

That's the official testimony of Charter.  He was one of the special kind of witnesses that Charter picked to say this is what we -- this is our official position.

All of those witnesses told you that they always said it was patented.  Then we saw emails.  These are emails between the companies.  "I would like to set up a time to talk with you guys."

"Interested in learning more about Shodogg."

"They did a great job presenting to our division."

And remember, internally they didn't copy Shodogg on this from Greg King to Peter Stern.  Peter Stern's the big important executive.  "It's good for our engineers to be thinking about it for a future revision of Hydra or the Time Warner Cable TV app."

This is the timeline.  Mr. Strober files for his patent rights and then the parties start meeting.  For all those years they met again and again and again, and then in 2016 Charter launches that infringing application.

So we think it's easy by a feather on the scale to check 'yes' to all those questions.

That was invalidity.  I'm sorry.  Invalidity is 'no'.  Forgot to check my boxes.  Invalidity is 'no'.  Charter can't

1156

prove that by clear and convincing evidence.

Willfulness is 'yes'.

Now, damages.  To prove damages we brought in Dr. Russ Mangum, and he showed you his job.  He found -- what is a royalty base?  That's the number of infringing units.  And what's the royalty rate?  That's how you calculate your royalty damages.

He started with the Quadriga agreement.  That was a real deal between two parties.  Quadriga did the right thing.  They were willing to make a deal.  They didn't violate the patent laws.  We talked about it.  It's 48 cents a month.  That's JTX 12.  You may need to use that.

Dr. Mangum talked about the reasons Time Warner Cable would have wanted this technology, the benefits that Shodogg told Time Warner Cable.  Spectrum's webpage today says this is one of the five awesome features, Send-To-TV feature.  It's still up.

Dr. Mangum subtracted out the uses that aren't infringing.  We're not asking for money for internet customers, we're not asking for damages for phone customers; we are asking for the license for the cable customers that have this feature, they have it in their bundle, they can use it, and they do--22 percent of them.  Dr. Mangum did all that work to confirm the royalty.

Mr. Mitschele told you that running royalty made sense.

If you roll it out and you don't end up using it very much, you don't have to pay very much.  But if you use it a lot, if you have 15 million customers, you end up paying a lot.

Dr. Mangum talked about the extent of the use, and then he applied the formula.  This is another exhibit you may want--PTX 002.  This is a Charter internal document showing the number of customers.  And then you can do the calculation.  929,944,276 subscriber months multiplied by 48 cents equals $446,373,253.  Those numbers Charter doesn't even dispute.  Chris Bakewell said he agreed those are the right numbers.  And when you add them up up all over time it adds up.

And then he said, If you actually wanted to count the numbers of rooms, you have to count the additional set-top boxes.  Some customers have a cable box in their living room and one in a master bedroom and one in another bedroom.  On average, it's a little over 2.5, I think 2.54 per customer.  So you take that original number, the 446, and you multiply it by 2.54, and that's how you 1,131,743,280 with mathematical precision.

Charter continues to infringe today.  I'm going to talk about the running royalty question.  At the bottom, lump sum or running royalty.  Touchstream wants a running royalty and here's why.  Our damages are only calculated through 2023.  Charter has infringed all through 2024 and is still infringing today.

And running royalty makes sense for both of us.  If Charter really doesn't want this feature, turn it off and you don't have to pay us anymore.  That's why running royalty makes sense.  But if they keep it on, then they owe us 48 cents.  It's that simple.  So check that running royalty box.

All right.  Ladies and gentlemen of the jury, I just want to thank you again.  I've been watching and you have been paying attention, you've been taking notes, and we really appreciate that.  This case is very important to Touchstream and very important to Mr. Strober.  Thank you.

THE COURT:  All right.  Defendants may now present their closing argument to the jury.

Would you like a warning on your time, Mr. Dacus?

MR. DACUS:  Yes, Your Honor.  Would you please let me know when I have 15 minutes and then five minutes remaining?

THE COURT:  I will do that.

MR. DACUS:  Thank you.

THE COURT:  You may proceed with Defendants' closing argument.

MR. DACUS:  Thank you, Your Honor.  May it please the Court.

Good morning.  I want to start this morning where I hope I've started with you each time that I've had an opportunity to talk with you, and that is to say a very sincere thank you

on behalf of the men and women who work at Charter and on behalf of myself for giving them an opportunity to defend themselves.

And I want to be really clear here. The thank you that comes from the folks at Charter, the folks that are here, from Mr. Frusciano, the thanks is unconditional. It's not conditional on what your verdict is. When we had jury selection on Monday, we talked about when you're falsely accused of doing something, the only thing you want is an opportunity for somebody to take the time and listen to your side of the story and then let the chips fall where they may, and that's what you've provided to Charter is an opportunity to present you with what they think the actual facts are.

I told you on Monday, we wouldn't be here, Charter wouldn't be here if this case wasn't important. This case is important. I'm sure you know by now this case is very important to Charter as a company. And, in fact, it has broader ramifications. We seem to agree that protecting the purpose of our constitutional patent system and the purpose behind it--that is, to promote science--is absolutely at the forefront of what we should be doing here.

And you remember on Monday I asked you to think about as we went through this case whether or not what's going on here is actually about the promotion of science. And we really have two fundamental principles involved in this case that the

way it's set up the jury's here to protect.  The first is when you receive a patent, just like a deed of land, you get a very specific grant, very specific piece of property; in our example, 21.4 acres.  And you don't get to move the fence on your property to try to capture others just because you think by doing so you might get hundreds of millions of dollars.

The second thing you can't do is you can't claim in your patent more than what you actually described, and as the Judge just read to you, told the world how to specifically do the process.  The bargain that you make as a patent owner is you promise the Government that you will fully describe everything that you intend to claim, and if you don't, then you haven't given a full written description and your patent's invalid.

Now, we're going to talk about the details and the technical details in this case, but I think, as much as in any case I've seen in a long time, the history of Touchstream and specifically the history between Touchstream and Charter put these technical details that we're going to talk about into context, and ultimately they support what Charter says in this case.

I don't -- some of this is going to be a rehash of what I said to you in opening that the evidence has now shown you, but you know this case.  I mean, this company Shodogg started with Mr. Strober's invention, with his idea that he wanted to take his internet video that he was watching on his phone,

find a way to stream that or cast that onto a larger screen. He didn't want to use the mirroring concept; he wanted to find a different way to put that on the screen.  And what these folks told you in opening, what Touchstream's lawyer told you in opening, and, frankly, Mr. Strober said it on the stand, is that he invented casting.  Remember, actually Mr. Dykal wrote that on a piece of paper--we're going to show you that we invented casting.  And it was, to be candid, the first exaggeration that they made in this trial.  Because although Mr. Strober has a patent, he did not invent casting.  And you now know that for a fact.

You remember when he was on the stand and I cross examined him?  I showed him that patent from that gentleman by the name of Redford.  And we all agreed, including Mr. Strober, that the Redford patent came significantly before his and it involved casting.  It had a phone where you make a selection of a video content, it passed through a computer server, and then went to a television.  These lawyers knew that when they told you that he invented casting.

They knew it for another reason, and so did Mr. Strober, candidly.  Remember when he first applied for this patent?  By his own admission, the Patent Office said no and rejected his application; said it wasn't new.  Only after he added this synchronization code did they allow it.

And by his own admission he didn't invent synchronization

1162

codes.  He took this invention or prototype that he had, he showed it to Mr. Mitschele, Mr. Rinzler, Mr. Cohen in that bar 48 Lounge in New York City and they started a business.  And I won't belabor the point, but you now know they had a consumer app, they had a business app, they add an app for a hotel, and none of them were successful.

And from my perspective, perhaps the most compelling piece of evidence in this case is they took this idea to over -- by their own admission, to over 100 media and cable companies.  Let's be clear.  Counsel said they took it to a hundred companies.  No, they took it to 100 media and cable companies, and every one of those said no, every one of them.

Now, it is true that they got a contract related to a hotel, they got a contract with HP related to the business app, but all media and cable companies said no to the idea.  And so in 2017 it was clear that the marketplace in the industry did not see the value or the benefit in this invention.  So in 2017 Touchstream said, We'll just turn to the courthouse, and that will be our sole business going forward.  And so some eight years after we had last heard from them, in 2023 they sued Charter.

And we now know a few things about this lawsuit we didn't know when I presented in opening to you, and that is none of these founders of Touchstream are paying anything for this lawsuit.  None of them are out a penny for it.  You heard

Mr. Mitschele say that expressly from the witness stand. They do, however, stand to profit a lot. Mr. Strober we know has more than five percent interest in any award; more than $50 million potentially to come from this lawsuit to him, by his own admission.

Mr. Mitschele, by his own admission, stands to recover more than a hundred million dollars. And maybe I'm the only one in the courtroom that found this odd or interesting, but Mr. Mitschele, when I asked him, Are you going to at least hang around for the trial, he said no. He left. And he did; he left. If I thought that these folks at Charter had actually wronged me, I think I'd hang around for the trial and see what they say on the witness stand, see what the jury actually says about whether or not Charter actually wronged.

So from the founders' perspective, this is essentially, if we're just talking candidly, a chance to take a wild swing, they're not out any money, see if you can hit a home run. Maybe you can get a jury who doesn't look at the facts and the evidence, maybe you get a jury who follows the speech about an American dream, or maybe you get a jury that doesn't look at the facts and evidence; instead looks at big versus small. But Charter said, No, we have the right to defend ourselves, and that's what they planned to do.

Now, these meetings between Charter and Touchstream, you remember in the opening what Touchstream's lawyer said to you

is that Charter was stringing along Touchstream--you remember that?--and left you with the impression that Charter was coming to Touchstream and trying to essentially milk them for information.  You now know that's not at all accurate.  You know from Touchstream's own mouth, from Mr. Mitschele's own mouth, that Charter did not reach out to Touchstream a single time; not one time.  Each time from 2011 to 2015 it was Touchstream reaching out to Charter, beginning with what Mr. Mitschele said was a 30-second ambush of a gentleman by the name of Chris Cholas who worked at Charter and ending by Mr. Mitschele having one of his executive friends in the media company reach out to Peter Stern and set up a meeting With Mr. Stern, who Mr. Mitschele said was a powerful person in that business, and then Mr. Mitschele said he didn't remember anything about the meeting.

So contrary to Touchstream's claim that Charter was stringing them along, it was Touchstream reaching out through paid consultants, paid PR people, asking Charter to meet.  And look, there's nothing wrong with that.  There's nothing wrong with a start-up company or beginning company being diligent and trying to pursue that.  But there is something wrong with coming to Court and saying to a jury that Charter was pursuing Touchstream when it's not at all, not at all factually accurate.

At the end of the day, you know and you heard from

Mr. Lui that Charter was not interested in Touchstream's technology. In fact, Charter had independently developed its own app.

And I think it's important to remember what Touchstream was saying to Charter in these meetings and, frankly, in every meeting that Touchstream had. You heard Mr. Mitschele say this is the pitch that they gave to everyone, to those hundred-plus companies. They said, We have a technology that allows any mobile device, so any phone, to connect and share any digital content to any other internet-connected screen. That's how they -- that's what they told folks the value was--Hey, if you've got a TV that is connected to the internet, we've got the solution for you. That's exactly what their patent said.

But Charter knew, and you heard it from Mr. Lui, Charter didn't need that type of system. Charter didn't want that type of system. Charter's content is cable content, be it video-on-demand or live cable television or DVR, Charter only plays Charter content. In fact, you heard -- I don't know if you remember this, but Mr. Lui said, The thing that Shodogg was pitching was actually the opposite of what we wanted. We don't want internet streaming in through Send-To-TV and competing with our Charter cable content. And that makes absolute sense.

And I think this is critically important in the case.

This is JTX 4.  So if you wanted to look at it when you go back, you can.  You've heard what Charter says today, that we didn't need or want their technology.  This is an email from 13 years ago from Mr. Lui to his boss after Mr. Lui had met with Touchstream multiple times, and he said then exactly what we say now--Hey, these Touchstream people, maybe they have something for a hotel, maybe; but for us, they're not solving any problems for us.  So when the Judge says to you in his instructions, Look to see if people testify and say things consistently over time, Charter is saying today what it said 13 years ago--we neither need nor want this technology.

And one of the reasons Charter didn't need it is Charter had developed its own remote control app on its iPad or on an iPhone, or on any phone, before it ever met Touchstream.  By 2011 it had the features that are actually being accused today.  And let's be clear on this.  Touchstream keeps putting up this timeline and saying that what they accused is in 2016, and they show all these meetings and then they say the app is in 2016.  And of course, the impression they want you to leave you with is we took something from them and incorporated it in 2016.  But you heard from Mr. Bell, from Mr. Frusciano--what they accuse in 2016 existed in 2011.  The app that they accuse, the Send-To-TV in 2016, these same features were the same in 2011.  With those -- despite those facts, they brought this lawsuit in 2023.

And now that they have, there are potentially three questions that you answer as jurors--infringement, invalidity, and damages, if you were to reach them.  I'm going to start at the bottom and I'm going to talk about damages.  And I will say to you very candidly, what they teach you in law school is if you are being sued and somebody's asking for money, you don't talk about money.  But in this case I'm going to violate it because do you remember what I asked you to do on Monday as it relates to damages?  I told you I wasn't going to talk about it.  But I told you and I asked you, Please listen to the methods, the methods that these folks use to get to these hundreds of millions of dollars that they ask for.

THE COURT:  Mr. Dacus, I hate to interrupt, but approach the bench, please.

Counsel, approach the bench.

(The following was had outside the hearing of the jury.)

THE COURT:  I have a juror who tells me she's having an emergency and we have to take a short break.

MR. DACUS:  That's fine.

THE COURT:  I hate it, but I don't think we have any alternative.

MR. DACUS:  I understand.

MR. DYKAL:  Thank you.

(The following was had in the presence and hearing

of the jury.)

THE COURT:  Ladies and gentlemen we're going to take a very short recess.  Please leave your notebooks in your chairs, follow all my instructions, and we'll have you back in here just as soon as possible to continue.

The jury's excused for recess.

(Whereupon, the jury left the courtroom.)

THE COURT:  Be seated, please.

For the record, I've received a note from one of the jurors that they had a need to visit the restroom and it was an emergency.  I don't know that I've ever broken a closing argument like this before, but when I'm told it's an emergency I have no choice.  I regret the disruption.

I will note that the staff tells the jury in advance of closing and final arguments that there will be a long period of time without a break, but in this case -- I don't know what the reason is, but one of our jurors had an emergency need to visit the restroom.

What I'm going to do out of fairness is, Mr. Dacus, I'm going to afford you an additional 30 seconds so you can pick back up where you were broken in the middle of your closing.

MR. DACUS:  Thank you, Your Honor.

THE COURT:  And Mr. Estes, if you'll monitor the jury and let me know as soon as they're ready to come back in.

(Pause in proceedings.)

THE COURT:  All right.  Let's bring them back in.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Please be seated.

Counsel, you may continue with Defendants' closing argument.

MR. DACUS:  Thank you, Your Honor.

Welcome back.  We were about to talk and I was reminding you of the fact that on Monday I asked you to pay particular attention to the methods that Touchstream went through to arrive at these numbers, because from my experience you can tell a lot about the credibility and believability not only of what folks say damages are but of their entire case if you listen to how they go about this damages issue.

So what are they supposed to do and what are you supposed to do as jurors?  This is an excerpt from what the Judge read to you.  This is the transcript from what the Judge read to you as the instructions at -- his preliminary instructions at the beginning of the case.  And I'll tell you, for you note-takers, you can look on page 16 and 22 of those final instructions that you have and you'll see these very instructions.  And what they say is, unlike an apparatus claim, because these are method claims, they are not infringed by the sale or distribution of a product merely capable of performing the process.  To find infringement of a method claim, all the steps of the claim must be performed, and the

damages for infringement of a method claim should be based on the products that are actually used to perform the claimed method, or if you don't have everything you need, you can make a reasonable approximation.  That's the law that the Court has given you to follow, and, frankly, has given Touchstream to follow.

So it begs the question, what is it that's required for infringement here.  And you don't have to believe me; you can take it from Touchstream's own expert Dr. Wicker.

Your opinion is that you have to use Send-To-TV to practice or infringe the claim.

He said, That's right.  You have to use the app.

And then Mr. Reisner made him clarify, Well, it's not just the app; you actually have to use the Send-To-TV feature.

And Dr. Wicker agrees.

And you know who heard that?  Their damages expert Dr. Mangum.  Because I said to him and I confirmed with Dr. Mangum, You heard when Mr. Reisner was questioning Dr. Wicker, you heard Dr. Wicker say that to infringe you have to download the app, you have to use the app, and then you have to use the Send-To-TV feature.  You heard him say that. Right?

Dr. Mangum said, Yes.

And then I confirmed with Dr. Mangum, You have included all subscribers, all set-top boxes that are capable of using

the app and the Send-To-TV feature.  Right?  So he included everything that was capable.  But remember the Judge has instructed us then and now it takes more than being capable; you have to actually use it.

Then I confirmed with Dr. Mangum -- remember what happens here.  He writes a report, then we get to take his deposition.  So in his deposition I asked him, You have the understanding that for a method claim, it requires actual use of the method for damages to be assessed.  Because I knew the Judge was going give that instruction.

And under oath Dr. Mangum said, "I do not agree with that."  He directly contradicts the law that the Judge has given.

I said in trial, Did your calculation, sir, did you do it with the understanding that for a method claim you can include instances or events where the methods and the steps of the methods were not actually used by the alleged infringer?

And he said, I agree.

He included in here things that were not actually used, directly contrary to what the Court has told you the law is.  This is all his trial testimony from Dr. Mangum.

"Are you telling the jury that you do not know what the actual usage is as far as percentages as to folks who downloaded the app, used the app, and then used the Send-To-TV feature within the app?"

Incredibly, he said, "I'm aware of the information pointing to that." So he's aware of it. "I don't believe it's relevant..." despite the fact that the judge says that's what you're supposed to be looking at it. But then he says something remarkable at the end. "But I've not challenged that number."

So this 1 to 2 percent number right there, he doesn't even challenge it; he just ignores it, despite the fact the Judge says you better look at it.

So I said, Sir, to infringe these method claims, you have to not only download the app, you have to use the app, you specifically have to use Send-To-TV to get to the actual use number.

And he says, Yeah, I kind of see where you're going. I see that methodology and you could calculate it that way.

And I said, But you did not.

And he said, That's right, I didn't.

In direct contravention of what the Court's instructions are.

I think it's clear that there's nothing about Dr. Mangum's calculation that you can use without violating the Court's instructions and the law, and it doesn't get any better. Remember his calculation is the base. That's what we're talking about that requires actual use times the rate. The rate is this 48 cents that Dr. Mangum used and Touchstream

uses from the Quadriga agreement; a software license agreement. You, the jury, the Judge just told you, you're deciding a patent license agreement and a royalty to be paid for that patent license. And we know a software license and a patent license are different. How do we know? From Touchstream's own witness. This is what I asked Mr. Mitschele on the stand.

You agree, sir, that a license fee that was paid by Quadriga was for a software license. Right?

Yes, it was.

The 48 cents was for a software license. You, the jury, are deciding a patent license.

You've been in the professional world enough to know, I asked Mr. Mitschele, you know what a software license is. Right?

He said, I do.

And it's different from a patent license.

It is.

You know who else agrees? Their own witness Dr. Wicker. We asked him, "I think we heard from Mr. Mitschele that a patent license is not the same thing as a software license."

Dr. Wicker unsurprisingly said, "I would think those are two different things."

So not only is the base contrary to the law, the rate of 48 cents is. The Judge has told you expressly,

explicitly--you can look in your instructions when you go back--you are to determine a patent license and a royalty for these three patents, and they're trying to get you to assess 48 cents that was paid for a software license.

At the end of the day, there's nothing about what Dr. Mangum did or his calculation that is consistent in any way with the law.

In contrast to that, Mr. Bakewell for Charter took the stand and he did what he calls triangulating by actually using all three of the methods.  Remember Dr. Mangum only used one of the methods, the market approach, rather than the cost and the income approach.  Mr. Bakewell took the stand and said, Look, if we look over here on the right--I'll look at this red bar on the right--if we adjust the base to the actual 1 to 2 percent usage without even considering that the 48 cents is also wrong, the number is $6.1 million.  It's about 1.3 percent; $6.1 million.

But Mr. Bakewell said, Look, I think there's better ways to do this.  If you actually go look at this Vizbee agreement--you remember that's the agreement where I said it's just like house shopping; by the way, the Judge just read you an instruction that explicitly says, and you can look, page 21 and 22 of your instructions, this is how you go about doing this--Touchstream gave Vizbee a license to these patents, these three patents, plus 12 others, for a lump sum payment of

$2.3 million, and an unlimited right to use it.  And yet they want us to pay hundreds and hundreds of millions of dollars for just those same three patents and not even for an unlimited right, just for a limited right to use.  They want to assess us more going forward.

Then we have what the Judge just read to you which is this non-infringing alternative.  So the way you're supposed to look at this -- and remember, Dr. Mangum just completely ignored it; didn't even talk to you about this.  The Judge just told you this is what you're supposed to do.  Dr. Mangum didn't say word boo about it.

You're supposed to imagine that you're back at that negotiation and Touchstream is saying to you, Hey, we'd like a billion dollars, and what would Charter say in response--do we have a design-around.  The answer is yes.  These playback control commands that go through the system, that currently go through the server, we could just do that on the phone.  You heard Dr. Shamos say these phones have enough processing power these days that you can just put that in the phone, and it would not infringe; would cost them about $3 million.

So at the end of the day, my hope and expectation is you do not get to this damages question because you don't find infringement, but if you do, the number is somewhere around $5 million.

THE COURT:  You have 15 minutes remaining.

MR. DACUS:  Thank you, Your Honor.

I want to talk about the question of infringement.  You know that there are three patents involved and you remember that I said to you on Monday these patents are very -- the claims that are at issue are very similar.  They are not identical, but they are very similar and they have very similar requirements.  And we had Dr. Shamos compare these very similar patents to Charter's closed cable network.  And this is the result.

So you may wonder what do lawyers do on Thursday night before they give a closing.  Well, this lawyer lays awake and he thinks of all the things that he could have done better, and this is one of the things we could have done better is summarize for you why we don't infringe.  And I heard Mr. Dykal say we had three reasons.  There's actually four reasons, and that's what you see here on this slide.  So for you note-takers, we being perfectly candid, I should -- we should have put this up so we could summarize it for you earlier.

Let's just start at the bottom.  All three of these patents require software for playing media.  All three of them require that.  If you find there's no software for playing media, then all three of the patents are not infringed.  And there is no software for playing media in these patents.

Think about what -- I mean in the Charter product.

Think about what Touchstream's patent was.  It was to play any type of media from the internet.  So it needed to be flexible.  And so, as Dr. Shamos said, when you need to be flexible, you play the media in software.  Charter doesn't need to be.  Charter knows what content, it knows what media players it has, it's confined and limited, so it can do that on hardware.  And that's exactly what they did.

And I think of that a little bit like this.  Because even Dr. Wicker for Touchstream admitted that the software doesn't actually play on the software.  Remember what he said?  It's related to.  It's related to that.

And I think of it like this.  If I said to you, Where's the light coming from, what's producing the light in this room, you'd say the lightbulb.  Right?  You wouldn't say the light switch; you'd say the lightbulb.  And that's a little bit what's going on here, because this java file that Dr. Wicker points to, by his own admission out of his own mouth, it's not doing the playing; it's sending a command or allowing the playing to be done within the hardware.  And that's just like the light switch.  The light switch is not what's producing the light; the lightbulb is.

So at the end of the day, the Charter system does not have a media player, as defined by the Court, which is a software for playing media.

Two of these patents, the '251 and the '934, also require

this universal playback control command.  And when you go home and go to sleep tonight and you close your eyes, you may see those line items that say 'flick' and 'play' because you've seen them so many times.  But again, it goes back to just common sense and how this came to be.

Touchstream's patent, because they were streaming internet media from any phone to any television, it needed to be universal because you didn't know what phone, you didn't know what television.  Charter's very different.  Charter knows these commands are only going to be sent within the Charter network.  So if you look at those command lines -- and by the way, you're supposed to look at the whole line because that's the command.  Those are all idiosyncratic or specific to Charter.  If we sent those commands to some network outside of Charter, they're not universal; they couldn't be interpreted.

Even if you did what Dr. Wicker said to do, which is not accurate, but you looked at only the word 'flick', that's certainly not universal.  Dr. Shamos said he's never seen that in his career.  And I think basically that's common sense--that the command 'flick' is not a universal command for 'play'.

Now, the '751 and the '934 Patents, they had these 'providing' elements.  So let's just reorient ourself.  The patent requires providing by the content presentation

device--that's essentially -- the example is the television--the synchronization code to a remote computing device.  So that's the phone.  Okay?  So that's what the patent requires.  And look, the patent actually has an example of this.

This is an excerpt from the patent and it shows you how this would work.  This is -- here they have a computer monitor rather than a television, and the computer monitor or television would provide this synchronization code to the phone under the patent.  And that makes sense because that's what Touchstream needed to do when you're connecting any television to any phone.

But Charter doesn't work that way.  Charter has no need and does not provide any sort of synchronization code from the television to the customer's phone.  They already know each other.

And then what about this last step, this assigning or obtaining step in the '251 and the '751?  This is the thing that relates to the MAC address.  Again, what the patent requires--and it makes sense--is just look at the first sentence:  "Assigning, by a server system, a synchronization code to the display device," the display device being the television.

So here is the excerpt from the patent.  So what's happening here is there's a server in the background, under

the patent; the server is supplying this synchronization code to the computer monitor or the television; and then it's being supplied to the phone. It's being assigned by the server, the sync code is, to the computer monitor or the television. Charter doesn't do that. Charter has no need to do that. The MAC address that they point to was assigned by the manufacturer. The MAC address is not being assigned, as in the patent, from a server to the television.

Now, that's four things that Charter does differently than what the patent describes. If you find for each patent that any one of those that we've -- that they failed to prove any one of those, then those patents are not infringed. And when you get the verdict form, the first question you'll be asked is did Touchstream prove--because it's their burden of proof--did they prove by a preponderance of the evidence that any of these patents were infringed, and it's your decision, but we respectfully submit that the evidence says they are not.

Let me talk about the second question. And let me say to you, if you answer that all these patents are not infringed, you're done; you won't answer the invalidity question and you won't answer the damages question. You'll be done for the day.

If you find that one or more of these patents is infringed, then you need to answer this question of

invalidity.  And this is this question where the patent owner, when they get a patent they promise to fully describe for the public all it is that they claim.  And if they don't, then there's a violation of what we call and what the Judge has just said to you of the written description.

So what we're trying to figure out here is does this patent specification include all that they claim.  So remember, for video content, what Touchstream claims is internet content, and now they claim non-internet content also.  So we've got to go look in the patent specification and see if they actually taught people how to do that and described it.

So let's just start with the background of the invention because I think it's very important.  This was the purpose of Mr. Strober's patent.  Given the desire to watch various worldwide web--that's internet media--on a family's primary television set.  It's the sole purpose in the patent.  You can read it for yourself.  Some -- he wants to find a way to watch internet media on a television.  Unsurprisingly, with that sole purpose in mind, unsurprisingly, every time you see a description of content and video content in the specification of the patent, it says "content providers on the internet."

THE COURT:  Five minutes remaining.

MR. DACUS:  Thank you, Your Honor.

"A content provider through the internet," "via the

internet," "content provider over the internet," "content provider over the internet."  Every time we're talking about a content provider in that specification, in Mr. Strober's patent, it says it's coming over the internet.

And they reference to figure 1.  That's exactly what figure 1 shows you--when you're getting content from a content provider it's going through the internet.  You can look at figure 5 in the patent when you go back there.  Same thing, every example, every example of where video is coming from is from the internet; not one mention, not one mention of video content from any source besides the internet.

Now, you heard them say yesterday, Mr. Dykal said just a minute ago, Well, but we've got this other phrase out there that says 'or other network'.  We've got this other phrase that says it could come from another network beyond the internet.

May I have the elmo, please, Ms. Brunson?

But let's be clear.  Let's don't be confused here.  So this is when Mr. Reisner was questioning Dr. Wicker yesterday on this very issue, and he said, Now, you pointed to different passages in the specification that talked about other networks.

And Dr. Wicker said, Yes, I did.

And then Mr. Reisner said, "And in the passages that you were pointing to, it never said content providers."

Dr. Wicker said, "Not that I recall."

So every time we're talking about where video content is coming from in the specification, it's coming from the internet. And now these folks are trying to claim and have claimed in their patent non-internet content. That is a violation of the written description. Not one mention of video content from any source besides the internet in the patent. He did not fully describe it. That's breaking your bargain.

We don't know why it slipped through, I don't know if it's because of this expedited process that these patents underwent or what, but we know from the law that if you follow the law, these three patents are, in fact, invalid.

I'm going to sit down now. I want to say one last time to you, I probably can't say it enough how much the folks at Charter appreciate you being willing to give them a chance to tell their side of the story.

Mr. Dykal's going to get back up here and say something. I have no idea what he's going to say; no idea. He could say anything because I don't get to get back up. What I would ask you to do is, whatever he says, please just think back to the evidence that you've heard in the case, because I won't get to say anything in response. Just think back to the evidence and what you've heard.

We very much look for forward to the return of your

verdict in this case.  Thank you.

Thank you, Your Honor.

THE COURT:  If you'll turn your sheet to a --

MR. DACUS:  I will.  Thank you, Your Honor.

THE COURT:  -- your easel to a clean sheet.  Thank you.

MR. DACUS:  Thank you.

THE COURT:  All right.  Plaintiff may present its final closing argument.

You have five minutes and 8 seconds remaining.  Would you like any kind of a final warning?

MR. DYKAL:  A one-minute warning, please.

THE COURT:  All right.

MR. DYKAL:  And may we approach briefly?

THE COURT:  Approach the bench.

(The following was had outside the hearing of the jury.)

MR. DYKAL:  In his closing argument Mr. Dacus said, Mr. Strober did not invent casting, and you know it because we showed you the Redford patent and it has everything in there.  He just blatantly -- he's done that many times this trial --

THE COURT:  We are not bringing anything new in closing arguments that wasn't presented during the evidence.

MR. DYKAL:  No, no, I'm not suggesting that, but I'm suggesting we need some sort of instruction because this jury

now thinks that Redford might be invalidating this patent.  He just came out and said it.  You've warned him multiple times it's only relevant for damages, and he said, Mr. Strober didn't invent casting, you saw Redford, it had all those elements in there.

THE COURT:  Mr. Dacus?

MR. DACUS:  What I said is it had -- I said this expressly.  I said it had the phone, I said it had the computer server, and it had a television.  I didn't say that it had everything; I said that it had those three things is expressly what I said.

MR. DYKAL:  And he said he didn't invent --

THE COURT:  We are not going to delay this process.  Give us your final closing argument.

MR. DYKAL:  Thank you.

(The following was had in the presence and hearing of the jury.)

THE COURT:  Let's proceed with closing.

I'll give you a one-minute warning, counsel.

MR. DYKAL:  Thank you, Your Honor.

When I was up here first I talked about the rules.  Now I'd like to talk about accountability.  Accountability means taking responsibility for the choice that is you make.

What have you seen from Charter this week that gives them -- that shows that they take one single ounce of

responsibility for the decisions they've made?  Mr. Dacus says that they're glad to be here so they could tell their side of the story.  Is this how you tell your side of the story?

When we filed our lawsuit, they told us, You need to use the silver remote; we don't infringe.  Well, guess what.  That signed document under perjury was false.  The testimony from Mr. Frusciano under oath turned out to be false.  They said all the things worked the same.  False.  Dr. Wicker had to test it to discover that.  Is that how you clear the air?  You assess credibility.  Who's credible here?  Does that say credibility to you?

What about the usage data?  They keep harping on this data again and again.  They deleted it.  We don't know.  We don't have evidence about how much this has been used.  We saw a document back in the day that 22 percent of people use it.  Now they say it's only 1 or 2 percent.  In between there--gone.  Does that tell you they want to tell their side of the story?  We have opted to purge some of those data attributes.  They're gone.  We don't have the benefit.  It's not credible.

Their damages expert got on that stand and said, Well, maybe if a Charter customer didn't watch a TV channel they could call and ask for a refund and that might actually work.  Is that credible?

They started out by showing you this slide.  Why did they

show you this slide?  What does that have to do with this case?  They are trying to distract you.  What does the Redford patent have to do with this case?  Look in your instructions.  They're not saying Redford invalidates Mr. Strober's patent.  The only theory they have is written description.  And written description is only based on the specification in the claims, not some Redford patent they found.  They're trying to distract you.  Is that what you do when you want to clear the air?

Remember when they talked about that flick patent?  And then I asked Mr. Bell, Do you even use that flick patent?

And he said, No, we don't.

Why bring it up?  That's not how you clear the air.

Now, I've been thinking a lot about this over the week, and one other thing they're doing to distract you, they keep talking about the customers, only 1 or 2 percent of customers use this app.  That's what they say.  Touchstream isn't accusing Charter's customers of infringing.  Look in your instructions.  Page 22.  Damages for infringement of a method claim should be based on the products that were actually used to perform the claimed method or a reasonable approximation of the infringing use."  The products that were actually used to perform the infringing methods.  What were the products that infringe?  Charter's IPVS server.

Look at claim 1 of the '251 Patent.  Look at it closely.

It says, "a server system that performs a method." It doesn't say a customer downloading an app that performs a method. That's not what we're accusing of infringement--a server that performs a method. You saw that IPVS server right there in black and white. That IPVS server has infringed time and time and time and time again.

THE COURT: One minute remaining.

MR. DYKAL: It's sitting out there right now infringing, right now.

Charter wants you to award nothing or they want you to award $5 million. Well, let me tell you, they're here because they think they can get away with it. They think they can distract you and confuse you. And maybe some of you will decide that, you know, maybe some of these things matter. They don't. You have the evidence, that server, that IPVS server was built to infringe, and we showed you evidence that it's out there and it's used, and it can be used by every single cable customer.

Now, you've seen a range of damages and we have provided you support for all of them. You have the evidence to find anywhere within that range, but I want to remind you of one thing that Mr. Strober said. Mr. Dacus asked him, Are you asking for a billion dollars up here, and he said, I'm asking for the jury to do what's right.

THE COURT: Mr. Dykal, your time is expired.

MR. DYKAL:  Thank you.

THE COURT:  All right, ladies and gentlemen, I'd like to provide you with just a few final instructions before you begin your deliberations.  You must perform your duty as jurors without bias or prejudice as to any party.  The law does not permit you to be controlled by sympathy, prejudice, or public opinion.  All parties expect that you will carefully and impartially consider all the evidence, follow the law as I have given it to you, and reach a just verdict regardless of the consequences.

Answer each question in the verdict form based on the facts as you find them to be, following the instructions that the Court has given you about the law.  Again, do not decide who you think should win this case and answer the questions to reach that result.  And one more time, let me remind you that your answers to the questions in the verdict form must be unanimous.

You should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life.  This is true in patent cases between corporations, partnerships, individuals, other business entities.  A patent owner is entitled to protect his rights under the laws of the United States, and this includes bringing a suit in a U.S. District Court for money damages based on allegations of infringement.

And by the same token, an accused infringer is entitled to defend itself against assertions of infringement, including by arguing that it does not infringe the asserted patents and that the asserted patents are invalid.  The law recognizes no distinction between types of parties, and all corporations, partnerships, business entities, and individuals are equal before the law and should be treated as equals.

Now, when you retire to the jury room to deliberate on your verdict, as I've told you, you're each going to have your own printed copy of these final jury instructions I'm giving you orally.  If during your deliberations you desire to review any of the exhibits that the Court has admitted into evidence over the course of the trial, you should advise me by sending me a written note signed by your foreperson identifying any exhibit or exhibits.  Deliver that note to the Court Security Officer once your foreperson has signed it, and I'll then send you that exhibit or those exhibits.  Now, once you retire, you should select your foreperson and then conduct your deliberations.  And if you recess during your deliberations, follow all the instructions the Court's given you about your conduct as jurors during the trial.

After you reach your verdict, your foreperson is to fill in your unanimous answers to the questions in the verdict form, and you are not to reveal your answers until such time as you're discharged, unless otherwise directed by me.  And

you are never to disclose to anyone, not even to me, your numerical division on any unanswered question.

Now, any notes that you've taken over the course of the trial are aids to your memory only. If your memory should differ from your notes, then you should rely on your memory and not your notes. The notes are not evidence, and a juror who has not taken notes must rely on his or her own independent recollection of the evidence and should not be unduly influenced by the notes of other jurors. Notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony.

Now, if you want to communicate with me at any time during your deliberations, you should give a written message or a question signed by your foreperson to the Court Security Officer who will bring it to me, and I'll then respond as promptly as possible, either in writing or by having you brought back into the courtroom where I can address you orally. And I will always first disclose to the attorneys your question and my intended response before I answer any question.

Now, after you've reached a verdict and I have accepted your verdict and discharged you as jurors, I want you to understand at that time, ladies and gentlemen, you are not required to talk with anyone about your service as a juror in this case. But by the same token, if you choose to at that

point, you will be completely free to talk to anyone of your choosing about your service as a juror in this case.  At that point it will be totally and 100 percent up to you.

I'm now going to hand eight printed copies of the Court's final jury instructions and one clean copy of the verdict form to the Court Security Officer who will bring them and deliver them to you in the jury room.

Ladies and gentlemen of the jury, you may now retire to the jury room to deliberate on your verdict.  We await your response.

(Whereupon, the jury left the courtroom.)

THE COURT:  Counsel, you are welcome to wait here in the courtroom or to leave a representative here.  If you wait off premises, make sure that your designated contact person's cell phone is on and operating so that we can get in touch with you quickly if we receive a note or when we receive a return of the jury's verdict.

Awaiting either a note from the jury or the return of their verdict, we stand in recess.

(Jury deliberates.)

THE COURT:  Be seated, please.

Counsel, I've received the following note from the jury. I'm going to read it, and I also have a printed copy of the note for each side, which after I've read it I'll let you get from the Courtroom Deputy.

The note reeds as follows:  "Can we please get the slides from the Defense closing argument?  We are looking for the definition of words by the Judge that were highlighted by Defense."  And this is signed by Juror No. 1 as the foreperson.  That's Mr. Dispenza.

I'm going to mark the original note in the upper right-hand corner with a '1' for identification.  I'll hand it to the Courtroom Deputy, and I'll hand her two copies for counsel of the note itself.

Counsel, I've prepared a proposed written response.  I'd like to read it to you and then I'll take any comments from either side.

"Members of the jury, in response to Jury Note No. 1, the demonstrative slides used in closing argument by Defense counsel are not something I can send you while you deliberate.  As I said in my final jury instructions, demonstratives are not evidence and will not be available for you to review in the jury room as you deliberate.  Any specific words highlighted by the Defense in their closing argument are something concerning which you will have to rely upon your memory."

All right.  Any comments, thoughts, or objections from Plaintiff?

MS. SMITH:  No, Your Honor.

THE COURT:  Any thoughts, comments, or objections

from the Defendant?

MR. DACUS:  No, Your Honor.  We have no objection to what the Court has proposed.

THE COURT:  All right.  I'll sign one copy of this note and hand it to the Courtroom Deputy with instructions to deliver it to the jury--excuse me--the Court Security Officer to hand to the jury.  And I've handed a signed duplicate copy to the Courtroom Deputy of this note for the file, and you may approach the Courtroom Deputy to get your copies after I leave the bench, if you'd like.

Awaiting either another note from the jury or the return of their verdict, we stand in recess.

(Deliberations continue.)

THE COURT:  Be seated, please.

Counsel, I've received the following from the jury: "Your Honor, we have a verdict."  Signed by Mr. Dispenza, Juror No. 1 as foreperson.

I'll hand the original note to the Courtroom Deputy.

And let's bring in the jury.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Be seated, please.

Mr. Dispenza, I understand you're the foreperson of the jury.  Is that correct?

THE PRESIDING OFFICER:  Yes, sir.

THE COURT:  Has the jury reached a verdict?

THE PRESIDING OFFICER:  Yes, sir.

THE COURT:  Would you hand the completed verdict form to the Court Security Officer who will bring it to me.

Ladies and gentlemen of the jury, I'm going to announce the verdict into the record at this time.  I'd like to ask each one of you to listen very carefully as I do this, because once I've announced the verdict into the record, then I'm going to poll you to make sure that this is, in fact, the unanimous verdict of all eight members of the jury.

Turning to the verdict and beginning on page 4 where Questions 1A, 1B, and 1C are located, Question 1A, "Did Touchstream prove by a preponderance of the evidence that Charter infringed claim 1 and/or 7 of the '251 Patent?"

The jury's answer is, "No."

Question 1B, "Did Touchstream prove by a preponderance of the evidence that Charter infringed claims 12 and/or 13 of the '751 Patent?"

The jury's answer is, "No."

Question 1C, "Did Touchstream prove by a preponderance of the evidence that Charter infringed claims 17, 18, and/or 20 of the '934 Patent?"

The jury's answer is, "No."

Following the instructions set forth in the verdict form on page 5, the remainder of the questions in the verdict form are not answered.

And turning to the final page, page 10 of the verdict form, I find it is dated with today's date, March the 7th, 2025, and it is signed by Mr. Dispenza as foreperson of the jury.

Ladies and gentlemen, let me poll you to make sure that this is, in fact, the unanimous verdict of all eight members of the jury. If this is your verdict as I have read it, would you please stand up? Thank you, ladies and gentlemen. Be seated.

Let the record reflect that all eight members of the jury immediately rose and stood in response to the question from the Court to poll the jury.

Based on that, the Court finds that this is the unanimous verdict of all eight members of the jury. The Court accepts the jury's verdict. I'll hand the original verdict form to the Courtroom Deputy.

Ladies and gentlemen, this now completes the trial of this case. From the very beginning I have given you instructions about your conduct as jurors during this trial. I've reminded you of those instructions and obligations probably more times than you wanted to hear. Having received your verdict, accepted it, the Court is now discharging you as jurors and you are no longer bound by any of those instructions. That means that you're free to talk to anybody you want to about your experience as a juror in this case. It

also means that you're under no obligation whatsoever to talk to anybody ever about your experience as a juror in this case. It is completely and totally up to you.

I will tell you, ladies and gentlemen, because it's been the practice in this courthouse since -- well, since I started practicing law, and that's a long time ago, that there's one way in and there's one way out, and that's up and down those front steps at the front of the building.  When you leave the building and go down those front steps, don't be surprised if some or several of these lawyers are standing on the sidewalk at the bottom of the steps.  Traditionally that's where the lawyers stand if they want to hope that a juror will stop and initiate a conversation with them about their jury service. They can't initiate a conversation with you.  They are not going to impede your progress, they are not going get in your way, but they are going to make it convenient in case you want to stop and have a conversation.

If you do want to stop and have a conversation, feel free to.  I promise you they're interested in your comments about their performance and their presentation and all aspects of this trial.  But if you don't want to stop and have a conversation, don't.  And nobody will interfere with you or try to force you to do that.  I promise you, you will be completely unimpeded and you can walk right by, go to your vehicles, go about your business.

But I want you to be aware that it's entirely likely that there will be several of the lawyers from both sides in this case conveniently positioned near the bottom of the stairs when you leave the building.  It's been that way for over 30 years, and I suspect, given the way this building is constructed, it will probably always be that way.  But I wanted you to be aware of that.  Again, whether you choose to talk to anyone about your experience in this case is strictly up to you.

Now, if I guessed right, when we started this process I told you that when you got home that first evening, whoever was there was going to ask you about what happened in federal court.  You're free to answer that question now if you want to, and you're not obligated to, either.  Again, it is 100 percent your call.

Also, ladies and gentlemen, I'd like to ask a personal favor of each one of you.  Now that the trial is complete, now that I've accepted your verdict and discharged you as jurors, I'd like to have the opportunity when you leave the courtroom in just a minute to come into the jury room and thank you before you leave the courthouse.  I'd like the opportunity to shake each hand and look each one of you in the eye and tell you personally how much the Court appreciates your service and your sacrifice as jurors in this case.  I think what you've done is important, I think it warrants that kind of personal

word of attention and appreciation, and I'd consider it a personal favor if you'd give me just a few moments to do that before you leave.

I know it's a Friday.  I'm not going to keep anybody.  Believe me, my wife expects me to be home early today.  So it won't be a long process, but I would like the opportunity to say thank you because I think the hard work you put in and diligence and the attention you've shown is very real and important public service and I think that warrants a word of thanks in a personal manner.  So if you would give me that opportunity, I would certainly appreciate it.

That completes the trial of this case.  The Court having accepted the jury's verdict and discharged them, counsel, you are excused.

Ladies and gentlemen, I'll meet you in the jury room.

Court stands in recess.

(The proceedings were concluded at 3:24 p.m.)

I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER. I FURTHER CERTIFY THAT THE TRANSCRIPT FEES FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL CONFERENCE OF THE UNITED STATES.

S/Shawn McRoberts                03/07/2025

_____DATE_____
SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER