# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| TOUCHSTREAM TECHNOLOGIES, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CASE NO. 2:23-CV-00059-JRG-RSP |
| | § | |
| CHARTER COMMUNICATIONS, INC., et al., | § | |
| | § | |
| | § | |
| *Defendants*. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the Motion for New Trial filed by Plaintiff Touchstream Technologies, Inc. ("Touchstream"). (Dkt. No. 396.) Also before the Court is Touchstream's Motion and Memorandum in Support of its Rule 50(b) Motion for Renewed Judgment as a Matter of Law (the "JMOL Motion"). (Dkt. No. 397.) Having considered the Motion for New Trial and JMOL Motion, the Court finds that both motions should be **DENIED**.

## I.    BACKGROUND

Touchstream filed the above-captioned case on February 16, 2023. (Dkt. No. 1.) The Court held a jury trial beginning on March 3, 2025. (Dkt. No. 366.) At trial, Touchstream asserted that Defendants Charter Communications, Inc.; Charter Communications, Inc.; Charter Communications Operating, LLC; Spectrum Management Holding Company, LLC; Time Warner Cable Enterprises, LLC; Spectrum Gulf Coast, LLC; and Charter Communications LLC (collectively, "Charter") infringed certain claims of U.S. Patent Nos. 8,356,251 (the "'251 Patent"); 11,048,751 (the "'751 Patent"); and 11,086,934 (the "'934 Patent") (collectively, the "Asserted Patents"). (Dkt. No. 350.) Specifically, Touchstream asserted that Charter infringed

claims 1 and 7 of the '251 Patent, claims 12 and 13 of the '751 Patent, and claims 17, 18, and 20 of the '934 Patent (collectively, the "Asserted Claims"). (*Id.*)

At the close of evidence, the parties moved for judgment as a matter of law ("JMOL") under Rule 50(a) of the Federal Rules of Civil Procedure. (Dkt. No. 389 at 1055:9-1082:21.) Among the parties' Rule 50(a) oral motions, the Court heard Touchstream's motion for JMOL of infringement of the Asserted Claims. (*Id.* at 1056:24-1057:6.) The Court denied, *inter alia*, Touchstream's motion. (*Id.* at 1081:12-18.)

The Jury returned a verdict of no infringement with respect to all Asserted Claims.[1] (Dkt. No. 379.) The Court subsequently entered Final Judgment. (Dkt. No. 391.) Touchstream timely filed its Motion for New Trial and JMOL Motion.

## II.    MOTION FOR NEW TRIAL (DKT. NO. 396)

In the Motion for New Trial, Touchstream requests a new trial because the verdict was against the great weight of the evidence. (Dkt. No. 396 at 3.) Touchstream relies on its evidence and arguments presented in its JMOL Motion. (*Id.*) Touchstream also requests "a new trial because Charter repeatedly offered evidence and argument designed to confuse the jury as to the issues relevant to infringement." (*Id.* at 3-11.) Touchstream argues that "Charter distracted the jury with irrelevant and highly prejudicial evidence and attorney arguments" in three ways. (*Id.*) The Court addresses each in turn and finds no basis to set aside the Jury's verdict and grant a new trial.

### A.    Applicable Law

Rule 59 provides that a new trial may be granted on all or part of the issues on which there has been a trial by jury for "any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). Notwithstanding the broad sweep of Rule 59,

---

[1] The Jury did not answer the questions concerning invalidity because Charter only asserted invalidity as a defense to infringement. (Dkt. No. 58.) Charter did not file any invalidity counterclaims. (*Id.*)

"courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial." *Metaswitch Networks Ltd. v. Genband US LLC*, No. 2:14-cv-00744-JRG, 2017 WL 3704760, at *2 (E.D. Tex. Aug. 28, 2017); *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, 276 F. Supp. 3d 629, 643 (E.D. Tex. 2017). "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612-13 (5th Cir. 1985); *see also Laxton v. Gap Inc.*, 333 F.3d 572, 586 (5th Cir. 2003) ("A new trial is warranted if the evidence is against the great, and not merely the greater, weight of the evidence."). Furthermore "[u]nless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial. … the court must disregard all errors and defects that do not affect any party's substantial rights." Fed. R. Civ. P. 61.

## B.    Discussion

### 1.    The Jury's Non-Infringement Verdict Was Not Against the Great Weight of the Evidence

Touchstream argues that "[t]he Court should order a new trial because the arguments and evidence cited in Touchstream's concurrently filed JMOL motion demonstrate that 'the verdict is clearly contrary to the weight of the evidence….'" (Dkt. No. 396 at 3 (quoting *Smith*, 773 F.2d at 613).) Touchstream asserts that the Court has a duty to set the verdict aside and order a new trial if the Court is not satisfied with the Jury's verdict. (*Id.*) Touchstream argues that this "duty is particularly applicable here: … Charter's non-infringement defense was predicated on irrelevant and confusing evidence that even Charter admitted pretrial was not relevant to infringement." (*Id.*)

Charter responds that for the reasons set forth in its opposition to the JMOL Motion, there was substantial evidence supporting the Jury's verdict. (Dkt. No. 399 at 9.)

Touchstream replies that Charter misreads the law. (Dkt. No. 405 at 1-2.) Touchstream asserts that the Court may grant a new trial even if there is substantial evidence supporting the Jury's verdict if the Court is not satisfied with the Jury's verdict. (*Id.*) Touchstream argues that the Court's "duty applies here for two related reasons: (1) Touchstream's infringement evidence was strong, as evidenced by its renewed JMOL motion; and (2) in contrast, Charter systematically relied on irrelevant and confusing evidence and arguments that violated the Court's standing *in-limine* order in order to distract from Touchstream's evidence." (*Id.* at 2.)

Charter reiterates its response that "Touchstream comes nowhere close to meeting the new trial standard." (Dkt. No. 412 at 1.) Charter argues that "for the reasons explained in Charter's JMOL Opposition (Dkt. 398), the 'great weight of the evidence' affirmatively **supports** the jury's verdict." (*Id.* (emphasis added by Charter).)

As discussed in detail below regarding Touchstream's JMOL Motion, the Court finds that the Jury's non-infringement findings were not against the great weight of the evidence. (*Infra* Section III.B.) Accordingly, the Court finds that a new trial is not warranted on this basis.

### 2.     Charter's Presentation was Not Unfair or Prejudicial

#### a.     Charter Did Not Confuse the Jury into Finding Non-Infringement Based on a Preferred Internet Embodiment

Touchstream argues that "Charter repeatedly contrasted the asserted patents' preferred 'internet' embodiment and related language derived from Touchstream's marketing materials with the accused Charter functionalities to confuse the jury into ignoring the claim language and instead conducting an improper non-infringement analysis." (Dkt. No. 396 at 4-8.) Touchstream asserts that Charter repeatedly suggested and argued "that there was no infringement because Charter's

'closed system' differs from the patents' *preferred embodiment*, which delivers internet video content." (*Id.* at 4 (emphasis added by Touchstream).) Touchstream asserts that "Charter used Touchstream's 'three anys' marketing materials for the same improper purpose—to suggest that the Asserted Claims require the ability to deliver content from any source such as the internet." (*Id.* at 4-6.) Touchstream contends that "[i]n response to an objection to this improper non-infringement argument, Charter claimed the testimony 'goes to damages.'" (*Id.* at 6-7.) Touchstream asserts that in response to the Court's statement that "it would need to instruct the jury that the argument has no application to any other issue in order to "avoid any confusion by the jury," Charter agreed to "move on." (*Id.* (quoting Dkt. No. 388 at 980:19-8).) Touchstream argues that "instead of 'moving on,' Charter highlighted the issue again in its closings" to "confuse the jury into focusing on irrelevancies instead of the claims of the asserted patents." (*Id.* at 7-8 (citing Dkt. No. 390 at 1176:11-14, 1177:1-17, 1178:6-9).)

Charter first responds that Touchstream waived its internet argument. (Dkt. No. 399 at 9-10.) Charter asserts that "Touchstream chose not to object to almost all of the testimony it cites regarding Charter's alleged efforts to confuse the jury into believing that the claims were limited to Internet content." (*Id.*) Charter further responds that Touchstream's internet argument is meritless by arguing that it "never said it did not infringe because it did not provide Internet content—to the contrary, it relied on the claims' breadth to show invalidity due to lack of written description." (*Id.* at 10.) Charter asserts that it "explained why, for damages purposes, certain claim elements would be useful in a system that provided Internet content and why they would not be useful in Charter's system, and Touchstream did not object to this testimony and argument." (*Id.*) Charter also asserts that it "showed that Touchstream's marketing materials described its patented technology as 'web-enabled,' which showed no willfulness, because it explained why Charter was

not interested in Touchstream after their various meetings." (*Id.*)

Touchstream responds that it was not required to object to every instance of Charter's improper use of embodiments to argue non-infringement because it objected at the beginning of trial and then again during trial. (Dkt. No. 405 at 2-3.) Touchstream also responds, emphasizing its argument that, contrary to Charter's assertion, Charter relied on internet content to improperly argue non-infringement. (*Id.* at 3-4.)

In its sur-reply, Charter emphasized that it never argued that the claims require internet content. (Dkt. No. 412 at 2-4.) Charter asserts that it "affirmatively relied on the fact that the claims *are* broad enough to cover Internet content to show invalidity for lack of written description." (*Id.* at 2 (emphasis added by Charter).) Charter argues that "Touchstream also ignores that Charter identified four separate reasons why it did not infringe, and none of those was its inability to provide Internet content." (*Id.*)

The Court finds that Touchstream has failed to meet its burden to show that a new trial on this basis is warranted. As an initial matter, Touchstream waived its objection to most of the testimony it relies on in the Motion for New Trial by failing to properly raise it at trial. *See ATEN Int'l Co. v. Uniclass Tech. Co.*, 932 F.3d 1364, 1370 (Fed. Cir. 2019) (holding that a contemporaneous objection must be specific and that by failing to object the party "waived any challenge to the jury's finding of infringement based on this testimony"); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009) ("Any implicit objection on appeal is deemed waived by failing to object at trial."). During trial, Touchstream only objected to one question during Charter's direct examination of its expert, Dr. Michael Shamos. (Dkt. No. 388 at 978:15-981:25.) Touchstream did not object to the other testimony it now seeks to rely on in support of its challenge. (Dkt. No. 386 at 156:2-160:2; Dkt. No. 387 at 574:24-575:2; Dkt. No. 388 at 752:2-6,

814:14-17, 819:25-820:4, 843:6-10, 941:4-7, 946:1-17, 955:9-956:13, 964:21-965:5; Dkt. No. 390 at 1176:11-1178:9.) During its single objection, Touchstream's counsel admitted that he had not objected to prior testimony he contended raised to the level of an improper non-infringement argument. (Dkt. No. 388 at 978:21-979:4.) In response to Touchstream's objection and the Court's ruling that it would allow the question if the Court instructed the Jury that Dr. Shamos's answer was relevant only to damages, Touchstream agreed to move on. (Dkt. No. 388 at 978:21-981:8.) While Touchstream asserts that Charter did not "move on," the Court disagrees. Touchstream asserts that Charter "highlighted" this issue in its closing argument but, again, Touchstream failed to object. (Dkt. No. 390 at 1177:1-17, 1178:6-9.) The fact that Touchstream lodged a single objection to a single question as an improper infringement comparison is insufficient to justify its failure to object to the remainder of the testimony Touchstream now cites. *See Smart Path Connections, LLC v. Nokia Corp. et al.*, No. 2:22-cv-00296-JRG-RSP, Dkt. No. 332 (E.D. Tex. Oct. 18, 2024). By failing to expressly object to the testimony when Charter presented it at trial, Touchstream has waived any objection that it might have had.

Even if the Court did not consider Touchstream's objection waived, on the merits, Touchstream fails to establish how Charter's trial presentation based on the Asserted Patents' internet preferred embodiment constituted prejudicial error or how substantial justice was not done. The Court disagrees that Charter argued it did not infringe because the accused system differs from the Asserted Patents' preferred embodiment, which delivers internet video content. Instead, Charter argued that the Asserted Claims were invalid for a lack of written description because the Asserted Claims covered both internet and non-internet content. (*E.g.*, Dkt. No. 386 at 165:20-166:5; Dkt. No. 390 at 1181:7-12.) Charter properly relied on prior art for damages. Specifically, Charter sought to rebut Touchstream's argument that it owns the patents for casting and to value

the Asserted Patents' purported invention. (Dkt. No. 386 at 138:12-13, 140:21-141:5, 175:18-176:8, 179:7-12, 218:3-220:17.) Charter also properly relied on Touchstream's marketing materials for damages and willfulness related issues. Specifically, Charter relied on Touchstream's marketing materials to show the purported invention's value and rebut Touchstream's contention that Charter was willfully infringing. (*Id.* at 145:21-147:10, 155:9-156:1, 262:20-22, 269:16-270:1, 429:20-430:7.)

Further, the Court specifically instructed the Jury that they should not compare the accused system to a preferred embodiment when determining infringement:

> You should not compare the accused functionalities with any specific examples set out in the patent or Touchstream's own products in reaching your decision on infringement. In deciding infringement, the only correct comparison is between use of the accused functionalities and the limitations of the asserted claims as the Court may have construed or defined them.

(Dkt. No. 390 at 1121:19-25.) Jurors are presumed to follow the Court's instructions. *E.g., Hollis v. Provident Life & Acc. Ins. Co.*, 259 F.3d 410, 417 (5th Cir. 2001); *Richardson v. Marsh,* 481 U.S. 200, 206 (1987). Touchstream has not presented any evidence that the Jury disregarded the Court's instructions. There is no reason to believe that the Jury in this case did not follow the Court's instruction.

Accordingly, the Court finds that a new trial is not warranted on this basis.

### b.    Charter Did Not Confuse the Jury into Finding Non-Infringement by Comparing an Embodiment to the Prior Art

Touchstream argues that Charter confused the Jury by comparing the Asserted Patents' internet-delivery example to prior art when there were no prior art defenses. (Dkt. No. 396 at 8-9.) Touchstream asserts that the Court recognized the irrelevancy of Charter's questioning of the inventor, David Strober, regarding "whether he claimed to be 'the first to take internet video content from a phone, pass it through an intermediary like a server, and then display it on a larger

screen like a television.'" (*Id.* at 8-10 (quoting Dkt. No. 386 at 212:3-7).) Touchstream asserts that "[i]n closing, Charter reminded the jury of these exchanges, irrelevantly arguing that the prior art patent came before the asserted patents, and that the PTO rejected the application because 'it wasn't new.'" (*Id.* at 10 (quoting Dkt. No. 390 at 1161:12-23, 1184:24-1185:12).) Touchstream argues that it "sought a jury instruction—which Charter agreed to—that would have helped clear up some confusion by instructing that '[p]rior art is not relevant to the issues of infringement or invalidity, but may be relevant to the issue of damages,'" but the Court denied the request. (*Id.* (quoting Dkt. No. 373-1 at 10).) Touchstream further argues that "Charter's questioning and argument based on the prosecution history were also improper because the court rejected these same arguments" during claim construction and during the pretrial conference (*Id.* at 10 n.7.)

Charter responds that "Touchstream opened the door to the prior art when it argued in opening, and presented via Mr. Strober, that it had invented 'the casting patents' with a three-part architecture having a server in between the phone and the display device." (Dkt. No. 399 at 12-13 (citing Dkt. No. 386 at 138:12-13, 140:21-141:5, 175:18-176:8, 179:7-12).) Charter asserts that to rebut Mr. Strober's contention, Charter cross-examined him with a prior art patent that Mr. Strober admitted "disclosed casting using the same three-part architecture, which undoubtedly undermined his credibility with the jury." (*Id.* at 12-13 (citing Dkt. No. 386 at 218-220).) Charter argues that its use of the prior art patent was proper to rebut Mr. Strober's assertions, "to show the jury the 'old modes' of casting for purposes of the *Georgia-Pacific* analysis (factor 9)[,] and to show the incremental value of the invention over the prior art." (*Id.* at 13 (citing Dkt. No. 386 at 218:11-18).) Charter further responds that "Charter used the prosecution history to attack Mr. Strober's credibility and to focus the jury on the claims, not Mr. Strober's subjective views on what he invented." (*Id.* at 13 n.1 (citing Dkt. No. 386 at 210:4-212:18, 218:3-220:17).)

Touchstream responds that Charter's use of the prior art patent "further cemented in the jury's mind that it should focus on the irrelevant 'internet' embodiment in the patents." (Dkt. No. 405 at 4 (citing Dkt. No. 386 at 212:3-7, 218:19-220:17).) Touchstream also emphasized its assertion that "the Court has already rejected justifications similar to what Charter now makes, … finding that the line of questioning 'on a stand-alone basis is confusing and prejudicial' (because the jury was not tasked with assessing a prior-art invalidity defense)." (*Id.* (quoting Dkt. No. 386 at 215:9-20, 216:5-10, 217:17-20).)

Charter replies that "it was Touchstream, not Charter, that told the jury the 'invention' was something other than the claims and that the 'invention' included Internet content." (Dkt. No. 412 at 4-5.) Charter reiterates its argument that its "reliance on the 'prior art' Redford patent was solely to contradict Touchstream's story that it invented 'casting' with a three-part architecture, rather than the actual patent claims." (*Id.* at 5 (citing Dkt. No. 386 at 212:3-7, 218:19-220:17; Dkt. No. 388 at 940:18-941:7).)

The Court finds that Touchstream has failed to meet its burden to show that a new trial on this basis is warranted. As an initial matter, the Court does not find that Charter's use of the prior art patent caused any juror confusion. Touchstream's counsel and Mr. Strober told the Jury that Touchstream invented "casting" using a three-part architecture having a server in between the phone and the display device. (Dkt. No. 386 at 138:12-13, 140:21-141:5, 175:18-179:12.) Charter properly sought to rebut Touchstream's statements and Mr. Strober's testimony. Touchstream cannot open the door at trial and then use its opponent's taking advantage of that open door as a basis to secure a new trial after the Jury rejects them. To allow such would only encourage baiting an opponent in trial to bank a "get a new trial free card" if they lose. Charter also properly challenged Mr. Strober's credibility by demonstrating that these broad concepts were invented

before Mr. Strober's invention and that his invention was an improvement over the prior art. (*Id.* at 138:12-13, 140:21-141:5, 175:18-179:12, 210:4-212:18, 218:3-220:17.) Charter's cross-examination of Mr. Strober on the prior art patent was also relevant to damages. As the Court noted, and Touchstream conveniently omitted from its motion, the Court permitted Charter to lay the factual predicate with Mr. Strober to allow Charter's damages expert to provide opinions on the value of Mr. Strober's improvement over the prior art. (*Id.* at 216:21-217:20.) The Court also finds that Charter's use of the prosecution history was proper. Charter appropriately used the prosecution history to attack Mr. Strober's credibility and to focus the Jury on what Mr. Strober did and did not invent. (*Id.* at 210:4-212:18, 218:3-220:17.)

Also, the Court does not find Touchstream's challenge to the Court's decision to not provide a specific proposed jury instruction persuasive. The parties proposed a jury instruction regarding prior art. Specifically, the proposed instruction stated that "[p]rior art is not relevant to the issues of infringement or invalidity, but may be relevant to the issue of damages." (Dkt. No. 373-1 at 10.) While the Court agrees that the proposed instruction is a correct statement of law, the Court disagrees that the proposed instruction "was not covered by other instructions, and it addressed an important issue needed to help avoid jury confusion." (Dkt. No. 396 at 10.)

The Court, within its discretion, declined to give the parties' proffered jury instruction to avoid juror confusion. Charter only presented a written description invalidity defense under § 112 at trial. Charter did not present a prior art invalidity defense under §§ 102 or 103. Thus, the Court did not instruct the Jury on prior art. The single reference to prior art in the Court's final instructions was with respect to the level of disclosure the jurors can consider when analyzing written description:

> The written description does not have to be in the same exact words as the claim. The requirement may be satisfied by any combination of the words, structures,

figures, diagrams, formulas, et cetera, contained in the patent specification. Adequate written description does not require either examples or an actual reduction to practice the claimed invention. However, a mere wish or plan for obtaining the claimed invention is not adequate written description. Rather, the level of disclosure required depends on a variety of factors, such as the existing knowledge in the particular field, the scope and content of the prior art, the maturity of the science or technology, and other considerations appropriate to the subject matter.

(Dkt. No. 390 at 1128:24-1129:11.) The Court did not instruct the Jury on what is prior art. In this context, the Court found that the parties' proposed instruction, which would have instructed the Jury on what prior art was relevant to, would likely have caused juror confusion when the Jury had not heard about prior art before.

Further, the Court's instructions specifically instructed the Jury on how to analyze infringement and invalidity. For infringement, the Court instructed the Jury that:

> [I]n reaching your decision on infringement, keep in mind that only the claims of a patent can be infringed, and you must compare the asserted claims as I have construed them to the accused functionalities to determine whether or not there is infringement. ***And this, ladies and gentlemen, is the only correct comparison; a comparison between the asserted claims and the accused functionalities***.
>
> …
>
> For purposes of finding infringement, the proper comparison is between the language of the asserted claims and the accused functionalities. The fact that Charter has its own patents is not to be considered when making this comparison.
>
> …
>
> In determining whether the use of the accused functionalities infringes a patent claim in this case, you must compare use of the accused functionalities with each and every one of the required steps of that claim to determine whether such use performs each and every step recited in the claim.

(Dkt. No. 390 at 1121:12-18, 1122:22-24, 1123:21-1124:1 (emphasis added).) The Court's instructions clearly instructed the Jury that to find infringement, the jurors must compare the accused system to the Asserted Claims, nothing else. For Charter's written description invalidity defense, the Court instructed the Jury that:

> To succeed on its claims of lack of adequate written description as to the asserted claims, Charter must show by clear and convincing evidence that a person having ordinary skill in the field reading the patent specification as of the priority date of that patent would not have understood that the specification describes the full scope of the invention as it is claimed in the claims of the patent.
>
> …
>
> Now, in deciding whether the patents-in-suit satisfy the written description requirement, you must consider the description from the viewpoint of a person having ordinary skill in the field of the technology of the patent as of the filing date of the patents-in-suit, as I've previously instructed. The specification, ladies and gentlemen, must describe the full scope of the claimed invention, including each element thereof, either expressly or inherently.
>
> …
>
> ***The only proper comparison for evaluating whether a patent satisfies the written description requirement is comparing the specification to the claims.*** You may not consider Touchstream's theories of infringement when deciding whether Charter has proven lack of adequate written description.

(Dkt. No. 390 at 1127:23-1128:4, 1128:6-1128:13, 1128:18-23 (emphasis added).) The Court's instructions clearly instructed the Jury that to find invalidity based on a lack of adequate written description, the jurors must compare the specification to the claims, nothing else. As discussed above, jurors are presumed to follow the Court's instructions. *E.g., Hollis*, 259 F.3d at 417; *Richardson,* 481 U.S. at 206. Touchstream has not presented any evidence that the Jury disregarded the Court's instructions. There is no reason to believe that the Jury in this case did not follow the Court's instruction.

Further, the final instructions to the Jury on the law are squarely within the Court's purview, not the parties. It is the Court's charge to the Jury. Counsel may suggest and request, but it falls to the trial judge to present a fulsome and unconfusing charge. These concerns often result in the Court's rejection of suggestions by counsel that are many times duplicative and/or might lead to juror confusion. That concern is what led to the rejection of this (and other) proffered instructions from the parties.

Accordingly, the Court finds that a new trial is not warranted on this basis.

> **c.** **Charter Did Not Confuse the Jury into Finding Non-Infringement by Pointing Out that Mr. Mitschele Left Trial**

Touchstream argues that Charter confused the Jury "by suggesting that the jury should find no infringement (no 'wrong') because Touchstream's CEO was not present for closing arguments." (Dkt. No. 396 at 11.) Touchstream asserts that Charter's argument violated the Court's standing motion *in limine* No. 24. (*Id.*) Touchstream also asserts that "Charter made things worse by asking the jury to place themselves in the absent CEO's position: a variant of the prohibited 'Golden Rule' argument that improperly 'encourage[s] the jury to decide the case on the basis of personal interest and bias rather than on the evidence.'" (*Id.* (quoting *Whitehead v. Food Max of Mississippi, Inc.*, 163 F.3d 265, 278 (5th Cir. 1998)) (cleaned up).)

Charter first responds that Touchstream waived this argument. (Dkt. No. 399 at 14-15.) Charter argues that Touchstream waived this argument by not objecting during Charter's questioning of Touchstream's CEO, Herb Mitschele, or during Charter's closing. (*Id.* at 14.) Charter further responds that, even if not waived, Touchstream's argument is meritless. (*Id.* at 14-15.) Charter contends the Court's standing motion *in limine* "exists to prevent the jury from speculating about what might be said by people who are not present at trial." (*Id.*) Charter asserts that Mr. Mitschele "was at trial, and the jury heard his sworn testimony so it did not have to speculate." (*Id.* at 15.) Charter further argues that "there is absolutely no way that counsel's sole comment in closing materially affected the trial." (*Id.*) Touchstream contends that "[c]ounsel did not argue that Charter should be let off the hook because Mr. Mitschele decided to leave early." (*Id.*) Touchstream states that, instead, Charter was challenging Mr. Mitschele's credibility. (*Id.*)

Touchstream responds that even though it did not object to Charter's argument during trial "'substantial injustice would result, contrary to Rule 61,' if the infringement verdict were left

standing." (Dkt. No. 405 at 5 (quoting *Whitehead*, 163 F.3d at 278).) Touchstream also emphasizes its argument that Charter violated the Court's standing motion *in limine*, and Charter's argument is an obvious variant of the prohibited Golden Rule argument. (*Id.*)

In its sur-reply, Charter responded that Touchstream "ignores the reasons for the cross-examination of Mr. Mitschele about which it complains." (Dkt. No. 412 at 5.) Charter reiterates its argument that its cross-examination was a proper impeachment of Mr. Mitschele's testimony about how personally invested he was in Touchstream and how important it was to him that Mr. Strober and Touchstream's investors be compensated. (*Id.*) Charter emphasized that Touchstream did not object to Charter's cross-examination of Mr. Mitschele. (*Id.*) Charter also responds that "none of this has anything to do with the 'Golden Rule,' which forbids parties from encouraging jurors to put themselves in the place of the plaintiff and to award plaintiff the damages they themselves would want if they stood in the plaintiff's shoes." (*Id.*)

The Court finds that Touchstream has failed to meet its burden to show that a new trial on this basis is justified. As an initial matter, Touchstream waived this objection by failing to properly raise it at trial. *See ATEN Int'l*, 932 F.3d at 1370 (holding that a contemporaneous objection must be specific and that by failing to object the party "waived any challenge to the jury's finding of infringement based on this testimony"); *Lucent Techs.*, 580 F.3d at 1325 ("Any implicit objection on appeal is deemed waived by failing to object at trial."). It is undisputed that Touchstream neither objected to Charter's cross-examination of Mr. Mitschele nor Charter's closing argument.

Even if the Court did not consider this objection waived, the Court does not find, on the merits, that Charter made an impermissible "Golden Rule" argument. During closing arguments, Charter attacked Mr. Mitschele's credibility by reminding the Jury of Mr. Mitschele's unobjected-to testimony regarding how personally invested he was in Touchstream and how important it was

to him that Mr. Strober and Touchstream's investors be compensated. Despite this, Mr. Mitschele left trial early. That was Mr. Mitschele's decision and Charter did not ask the Jury to treat any party as they would want to be treated or to put themselves in someone else's shoes. However, even if Charter had invoked the Golden Rule, "a new trial is warranted only if the opposing party shows that it was sufficiently prejudiced considering all the facts and circumstances of the case." *United States v. Jefferson,* 258 F.3d 405, 412 (5th Cir. 2001). Here, Touchstream has not shown that it was sufficiently prejudiced, especially considering Touchstream's failure to object during either Mr. Mitschele's cross-examination or during Charter's closing argument.

Regarding Touchstream's argument that Charter violated the Court's standing motion *in limine* No. 24, even if not waived, the Court finds that Charter's reference to Mr. Mitschele leaving trial early made during Charter's closing argument was not so prejudicial as to warrant a new trial. This, again, is confirmed by Touchstream's failure to object during trial. No trial is error free, but only errors objected to and properly preserved should be raised post-trial.

The Court finds nothing in what Touchstream has raised, either individually or collectively, which warrants setting aside the Jury's verdict and ordering a new trial. Accordingly, the Court finds that a new trial is not warranted on this basis.

## III.    JMOL MOTION (DKT. NO. 397)

In the JMOL Motion, Touchstream moves for JMOL that the Asserted Claims of the Asserted Patents are infringed. (Dkt. No. 397 at 1.) Specifically, Touchstream argues that no reasonable juror could find non-infringement based on Charter's three non-infringement arguments.[2] (*Id.*) The Court addresses each argument in turn. However, the Court finds that no

---

[2] Touchstream also argues that it established infringement as a matter of law. (Dkt. No. 397 at 4-7.) Considering the Court's finding that substantial evidence supports the Jury's finding of non-infringement, the Court need not consider Touchstream's argument that it affirmatively established infringement as a matter of law.

basis compels setting aside the Jury's verdict and granting Touchstream's JMOL.

### A.    Applicable Law

"Judgment as a matter of law is proper when 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir. 2013) (quoting Fed. R. Civ. P. 50(a)). The non-moving party must identify "substantial evidence" to support its positions. *TGIP, Inc. v. AT&T Corp.*, 527 F. Supp. 2d 561, 569 (E.D. Tex. 2007). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1363 (Fed. Cir. 2004).

"The Fifth Circuit views all evidence in a light most favorable to the verdict and will reverse a jury's verdict only if the evidence points so overwhelmingly in favor of one party that reasonable jurors could not arrive at any contrary conclusion." *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1361 (Fed. Cir. 2018) (citing *Bagby Elevator Co. v. Schindler Elevator Corp.*, 609 F.3d 768, 773 (5th Cir. 2010)). A court must "resolve all conflicting evidence in favor of [the verdict] and refrain from weighing the evidence or making credibility determinations." *Gomez v. St. Jude Med. Diag. Div. Inc.*, 442 F.3d 919, 937-38 (5th Cir. 2006).

Rule 50(a)(2) requires the movant, before the case is submitted to the jury, to "specify the judgment sought and the law and the facts that entitle the movant to the judgment." Generally, a party who fails to present a Rule 50(a) motion on an issue at the close of evidence waives its right to present a Rule 50(b) motion after judgment and its right to challenge the sufficiency of the evidence on appeal. Fed. R. Civ. P. 50(b); *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 288 (5th Cir. 2007). Furthermore, "it is improper to use a JMOL motion as a renewed *Daubert* challenge" and "[t]he same is true of claim construction and summary judgment arguments previously rejected by the Court." *U.S. Silica Co. v. Amberger Kaolinwerke Eduard*

*Kick GMBH & Co. KG*, No. 2:20-cv-00298-JRG, 2023 WL 2542600, at *4 (E.D. Tex. Mar. 15, 2023), *appeal dismissed*, No. 2023-1813, 2023 WL 4985730 (Fed. Cir. Aug. 3, 2023).

### B.   Analysis

#### 1.   Touchstream Did Not Waive its JMOL Motion

As an initial matter, Charter argues that Touchstream waived its JMOL motion. (Dkt. No. 398 at 3-5.) Charter asserts that during its oral 50(a) motion, Touchstream did not identify any law or facts that entitled it to JMOL. (*Id.*) Touchstream responds that its oral 50(a) motion raised the same grounds as its JMOL Motion. (Dkt. No. 406 at 1-2.) Touchstream asserts that its oral "arguments were more than sufficient to preserve Touchstream's Rule 50(b) motion." (*Id.* at 1.)

The Court does not find that Touchstream waived its JMOL Motion. Touchstream moved for JMOL under Rule 50(a) on the issue of infringement at the close of evidence. (Dkt. No. 389 at 1056:24-1057:6.) The Federal Circuit has "held that even a cursory motion suffices to preserve an issue on JMOL so long as it 'serves the purposes of Rule 50(a), *i.e.,* to alert the court to the party's legal position and to put the opposing party on notice of the moving party's position as to the insufficiency of the evidence.'" *W. Union Co. v. MoneyGram Payment Sys., Inc.*, 626 F.3d 1361, 1367 (Fed. Cir. 2010) (quoting *Blackboard, Inc. v. Desire2Learn, Inc.,* 574 F.3d 1371, 1379-80 (Fed. Cir. 2009)). While rather concise, the Court finds that Touchstream's 50(a) motion on the issue of infringement was sufficient to preserve its JMOL Motion.

#### 2.   The JMOL Motion Focuses on Factual Disputes

Charter argues that Touchstream's JMOL Motion raises questions of fact, not law. (Dkt. No. 398 at 5-7.) Charter contends that Touchstream is factually and legally wrong. (*Id.*) Charter asserts that, factually, "there was disagreement between the experts about how the accused feature works." (*Id.* at 5-6.) Charter argues that while Dr. Shamos and Touchstream's expert, Dr. Stephen Wicker, generally agreed on how the system works, there were still disagreements. (*Id.*) Charter

asserts that, legally, "even where Dr. Wicker and Dr. Shamos agree on how the Charter system works, the application of the claims to that system is still a matter for the jury, particularly where the majority of the terms in this case were construed to have their plain and ordinary meaning." (*Id.* at 6-7.)

Touchstream responds that its JMOL Motion only raises questions of law. (Dkt. No. 406 at 3-4.) Touchstream contends that Charter asks to Court to adopt a position "that even where two experts agree in all material respects on the structure and operation of an accused device, the case must always go to the jury if the experts disagree about the ultimate issue of infringement." (*Id.*) Touchstream argues that "even under Dr. Shamos's description of the accused devices, no reasonable juror could have found infringement because his bases for non-infringement were based on misapplications of the claims." (*Id.* at 4.) Touchstream asserts that "Dr. Shamos recognized at trial that his key bases for his disagreement with Touchstream's expert were over who 'obeyed the Court's claim constructions.'" (*Id.* (quoting Dkt. No. 388 at 936:14-20).) Touchstream also asserts that Dr. Shamos's alleged parroting of the claim language cannot create substantial evidence or a factual dispute. (*Id.*)

The Court finds that, as further discussed below, Touchstream's JMOL Motion raises questions of fact, not law. With respect to each of the three bases Touchstream raises in its JMOL Motion, the parties presented factual disputes with respect to how the accused system works. While Touchstream asserts that Dr. Wicker and Dr. Shamos "agree[d] in all material respects on the structure and operation of" the accused system and, thus, they inherently agree on infringement, the Court disagrees. Based on the evidence and testimony presented at trial, there were material factual disputes about Charter's accused system. Such factual disputes are for the Jury to decide. Further, the Court agrees with Charter that even if the parties agreed on how the accused system

operates, the application of the Asserted Claims to the accused system is a question of fact for the Jury to decide. Decisions regarding disagreements within the record are left solely to the Jury. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."). The Court's role at the 50(b) stage is to assess whether substantial evidence supports the result that the Jury reached. *KAIST IP US LLC v. Samsung Elecs. Co.*, 439 F. Supp. 3d 860, 879 (E.D. Tex. 2020). Here it does.

### 3. Substantial Evidence Supports Non-Infringement Based on Charter's MAC Address Argument

Touchstream argues that Charter's MAC address argument conflicts with the Asserted Claims. (Dkt. No. 397 at 8-12.) Touchstream's challenge concerns three limitations of the Asserted Claims and the Court will now address each in turn.

#### a. "Providing" Limitation

Touchstream argues that "Charter wrongly contends that the MAC address uniquely associated with each of its STBs[3] does not meet the" providing limitations of the '751 and '934 Patent. (*Id.*) Touchstream states that "Claim 17 of the '934 patent recites that a 'unique identifier' is provided by a 'media receiver' 'to a computing device in communication with a server system ….'" (*Id.* at 8.) Touchstream also states that the '751 Patent "include[s] [a] similar limitation[], except use[s] the phrase, 'synchronization code,' instead of 'unique identifier.'" (*Id.* at 8-9.) Touchstream argues that the accused system satisfies these limitations. (*Id.* at 9.) Specifically, Touchstream asserts that the testimony and evidence establish that "(a) Charter's servers receive the MAC addresses for each of Charter's STBs and use them to uniquely identify each STB ('media receiver'); and (b) if someone uses the accused Spectrum TV mobile application, the MAC

---

[3] "STB" refers to set-top box. (Dkt. No. 397 at 5.)

address is sent to that user's mobile phone (or other computing device) via Charter's servers." (*Id.* (citing Dkt. No. 387 at 495:2-497:25; Dkt. No. 388 at 810:10-14).) Touchstream argues that Charter's expert, Dr. Shamos, agreed with Touchstream on how the accused feature worked, but concluded that the accused feature did not infringe because "the STBs … do not 'provide' their MAC addresses to a phone." (*Id.* at 9-10 (citing Dkt. No. 388 at 966:12-24; Dkt. No. 389 at 999:3-1000:17, 1003:2-5).) Touchstream contends that Dr. Shamos's reasoning "is based on the facts that (a) Charter uses an 'intermediary' (a server) to transfer the MAC from the STB to a phone; and (b) the transfer steps (from the STB to the server, and then from the server to phone) 'occur at wildly different times' ….'" (*Id.* at 10 (quoting Dkt. No. 388 at 962:25-963:20).) Touchstream argues that the Asserted Claims neither have a timing requirement nor preclude a server from being an intermediary. (*Id.*)

Touchstream also argues that Charter's non-infringement position is contrary to the Court's claim construction and Charter's claim construction arguments. (*Id.*) Touchstream represents that "the Court stated that the 'claim language *leaves open how* the personal computing device obtains the synchronization code[/unique identifier],' and that there is '*no limitation on how the content presentation device provides* the synchronization code to a remote computing device.'" (*Id.* at 10-11 (quoting Dkt. No. 74 at 13-15, 31) (emphasis added by Touchstream).) Touchstream asserts that Charter "urged the Court to limit the claim scope to require an 'intermediary': a person," but that the Court rejected Charter's attempt the narrow the claim limitations. (*Id.* at 11.) Touchstream argues that "by raising this during claim construction, Charter demonstrated that this is a claim construction argument rather than an infringement argument," and that testimony and evidence regarding this issue was improper. (*Id.*)

Charter responds that "to prove infringement, Touchstream had to show that the STB provided its MAC address to the mobile device while the mobile device was in communication with the server." (Dkt. No. 398 at 19-22.) Charter contends that "Dr. Shamos explained that the STB never provides its MAC address to the mobile device, and that instead it is the server that provides the MAC address to the mobile device." (*Id.* at 19-20 (citing Dkt. No. 388 at 962:11-964:18).) Charter asserts that "Dr. Wicker admitted that the STB communicates only with Charter's servers, and not with the mobile device." (*Id.* (citing Dkt. No. 387 at 497:20-22).) Charter argues that Touchstream "ignores the claim language, which requires that the 'content presentation device' provides the 'synchronization code' to the 'remote computing device.'" (*Id.* at 20.) Charter asserts "[t]hat cannot happen if, as with Charter, the 'content presentation device' (the STB) has no idea that the 'remote computing device' (the phone) even exits." (*Id.* (citing Dkt. No. 388 at 962:21-964:18).) In response to Touchstream's improper claim construction argument, Charter asserts that Touchstream waived this argument by not raising it under Rule 50(a) or objecting during Dr. Shamos's testimony. (*Id.* at 21.) Charter also argues that Touchstream's argument is meritless because Dr. Shamos applied the Court's construction and Touchstream misrepresents Charter's positions during claim construction. (*Id.*)

Touchstream replies that "Charter's opposition … boils down to Dr. Shamos's 'wildly different times' argument." (Dkt. No. 406 at 4-5.) Touchstream asserts that "Charter points to nothing in the claim requiring instantaneous communication—or that the phone is communicating with the server while the STB transfers the MAC to the server." (*Id.* at 5.) Touchstream contends that the Court found that there is "*no limitation on how the content presentation device provides the synchronization code [or unique identifier] to a remote computing device.*" (*Id.* (quoting Dkt. 74 at 13) (emphasis added by Touchstream).)

Charter reiterates its argument that "Dr. Shamos explained to the jury that the accused STBs never provide their MAC addresses to the mobile device; instead, it is the server that provides the MAC addresses to the mobile device, without any involvement by the STB." (Dkt. No. 411 at 7-8.)

The Court finds that substantial evidence supports the Jury's finding that the accused systems do not practice the "providing" limitations. First, Touchstream waived any argument that Dr. Shamos provided opinions contrary to the Court's claim construction as Touchstream failed to raise this objection at trial. *Hewlett-Packard Co. v. Mustek Sys. Inc.*, 340 F.3d 1314, 1320 (Fed. Cir. 2003) ("[P]arties cannot reserve issues of claim construction for the stage of post-trial motions."); *see also ATEN Int'l*, 932 F.3d at 1370. "Having failed to raise such objection during the course of the trial, when any objectionable argument could have been rectified, the Court does not find that the remedy of a new trial is warranted." *See Paice LLC v. Toyota Motor Corp.*, 2006 U.S. Dist. LEXIS 61603, at *3-5 (E.D. Tex. Aug. 16, 2006).

Second, the Court finds that Charter, through Dr. Shamos, presented substantial evidence regarding the "providing" limitations to support the Jury's non-infringement verdict. For instance, the Jury heard testimony from Dr. Shamos that the server provides the MAC address to the mobile device, not the STB:

> Q. Let's talk about the next claim element, which we haven't talked about yet. Can you explain this one to the jury, please? This is 12.b, the 'providing' step.
>
> A. Okay. So this is a little different from the '251 claim. I'm going to translate this into device language that's being used in this case--providing, by the set-top box, the MAC address to a cell phone in communication with the remote server device.
>
> Q. Does Charter's system do that step?
>
> A. No, it doesn't do that.
>
> Q. And what did Dr. Wicker do wrong with respect to this step?
>
> A. So he drew -- I recall him drawing a picture where the set-top box sends its MAC address to a server and then the server sends a MAC address to the phone. And he

made it look like the server was kind of an intermediary there, but these steps occur at wildly different times. The MAC address is sent to the server when the box is first turned on. When the box is first turned on, there's no cell phone running the Spectrum TV app. You might not turn on your phone for month or you might never turn it on. And so the MAC address is not received by the phone from the set-top box; it's from the server.

Q. Is there particular words in the claim that you believe Dr. Wicker wasn't paying attention to?

A. Yeah.

Q. Which ones?

A. 'By the content presentation device'. It's not provided by the content presentation device; it's provided by the server.

Q. And what about the remote computing device in communication with the remote server device?

A. Well, there's no cell phone communicating with the server device at the time the MAC address is sent up by the set-top box to the server.

Q. So that doesn't happen either?

A. No.

(Dkt. No. 388 at 962:11-963:22.) Dr. Shamos further testified that the STB never provides anything to the phone; instead, the STB sends the MAC address to the server and has no idea what happens after:

Q. Can you explain what this slide is showing in terms of the 'providing' step?

A. Yes. So when you first turn on your set-top box, it sends its MAC address up to the servers, and the servers make a note that this set-top box is alive and well in case it ever has to address it for some reason. Then a week later you turn on your phone and when you log onto your account, or in the case where you got logged on automatically, the Charter servers inform your phone of all of the set-top boxes that you have the ability to control.

Q. Does the Charter set-top box ever provide its MAC address to the user's phone?

A. No. The set-top box has no idea that there's a phone in the picture anywhere.

Q. Is that because the server controls everything?

A. Well, not only does the server control everything, but the set-top box neither knows nor cares if there's a phone around.

(*Id.* at 964:1-18.)

Touchstream essentially moves for JMOL because it disagrees with Dr. Shamos. There is adequate evidence in the record via Dr. Shamos's expert testimony for a reasonable juror to conclude that the accused systems do not meet the "providing" limitation. The Jury is entitled to afford credit to the competing experts as it sees fit, and to "reject 'an expert's testimony that has been contradicted or impeached.'" *Core Wireless*, 880 F.3d at 1364. As such, it is immaterial that Dr. Wicker provided contradictory opinions. Such testimony cannot, on a motion under Rule 50(b), justify overturning the Jury's verdict and entering JMOL in Touchstream's favor. *See Reeves*, 530 U.S. at 150 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").

Accordingly, judgment as a matter of law on this basis is not warranted.

### b.    "Assigning" and "Obtaining" Limitations[4]

Touchstream argues that "Charter wrongly contends that the MAC address uniquely associated with each of its STBs does not meet the" assigning and obtaining limitation of the '251 and '751 Patents. (Dkt. No. 397 at 8-12) Touchstream contends that Charter's argument "that the 'assigning a synchronization code' and 'obtaining a synchronization code' limitations … are not met because the MAC addresses for Charter's STBs are already 'baked into' the STBs when they are manufactured," was irrelevant. (*Id.* at 11-12 (citing Dkt. No. 388 at 943:2-13, 943:14-947:25, 960:9-962:8).) Touchstream asserts that the "patents expressly contemplate Charter's configuration, *i.e.*, that a MAC address may be assigned as a synchronization code." (*Id.*) Touchstream contends that "in Charter's system, it is undisputed that its *servers* associate a unique ID (MAC address) with each STB, and then provide the unique ID to computing devices with the Spectrum TV app." (*Id.* at 12 (citing Dkt. No. 387 at 495:2-497:25, 537:1-539:6) (emphasis added

---

[4] Consistent with Touchstream combining its arguments for the "assigning" and "obtaining" limitations in the JMOL, the Court will address these limitations together.

by Touchstream).) Touchstream states that "[t]he unique number (MAC address) is 'assign[ed] by a server system' to the STB for purposes of using the Spectrum TV app" … and "that unique MAC is certainly 'obtain[ed]' and 'stored on a remote server,' as recited in the '751 patent." (*Id.*)

Charter states that "[b]oth parties' experts agreed that MAC addresses are built … onto every STB ***by the box's third party manufacturer***, not by Charter." (Dkt. No. 398 at 17-19 (citing Dkt. No. 387 at 557:8-24; Dkt. No. 388 at 943:3-25) (emphasis added by Charter).) Charter asserts that "Dr. Shamos explained that the assigning step 'is not done by Charter. It's not done by a server system. Charter doesn't assign anything to the box. Oh, it records the MAC address somewhere else on the server, but that's not assigning an address to the set-top box.'" (*Id.* at 17-18 (quoting Dkt. No. 388 at 942:3-21).) Charter argues that "Charter's servers never perform the assigning step, because the STBs already had their MAC addresses assigned to them by the manufacturer before they were purchased by Charter." (*Id.*) Charter asserts that the trial testimony established that the STB did not obtain a MAC address from any Charter server but, instead, from the third-party manufacturer. (*Id.* at 18-19 (citing Dkt. No. 387 at 557:8-24; Dkt. No. 388 at 960:9-961:4, 962:1-8).)

Touchstream replies that "Charter does not dispute two dispositive facts: (a) Charter's server records a MAC address that it uses to uniquely identify a Charter STB … and (b) those servers could have been programmed to assign a different number than the MAC address." (Dkt. No. 406 at 6 (citing Dkt. No. 387 at 538:6-10; Dkt. No. 388 at 942:19-20; Dkt. No. 389 at 999:3-18).) Touchstream asserts that "irrespective whether a manufacturer assigned the MAC to the STB, the server also does so" and "[t]here is nothing in the claim requiring the server to use a new number." (*Id.*)

Charter reiterates its response that "the MAC address is built into each STB by the manufacturer, not assigned by a Charter server to the STB." (Dkt. No. 411 at 6.) Charter argues that "[a] server 'recording' which MAC address was previously assigned to the STB is not the same as a server 'assigning' a MAC address to the STB." (*Id.*) Charter also asserts that "Touchstream concedes that the STB does not obtain its MAC address from the server but rather '*from [the STB's own internal] hardware* by using software described as the getter for the MAC address of this set-top box.'" (*Id.* at 6-7 (quoting Dkt. No. 406 at 6) (emphasis added by Charter) (cleaned up).)

The Court finds that substantial evidence supports the Jury's finding that the accused systems do not practice the "assigning" and "obtaining" limitations. The Asserted Claims of the '251 Patent recite: "assigning, by a server system, a synchronization code to the display device." The Asserted Claims of the '751 Patent recite: "obtaining, by a content presentation device, a synchronization code associated with the content presentation device, wherein the associated synchronization code is stored on a remote server device." Touchstream asserts that the STB is a "display device" or "content presentation device" and a MAC address is a "synchronization code." (*E.g.*, Dkt. No. 397 at 11-12; Dkt. No. 387 at 495:11-20, 496:3-15.) At trial, Charter presented undisputed evidence that a third-party manufacturer builds into each STB the MAC Address when they manufacture them. (Dkt. No. 387 at 557:8-24; Dkt. No. 388 at 943:3-25.) Dr. Shamos disputed Dr. Wicker's testimony that Charter's servers assign a MAC address to the STB:

> Q. So my next question was what did Dr. Wicker do wrong. I think you already answered that.
>
> A. Well, he kind of waved his hands and he says, Well, there's a MAC address and there's a set-top box and it gets recorded in the server so there's some kind of assignment.
>
> Q. Okay. So let's be clear about this claim. The verb is 'assigning'. Right?
>
> A. Yes.

Q. And what has to do that assigning?

A. Charter has to do the assigning.

Q. Charter's server?

A. Yes; assigning by a server.

Q. Now, the MAC address is assigned to the set-top box how?

A. It's baked into the set-top box when the box is manufactured, and I think everybody in this case agrees with that. Dr. Wicker said that, the fact witnesses said that, there is no doubt about that.

(Dkt. No. 388 at 942:22-943:13.) Dr. Shamos further disputed Dr. Wicker's testimony that the

STB is obtaining the MAC address from the server system but, instead, the STB is giving the MAC

address to the server system:

Q. Mr. Frusciano testified that, When a set-top box is first connected to Charter's network, does it inform the network of its device MAC ID?

A. Yes, it does.

Q. So the set-top box is giving its MAC address to the Charter system. Is that right?

A. Yes. It's not obtaining it from the server system; it's giving it to the server system.

(*Id.* at 962:1-8.)

Again, Touchstream essentially argues that the Jury should have believed its expert, Dr.

Wicker, over Dr. Shamos.[5] The Court reiterates that re-arguing disputed factual positions and

urging the Court to usurp the Jury's role as fact finder and arbiter of credibility is not proper on a

request for JMOL under Rule 50(b). *See Reeves*, 530 U.S. at 150 ("Credibility determinations, the

weighing of the evidence, and the drawing of legitimate inferences from the facts are jury

functions, not those of a judge."). That Touchstream presented conflicting evidence to Dr. Shamos

---

[5] Touchstream raised a new argument in its reply that, for the "obtaining" step, "[n]othing in the claims requires the STB to obtain the MAC address (sync code) from the server, as Charter argues." (Dkt. No. 406 at 6.) The Court finds that Touchstream waived this argument by not raising it until its reply. "It is black-letter law that arguments raised for the first time in a reply brief are waived 'as a matter of litigation fairness and procedure.'" *Intell. Ventures II LLC v. Sprint Spectrum, L.P.*, No. 2:17-cv-00662-JRG-RSP, 2019 WL 2959568, at *3 (E.D. Tex. Apr. 18, 2019) (quoting *Novosteel SA v. United States*, 284 F.3d 1261, 1273 (Fed. Cir. 2002)).

at trial regarding the "assigning" and "obtaining" limitations placed the question as to who to believe squarely into the Jury's hands. The Jury sided with Dr. Shamos and Charter, and the Court will not upset that result. *Montano v. Orange Cty., Texas*, 842 F.3d 865, 874 (5th Cir. 2016) ("[I]t is for the jury alone to judge the credibility of witnesses and weigh the evidence.").

Accordingly, judgment as a matter of law on these bases is not warranted.

### 4.    Substantial Evidence Supports Non-Infringement Based on Charter's "Media Player"/"Media Player Application"/"Media Playing Application" Argument

Touchstream asserts that Charter's argument regarding "media player" and related terms[6] conflicts with the Asserted Claims. (Dkt. No. 397 at 12-15.) Touchstream states that the Court construed the "media player" limitations to mean "software for playing media." (*Id.* at 12 (citing Dkt. No. 74 at 9).) Touchstream asserts that Charter "takes the untenable position that it does not infringe because hardware, not the 'player' files in its STBs, plays the media." (*Id.* (citing Dkt. No 388 at 951:13-20).) Touchstream argues that Charter's position "is contrary to the way computers operate and the claim constructions." (*Id.* at 12-13.) Touchstream contends that a computer needs both hardware and software to play back media. (*Id.* at 13.) Touchstream asserts that it "identified three media players on Charter's STBs, all of which have 'player' in their names: VODplayer.java, TVplayer.java, and DVRplayer.java." (*Id.* (citing Dkt. No. 387 at 514:1-7).) Touchstream also asserts that Dr. Shamos and Charter's fact witness, David Bell, admitted that these media players are software that initiates or is involved in playing media. (*Id.* (citing Dkt. No. 388 at 760:9-17, 951:21-952:7).) Touchstream also contends that Charter's non-infringement argument seeks to reconstrue the "media player" limitations as requiring only the software to play the media, without

---

[6] Claims 1 and 7 of the '251 Patent recite "media player," claims 12 and 13 of the '751 Patent recite "media player application," and claims 17, 18, and 20 of the '934 Patent recite "media playing application" (collectively, the "'media player' limitations"). (*E.g.*, Dkt. No. 74 at 6.)

assistance from the hardware. (*Id.* at 13-14; Dkt. No. 406 at 6-7.) Touchstream further asserts that "Charter resorted to an improper comparison of Charter's system with the 'internet' embodiment in Touchstream's specification to prove non-infringement" of these limitations. (Dkt. No. 397 at 14 (citing Dkt. No. 388 at 955:9-956:2).)

Charter responds that Touchstream seeks to ignore the word "software" in the Court's construction, a construction to which the parties agreed. (Dkt. No. 398 at 7-8.) Charter contends that Dr. Shamos explained that media players can be implemented in either hardware or software. (*Id.* at 8 (citing Dkt. No. 388 at 948:12-950:12).) Charter asserts that Dr. Shamos "examined the accused STBs and saw that they used a chip—hardware—to play the media" and, thus, could not infringe under the Court's construction. (*Id.* (citing Dkt. No. 388 at 948:1-951:20, 955:1-4, 965:6-22, 967:2-8).) Charter asserts that Dr. Shamos explained how and why the files Touchstream asserts meet the "media player" limitations cannot play any media. (*Id.* (citing Dkt. No. 388 at 951:21-954:25).) Charter asserts that "[i]n addition to Dr. Shamos's testimony, the jury also considered testimony from fact witnesses about how the accused feature works." (*Id.* at 9.)

In response to Touchstream's argument that Charter infringes because "the software files Charter's STBs use includes the word 'player' in them," Charter points out that "Touchstream ignores the fact that Dr. Shamos and Mr. Bell both explained that what these files are ***called*** is not relevant to what they actually ***do***." (*Id.* (emphasis added by Charter).) Charter argues that "[t]here was disagreement in the record between Dr. Wicker on the one hand, and Dr. Shamos and Mr. Bell on the other, about aspects of what these files do, and the jury was free to credit either side." (*Id.* at 9-10.) Charter asserts that the Jury had reason to disregard Dr. Wicker, including for his lack of diligence in only testing one of the three accused STBs, which he knew operated differently. (*Id.* at 10-11 (citing Dkt. No. 387 at 551:1-11, 552:22-553:7, 555:18-25, 583:5-585:12, 587:25-588:5).)

Charter also argues that Touchstream's attempt to alter the construction of the "media player" limitations would "render[] the word 'software' meaningless, because *the entire STB* "exists for the purpose of facilitating playing media" and thus any part of it—hardware and software alike— would fall within Touchstream's new definition of media player." (*Id.* at 11-12 (emphasis added by Charter).) Finally, Charter responds that Touchstream waived its argument that Dr. Shamos made an improper comparison argument by failing to object at trial. (*Id.* at 12 (citing Dkt. No. 388 at 955:9-956:2).) Charter also asserts that Dr. Shamos did not make an improper comparison argument but, instead, responded to Dr. Wicker's generalizations about hardware and software. (*Id.* (citing Dkt. No. 387 at 578:22-579:9; Dkt. No. 388 at 955:9-956:2).)

The Court finds that substantial evidence supports the Jury's finding on the "media player" limitations. Touchstream essentially, but improperly, asks the Court to weigh the testimony of Dr. Wicker against Dr. Shamos and Mr. Bell and conclude that the Jury should have believed Dr. Wicker. For instance, Touchstream asks the Court to accept Dr. Wicker's disputed testimony that the three files on Charter's STBs—VODplayer.java, TVplayer.java, and DVRplayer.java—meet the claim limitations because they have the word "player" in their names. In response to Dr. Wicker's testimony, Charter presented rebuttal testimony from Dr. Shamos and Mr. Bell. For instance, Mr. Bell testified regarding what these three files do and what they do not do:

> Q. Do Charter set-top boxes have software for playing the media content requested with the Send-To-TV feature?
>
> A. No, they do not.
>
> Q. Why is that?
>
> A. Because the actual processing of that media occurs in hardware.
>
> Q. Are you familiar with software files that run on an ODN/MDN set-top box called VODcontentplayer.java?
>
> A. Yes, I am.
>
> Q. And what about TVplayer.java and DVRplayer.java?

A. Yes, I am.

Q. Are these files software for playing the media?

A. No, they are not.

Q. Why do they use the term 'player' if they don't play media?

A. Because in each of those three files, they're actually sending the command down to the hardware where the actual play is happening.

Q. So a play command would pass through these media files--I'm sorry--would pass through these TVplayer.java and other .java files to go to the hardware to actually play back the media?

A. Yes, that's correct.

(Dkt. No. 388 at 749:3-25.) Dr. Shamos provided similar rebuttal testimony. (*E.g.*, *id.* at 951:21-954:25.) Decisions regarding disagreements within the record are left solely to the Jury. *Reeves*, 530 U.S. at 150 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").

Further, the Court does not find Touchstream's argument persuasive that Dr. Shamos made an improper comparison argument. First, Touchstream did not object to this testimony from Dr. Shamos during trial. As a result, Touchstream has waived this argument. (Dkt. No. 388 at 955:9-956:2; *ATEN Int'l*, 932 F.3d at 1370 (holding that a contemporaneous objection must be specific and that by failing to object the party "waived any challenge to the jury's finding of infringement based on this testimony"); *Navigant Consulting*, 2006 WL 2422868, at *1 ("The failure to raise an objection at trial waives that objection, and the Court will not grant a new trial on that count.") (citing *Johnson v. Michelin Tire Corp.,* 812 F.2d 200, 210 n. 8 (5th Cir. 1987)).) Second, the Court does not find that Dr. Shamos's testimony constituted an improper comparison. The Court agrees that Dr. Shamos was responding to Dr. Wicker's generalizations about hardware and software. Dr. Wicker testified that "software needs hardware on which to run, and most complicated hardware requires some software to control it," and "a media player can exist in software and it just tells the hardware to decode it." (Dkt. No. 387 at 578:22-579:9.) Dr. Shamos could properly explain to the

Jury why Charter does not use the type of software Dr. Wicker testified about. (Dkt. No. 388 at 955:9-956:2.)

The Court's role at the 50(b) stage is to assess whether substantial evidence supports the result that the Jury reached. *KAIST*, 439 F. Supp. 3d at 879. Here, Charter and its expert, Dr. Shamos, and its fact witness, Mr. Bell, provided substantial evidence to support the Jury's non-infringement finding as to these limitations. While the Court recognizes that Touchstream and its expert, Dr. Wicker, disagree with Dr. Shamos's and Mr. Bell's testimony, that is irrelevant for the purposes of the present motion. Here, the parties presented the Jury with conflicting evidence and it "was free to credit whichever experts and their testimony it found to be credible." *Id.* at 881.

Accordingly, judgment as a matter of law on this basis is not warranted.

> **5.** **Substantial Evidence Supports Non-Infringement Based on Charter's Argument that Its Systems Do Not Include "Universal" Commands**

Touchstream argues that Charter wrongly contends that its systems do not meet the "universal command" limitations.[7] (Dkt. No. 397 at 15-17.) Touchstream states that the Court did not construe the "universal command" limitations and, thus, they are given their plain and ordinary meaning. (*Id.* at 15 n.9.) Touchstream contends that its expert, Dr. Wicker, explained that "Charter's Spectrum TV app sends universal playback commands in 'HTTP POST' format." (*Id.* at 15 (citing Dkt. No. 387 at 501:20-502:19).) Touchstream states that "there are three POST commands sent from phones using the accused app to Charter's server; the commands specify the content to be played from video-on-demand ('VOD'), linear TV ('Linear'), and DVRs ('FDVR'):

---

[7] Claim 17 of the '934 Patent requires "commands converted from a universal format" and claim 1 of the '251 requires "universal playback control command[s]" (collectively, the "universal command" limitations). (Dkt. No. 74 at 32-33.) The '751 Patent does not include these disputed limitations. (Dkt. No. 397 at 15.)

(*Id.* at 15-16 (citing Dkt. No. 387 at 502:14-505:20; JTX 5).) Touchstream asserts that "[t]he first two commands (for VOD and Linear) include the word 'flick' in them; and the third uses the word 'play.'" (*Id.* at 16.) Touchscreen argues these are in a universal format. (*Id.*) Touchstream asserts that Charter's expert, Dr. Shamos, "admitted that at least one of those three commands—the "play" (DVR) command—is universal:"

> Q. So when a Charter Spectrum app user casts DVR, that command is play. Correct?
>
> A. Yes.
>
> Q. And you agree that's a universal command.
>
> A. Yes.

(*Id.* (quoting Dkt. No. 389 at 1010:2-6).) Touchstream asserts that Dr. Shamos's argument that "the other two commands are not universal is conclusory and based on the irrelevant point that he's 'never heard "flick" used as a command before.'" (*Id.* (quoting Dkt. No. 388 at 957:21-958:2).) Touchstream contends that Charter's choice of words is irrelevant to whether the command is universal. (*Id.* at 17.) Touchstream argues that its expert, Dr. Wicker, "explained, the 'flick' command (which Dr. Shamos claims are not universal) and the 'play' command (which Dr. Shamos admits is universal) are synonymous: they each mean 'play.'" (*Id.* (quoting Dkt. No. 387 at 503:18-504:25).) Touchstream further asserts that "there is no dispute among the parties' experts

that the HTTP POST 'play' command (for DVRs) is universal" and "[t]hat alone means that the accused systems meet the 'universal' command limitation of the '934 and '251 patents." (*Id.*)

Charter responds that Touchstream's arguments concern disputes between experts. (Dkt. No. 398 at 13-16.) Charter asserts that "Dr. Wicker and Dr. Shamos disagreed about two key factual issues: (1) what constitutes the alleged 'commands' (the entire HTTP post command or just a part of it) and (2) is the alleged command 'universal' according to the plain and ordinary meaning of the Universal Command Limitations." (*Id.*) Charter argues that Touchstream "plucked 'flick' and 'play' out of the larger HTTP post command, but it was the entire HTTP post command that must be considered." (*Id.* at 13-14.) Charter contends that Dr. Shamos and Mr. Bell explained that the HTTP post commands are Charter-specific, not universal. (*Id.*) Charter also asserts that "Dr. Wicker conceded that the commands as a whole were not universal." (*Id.* (citing Dkt. No. 387 at 562:7-10).) Charter further responds that even if "flick" and "play" were commands, they are not "universal." (*Id.* at 15-16.) Charter asserts that Dr. Shamos explained that neither "flick" nor "play" "applies to all three of the modes of operation, *i.e.*, Linear, VOD, and DVR, and thus they do not work 'across the universe of available players.'" (*Id.* (citing Dkt. No. 388 at 957:8-958:7, 1019:25-1021:6).) Charter contends that "Dr. Wicker agreed with Dr. Shamos that 'flick' and 'play' do not work for all three of the alleged media players." (*Id.* (citing Dkt. No. 387 at 561:9-563:12).) Charter argues that the Jury was free to accept either side's testimony to find whether the "universal command" limitations were met. (*Id.* at 13-16.)

The Court finds that substantial evidence supports the Jury's finding on the "universal command" limitations. Touchstream, once again, essentially asks the Court to weigh the testimony of Dr. Wicker against Dr. Shamos and Mr. Bell and conclude that the Jury should have believed Dr. Wicker. Touchstream asks the Court to accept Dr. Wicker's disputed testimony and

Touchstream's assertion that Dr. Shamos "admitted" that the accused systems meet the "universal command" limitations. As an initial matter, the Court disagrees that Dr. Shamos made "an unequivocal admission" that "play" is a universal command. Dr. Shamos testified that "play" is a universal command when Charter's Spectrum app user casts DVR:

> Q. And first I wanted to point out on No. 3 at the bottom, the command there is play, isn't it?
>
> A. Yes, it is.
>
> Q. So when a Charter Spectrum app user casts DVR, that command is play. Correct?
>
> A. Yes.
>
> Q. And you agree that's a universal command.
>
> A. Yes.
>
> Q. Okay. But you're saying for video-on-demand and linear, because the command is flick, it's not universal. Right?
>
> A. That's right.

(Dkt. No. 389 at 1009:24-1010:9.) However, Dr. Shamos's non-infringement conclusion was that "flick" and "play" are not universal commands because they are not being used as universal commands in Charter's system as they do not work "across the universe of available players:

> Q. All right. Now, you were asked about flick and play. Those two are words that Dr. Wicker picked out of the larger POST command. Right?
>
> A. Yes.
>
> Q. Now, again, getting back to this idea of ignoring the claim language, the word 'universal' is when something works across the whole universe. Right? That's what the word means?
>
> A. The appropriate universe, yes.
>
> Q. Right. And in this case the appropriate universe is all the alleged players that you have on your device. . . . is that right?
>
> A. The players you want to send content to. . . .
>
> Q. Does play work across the universe of available players--VOD, linear, and DVR?
>
> A. No.
>
> Q. Does flick?

A. No.

Q. Is there any command that works across the universe of available players?

A. No.

Q. So is there any universal command at all in this system?

A. No.

(Dkt. No. 389 at 1019:25-1021:6.)

Further, in response to Dr. Wicker's testimony, Charter presented testimony from Dr. Shamos and Mr. Bell that the claimed "command" is the entire HTTP post command, not a small sub-part and that the accused sub-parts—"flick" and "play"—are not universal because they do not work across all the accused media players. (Dkt. No. 387 at 562:7-10; Dkt. No. 388 at 750:11-751:7; Dkt. No. 389 at 1019:15-24.) Decisions regarding disagreements within the record are left solely to the Jury. *Reeves*, 530 U.S. at 150 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").

The Court's role at the 50(b) stage is to assess whether substantial evidence supports the result that the Jury reached. *KAIST*, 439 F. Supp. 3d at 879. Here, Charter and its expert, Dr. Shamos, and its fact witness, Mr. Bell, provided substantial evidence to support the Jury's non-infringement finding as to these limitations. While the Court recognizes that Touchstream and its expert, Dr. Wicker, disagree, that is irrelevant for the purposes of the present motion. Here, the parties presented the Jury with conflicting evidence and it "was free to credit whichever experts and their testimony it found to be credible." *Id.* at 881.

Accordingly, judgment as a matter of law on this basis is not warranted.[8]

---

[8] In its Opposition, Charter makes additional arguments regarding Touchstream's alleged failure of proof as to the Spectrum and iGuide STBs and Charter's invalidity defense. (Dkt. No. 398 at 22-28.) Given the Court's determination that substantial evidence supports the Jury's finding of non-infringement on all Touchstream's challenged bases, the Court need not address Charter's remaining arguments.

IV.    **CONCLUSION**

Having considered the Motion for New Trial (Dkt. No. 396) and JMOL Motion (Dkt. No. 397), and for the reasons stated herein, the Court finds that both motions should be and hereby are **DENIED**.

**So ORDERED and SIGNED this 22nd day of August, 2025.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE